ACCEPTED
15-25-00209-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/22/2025 5:16 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00209-CV

**IN THE FIFTEENTH COURT OF APPEALS, AUSTIN, TEXAS**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
12/22/2025 5:16:47 PM
CHRISTOPHER A. PRINE
Clerk

*In re TikTok Inc.; TikTok Ltd.; TikTok Pte. Ltd.;*
*TikTok U.S. Data Security Inc.; ByteDance Ltd.; and ByteDance Inc.,*

**Relators.**

On Petition for Writ of Mandamus from the
250th District Court of Travis County, Texas
Cause No. D-1-GN-25-003118, The Honorable Cory Liu

**REAL PARTY IN INTEREST STATE OF
TEXAS'S RESPONSE TO RELATORS'
PETITION FOR WRIT OF MANDAMUS**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant
Attorney General

AUSTIN KINGHORN
Deputy Attorney General for
Civil Litigation

JOHNATHAN STONE
Chief, Consumer Protection
Division

RICHARD R. McCUTCHEON
State Bar No. 24139547
MADELINE FOGEL
State Bar No. 24141985
Assistant Attorneys General
**OFFICE OF THE ATTORNEY
GENERAL OF TEXAS**
Consumer Protection Division
808 Travis Street, Suite 1520
Houston, Texas 77002
Tel: (713) 225-8922
Fax: (713) 223-5821
Richard.McCutcheon@oag.texas.gov
Madeline.Fogel@oag.texas.gov

DAVID H. THOMPSON*
BRIAN W. BARNES*
JOHN D. OHLENDORF*

i

**COOPER & KIRK, PLLC**
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com
*Admitted Pro Hac Vice*

JOHN C. HERNANDEZ
Texas State Bar No. 24095819
Assistant Attorney General
**OFFICE OF THE ATTORNEY
GENERAL OF TEXAS**
Consumer Protection Division
P.O. Box 12548
Austin, Texas 78711-2548
Tel: (512) 463-2185
Fax: (512) 473-8301
JC.Hernandez@oag.texas.gov

ADAM HOLTZ
State Bar No. 24143021
Assistant Attorney General
**OFFICE OF THE ATTORNEY
GENERAL OF TEXAS**
Consumer Protection Division
112 E. Pecan Street, Ste. 735
San Antonio, Texas 78205
Tel: (210) 225-4191
Fax: (210) 225-1072
Adam.Holtz@oag.texas.gov

**ATTORNEYS FOR THE STATE OF TEXAS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................v

INTRODUCTION ...............................................................................................1

STATEMENT OF FACTS ...................................................................................4

I. TikTok Communicates Misleading Information to Texas Consumers About the Maturity of its Content.............................................................................4

 A. TikTok Makes Misrepresentations to Texas Consumers About the Maturity of the Content it Hosts.................................................................5

 B. TikTok's Representations About the Maturity of its Content Are Misleading and Deceptive. ........................................................................7

II. TikTok Intentionally Designs its Platform to Be Addictive for Child Users. .............................................................................................................10

III. TikTok Violates the SCOPE Act by Failing to Verify Purported Parents, Collecting and Disclosing Minor Data, and Failing to Provide Supervisory Tools. ..............................................................................................................11

ARGUMENT .......................................................................................................12

I. The SCOPE Act Is Not Unconstitutionally Vague. .....................................13

II. The DTPA Applies to TikTok's Highly Profitable Platform. .......................19

 A. TikTok Is a Service that Consumers Purchase........................................20

  1. The TikTok Platform Is a Service.............................................20

  2. The Texans who Use TikTok Qualify as Consumers who Purchase it. .................................................................................21

 B. Public DTPA Suits Need Not Identify Specific Services, Purchases, Or Consumers. ...............................................................................................25

III. The Attorney General's Claims Do Not Implicate Section 230....................31

IV. TikTok Does Not Have a First Amendment Right to Mislead Texans About Its Product. ....................................................................................................38

V. The Ordinary Appellate Process Provides TikTok with an Adequate Remedy for Any Asserted Errors.................................................................................44

CONCLUSION ....................................................................................................49

CERTIFICATE OF COMPLIANCE ...................................................................52

CERTIFICATE OF SERVICE ...............................................................................53

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    591 U.S. 430 (2020)..................................................................................38

*Angelilli v. Activision Blizzard, Inc.*,
    781 F. Supp. 3d 691 (N.D. Ill. 2025).....................................................43

*Arkansas v. Meta Platforms, Inc.*,
    No. 57CV-23-47, 2024 WL 4037209 (Ark. Cir. Ct. June 13, 2024) ......37, 44

*Barnes v. Yahoo!*,
    570 F.3d 1096 (9th Cir. 2009) ...............................................................31

*Beckman v. Match.com, LLC*,
    668 F. App'x 759 (9th Cir. 2016) ..........................................................36

*Beckman v. Match.com*,
    No. 2:13-cv-97, 2013 WL 2355512 (D. Nev. May 29, 2013).................36

*Bennett v. Google, Inc.*,
    No. 1:16-cv-02283, 2017 WL 2692607 (D.D.C. June 21, 2017).................36

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000).................................................................................43

*Burton v. Prince*,
    577 S.W.3d 280 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ..............26

*Cameron v. Terrell & Garrett, Inc.*,
    618 S.W.2d 535 (Tex. 1981) ................................................................19

*Comm'n for Law. Discipline v. Benton*,
    980 S.W.2d 425 (Tex. 1998) ....................................................14, 15, 49

*Demetriades v. Yelp, Inc.*,
    175 Cal. Rptr. 3d 131 (Cal. Ct. App. 2014).........................................33, 34

*District of Columbia v. Meta Platforms, Inc.*,
    No. 2023-CAB-6550, 2024 WL 5700129
    (D.C. Super. Ct. Sep. 9, 2024)..............................................................37, 44

*Doe v. Grindr*,
    128 F.4th 1148 (9th Cir. 2025).............................................................36, 37

*Doe v. Internet Brands*,
    824 F.3d 846 (9th Cir. 2016)..................................................................34

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ....................................................36

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938) ...................................................................29

*Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*,
    112 F.4th 1168 (9th Cir. 2024) ................................................34

*Fair Hous. Council of San Fernando Valley v. Roommates.Com*,
    521 F.3d 1157 (9th Cir. 2008) ..................................................35

*FCC v. Pacifica Found.*,
    438 U.S. 726 (1978) .................................................................43

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016) ...................................35

*Fla. Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995) .................................................................39

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) .......................................................35

*G.G. v. Salesforce.com, Inc.*,
    76 F.4th 544 (7th Cir. 2023) ....................................................32

*Gaede v. SK Invs., Inc.*,
    38 S.W.3d 753 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ..........22

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) .....................................................................15

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019) ....................................................32

*Household Retail Services, Inc. v. State*,
    No. 04-00-00734-CV, 2001 WL 984779
    (Tex. App.—San Antonio Aug. 29, 2001, no pet.) .............27, 28

*In re Butt*,
    495 S.W.3d 455 (Tex. App.—Corpus Christi–Edinburg
    2016, no pet.) .....................................................................47, 48

*In re City of Dallas*,
    445 S.W.3d 456 (Tex. App.—Dallas 2014, no pet.) ..................47

*In re Essex Ins. Co.*,
    450 S.W.3d 524 (Tex. 2014) ................................................46, 47

*In re Facebook*,
    625 S.W.3d 80 (Tex. 2021) ........................................................35, 46, 47, 48

*In re Greater McAllen Star Props., Inc.*,
    444 S.W.3d 743 (Tex. App.—Corpus Christi-Edinburg 2014, no pet.) .......49

*In re Houston Specialty Ins. Co.*,
    569 S.W.3d 138 (Tex. 2019) ....................................................................47, 48

*In re John G. & Marie Stella Kenedy Memorial Foundation*,
    315 S.W.3d 519 (Tex. 2010) ..............................................................................47

*In re Prudential Ins. Co. of Am.*,
    148 S.W.3d 124 (Tex. 2004) ....................................................................46, 48

*In re Roman Cath. Diocese of El Paso*,
    626 S.W.3d 36 (Tex. App.—El Paso 2021, no pet.) ....................................49

*In re Samonte*,
    163 S.W.3d 229 (Tex. App.—El Paso 2005, no pet.) ......................47, 48, 49

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*,
    702 F. Supp. 3d 809 (N.D. Cal. 2023)...........................................................34

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
    753 F. Supp. 3d 849 (N.D. Cal. 2024)...........................................................25

*In re St. Thomas High Sch.*,
    495 S.W.3d 500 (Tex. App.—Houston [14th Dist.] 2016, no pet.) .............49

*In re State Farm Mut. Auto. Ins. Co.*,
    712 S.W.3d 53 (Tex. 2025) ............................................................................45

*In re State Nat'l Ins. Co.*,
    No. 13-25-00133-CV, 2025 WL 2318636
    (Tex. App.—Corpus Christi-Edinburg Aug. 11, 2025, no pet.)..............47, 48

*In re UMTH Gen. Servs., L.P.*,
    No. 24-0024, 2025 WL 3180859 (Tex. Nov. 14, 2025)..........................45, 46

*In re V.K.*,
    607 S.W.3d 471 (Tex. App.—Houston [14th Dist.] 2020, no pet.) .............49

*Indiana v. TikTok Inc.*,
    245 N.E.3d 681 (Ind. Ct. App. Sep. 30, 2024)..............................................25

*James v. Meow Media, Inc.*,
    300 F.3d 683 (6th Cir. 2002) ........................................................................43

*Jaster v. Comet II Constr., Inc.*,
 438 S.W.3d 556 (Tex. 2014) ........................................................13

*Lemmon v. Snap, Inc.*,
 995 F.3d 1085 (9th Cir. 2021) ...........................................32, 33, 34

*Longview Sav. & Loan Ass'n v. Nabours*,
 673 S.W.2d 357 (Tex. App.—Texarkana 1984) ......................22, 24

*Longview Sav. & Loan Ass'n v. Nabours*,
 700 S.W.2d 901 (Tex. 1985) .....................................................22

*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*,
 289 S.W.3d 844 (Tex. 2009) ...............................................22, 23

*Massachusetts v. Meta Platforms, Inc.*,
 No. 23-2397-BLS1, 2024 WL 4648435
 (Mass. Super. Ct. Oct. 17, 2024) ...................................25, 37, 44

*Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*,
 642 S.W.3d 551 (Tex. 2022) ...............................................29, 30

*Memet v. State*,
 642 S.W.2d 518 (Tex. App.—Houston [14th Dist.] 1982, pet. ref'd) ..........21

*Moody v. NetChoice, LLC*,
 603 U.S. 707 (2024).............................................................39, 40

*Morgan Stanley Dean Witter Credit Corp. v. Griffin*,
 No. 03-01-00131-CV, 2002 WL 463312
 (Tex. App.—Austin Mar. 28, 2002, no pet.) ...............................18

*National Institute of Family & Life Advocates v. Becerra*,
 585 U.S. 755 (2018).............................................................41, 42

*NetChoice v. Carr*,
 789 F. Supp. 3d 1200 (N.D. Ga. 2025).......................................18

*New York v. Ferber*,
 458 U.S. 747 (1982)................................................................44

*Petroleum Workers Union v. Gomez*,
 503 S.W.3d 9 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ............22, 24

*Riverside Nat'l Bank v. Lewis*,
 603 S.W.2d 169 (Tex. 1980) .....................................................20

*Sells v. Six Flags Over Tex., Inc.*,
 No. 3:96-CV-1574-D, 1997 WL 527320 (N.D. Tex. Aug. 14, 1997)...........21

viii

*Sidetracked Bar, LLC v. Hegar*,
665 S.W.3d 81 (Tex. App.—Austin 2022, pet. denied) ................................21

*Smith v. Goguen*,
415 U.S. 566 (1974) ................................................................................15

*Snyder v. Phelps*,
562 U.S. 443 (2011) ...........................................................................42, 43

*Social Media Cases*,
Nos. JCCP 5255, 22STCV21355, 2023 WL 6847378
(Cal. Super. Ct. Oct. 13, 2023) .................................................................44

*Students Engaged in Advancing Tex. v. Paxton*,
765 F. Supp. 3d 575 (W.D. Tex. 2025) ("*SEAT*") .................................15, 16

*Tennessee v. Meta Platforms, Inc.*,
No. 23-1364-IV, 2024 WL 3253106 (Tenn. Ch. Mar. 13, 2024)......37, 38, 44

*Tex. Dep't of Ins. v. Stonewater Roofing, Ltd.*,
696 S.W.3d 646 (Tex. 2024) .........................................................15, 16, 19

*Texas v. Colony Ridge, Inc.*,
No. H-24-0941, 2024 WL 4553111 (S.D. Tex. Oct. 11, 2024) ....................28

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025)...........................................................................38, 39

*Tilton v. Marshall*,
925 S.W.2d 672 (Tex. 1996) ...................................................................49

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)...................................................................42, 43, 44

*Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*,
No. 230908060, 2024 WL 3741422 (Utah 3d Dist. Ct. July 18, 2024) ..37, 38

*Vermont v. Meta Platforms, Inc.*,
No. 23-CV-4453, 2024 WL 3741424
(Vt. Super. Ct. July 29, 2024)...............................................25, 37, 38, 44

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982)................................................................................16

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992) ........................................................12, 45, 46

*Winter v. Facebook, Inc.*,
No. 4:21-cv-01046, 2021 WL 5446733 (E.D. Mo. Nov. 22, 2021)..............36

*Word of Faith World Outreach Center Church, Inc. v. Morales*,
787 F. Supp. 689 (W.D. Tex. 1992) ("*Word of Faith I*")..........................29, 30

*Word of Faith World Outreach Center Church, Inc. v. Morales*,
986 F.2d 962 (5th Cir. 1993) ("*Word of Faith II*") ......................................29

**Statutes and Codes**

15 U.S.C.
  § 7706(f) ....................................................................................13
  § 7706(g) ....................................................................................13

16 C.F.R.
  § 312.5 (2000)............................................................................14
  § 312.5 (2025)............................................................................14

17 U.S.C.
  § 115 .........................................................................................13

31 C.F.R.
  § 1020.220 (2011)......................................................................14
  § 1020.220 (2025)......................................................................19

31 U.S.C.
  § 5325(a) (1988) ........................................................................14

47 U.S.C.
  § 230 .........................................................................................31
  § 230(c)(1) .................................................................................31
  § 230(e)(3) .................................................................................31

TEX. R. CIV. P. 168 .....................................................................45

TEX. BUS. & COM. CODE
  § 9.610 ......................................................................................13
  § 17.45(2).............................................................................3, 4, 20
  § 17.45(4)................................................................3, 4, 20, 21, 22
  § 17.45(6)...........................................................................3, 26
  § 17.46(a)........................................................................19, 26, 28
  § 17.46(b)..................................................................................26
  § 17.46(c)(2) .............................................................................25
  § 17.46(d)..................................................................................19
  § 17.47 ......................................................................................19
  § 17.50 ......................................................................................19
  § 17.50(a)..............................................................................25, 26
  § 509.001(7)..............................................................................11

§ 509.052(2)(B) ...................................................................................11
§ 509.054 ...................................................................................11, 12
§ 509.101 ...........................................................................11, 13, 17, 18

TEX. CIV. PRAC. & REM. CODE
§ 51.014(a)(9) .....................................................................................45
§ 51.014(a)(11) ...................................................................................45
§ 51.014(a)(16) ...................................................................................45
§ 51.014(d) ..........................................................................................45

U.C.C.
§ 2-402 ................................................................................................13
§ 2-614 ................................................................................................13
§ 9-610(b) ...........................................................................................13

## Other Authorities

*Commercially Reasonable*, BLACK'S LAW DICTIONARY
(12th ed. 2024).................................................................13, 14, 17, 18

*Distribution*, BLACK'S LAW DICTIONARY (12th ed. 2024) ....................................27

Hr'g Tr., *District of Columbia v. TikTok, Inc.*, No. 2024-CAB-6377 (D.C. Super.
Ct. Feb. 24, 2025), attached as Exhibit L .................................................37, 44

Op. & Order, *Illinois v. TikTok*, No. 2024CH09302 (Ill. Cir. Ct. June 12, 2025),
attached as Exhibit M ...........................................................................37, 44

*Price*, BLACK'S LAW DICTIONARY (12th ed. 2024) .................................................22

*Purchase*, BLACK'S LAW DICTIONARY (12th ed. 2024).............................................22

*Purchase*, MERRIAM-WEBSTER.COM DICTIONARY,
https://perma.cc/R6WH-4B55 .................................................................22

*Sale*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...................................................22

Slip Op., *Arizona v. Google, LLC*, No. CV-2020-6219 (Ariz. Super. Ct. Jan. 21,
2022), attached as Exhibit A.......................................................................25

Slip Op., *Arkansas v. TikTok Inc.*, No. 12CV-23-65 (Ark. Cir. Ct. May 15, 2024),
attached as Exhibit B .................................................................25, 34, 37

Slip Op., *Fitch* ex rel. *Mississippi v. TikTok, Inc.*, No. G2024-1235 (Ch. 1st Jud.
Dist. Aug. 27, 2025), attached as Exhibit N .....................................37, 38, 44

Slip Op., *Iowa v. TikTok Inc.*, No. EQCE089810 (Iowa Dist. Ct. Aug. 26, 2025),
attached as Exhibit C ..............................................................................25, 37

Slip Op., *Louisiana v. TikTok, Inc.*, No. 184754 (La. 21st Jud. Dist. Ct. Oct. 16, 2025), attached as Exhibit D............................................................25, 37, 44

Slip Op., *Nevada v. Snap, Inc.*, No. A-24-886113-C (Nev. Dist. Ct. Feb. 13, 2025), attached as Exhibit E ..........................................................25, 37, 38, 44

Slip Op., *New Hampshire v. Meta Platforms, Inc.*, No. 217-2023-CV-00594 (N.H. Super. Ct. Dec. 10, 2024), attached as Exhibit F ........................25, 37, 38, 44

Slip Op., *New Hampshire v. TikTok Inc.*, No. 217-2024-CV-00399 (N.H. Super. Ct. July 8, 2025), attached as Exhibit G .......................................................25

Slip Op., *New Mexico v. Meta Platforms*, *Inc.*, No. D-101-CV-2023-02838 (N.M. 1st Jud. Dist. Ct. June 21, 2024), attached as Exhibit H .............25, 37, 38, 44

Slip Op., *North Carolina v. TikTok Inc.*, No. 24CV032063-910 (N.C. Super. Ct. Aug. 19, 2025), attached as Exhibit P .............................................37, 38, 44

Slip Op., *Oklahoma v. Meta Platforms, Inc.*, No. CJ-2023-180 (Okla. Dist. Ct. Nov. 20, 2024), attached as Exhibit I ......................................25, 37, 38, 44

Slip Op., *South Carolina v. TikTok Inc.*, No. 2024-CP-40-06018 (S.C. 5th Jud. Dist. Ct., May 6, 2025), attached as Exhibit J ......................25, 37, 38, 39, 44

Slip Op., *TikTok Inc. v. Eighth Jud. Dist. Ct.*, No. 89709 (Nev. Nov. 6, 2025), attached as Exhibit O ...........................................................................37, 38

Slip Op., *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 230907634 (Utah Dist. Ct. Nov. 12, 2024), attached as Exhibit K..............................................25, 44

Slip Op., *Virginia v. TikTok Inc.*, No. CL25-0294 (Va. Cir. Ct. Oct. 24, 2025), attached as Exhibit Q .....................................................................37, 38, 44

*Terms of Service*, TIKTOK (last updated Nov. 2023), https://perma.cc/C79C-EZFM ..............................................................23, 24

*Thing*, BLACK'S LAW DICTIONARY (12th ed. 2024)................................................27

**INTRODUCTION**

Millions of Texas consumers have downloaded TikTok's mobile application for the purpose of gaining access to the TikTok platform and its immensely popular library of global social media content—mainly in the form of short videos. Many of these users are minors, and TikTok encourages Texas minors, and their parents, to download its application by representing that it is safe for kids to use. Specifically, the State alleges TikTok has misrepresented, in the Apple App Store, that TikTok contains only "Infrequent/Mild" "Alcohol, Tobacco, and Drug References," "Sexual Content or Nudity," "Mature/Suggestive Themes," and "Profanity or Crude Humor." It similarly reports that its application qualifies for a "12+" age rating in the App Store and a "T" for "Teen" rating in the Google Play and Microsoft Stores.

These representations are all patently false. In reality, the TikTok platform is rife with mature content. For example, rather than containing "infrequent" or "mild" drug or alcohol content, the TikTok platform contains voluminous content describing and encouraging the use of alcohol, cannabis, and cocaine— ███████ ████████████████████████████████████████████ Rather than containing "infrequent" or "mild" sexual content, the TikTok platform contains countless videos featuring intense sexual content. And rather than containing "infrequent" or "mild" "profanity or crude humor," the TikTok platform contains countless hours of video, viewed by hundreds of millions of users, suffused with the

1

most profane words known to the English language— ██████████████████ ██████████████ None of this content is suitable for a 12-year-old, and yet TikTok places all of it at the fingertips of Texan children—all the while representing that its platform is safe for kids.

To make matters worse, TikTok specifically targets its app to young people and purposefully designed its app to be *addictive*—and yet *fails to tell Texas consumers* about its addictive nature. American youth are now in the grip of a profound mental health crisis driven by excessive social media use. TikTok has knowingly contributed to this crisis by creating its platform to be intentionally addictive to youth, designing elements that prey upon young people's unique psychological vulnerabilities and concealing the truth about these addictive design features from Texan kids and their parents.

The Attorney General sued under the Texas Deceptive Trade Practices Act ("DTPA") to put a stop to TikTok's misrepresentations about the addictiveness and maturity of the platform, as well as TikTok's ongoing violation of the child-protective measures required by Texas's Securing Children Online through Parental Empowerment ("SCOPE") Act. TikTok sought to dismiss the suit, but the trial court denied TikTok's motion across the board, and the case is currently scheduled for trial this coming August.

TikTok now seeks to interrupt the ordinary litigation process through a petition for mandamus. That extraordinary relief would require an equally extraordinary showing that there is some momentous reason for interrupting the ordinary course of proceedings in this way. Instead, TikTok offers a suite of unpersuasive arguments that (in the case of the SCOPE Act) disregard long-settled legal meanings and distort the vagueness doctrine, and (in the case of the DTPA) have been rejected by virtually every court that has considered them.

TikTok's argument that the SCOPE Act fails to give fair notice of what the Act prohibits is baseless. The term "commercially reasonable" has a well-settled meaning and appears throughout the Uniform Commercial Code, Texas law, and federal law. As applied to TikTok, the relevant provision of the SCOPE Act unquestionably gave TikTok adequate notice that its actions—or, more precisely, its complete *failure* to take any actions to come into compliance—would violate the Act.

TikTok's defenses against the DTPA claim are no more persuasive. Indeed, these very same arguments have been resoundingly rejected by dozens of courts throughout the nation. TikTok plainly engages in "trade or commerce" in Texas. TEX. BUS. & COM. CODE § 17.45(6). Texans "purchase" TikTok's "service[ ]"— access to its platform and content library—under the meaning of the word "purchase" as every Texas authority has always understood it: an exchange for

valuable consideration. *Id.* § 17.45(2), (4). The fact that the consideration here comes in the form of user data—which TikTok then uses in conjunction with third parties to make money—rather than in money paid directly by the users themselves is completely irrelevant.

Finally, neither the federal Communications Decency Act ("CDA") nor the First Amendment poses any obstacle to the Attorney General's DTPA claims. The Attorney General seeks to hold TikTok liable, not for any *third-party content* on its platform, but for *TikTok's own conduct*—namely, its deceptive misrepresentations about the app's addictiveness and safety. That conduct is far outside the CDA. And because that conduct constitutes misleading commercial speech, it also enjoys no First Amendment protection.

TikTok may press these arguments before this Court on appeal after final judgment, just like all other litigants. But it has fallen short of justifying extraordinary, immediate review by this Court through a writ of mandamus. The petition should be denied.

## STATEMENT OF FACTS

### I. TikTok Communicates Misleading Information to Texas Consumers About the Maturity of its Content.

The TikTok app is a social media application made available for Texas consumers to download, including in Apple's App Store, the Google Play Store, and the Microsoft Store. Pl.'s First Am. Pet. ¶ 48, *Texas v. TikTok*, No. D-1-GN-25-

4

003118 (Travis Cnty. Dist. Ct. Aug. 19, 2025) ("Am. Pet.") (MR 0033). TikTok markets its platform in Texas, and millions of residents of the State have downloaded the app. *Id.* ¶¶ 19, 23 (MR 0026–27). When a Texas consumer downloads the app, the consumer and TikTok enter a continuing contractual relationship, under which TikTok provides the consumer with access to the content in its library. In return, the consumer allows TikTok to collect data about his usage of the platform—including, importantly, location data. *Id*. ¶ 23 (MR 0027). User data is critical to TikTok because TikTok's entire business model revolves around using this data to target advertisements and hone its algorithm's ability to keep users on the platform. *Id*. ¶¶ 20–25 (MR 0026–28). And this ongoing collection and monetization of user data has proven immensely lucrative: TikTok generates many billions of dollars of revenue. *Id*. ¶ 38 (MR 0030).

**A. TikTok Makes Misrepresentations to Texas Consumers About the Maturity of the Content it Hosts.**

When TikTok makes its app available for download on third party app stores, it self-reports information about the app's content to select and communicate an "age rating" to consumers. *Id*. ¶¶ 56–58 (MR 0034–35). For example, part of Apple's App Store age-rating process includes a series of content categories, and for each category, the app developer is prompted to select whether the level of intensity or frequency of that content on its app is "none," "infrequent/mild," or "frequent/intense." *Id*. ¶ 57 (MR 0035). The content categories include the topics

5

"Alcohol, Tobacco or Drug Use or References," "Sexual Content or Nudity," "Mature/Suggestive Themes," and "Profanity or Crude Humor." *Id*. When app developers answer these prompts, the App Store generates a recommended age rating. Apps with a "12+" rating, for example, are defined by Apple as containing, at most, "infrequent mild language" or "infrequent or mild mature or suggestive themes." *Id*. ¶ 59 (MR 0036). Apple defines applications with a "17+" age rating, by contrast, as potentially containing "frequent and intense" drug references, sexual content, or profanity. *Id*. ¶ 60 (MR 0036).

TikTok has consistently answered these prompts in a way that allows it to qualify for a "12+" age rating, by representing that mature content is "infrequent/mild" on its app. *Id*. ¶¶ 58–59 (MR 0035–36). And while the App Store further permits TikTok to voluntarily select a higher "17+" rating, it chooses not to do so. *Id*. ¶ 60 (MR 0036). In the Google Play and Microsoft Stores, TikTok also self-reports age-rating answers that allow it to claim a "T" for "Teen" rating. *Id*. ¶ 131 (MR 0059). Thus, when a Texas consumer views TikTok's page in the App Store, she sees that the app is rated "12+"—the age-rating that TikTok *itself selected*. *Id*. ¶¶ 59, 61 (MR 0036).

TikTok also represents to consumers that its published "Community Guidelines" "establish a set of norms and common code of conduct that provide for a safe and welcoming space for everyone." *Id*. ¶ 160 (MR 0067). TikTok represents

6

that these Community Guidelines "apply to everyone and everything on [TikTok]." *Id.* ¶ 158 (MR 0066–67). The company says: "[w]e will remove any content—including video, audio, livestream, images, comments, links, or other text—that violates our Community Guidelines." *Id.* ¶ 160 (MR 0067).

## B. TikTok's Representations About the Maturity of its Content Are Misleading and Deceptive.

TikTok's representations about the content it hosts are critically important to Texas consumers, especially parents, who rely on those representations in deciding whether to allow their children to download and use the app. *Id.* ¶ 167 (MR 0070). Yet all the communications to Texas consumers described above are false, deceptive, and misleading—and TikTok knows it.

TikTok represents to Texas consumers that its app contains "Infrequent/Mild" "[a]lcohol, [t]obacco or [d]rug [u]se or [r]eferences," *id.* ¶ 58 (MR 0035), but in reality drug and alcohol content on its app is both frequent and intense. ▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆ Worse still, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆ While TikTok's published Community Guidelines assure Texas consumers that "[w]e do not allow showing or promoting recreational drug use, or the trade of alcohol, tobacco products, and drugs," *id.* ¶ 85 (MR 0043–44),

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

7

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

TikTok represents to Texas consumers that its application contains "Infrequent/Mild" "[s]exual [c]ontent and [n]udity," *id*. ¶ 58 (MR 0035), but in reality, mature sexual content is rampant on the app. *Id.* ¶¶ 97–104 (MR 0048–51). This includes numerous freely available videos of woman dancing provocatively in thong underwear, including to overtly sexualized lyrics. Indeed, TikTok's content moderators ███████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

TikTok represents that its application contains "Infrequent/Mild" "[p]rofanity or [c]rude [h]umor," *id.* ¶ 58 (MR 0035), but in reality, it is overflowing with videos rife with the most crude and profane words in the English language. Videos set to explicit songs "have *hundreds of millions* of views" on TikTok. *Id.* ¶ 79–83 (MR 0041–43) (emphasis added). For example, a video set to profane lyrics regarding graphic sexual intercourse is freely available to all users on the app and eligible to be fed into any user's For You Feed. *See id.* ¶ 80 (MR 0041–42). Other profane videos that abound on TikTok include a video of a man in a McDonald's hat repeatedly using the N-word while complaining about customers who ask for "light ice," and a video of a girl dancing to profane and graphic lyrics describing oral sex. *Id.* ¶ 82 (MR 0042–43). TikTok *knows* that a huge volume of intense profanity is freely available on its platform: ███████████████████████████████████

████████████████████████████████████████████ pursuant to a massive loophole for content deemed to constitute "artistic content," including "song lyrics," *id.* ¶ 163 (MR 0069).

TikTok's other representations about the nature of its content are false and misleading too. While TikTok represents that its Community Guidelines "apply to everyone and everything on [TikTok]," *id.* ¶ 158 (MR 0066–67), in reality TikTok

does not enforce those guidelines as written against a vast quantity of adult content, *id.* ¶¶ 161–64 (MR 0068–69).

## II. TikTok Intentionally Designs its Platform To Be Addictive for Child Users.

TikTok *intentionally designed* its platform to be highly addictive for even its youngest users. It does this through exploiting well-known psychological and physiological mechanisms, such as the neurotransmitter dopamine, which helps humans feel pleasure as part of the brain's reward system to encourage reinforcement. *Id.* ¶ 135 (MR 0060). For example, TikTok has carefully designed the algorithm that curates each user's video feed—called the For You Feed—to be highly addictive. *Id.* ¶ 139 (MR 0061–62). The app uses features like "autoplay" and "infinite scroll" to ensure that young users continuously remain on the app as they are endlessly and seamlessly fed video after video. *Id.* ¶¶ 135–37 (MR 0060–61). It employs push notifications to keep child users coming back for more content. *Id.* ¶ 136 (MR 0060–61). It presents rapidly disappearing content to keep young users constantly checking the platform. *Id.* ¶ 138 (MR 0061). ██████████ ███████████████████████████████████████████████████████████ ██████. But despite designing its platform to be highly addictive, TikTok fails to inform Texas consumers about its addictiveness. *Id.* ¶¶ 133, 140, 150–53, 157 (MR 0060, 62, 64–66). Instead, TikTok claims to support healthy use of the app by promoting features that are ineffective and easy to circumvent. For example, TikTok

10

touts its "Family Pairing" feature that, it claims, "allow[s] 'parents or guardians [to] link their TikTok accounts to their teens' to manage a variety of content, privacy, and wellbeing settings." *Id.* ¶ 178 (MR 0073–74). In reality, the "Family Pairing" feature has little functionality and is easy to disable or bypass. *Id.* ¶¶ 180, 267 (MR 0074, 90).

### III. TikTok Violates the SCOPE Act by Failing to Verify Purported Parents, Collecting and Disclosing Minor Data, and Failing to Provide Supervisory Tools.

TikTok also violates the SCOPE Act by failing to comply with the SCOPE Act's requirements for protecting Texas minors. First, TikTok does not "verify" the identity and relationship of a parent of a known minor using a "commercially reasonable" method—because TikTok does not verify identities at all. TEX. BUS. & COM. CODE § 509.101; Am. Pet. ¶ 265 (MR 0090). Although TikTok offers a "Family Pairing" tool, the tool does nothing to "request, [ ] or verify, *any* information related to a purported parent or guardian's identity." Am. Pet. ¶ 266 (MR 0090) (emphasis added). Second, TikTok discloses or sells known minors' personal identifying information without the permission of a parent verified under section 509.101. TEX. BUS. & COM. CODE §§ 509.001(7), 509.052(2)(B), 509.101. Finally, TikTok fails to provide a suite of required parental tools that permit the verified parent to control the privacy of a minor and limit the minor's time on the platform.

11

*Id.* § 509.054. These violations of the SCOPE Act are also per se violations of the DTPA.

## ARGUMENT

"Mandamus is intended to be an extraordinary remedy, available only in limited circumstances." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). To warrant this extraordinary relief, TikTok must establish both (1) that the trial court's denial of its motion to dismiss was "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law," and (2) that the case "involve[s] manifest and urgent necessity" that makes the ordinary appellate process inadequate. *Id.* at 839, 840. It cannot satisfy either prong. The district court did not abuse its discretion in denying TikTok's motion to dismiss, which was largely based on arguments that it has advanced—and that have been roundly rejected—in dozens of state trial, appellate, and supreme courts around the country. And in any event, TikTok has an adequate remedy through appeal. While Texas courts occasionally use mandamus to overturn a lower court's denial of a motion to dismiss, they generally do so when the case suffers from egregious structural defects. Garden-variety legal disputes such as those here should not warrant immediate review, lest mandamus replace Texas's appellate process.

# I. The SCOPE Act Is Not Unconstitutionally Vague.

TikTok violated the SCOPE Act by failing to implement "a commercially reasonable method" for verifying the identity and relationship of a user purporting to be the parent of a minor user, as required by the SCOPE Act. TEX. BUS. & COM. CODE § 509.101. TikTok moved to dismiss this claim on the ground that the phrase "commercially reasonable" is unconstitutionally vague since it is not defined in the SCOPE Act. The district court did not abuse its discretion in rejecting this argument.

It is entirely unremarkable that the SCOPE Act uses the term "commercially reasonable" without defining it. "Commercially reasonable" appears without definition throughout the Uniform Commercial Code, Texas law, and federal law. *See, e.g.*, U.C.C. §§ 2-402, 2-614, 9-610(b); TEX. BUS. & COM. CODE § 9.610; 15 U.S.C. § 7706(f), (g); 17 U.S.C. § 115. The term's well-established meaning is "conducted in good faith and in accordance with commonly accepted commercial practice." *Commercially Reasonable*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014) (explaining that when a statute does not provide a definition for a term, courts apply the "common, ordinary meaning").

Thus, the SCOPE Act put TikTok on notice that it was required to implement, in good faith, a method consistent with "commonly accepted commercial practice" to verify the identity and relationship of parents and guardians. *Commercially*

13

*Reasonable*, BLACK'S LAW DICTIONARY (12th ed. 2024). This requirement is unquestionably one that an ordinary business "exercising ordinary common sense can sufficiently understand and comply with." *Comm'n for Law. Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex. 1998) (quoting *United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 579 (1973)). Know-your-customer laws and regulations have existed for decades. *See, e.g.*, 31 U.S.C. § 5325(a) (1988) (requiring identification for certain transactions); 31 C.F.R. § 1020.220 (2011) (requiring banks to develop a "Customer Identification Program (CIP) appropriate for [the bank's] size and type of business"); 16 C.F.R. § 312.5 (2000) (requiring website operators to "make reasonable efforts to obtain verifiable parental consent, taking into consideration available technology"); *id.* § 312.5 (2025) (authorizing "knowledge-based authentication" for same). Given this regulatory history, there is no question that TikTok could have identified at least one "commonly accepted commercial practice" for verifying the identity of users purporting to be parents of minor users.

In an attempt to muddy the waters, TikTok asserts that a stricter vagueness standard applies because the SCOPE Act "is capable of reaching protected speech." Pet. for Writ of Mandamus at 14 (Nov. 18, 2025) ("Mandamus Pet.") (quoting *Benton*, 980 S.W.2d at 437). Without making any First Amendment argument, TikTok cites a single case holding that the SCOPE Act *as a whole* is content-based

14

and subject to strict scrutiny because it applies only to some digital service providers. *See* Mandamus Pet. at 15 (citing *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 591–92 (W.D. Tex. 2025) ("*SEAT*")). That decision is wrong because the SCOPE Act "regulat[es] commerce," not speech. *Tex. Dep't of Ins. v. Stonewater Roofing, Ltd.*, 696 S.W.3d 646, 654 (Tex. 2024), *reh'g denied* (Sep. 27, 2024). But even if it were correct, it would at most support an argument that the dividing line between regulated and unregulated digital service providers should be subject to a heightened vagueness standard. It would not follow that every *other* requirement in the SCOPE Act—including the parent verification requirement at issue here—is subject to a heightened vagueness standard.

The heightened vagueness standard applies only to "statutory language" whose "literal scope . . . is capable of reaching expression sheltered by the First Amendment," such as a prohibition on "treat[ing] contemptuously the flag of the United States."[1] *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (cleaned up); *see also Benton*, 980 S.W.2d at 440 n.6 (citing *Smith*, 415 U.S. at 573). TikTok does not even try to explain how the provisions of the SCOPE Act that the Attorney General seeks to enforce here—requiring TikTok to (1) verify the identity of users purporting to

---

[1] Indeed, a heightened vagueness standard may not apply at all. Both the Texas Supreme Court and the U.S. Supreme Court have cast doubt on whether the "stricter" vagueness standard should exist. *See Stonewater Roofing*, 696 S.W.3d at 661 & n.69; *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19–20 (2010) (noting past precedent applying the "more stringent" test but explaining that "a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression").

be parents, (2) develop certain tools for them, and (3) obtain their consent before TikTok sells their minors' data—are restraints on speech. Indeed, the court in *SEAT*—TikTok's go-to case—concluded just the opposite. *See* 765 F. Supp. 3d at 604 n.18 ("Plaintiffs do not show that the process for verifying a parent and the powers of a verified parent under [the SCOPE Act] independently creates a[ ] [First Amendment] injury and violates the Constitution when not combined with the targeted advertising requirements . . . ."); *see also* Am. Pet. ¶¶ 268–69 n.33 (MR 0090–91) (expressly stating that the Attorney General's petition does not allege violations of the targeted advertising requirements of the SCOPE Act).

Contrary to TikTok's contentions, the vagueness standard is in fact at its nadir in this case. The provisions of the SCOPE Act the Attorney General seeks to enforce are economic regulations, and as such are "subject to a *less* strict vagueness test." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982) (emphasis added). Courts apply this "less . . . strict test" because economic regulation "is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Id.* Furthermore, the vagueness test is even more forgiving here because the SCOPE Act involves "civil rather than criminal penalties." *Id.* at 499. Considering the forgiving vagueness standard, TikTok's status as an entity worth billions of dollars, and the ubiquity of the term "commercially reasonable" in

16

commercial regulation, it is absurd to suggest that TikTok lacked notice that its failure to take any steps to verify the identity of users purporting to be parents would violate the SCOPE Act.

TikTok's protestation that it would have liked more guidance on what hypothetical actions would have satisfied the SCOPE Act only further confuses the issues. TikTok has expressly disclaimed a facial vagueness challenge. *See* Stay Pending Mandamus Reply Brief at 3–4. The only question then is whether TikTok had fair notice that *its actual* conduct was prohibited. *Stonewater Roofing*, 696 S.W.3d at 662. Of course it did. An "ordinary industry participant exercising common sense would understand" that the failure to take *any steps whatsoever* to verify parent identity would violate the SCOPE Act. *Id.* at 662. The flexibility the SCOPE Act offers through the "commercially reasonable" standard is not a license to do nothing.

To be sure, TikTok offers a "Family Pairing" tool. But that tool allows connections between purported parents and minors without "request[ing], [ ]or verify[ing], *any* information related to a purported parent or guardian's identity." Am. Pet. ¶ 266 (MR 0090) (emphasis added); *see also* MR 0441:18–25. That violates the SCOPE Act's easily understood requirement that TikTok verify the identity and relationship of parents and guardians using some method consistent with "commonly

accepted commercial practice." *Commercially Reasonable*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see* TEX. BUS. & COM. CODE § 509.101.

To the extent TikTok asserts that Family Pairing *does* verify parent identity in a commercially reasonable manner, that is not a vagueness defense, and the Attorney General is entitled to discovery to test the truth of the assertion. The Attorney General made this point at the motion to dismiss hearing, explaining that resolving disputed questions about "what [Defendants] are . . . doing" will require "discovery and expert testimony." MR 0430:20–31:1. TikTok's attempt to spin this uncontroversial statement into a fatal vagueness concession is entirely baseless. Judge Liu himself acknowledged at the hearing that "[m]aybe TikTok will be the best situated to answer what they currently do . . . ." MR 0431:10–11. That is clearly correct. In other contexts, the issue of whether a defendant's actions are "commercially reasonable" is "a question of fact" that is subject to expert testimony. *Morgan Stanley Dean Witter Credit Corp. v. Griffin*, No. 03-01-00131-CV, 2002 WL 463312, at \*3 (Tex. App.—Austin Mar. 28, 2002, no pet.).

Finally, this case is wholly unlike *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1231 (N.D. Ga. 2025), a case involving commercially reasonable *age verification*, for *all* users. The court in *NetChoice* did not even discuss vagueness when addressing Georgia's parental consent requirement, which in any event is substantially different from Texas's parent *verification* requirement. And the

18

Attorney General here certainly did not admit to a disparate enforcement plan for the SCOPE Act. *See* MR 0421:2–22. That an economic regulation may apply differently to companies of different sizes and character is hardly "arbitrary" or inviting of "discriminatory enforcement." *Stonewater Roofing*, 696 S.W.3d at 660; *see, e.g.*, 31 C.F.R. § 1020.220 (2025) (requiring banks to develop an identity verification system "appropriate for the bank's size and type of business").

## II. The DTPA Applies to TikTok's Highly Profitable Platform.

The DTPA makes it unlawful for anyone to engage in "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM. CODE § 17.46(a). It authorizes the Attorney General to bring suit to enforce that prohibition generally, and it further authorizes consumers to bring private actions against specified violations. *Id.* §§ 17.46(a), (d); 17.47; 17.50. TikTok utterly fails to show that its multinational, multi-billion-dollar business does not constitute "the conduct of any trade or commerce" within the meaning of this Act. *Id.* Courts apply a "rule of liberal construction" to the DTPA, giving the statute "its most comprehensive application possible without doing any violence to its terms." *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex. 1981). Even without that thumb on the scale in the Attorney General's favor, TikTok is obviously subject to the DTPA.

**A. TikTok Is a Service that Consumers Purchase.**

TikTok does not dispute that the DTPA applies to false, misleading, or deceptive acts that are related to the "purchase . . . [of] any goods or services" by a "consumer." Mandamus Pet. at 20 (quoting TEX. BUS. & COM. CODE § 17.45(4)). Instead, it argues that its business model is exempt from the DTPA because it has somehow generated millions of dollars of revenue in Texas without offering any "services" that Texas "consumers" "purchase." *Id.* at 3. It is wrong across the board.

**1.      The TikTok Platform Is a Service.**

TikTok's platform is a "service" under any definition, including the DTPA's own definition. The DTPA defines "service" as including "work, labor, or service purchased or leased for use." TEX. BUS. & COM. CODE § 17.45(2). And the Texas Supreme Court has further clarified that services under the DTPA are "action[s] or use that further[ ] some end or purpose: conduct or performance that assists or benefits someone or something: deeds useful or instrumental toward some object." *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex. 1980). TikTok's platform—software featuring videos selected by algorithms designed by engineers—easily qualifies.

TikTok resists this commonsense conclusion by claiming that its platform does not involve "conduct or performance that assists or benefits someone," Mandamus Pet. at 21 (quoting *Woods v. Littleton*, 554 S.W.2d 662, 667 (Tex. 1977)),

20

but that is not so. The "conduct" performed by TikTok and its employees is obvious: filtering content, maintaining the platform, and offering it to consumers on application stores. And the "conduct or performance" of those tasks just as clearly "benefits someone": the entertained user. *Id*. That is why TikTok calls the contract it enters with each of its users a "Terms of Service" contract: it provides the terms on which TikTok agrees to provide its *service* to consumers. Am. Pet. ¶ 23 (MR 0027).

Case law is in accord. Courts view other slot-machine-type products as "amusement *services*." *Sidetracked Bar, LLC v. Hegar*, 665 S.W.3d 81, 84 (Tex. App.—Austin 2022, pet. denied) (emphasis added). They also refer to the display of other videos—like "motion pictures"—as "service[s]." *Memet v. State*, 642 S.W.2d 518, 523 (Tex. App.—Houston [14th Dist.] 1982, pet. ref'd). And under the DTPA, "services" include "entertainment in the form of," for example, "shows, and similar attractions." *Sells v. Six Flags Over Tex., Inc.*, No. 3:96-CV-1574-D, 1997 WL 527320, at *5 (N.D. Tex. Aug. 14, 1997). TikTok's visual display fits easily within those precedents.

### 2. The Texans who Use TikTok Qualify as Consumers who Purchase it.

The Texans who download and use TikTok's app likewise quite obviously qualify as "consumers." A "consumer" under the DTPA is "an individual . . . who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM.

21

CODE § 17.45(4). The TikTok platform, as just shown, is surely a "service," and the Texans who seek and acquire it just as surely "purchase" it.

TikTok does not give away access to its platform out of good-hearted beneficence; it *sells* it, under any plausible understanding of that term. Every place one turns to discern the definition of the term "purchase" confirms that it is not limited to transactions for a price *in money*, but rather extends to any exchange of goods or services *for any valuable consideration*:

- *Ordinary meaning*: Webster's defines "purchase" as "to obtain by paying money *or its equivalent*."[2]

- *Legal meaning*: Black's Law Dictionary defines "purchase" as "[t]he acquisition of an interest in real or personal property by sale," "sale" as "[t]he transfer of property or title for a price," and "price" as "[t]he amount of money *or other consideration* asked for or given in exchange for something else."[3]

- *Texas Precedent*: State cases interpreting the DTPA contrast "[a] gratuitous act" which is not "within the meaning of the Act" with a "purchase" for "consideration." *Longview Sav. & Loan Ass'n v. Nabours*, 673 S.W.2d 357, 362 (Tex. App.—Texarkana 1984), *aff'd*, 700 S.W.2d 901 (Tex. 1985). And they further make clear that "consideration" is not limited to money but can consist of either "a benefit to the promisor or a detriment to the promisee," *Petroleum Workers Union v. Gomez*, 503 S.W.3d 9, 31 (Tex. App.—Houston [14th Dist.] 2016, no pet.), and that non-monetary consideration includes "expenditure of time and effort," *Gaede v. SK Invs., Inc.*, 38 S.W.3d 753, 760 (Tex. App.—Houston [14th Dist.] 2001, pet. denied), as well as the provision of valuable "information," *Mann Frankfort Stein &*

---

[2] *Purchase*, MERRIAM-WEBSTER.COM DICTIONARY, https://perma.cc/R6WH-4B55 (emphasis added).

[3] *Purchase*, BLACK'S LAW DICTIONARY (12th ed. 2024); *Sale, id.*; *Price, id.* (emphasis added).

22

*Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 851–52 (Tex. 2009).

A TikTok user's acquisition of access to TikTok's app and content library plainly qualifies as a "purchase" within these definitions. The Texans that download the TikTok app do not give TikTok *money* in exchange, but it is by no means "free" to download and use, Mandamus Pet. at 21, for those users do give *indisputably valuable consideration*: access to their data. As the Attorney General alleges, TikTok's "Terms of Service explicitly allow TikTok to collect and use Texans' geographic information" to "serve content to those users in Texas" and "serve[ ] users in Texas location-specific advertisements." Am. Pet. ¶ 20, 21, 23 (MR 0026–27). Indeed, TikTok's Terms of Service explicitly state:

> You acknowledge and agree that we may generate revenues, increase goodwill or otherwise increase our value from your use of the Services . . . through the sale of advertising, sponsorships, promotions, usage data and Gifts . . . [and] you will have no right to share in any such revenue, goodwill or value whatsoever.

*Terms of Service*, TIKTOK (last updated Nov. 2023), https://perma.cc/C79C-EZFM. Because users exchange access to their data as consideration for downloading the TikTok app, that transaction constitutes a "purchase" under the DTPA, and those users constitute "consumers."

TikTok resists this conclusion, insisting that its users do not give their data "in 'exchange' for downloading the app" but rather as "part-and-parcel of the experience that the user is receiving for free:" access to "a never-ending stream of

23

videos personalized for them by TikTok's algorithm." Mandamus Pet. at 21 n.8. This is mere argument by wordplay. One could just as easily say that the patron of a restaurant does not give his money "in exchange" for a meal, but rather as "part-and-parcel" of the dining "experience [he] is receiving for free." *Id.* TikTok may wish to call it all part of a "free experience" when an individual gives something of value (the right to exploit his data) in exchange for something else of value (access to entertaining videos), but the law calls it something else: the exchange of consideration, or a "purchase."

Indeed, it is hard to see how TikTok can deny an exchange of consideration. After all, TikTok claims that "[b]y accessing or using [its] Services," users consent to "a legally binding agreement." *Terms of Service*, TikTok (last updated Nov. 2023), https://perma.cc/C79C-EZFM; Am. Pet. ¶ 23 (MR 0027). But as every 1L knows, for an agreement to be "legally binding," it must be supported by consideration. *Petroleum Workers*, 503 S.W.3d at 31. And if users acquire TikTok in exchange for consideration, then they have *purchased* the service under the DTPA. *Longview*, 673 S.W.2d at 362.

Numerous courts across the country have held that TikTok and other purportedly "free" digital services are covered by analogous state consumer protection statutes—expressly rejecting arguments identical to those advanced by

24

TikTok here.[4] The trial court was right to follow this overwhelming weight of persuasive authority. Indeed, the DTPA expressly authorizes courts construing its text to "consider[ ] relevant and pertinent decisions of courts in other jurisdictions." TEX. BUS. & COM. CODE § 17.46(c)(2). Under these circumstances, the district court can hardly be faulted for denying TikTok's motion to dismiss without piling on with yet another opinion.

## B. Public DTPA Suits Need Not Identify Specific Services, Purchases, Or Consumers.

In any event, while TikTok's multi-billion-dollar business obviously involves the sale of a "service" to "consumers," an action *by the Attorney General* under the DTPA need not prove the existence of these elements to begin with. Yes, a *private plaintiff* suing under subsection (b) of the DTPA must establish that he is a

---

[4] *See* Slip Op. at 17, *Arizona v. Google, LLC*, No. CV-2020-6219 (Ariz. Super. Ct. Jan. 21, 2022), attached as Exhibit A; Slip Op. at 8–9, *Arkansas v. TikTok Inc.*, No. 12CV-23-65 (Ark. Cir. Ct. May 15, 2024), attached as Exhibit B; *Indiana v. TikTok Inc.*, 245 N.E.3d 681, 690, 693 (Ind. Ct. App. Sep. 30, 2024); Slip Op. at 18–19, *Iowa v. TikTok Inc.*, No. EQCE089810 (Iowa Dist. Ct. Aug. 26, 2025), attached as Exhibit C; *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 912–13 (N.D. Cal. 2024); Slip Op. at 2, *Louisiana v. TikTok, Inc.*, No. 184754 (La. 21st Jud. Dist. Ct. Oct. 16, 2025), attached as Exhibit D; *Massachusetts v. Meta Platforms, Inc.*, No. 23-2397-BLS1, 2024 WL 4648435, at *12 (Mass. Super. Ct. Oct. 17, 2024); Slip Op. at 8–9, *Nevada v. Snap, Inc.*, No. A-24-886113-C (Nev. Dist. Ct. Feb. 13, 2025), attached as Exhibit E; Slip Op. at 32–34, *New Hampshire v. Meta Platforms, Inc.*, No. 217-2023-CV-00594 (N.H. Super. Ct. Dec. 10, 2024), attached as Exhibit F; Slip Op. at 31–33, *New Hampshire v. TikTok Inc.*, No. 217-2024-CV-00399 (N.H. Super. Ct. July 8, 2025), attached as Exhibit G; Slip Op. at ¶ 6, *New Mexico v. Meta Platforms, Inc.*, No. D-101-CV-2023-02838 (N.M. 1st Jud. Dist. Ct. June 21, 2024), attached as Exhibit H; Slip Op. at 8–9, *Oklahoma v. Meta Platforms, Inc.*, No. CJ-2023-180 (Okla. Dist. Ct. Nov. 20, 2024), attached as Exhibit I; Slip Op. at 8, *South Carolina v. TikTok Inc.*, No. 2024-CP-40-06018 (S.C. 5th Jud. Dist. Ct., May 6, 2025), attached as Exhibit J; Slip Op. at 11–12, *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 230907634 (Utah Dist. Ct. Nov. 12, 2024), attached as Exhibit K; *Vermont v. Meta Platforms, Inc.*, No. 23-CV-4453, 2024 WL 3741424, at *7 (Vt. Super. Ct. July 29, 2024).

"consumer," *id.* § 17.50(a), and that his petition is based on specific "goods or services," *Burton v. Prince*, 577 S.W.3d 280, 291 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *see* TEX. BUS. & COM. CODE § 17.46(b). But *public* DTPA suits like this one are not so limited.

Several of the specific violations enumerated in Subsection 17.46(b) of the DTPA, which may be enforced through the statute's private right of action, involve the purchase of particular services. But the Attorney General's cause of action under the Act is governed by a completely different section of the DTPA: Section 17.50. And Subsection 17.46(d) makes clear that in a public action by the Attorney General under section 17.50, the "false, misleading, or deceptive acts or practices" barred by the DTPA *are not* "limited to the acts enumerated in . . . Subsection (b)." TEX. BUS. & COM. CODE § 17.46(d). Accordingly, under the plain statutory language, an action *by the Attorney General* under the DTPA need not be based on a specific "purchase" of "goods or services," *id.* § 17.46(b), but rather may target *all* "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," *id.* § 17.46(a).

Moreover, the Act defines "trade or commerce" expansively to include "the advertising, offering for sale, sale, lease, o*r distribution* of any good or service, of any property . . . and any other article, commodity, *or thing of value*," *id.* § 17.45(6) (emphases added). In other words, the general prohibition of Subsection (a)—which,

26

again, the Attorney General may enforce quite apart from the more specific prohibitions in Subsection (b)—covers "distribution" (not just sale or lease) of "any . . . thing of value" (not just a good or service). As a matter of plain text, the word "distribution" is broader than "purchase" or "lease" because it does not require any form of payment—the very element TikTok claims is missing from this case. *Distribution*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The act or process of apportioning or giving out."). And "any . . . thing of value" is as broad a phrase as the Legislature could have used—certainly broader than "good" or "service." *Thing*, *id.* (noting that a "thing" can be "corporeal" or "incorporeal" and "material" or "not"). It follows that the Attorney General's authority to sue under Subsection (a) is much broader than the authority for private consumer suits governed by Subsection (b)—broader in *precisely* the respects TikTok (mistakenly) claims would prevent this suit were it brought under Subsection (b).

Precedent supports this plain-text interpretation. In *Household Retail Services, Inc. v. State*, a Texas court of appeals rejected the defendants' argument that the Attorney General's DTPA claim there failed because "none of the potential claimants is a 'consumer,' " explaining that while "[a]n aggrieved individual must meet the statutory definition of 'consumer' to bring a private cause of action," that limitation "is not applicable where the cause of action is brought by the [Attorney General]," who "may bring an action to prevent a party from engaging in a violation

27

of the DTPA with respect to trade or commerce as defined in the statute." No. 04-00-00734-CV, 2001 WL 984779, at \*3 n.4 (Tex. App.—San Antonio Aug. 29, 2001, no pet.) (not designated for publication). While the decision was not published, its reasoning is persuasive. Similarly, the federal district court in *Texas v. Colony Ridge, Inc.* explained that because the DTPA "plainly separates causes of action brought by consumers from those brought by the State," "the presence of a consumer, or an injury to a consumer, is not required when the State initiates a DTPA lawsuit," and "*[a]nyone* engaging in deceptive practices may be subjected to a suit by the Consumer Protection Division of the Attorney General's Office." No. H-24-0941, 2024 WL 4553111, at \*7–8 (S.D. Tex. Oct. 11, 2024) (emphasis added) (quotation marks omitted). That reasoning, too, is persuasive even if non-binding. TikTok attempts to distinguish both cases on their facts, Mandamus Pet. at 23–24, but it cannot refute their persuasive reading of the DTPA's plain text.

TikTok instead argues that this interpretation of the DTPA "contradicts the statute's express purpose to protect 'consumers' seeking to 'purchase or lease' 'goods or services.' " *Id.* at 19–20. Not so. Even if the Attorney General's power to prevent "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" extends to cases that do not involve specific consumers, TEX. BUS. & COM. CODE § 17.46(a), obviously the preservation of fair and honest commerce will generally redound directly to the Texas consumer's benefit. And in any event, the

28

Texas Supreme Court has made clear that a statute's "literal text"—not its claimed "primary purpose"—is "the truest manifestation of what legislators intended." *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 642 S.W.3d 551, 557, 558 (Tex. 2022).

This last point also disposes of TikTok's argument that "the only court to address whether the State may bring a DTPA claim in the absence of any 'consumer' held that it cannot." Mandamus Pet. at 22. TikTok relies for this argument on the federal district court's decision in *Word of Faith World Outreach Center Church, Inc. v. Morales*, 787 F. Supp. 689, 698 (W.D. Tex. 1992) ("*Word of Faith I*"), *rev'd*, 986 F.2d 962 (5th Cir. 1993) ("*Word of Faith II*"), but that decision is an unpersuasive authority here for numerous independent reasons. First, because the federal courts lack the authority to issue binding interpretations of state law, that decision's interpretation of the DTPA would not be binding on this Court in any event. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 69 (1938). In fact, the district court's decision was *reversed on appeal* by the Fifth Circuit, which held that the district court never should have reached the state-law issue. *Word of Faith II*, 986 F.2d at 968. Second, *Word of Faith I* is distinguishable on its face: it involved a church that provided purely "gratuitous" services. 787 F. Supp. at 697. TikTok, to put it mildly, is not a church, and it is not in the business of giving out charity.

Finally, the dicta in *Word of Faith I* indicating that "there must be some 'consumer' " identified in every DTPA action, *id.*, is poorly reasoned to boot. The federal district court expressly grounded its reasoning on the statute's "purposes" and "legislative intent," rather than "the strict letter of the Act." *Id.* (cleaned up). Again, if that freewheeling style of interpretation was *ever* consistent with Texas law it is not today, now that the Texas Supreme Court, like its federal counterpart, has clarified that state statutes must be interpreted according to their "literal text"—not their purported, amorphous purposes. *Maxim Crane Works*, 642 S.W.3d at 557.

TikTok finally resorts to policy argument, claiming that the Attorney General's interpretation of the DTPA would "transform[ ] [it] into a generalized prohibition on alleged deception." Mandamus Pet. at 19. But it is in fact TikTok's interpretation that would transform the DTPA, rendering it wholly inapplicable to the standard way that the modern social-media behemoths generate revenue. For if the DTPA's guard-rails ensuring fair trade and commerce do not apply to TikTok's business model of exploiting its Texas users' highly profitable usage and location information, it is hard to see how it would apply to Facebook, Snapchat, Instagram, Twitter, or any of the other social-media companies that dominate modern life and commerce. The result would be that some of the biggest, most profitable, and most powerful modern corporations would have a get-out-of-jail-free card allowing them

30

to *lie to Texas consumers with impunity*. The DTPA does not contain any such Big-Tech loophole, and the district court was right not to fashion one.

## III. The Attorney General's Claims Do Not Implicate Section 230.

The trial court was likewise correct to reject TikTok's argument that it is immune from suit under Section 230 of the Communications Decency Act, 47 U.S.C. § 230. TikTok is not entitled to immunity and Section 230 has no bearing on this case. The reason is simple: Section 230 only protects providers of Internet services from liability for content created by "*another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). Here, by contrast, Texas seeks to hold TikTok liable for its *own* unfair and deceptive statements and acts against Texas citizens.

The CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.*; *see also id.* § 230(e)(3). The CDA "only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!*, 570 F.3d 1096, 1100–01 (9th Cir. 2009). TikTok does "provide[ ] . . . an interactive computer service," *id.*—a fact that, incidentally, completely undermines its argument that it is not a "service" for purposes of the DTPA. By claiming Section

31

230 immunity, TikTok necessarily asserts that it is an "interactive computer service." Yet TikTok turns around and argues that it is not a "service" when it comes to DTPA liability. TikTok cannot have it both ways.

TikTok's Section 230 argument fails, because it does not satisfy the second and third prongs of the test: the State's DTPA claims do not seek to treat it as a publisher or speaker, and they do not target information provided by a third party. "It is not enough that third-party content is involved," and courts have "rejected use of a 'but-for' test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019). Instead, Section 230 immunity is only even potentially available "for claims that depend on who publishes information or is a speaker—for, say, defamation, obscenity, or copyright infringement—but where the claim does not depend on publishing or speaking, Section 230(c) is irrelevant." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 566 (7th Cir. 2023) (cleaned up). Unlike claims seeking to hold an internet company liable for a third party's defamation, obscenity, or copyright infringement, the Attorney General's claims "rest[ ] on nothing more than [TikTok's] own acts." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1094 (9th Cir. 2021) (cleaned up).

32

In deciding whether alleged misconduct constitutes publishing another's content, courts typically "focus on whether the duty the plaintiff alleges stems from the defendant's status or conduct as a publisher or speaker." *Id.* at 1091 (internal quotation marks and citation omitted). In *Lemmon*, for example, surviving parents of two sons who had died in a car accident sued Snapchat for designing its app to include a "speed filter" that they alleged negligently encouraged their sons to drive at dangerous speeds. *Id.* at 1087–88. The Ninth Circuit rejected Snapchat's claim of Section 230 immunity, reasoning that the plaintiffs did

> not seek to hold Snap liable for its conduct as a publisher or speaker. Their negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing a product (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter). Thus, the duty that Snap allegedly violated "springs from" its distinct capacity as a product designer. This is further evidenced by the fact that Snap could have satisfied its "alleged obligation"—to take reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate.

*Id.* at 1092 (citations omitted).

So too here. Indeed, TikTok's effort to claim immunity for its misrepresentations about the maturity and addictiveness of the content it hosts contradicts all existing authority on misrepresentation or fraud claims under the CDA. The alleged misrepresentations and omissions are TikTok's "own acts," and thus not protected by the CDA. *Id.* at 1094 (citation omitted); *see Demetriades v. Yelp, Inc.*, 175 Cal. Rptr. 3d 131, 145 (Cal. Ct. App. 2014) ("Nowhere does plaintiff

33

seek to enjoin or hold Yelp liable for the statements of third parties (i.e., reviewers) on its Web site. Rather, plaintiff seeks to hold Yelp liable for its own statements regarding the accuracy of its filter."); *see also Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1179 (9th Cir. 2024); *Doe v. Internet Brands*, 824 F.3d 846, 851 (9th Cir. 2016); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 702 F. Supp. 3d 809, 834 (N.D. Cal. 2023). Where a complaint "demands only that TikTok be honest with consumers about what content the app contains. . . . [t]hat does not come within the purview of Section 230." *Arkansas v. TikTok*, Exhibit B, at 13.

TikTok's attempt to invoke Section 230 is built entirely on the mistaken premise that the Attorney General's misrepresentation claims "cannot be disentangled from the platform's publishing decisions" and thus "directly target editorial decisions." Mandamus Pet. at 30–31. That is simply false. Yes, the underlying mature *videos themselves* are obviously "third-party material," *id.* at 26, but TikTok did not violate the DTPA *by hosting* those videos; it violated the DTPA by *lying about the types of videos it hosts*. TikTok "could have satisfied its 'alleged obligation' " under the DTPA—to *truthfully* represent to consumers the adult nature of the content available on its app—"without altering [that] content" at all. *Lemmon*, 995 F.3d at 1092. Accordingly, the conduct that forms the basis of the Attorney General's claims *does not in the slightest* target TikTok's role as a publisher.

34

All of TikTok's cases on this point, by contrast, involved claims that *targeted the publication of third-party content itself*. They are thus wholly irrelevant. In *In re Facebook*, for instance, the Texas Supreme Court held that Section 230 immunity applied to common-law tort claims by human-trafficking victims who were led to their abusers through Facebook, explaining that the duty the plaintiffs alleged Facebook had violated "derives from the mere fact that the third-party content that harmed them was transmitted using the company's platforms." 625 S.W.3d 80, 93 (Tex. 2021); *see also Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) (plaintiffs sought to hold Facebook liable for hateful rhetoric and recruiting efforts of terrorist groups on Facebook); *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016) (same, relating to ISIS and Twitter). The Attorney General's DTPA claims here, by contrast, do not turn on what "third-party content" TikTok "publishe[s]" at all, *In re Facebook*, 625 S.W.3d at 93; instead, they turn on *what TikTok has represented to Texas consumers about* that content. Section 230 was not intended to give companies *carte blanche* to lie to their consumers, but TikTok's interpretation of the statute would sanction exactly that. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com*, 521 F.3d 1157, 1164 (9th Cir. 2008) ("The [CDA] was not meant to create a lawless no-man's-land on the Internet.").

That reasoning also disposes of TikTok's reliance on cases involving claims "based on a platform's alleged failure to follow its own content moderation

35

policies." Mandamus Pet. at 30. As Defendants' description of these cases reveals, they are all based on a platform's "failing to follow their own Community Standards," *id.* (quotation marks omitted), and they thus all alleged a duty that could only have been satisfied by the quintessential publishing activity of *removing or excluding content. See Doe v. Grindr*, 128 F.4th 1148, 1154 (9th Cir. 2025); *Doe v. MySpace, Inc.*, 528 F.3d 413, 419–20 (5th Cir. 2008); *Winter v. Facebook, Inc.*, No. 4:21-cv-01046, 2021 WL 5446733, at *4 (E.D. Mo. Nov. 22, 2021); *Bennett v. Google, Inc.*, No. 1:16-cv-02283, 2017 WL 2692607, at *2 (D.D.C. June 21, 2017); *Beckman v. Match.com*, No. 2:13-cv-97, 2013 WL 2355512, at *7 (D. Nev. May 29, 2013), *aff'd in part*, *rev'd in part sub nom.*, *Beckman v. Match.com, LLC*, 668 F. App'x 759 (9th Cir. 2016). The State's claims are nothing like that. The only aspects of the guidelines relied upon by the complaint are TikTok's *false representations* that it removes any violative content. Defendants could have avoided liability under the State's theory by simply refraining from those misrepresentations, without removing or altering third-party content in the slightest.

The Attorney General's claims that TikTok violated the DTPA by failing to disclose material information are not barred by Section 230 for the same reason. The theory behind these misrepresentation-by-omission claims is not that TikTok's "role as a publisher of third-party content" gives it a "a duty to warn users of a general possibility of harm resulting from the App." *Grindr*, 128 F.4th at 1154 (quotation

36

marks omitted). Rather, the State's point is that TikTok should have *truthfully disclosed*—rather than concealed—known, specific information about the addictiveness of its platform and the mature nature of the content available there. The Petition alleges in detail the concrete information TikTok possessed about these matters and its failure to reveal them to Texas consumers. *See, e.g.*, Am. Pet. ¶¶ 5, 9, 63, 64, 68–71, 74–78, 80, 85, 92, 101, 114, 136, 143–46, 148–49, 153 (MR 0022–23, 36–44, 46, 49, 54, 60–61, 63–65). TikTok's knowing failure to disclose this specific *true* information is no more protected by the CDA than its knowing dissemination of specific *false* information about its platform. TikTok is correct that the fact that these failure-to-disclose claims target misrepresentation by omission rather than commission "does not change the analysis." Mandamus Pet. at 29. But in both cases, the result of that analysis is that *the CDA does not apply*.

Again, the very arguments advanced by TikTok here have been resoundingly rejected by over a dozen trial, appellate, and state supreme courts throughout the country.[5] The trial court correctly determined that TikTok's Section 230 arguments do not suddenly become more persuasive when they cross the border into Texas.

---

[5] *See Arkansas v. Meta Platforms, Inc.*, No. 57CV-23-47, 2024 WL 4037209, at *2–3 (Ark. Cir. Ct. June 13, 2024); *Arkansas v. TikTok*, Exhibit B, at 13–14; *District of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-6550, 2024 WL 5700129, at *10–12 (D.C. Super. Ct. Sep. 9, 2024); Hr'g Tr. at 62–72, *District of Columbia v. TikTok, Inc.*, No. 2024-CAB-6377 (D.C. Super. Ct. Feb. 24, 2025), attached as Exhibit L; Op. & Order at 15–23, *Illinois v. TikTok*, No. 2024CH09302 (Ill. Cir. Ct. June 12, 2025), attached as Exhibit M; *Iowa*, Exhibit C, at 20–21; *Louisiana*, Exhibit D, at 3; *Massachusetts*, 2024 WL 4648435, at *5–8; Slip Op. at 9–10, *Fitch* ex

37

## IV. TikTok Does Not Have a First Amendment Right to Mislead Texans About Its Product.

The trial court likewise did not err in rejecting TikTok's First Amendment argument. As a threshold matter, the First Amendment has no application to the extent that TikTok's purported speech—for instance, its representations on the App Store or the insertion of deceptive statements in its Community Guidelines—was adopted and promulgated by the foreign defendants operating abroad. "[F]oreign organizations operating abroad . . . possess no rights under the First Amendment." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020). And under this rule, the Supreme Court has recently unanimously recognized that "[t]o the extent that ByteDance Ltd.'s asserted expressive activity occurs abroad, that activity is not protected by the First Amendment." *TikTok Inc. v. Garland*, 604 U.S. 56, 69 n.2 (2025). The Attorney General's Amended Petition alleges that the foreign Defendants "created TikTok's algorithm" and "exercise[ ] control over" the other defendants, Am. Pet. ¶¶ 41–42 (MR 0030–31), and to the extent TikTok's

---

rel. *Mississippi v. TikTok, Inc.*, No. G2024-1235 (Ch. 1st Jud. Dist. Aug. 27, 2025), attached as Exhibit N; *Nevada*, Exhibit E, at 5–6; Slip Op. at 15–21, *TikTok Inc. v. Eighth Jud. Dist. Ct.*, No. 89709 (Nev. Nov. 6, 2025), attached as Exhibit O; *New Hampshire v. Meta Platforms, Inc.*, Exhibit F, at 21–26; *New Mexico*, Exhibit H, at 2; Slip Op. at 12–19, *North Carolina v. TikTok Inc.*, No. 24CV032063-910 (N.C. Super. Ct. Aug. 19, 2025), attached as Exhibit P; *Oklahoma*, Exhibit I, at 5–6; *South Carolina*, Exhibit J, at 10–12; *Tennessee v. Meta Platforms, Inc.*, No. 23-1364-IV, 2024 WL 3253106, at *7–11 (Tenn. Ch. Mar. 13, 2024); *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 230908060, 2024 WL 3741422, at *4–5 (Utah 3d Dist. Ct. July 18, 2024); *Vermont*, 2024 WL 3741424, at *5–6; Slip Op. at 7–8, *Virginia v. TikTok Inc.*, No. CL25-0294 (Va. Cir. Ct. Oct. 24, 2025), attached as Exhibit Q.

"corporate leadership abroad makes the policy decisions about the viewpoints and content" of Defendants' claimed expression, the First Amendment does not offer it any protection, *Moody v. NetChoice, LLC*, 603 U.S. 707, 747 (2024) (Barrett, J., concurring); *see also South Carolina*, Exhibit J, at 12 (holding that "[t]o the extent that ByteDance Ltd.'s asserted expressive activity occurs abroad, that activity is not protected by the First Amendment" (quoting *Garland*, 604 U.S. at 69 n.2)).

TikTok's First Amendment defense also fails on the substance. As with its Section 230 argument, TikTok seeks to conflate its "choices about what third-party speech to display and how to display it" with *its own* misrepresentations *falsely describing the nature* of that "third-party speech." Mandamus Pet. at 33 (quotation marks omitted). Whatever protection the First Amendment affords the former is irrelevant, because the Attorney General's DTPA claims target only the latter: TikTok's misrepresentations that its content is suitable for 12-year-olds and its further misrepresentations that its platform is not highly and harmfully addictive. And it is black-letter law that misrepresentations of this kind are not constitutionally protected. "[T]he government may freely regulate commercial speech that . . . is misleading." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995).

Again: the Attorney General simply does not, by any stretch, seek to regulate TikTok's "editorial choices," "content-moderation policies," or other protected "expressive activities." Mandamus Pet. at 33–35. It merely seeks to keep TikTok

39

from *lying to consumers* about the type of content it hosts. The First Amendment offers no protection to this deceptive commercial speech, and it never has. That is the beginning and the end of TikTok's First Amendment defense.

TikTok relies heavily on the recent Supreme Court ruling in *Moody v. NetChoice*, but that case has no application here, for multiple independent reasons. First, the passages that TikTok cites—discussing the application of the First Amendment to "algorithms" that "prioritiz[e] . . . content," *NetChoice*, 603 U.S. at 734—were dicta. *See id.* at 717; *id.* at 766–67 (Alito, J., concurring). Second, *NetChoice*'s dicta explicitly *does not apply* to the type of algorithm used by TikTok. As the Court carefully explained, the algorithm and other content-moderation features at issue in that case were expressive because they "rest on a set of beliefs about which messages are appropriate and which are not." *Id.* at 736 n.5, 738. *NetChoice* "do[es] not deal . . . with" non-expressive features such as "algorithms [that] respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." *Id.* at 736 n.5; *accord id.* at 746 (Barrett, J., concurring). TikTok attempts to analogize its algorithm to the kind in *Moody*, Mandamus Pet. at 38–39 n.28, but the Petition plainly alleges that it is of this latter, non-expressive variety, Am. Pet. ¶ 139 (MR 0061–62).

Finally, and most fundamentally, *NetChoice*'s dicta about the non-expressive algorithm in that case is further irrelevant here because the Attorney General does

40

not challenge TikTok's *use* of its addicting algorithm to begin with. Instead, all the Attorney General challenges are TikTok's *deceptive statements and omissions* about that algorithm. And as discussed, the First Amendment offers no protection to deliberate misrepresentations of this kind. Yet again, TikTok thus fails to appreciate the distinction between content-moderation decisions themselves and representations regarding those content-moderation decisions. Even if TikTok's *algorithm* were protected expression (it is not), applying the DTPA to TikTok's *public statements* about the addictive nature of its platform does not burden that expression. TikTok can choose whatever algorithm it likes so long as it is honest about its choice.

TikTok's backup "compelled speech" argument fares no better. It claims that the Attorney General seeks to "to compel Relators to tailor how they label and speak about the types of content available on TikTok to reflect the State's perspective." Mandamus Pet. at 36. But that contention runs headlong into the rule recited above: misleading commercial speech is unprotected. The principal case TikTok cites for its compelled speech argument, *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) ("*NIFLA*"), illustrates the point. That case involved a California law that compelled crisis pregnancy centers "to speak a particular message" in the context of constitutionally protected "noncommercial speech" *Id.* at 766, 771. *NIFLA* expressly noted that a different rule applies to the disclosure of

41

"purely factual and uncontroversial information" in the context of *commercial* speech. *Id.* at 768. That is all the Attorney General seeks. This case, unlike *NIFLA*, involves misleading commercial speech, and since such speech is categorically unprotected, TikTok's compelled-speech theory goes nowhere.

TikTok disputes this conclusion, too, arguing that truthful disclosures about the content it hosts "are not mere commercial speech, which does no more than propose a commercial transaction." Mandamus Pet. at 36 (quotation marks omitted). But TikTok's misrepresentations (and misleading non-disclosures) about its platform are in the very heartland of commercial speech: they are *about the commercial service that TikTok provides*, and they are made for the very purpose of *inducing Texans to use that service*.

Even if this Court did find that the Attorney General's claims imposed some burden on speech, those claims are "content-neutral restrictions," and they thus would be subject only to intermediate scrutiny. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994). TikTok claims that the Court should simply "dismiss the [State's] claims," rather than "apply the tiers of scrutiny," because "the State seeks to impose tort-like liability." Mandamus Pet. at 38 n.27. That is an imaginary rule of TikTok's own creation. True, in the narrow context of defamation (and similar reputational torts), the Supreme Court has prescribed a set of First Amendment tests that are distinct from the scrutiny analysis that ordinarily applies. *See Snyder v.*

42

*Phelps*, 562 U.S. 443, 451–52 (2011). But outside of that context, the Supreme Court applies a scrutiny analysis to First Amendment defenses to civil claims enforcing liability under a state statute. *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Neither of the (nonbinding) cases cited by TikTok is to the contrary. In *Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691 (N.D. Ill. 2025), the court did not address any tiers-of-scrutiny argument *at all* (likely because the plaintiff did not advance one). And while *James v. Meow Media, Inc.*, 300 F.3d 683, 696–99 (6th Cir. 2002), does include some musings about the difficulty of judging narrow tailoring in the context of a common-law negligence claim, it ultimately declined to decide any First Amendment question at all.

Accordingly, intermediate scrutiny applies. Intermediate scrutiny is satisfied where the challenged restriction "promotes a substantial government interest that would be achieved less effectively absent the regulation," *Turner*, 512 U.S. at 662 (citation omitted), and it is satisfied here. The interest in protecting children from the kinds of mental health and other harms described in the Petition is clearly important. *See, e.g.*, *FCC v. Pacifica Found.*, 438 U.S. 726, 749–50 (1978). That interest is also "unrelated to the suppression of free expression." *Turner*, 512 U.S. at

43

662 (citation omitted). And finally, any incidental restrictions on speech would be minimal and certainly no greater than needed to serve that interest.[6]

Once again, a long line of courts have rejected First Amendment claims identical to TikTok's.[7] The trial court did not abuse its discretion in rejecting those same arguments again.

## V. The Ordinary Appellate Process Provides TikTok with an Adequate Remedy for Any Asserted Errors.

TikTok's mandamus petition should be denied for the independent reason that the ordinary appellate process offers it an adequate remedy for its asserted errors. There is no right to take an interlocutory appeal from the denial of a motion to dismiss, and using mandamus to create an exception to this general rule is not warranted here.

A defendant is not generally entitled to take an interlocutory appeal from the denial of a motion to dismiss. A defendant whose motion to dismiss is denied can retry his failed legal arguments in a motion for summary judgment or by appealing

---

[6] Indeed, given that the Attorney General's interests are compelling, *see New York v. Ferber*, 458 U.S. 747, 756–57 (1982), any restriction here would survive strict scrutiny as well.

[7] *See Arkansas*, 2024 WL 4037209, at \*3; *District of Columbia*, 2024 WL 5700129, at \*13; Hr'g Tr. at 72–81, *District of Columbia*, Exhibit L; *Illinois*, Exhibit M, at 23–25; *Louisiana*, Exhibit D, at 3; *Massachusetts*, 2024 WL 4648435, at \*8–9; *Mississippi*, Exhibit N, at 11–12; *New Hampshire v. Meta Platforms, Inc.*, Exhibit F, at 26–28; *Nevada*, Exhibit E, at 6; *New Mexico*, Exhibit H, at 2; *North Carolina*, Exhibit P, at 19–24; *Oklahoma*, Exhibit I, at 7; *Social Media Cases*, Nos. JCCP 5255, 22STCV21355, 2023 WL 6847378, at \*38 (Cal. Super. Ct. Oct. 13, 2023); *South Carolina*, Exhibit J, at 12–13; *Tennessee*, 2024 WL 3253106, at \*12; *Utah*, 2024 WL 3741422, at \*5; *Utah*, Exhibit K, at 14–15; *Vermont*, 2024 WL 3741424, at \*6; *Virginia*, Exhibit Q, at 8.

from final judgment. Immediate appeal is authorized only in narrow circumstances, such as when a district court denies a motion to dismiss based on a plaintiff's failure to serve a medical report required in medical malpractice, asbestos, and pandemic exposure suits. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9), (11), (16). Alternatively, a party can *ask* the district court to authorize immediate appeal from an interlocutory order if the order "involves a controlling question of law as to which there is a substantial ground for difference of opinion." *Id.* § 51.014(d); *see also* TEX. R. CIV. P. 168. TikTok did not do so here.

TikTok seeks to end-run this reticulated statutory scheme and acquire immediate review through a writ of mandamus. This gambit should be rejected. Mandamus is appropriate "only where there is no adequate remedy by appeal." *Walker*, 827 S.W.2d at 840–42; *see also In re State Farm Mut. Auto. Ins. Co.*, 712 S.W.3d 53, 58–59 (Tex. 2025). "Mandamus disrupts the trial proceedings, forcing the parties to address in an appellate court issues that otherwise might have been resolved as discovery progressed and the evidence was developed at trial." *Walker*, 827 S.W.2d at 842. Mandamus also causes potentially substantial "delays and expense." *Id.* Finally, mandamus burdens the judicial system, which cannot afford to review every pre-trial order. *Id.* Because these detriments are substantial, the Texas Supreme Court has repeatedly emphasized that "[c]ourts do not issue [mandamus] relief merely to avoid some 'expense or delay' associated with

appellate relief." *In re UMTH Gen. Servs., L.P.*, No. 24-0024, 2025 WL 3180859, at *6 (Tex. Nov. 14, 2025); *see also Walker*, 827 S.W.2d at 842. In short, "mandamus relief is often unavailable to correct the erroneous denial of a motion to dismiss . . . ." *In re Facebook*, 625 S.W.3d at 86.

Applying these principles, the Texas Supreme Court has held that mandamus may be warranted "in exceptional cases" to (1) prevent the impairment or loss of "important substantive and procedural rights[,]" (2) address issues of law that would "prove elusive in appeals from final judgments," or (3) "spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004). TikTok invokes the third and first of these principles, but both arguments are meritless.

Mandamus may be warranted in suits with egregious structural defects that render the proceedings "improperly conducted" and "fatally flawed," *In re Essex Ins. Co.*, 450 S.W.3d 524, 528 (Tex. 2014). This exception is inapposite here. In *Essex*, for example, the Supreme Court granted mandamus because the plaintiff was suing a defendant and its insurer simultaneously, violating the Texas rule that an insurer cannot be sued until *after* the plaintiff has secured a judgment finding the insured liable. The district court's failure to observe this sequencing rule created a conflict of interest that rendered the proceedings "fatally flawed," so the Court

46

granted mandamus to spare the parties from "time and money utterly wasted." *See id.* at 527–28. Similarly, in *In re John G. & Marie Stella Kenedy Memorial Foundation*, 315 S.W.3d 519, 523 (Tex. 2010), which TikTok also cites, the Texas Supreme Court granted mandamus to stop an order requiring the exhumation of a 60-year-old body for genetic testing in a probate action where the plaintiff could not inherit regardless of the test results. Because the plaintiff had no standing to seek exhumation, the Texas Supreme Court granted mandamus to put an end to the "improperly conducted proceeding." *Id.*

Neither of these cases suggests in any way that mandamus is warranted here. TikTok raises garden-variety statutory and constitutional arguments and complains of the "expensive discovery, trial, and appeal processes." Mandamus Pet. at 40. Every litigant faces these burdens. Concluding that mandamus is warranted under these circumstances would create a de facto right to immediate appeal from the denial of a motion to dismiss *in every case*, contravening the legislature's carefully designed scheme for interlocutory appeal and "fundamentally alter[ing] our system of trial and appeal."[8] *In re City of Dallas*, 445 S.W.3d 456, 462 (Tex. App.—Dallas 2014, no pet.).

---

[8] In its reply brief seeking a stay pending mandamus, TikTok cites *In re Butt*, in which an appellate court said in dicta that the legislature's creation of Rule 91a suggests the legislature *also* intended for immediate review of the denial of Rule 91a motions. 495 S.W.3d 455, 460 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.); *see* Stay Pending Mandamus Reply Brief at 17

47

Separately, mandamus may also be appropriate where a defendant asserts "important substantive and procedural rights," such as an immunity from suit, that will be lost if the suit progresses. *In re Prudential Ins. Co.*, 148 S.W.3d at 136; *see id.* at 127 (granting mandamus to enforce contractual waiver of jury right since review after being subjected to jury trial would be inadequate). But the only immunity that TikTok has asserted is Section 230. And while TikTok is correct that the Texas Supreme Court has found that denial of a Section 230 defense is reviewable on mandamus, *see In re Facebook*, 625 S.W.3d at 87, TikTok's Section 230 defense here is entirely meritless, as court after court (after court) has held. *See supra*, Part III. So even if TikTok's Section 230 argument clears the second requirement for mandamus, it fails the first.

---

n.10. This dicta in *In re Butt* cannot be squared with the legislature's actual decision *not to allow immediate appeal from the denial of Rule 91a motions*. Moreover, the broad statement in *In re Butt* must be read in context of the court's assumption that the then-novel Rule 91a procedure would be limited to "baseless claims," an assumption that, as this case proves, has turned out to be mistaken. In any event, the actual holding in *In re Butt* is very similar to that in *In re Essex*. The court found that appellate relief was not adequate because there was a "clear distinction" in a "well-developed body of law" that conclusively barred the plaintiff's claim. *In re Butt*, 495 S.W.3d at 467. In other words, the court found an egregious structural defect that justified immediate intervention. All the other cases TikTok cites involve similar structural defects—or immunity from suit. *See In re Houston Specialty Ins. Co.*, 569 S.W.3d 138, 139 (Tex. 2019) (involving "[a] legally invalid lawsuit that deprives the real plaintiff of the traditional right to choose the time and place of suit" (cleaned up)); *In re Facebook*, 625 S.W.3d at 96 (involving Section 230 immunity from suit); *In re Samonte*, 163 S.W.3d 229, 238 (Tex. App.—El Paso 2005, no pet.) (involving failure to serve statutorily required medical report in medical malpractice suit); *In re State Nat'l Ins. Co.*, No. 13-25-00133-CV, 2025 WL 2318636, at *6–7 (Tex. App.—Corpus Christi-Edinburg Aug. 11, 2025, no pet.) (involving mandatory dismissal under Texas Insurance Code).

TikTok tries to lump in its First Amendment and unconstitutional vagueness arguments as defenses that similarly will be "lost" if TikTok is forced to wait for summary judgment or the ordinary appellate process. *See* Mandamus Pet. at 41. There is nothing to this. The district court's decision denying TikTok's motion to dismiss did not strip TikTok of any constitutional rights, even on an interim basis. Neither the First Amendment nor the Due Process Clause creates a right to be free from judicial process, and relators' lone citation to *Benton* in no way suggests otherwise.[9] *Id.* (citing *Benton*, 980 S.W.2d at 437).

## CONCLUSION

For the foregoing reasons, TikTok's Petition for Writ of Mandamus should be denied.

---

[9] In its reply brief to its stay pending mandamus, TikTok cites a bevy of cases for the proposition that appellate relief cannot remedy the violation of First and Fifth Amendment constitutional rights. Not one of TikTok's cases suggests the denial of a motion to dismiss raising free speech or vagueness defenses somehow creates a constitutional injury. Especially misleading is TikTok's invocation of church autonomy doctrine cases involving an "inquiry into the truth or falsity of religious beliefs that is forbidden by the Constitution," such that "[t]he trial itself . . . would violate relator's constitutional rights." *Tilton v. Marshall*, 925 S.W.2d 672, 682 (Tex. 1996); *accord In re Roman Cath. Diocese of El Paso*, 626 S.W.3d 36, 50 (Tex. App.—El Paso 2021, no pet.); *In re St. Thomas High Sch.*, 495 S.W.3d 500, 514 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Similarly, none of TikTok's "Fifth Amendment" cases suggests the denial of a vagueness defense creates a constitutional injury warranting immediate appellate intervention. *See In re Samonte*, 163 S.W.3d at 238 (involving failure to serve statutorily required medical report in medical malpractice suit); *In re V.K.*, 607 S.W.3d 471, 480–81 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (involving denial of opportunity to be heard); *In re Greater McAllen Star Props., Inc.*, 444 S.W.3d 743, 748 (Tex. App.—Corpus Christi-Edinburg 2014, no pet.) (same).

DATED: December 22, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant
Attorney General

AUSTIN KINGHORN
Deputy Attorney General for
Civil Litigation

JOHNATHAN STONE
Chief, Consumer Protection
Division

Respectfully submitted,

*/s/ Richard R. McCutcheon*
RICHARD R. McCUTCHEON
State Bar No. 24139547
MADELINE FOGEL
State Bar No. 24141985
Assistant Attorneys General
**OFFICE OF THE ATTORNEY
GENERAL OF TEXAS**
Consumer Protection Division
808 Travis Street, Suite 1520
Houston, Texas 77002
Tel: (713) 225-8922
Fax: (713) 223-5821
Richard.McCutcheon@oag.texas.gov
Madeline.Fogel@oag.texas.gov

DAVID H. THOMPSON*
BRIAN W. BARNES*
JOHN D. OHLENDORF*
**COOPER & KIRK, PLLC**
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com
*Admitted Pro Hac Vice*

JOHN C. HERNANDEZ
Texas State Bar No. 24095819
Assistant Attorney General
**OFFICE OF THE ATTORNEY
GENERAL OF TEXAS**
Consumer Protection Division
P.O. Box 12548
Austin, Texas 78711-2548
Tel: (512) 463-2185

50

Fax: (512) 473-8301
JC.Hernandez@oag.texas.gov

ADAM HOLTZ
State Bar No. 24143021
Assistant Attorney General
**OFFICE OF THE ATTORNEY**
**GENERAL OF TEXAS**
Consumer Protection Division
112 E. Pecan Street, Ste. 735
San Antonio, Texas 78205
Tel: (210) 225-4191
Fax: (210) 225-1072
Adam.Holtz@oag.texas.gov

**ATTORNEYS FOR THE STATE OF TEXAS**

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Response to Relators' Petition for Writ of Mandamus contains 12,728 words as calculated under Texas Rule of Appellate Procedure 9.4(i)(1).

*/s/ Richard R. McCutcheon*
Richard R. McCutcheon

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2025, a true and correct copy of this document was served upon all counsel of record via electronic filing service.


*/s/ Richard R. McCutcheon*
Richard R. McCutcheon

53

# INDEX OF EXHIBITS

EXHIBIT A    Slip Op, *Arizona v. Google, LLC*, No. CV-2020-6219 (Ariz. Super. Ct. Jan. 21, 2022)

EXHIBIT B    Slip Op., *Arkansas v. TikTok Inc.*, No. 12CV-23-65 (Ark. Cir. Ct. May 15, 2024)

EXHIBIT C    Slip Op., *Iowa v. TikTok Inc.*, No. EQCE089810 (Iowa Dist. Ct. Aug. 26, 2025)

EXHIBIT D    Slip Op., *Louisiana v. TikTok, Inc.*, No. 184754 (La. 21st Jud. Dist. Ct. Oct. 16, 2025)

EXHIBIT E    Slip Op., *Nevada v. Snap, Inc.*, No. A-24-886113-C (Nev. Dist. Ct. Feb. 13, 2025)

EXHIBIT F    Slip Op., *New Hampshire v. Meta Platforms, Inc.*, No. 217-2023-CV-00594 (N.H. Super. Ct. Dec. 10, 2024)

EXHIBIT G    Slip Op., *New Hampshire v. TikTok Inc.*, No. 217-2024-CV-00399 (N.H. Super. Ct. July 8, 2025)

EXHIBIT H    Slip Op., *New Mexico v. Meta Platforms, Inc.*, No. D-101-CV-2023-02838 (N.M. 1st Jud. Dist. Ct. June 21, 2024)

EXHIBIT I    Slip Op., *Oklahoma v. Meta Platforms, Inc.*, No. CJ-2023-180 (Okla. Dist. Ct. Nov. 20, 2024)

EXHIBIT J    Slip Op., *South Carolina v. TikTok Inc.*, No. 2024-CP-40-06018 (S.C. 5th Jud. Dist. Ct., May 6, 2025)

EXHIBIT K    Slip Op., *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 230907634 (Utah Dist. Ct. Nov. 12, 2024)

EXHIBIT L    Hr'g Tr., *District of Columbia v. TikTok, Inc.*, No. 2024-CAB-6377 (D.C. Super. Ct. Feb. 24, 2025)

EXHIBIT M    Op. & Order, *Illinois v. TikTok*, No. 2024CH09302 (Ill. Cir. Ct. June 12, 2025)

EXHIBIT N    Slip Op., *Fitch* ex rel. *Mississippi v. TikTok, Inc.*, No. G2024-1235 (Ch. 1st Jud. Dist. Aug. 27, 2025

EXHIBIT O    Slip Op., *TikTok Inc. v. Eighth Jud. Dist. Ct.*, No. 89709 (Nev. Nov. 6, 2025)

EXHIBIT P    Slip Op., *North Carolina v. TikTok Inc.*, No. 24CV032063-910 (N.C. Super. Ct. Aug. 19, 2025)

EXHIBIT Q Order & Op., *Virginia v. TikTok Inc.*, No. CL25-0294 (Va. Cir. Ct. Oct. 24, 2025)

EXHIBIT R Slip Op., *TikTok Inc. v. Arkansas*, No. CV-24-522 (Ark. May 29, 2025)

EXHIBIT S Order, *Indiana v. TikTok, Inc.*, No. 23A-PL-03110 (Ind. June 24, 2025)

EXHIBIT T Order, *Louisiana v. TikTok, Inc.*, No. 2025-CC-01179 (La. Nov. 25, 2025)

EXHIBIT U Order, *New Hampshire v. TikTok, Inc.*, No. 2025-0445 (N.H. Sep. 15, 2025)



EXHIBIT A

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-006219                                          01/21/2022


                                                CLERK OF THE COURT
HONORABLE TIMOTHY J. THOMASON                        N. Johnson
                                                      Deputy


STATE OF ARIZONA, et al.                    BRUNN W ROYSDEN III

v.

GOOGLE L L C                                JEAN JACQUES CABOU


                                            SIMONA AGNOLUCCI
                                            JOSHUA D ANDERSON
                                            LORI ARAKAKI
                                            MICHAEL S CATLETT
                                            ALEXIS E DANNEMAN
                                            MICHAEL ESHAGHIAN
                                            BENEDICT Y HUR
                                            KEVIN D NEAL
                                            PETER A PATTERSON
                                            KENNETH NOEL RALSTON
                                            GUY RUTTENBERG
                                            BARRY C SCHNEIDER
                                            CHRISTOPHER M SLOOT
                                            DAVID H THOMPSON
                                            JUDGE THOMASON


**RULING**

Google LLC ("Google") has moved for summary judgment on the Arizona Consumer Fraud Act ("ACFA" or the "Act") claim brought by the Attorney General of the State of Arizona

(the "AG" or the "State"). The Court has considered the Motion, Response and Reply,[1] along with the arguments of counsel.[2]

## INTRODUCTION

The State accuses Google of misleading consumers about how and when it collects location information from various settings. Google has moved for summary judgment. Google's Motion argues that the alleged fraud or deceit was not made in connection with the sale or advertisement of merchandise, a requirement under the ACFA.

Google markets several devices to consumers online through the Google Store website, including smartphones. Google claims that its marketing of these devices has never concerned Google's handling of users' location data, or the functionalities at issue in this litigation: Location History ("LH"), Location Reporting, Location Sharing, Web & App Activity ("WAA"), Supplemental WAA ("sWAA"), WiFi, WiFi Scanning, Bluetooth Scanning, Device Location, Google Location Accuracy, app-level permissions, or Ad Personalization.

Google also offers dozens of apps to users, which are pre-installed on devices "free" of charge, including Maps, Translate, YouTube and Gmail. These apps collect user location data. Google points out that the State does not allege that these apps were deceptively marketed.

---

[1] The State has moved to strike Google's Response to the plaintiff's Controverting Statement of Facts ("Controverting Response"). Google's Controverting Response consists of 16 single-spaced pages purporting to controvert the State's contravention of Google's Statement of Facts. The Controverting Response is in addition to the 51 single-spaced pages Google filed in Response to plaintiff's Separate Statement of Facts. Thus, Google submitted the equivalent of over 100 double-spaced pages trying to convince the Court there is no factual dispute here. The submission of this vast amount of material was, for the most part, completely unhelpful to the Court. Moreover, submitting reams of material hardly supports Google's contention that there are no issues of material fact.

The State is correct that Rule 56(c) does not authorize the filing of the Controverting Response. The Court further notes that Rule 5.2(b)(1)(F) requires that, with limited exceptions, all documents filed with the Court must be double-spaced. Statements of fact and controverting statements are no exception. The Court is, however, reluctant to strike Google's Controverting Response in this instance. The Court likely would have granted leave to Google to submit the Controverting Response, had it asked for leave to do so, as it should have. As such, the State's Motion to Strike is denied. The Court admonishes the parties to follow the rules in future submissions.

[2] The State improperly cited three new cases in the slide show presented at oral argument. None of the cases really help the State. In fact, the *Norman Gershman* case was completely mis-cited by the State. The State provided a quote from the case that ostensibly denied summary judgment. In reality, just the opposite occurred: "Given this statutory limitation, it is clear that post-sale representations which are not connected to the sale of advertisement of the vehicle do not constitute consumer fraud under the Act. Therefore, Burton is entitled to summary judgment as to Count V of the Complaint based upon any alleged post sale representations." *Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc.,* 558 A.2d 1066,1074 (Del. Super. Ct. 1989), *aff'd on other grounds*, 596 A.2d 1358 (Del. 1991).

Google's primary argument is that the matters that the State complains about occur after the purchase of merchandise. Google contends that the collection, storage and use of location data fundamentally concern only post-sale conduct, unconnected to the bargaining process attendant to the purchase of merchandise. This post-sale conduct is, according to Google, not actionable under the ACFA.

For example, LH is a retrospective record of where users go with their devices, after users purchase them, set them up, create and sign into their Google accounts on the devices, opt into LH and use the devices. WAA is likewise a retrospective record of users' interaction with Google products, after users purchase and set up devices, then use them to interact with Google's products. Google argues that none of this conduct is connected to the sale or advertisement of merchandise.

The State contends, on the other hand, that there are multiple reasons why Google's Motion should be denied. For example, the State alleges that Google did engage in deceptive sales of Nexus and Pixel phones and Android devices. Specifically, the State asserts that Google programed the devices before they were sold with the ability to track user location data and did not tell users that the tracking settings could not be disabled.

Google's deceptive conduct is also alleged to include ongoing transactions, where Google provides services (search results through apps) in exchange for user data. Google allegedly misrepresents when and how it acquires and uses users' location data, it obtains in exchange for its search services. Google then allegedly monetizes the allegedly deceptively acquired data by matching users with targeted advertisements. The State argues there are fact questions about whether Google's allegedly deceitful conduct occurred in connection with consumer sales.

**SUMMARY OF THE STATE'S FACTUAL ALLEGATIONS**

**The State's Allegation that Google Collects and Monetizes User Location Data**

The State alleges that Google's deception is in connection with the sale or advertisement of merchandise in several different respects. Google allegedly uses purportedly "free" apps and other services, as well as software embedded in Android devices, to (1) gather data about users and (2) target ad placements to those users. Google profits, as advertisers bid more to appear "higher" in search results and in more relevant search locations.

The State contends that Google's deceptive and unfair practices and omissions enable it to collect user location data. For example, when a consumer buys an Android device, it comes pre-loaded with functions "configured to provide Google with the ability to collect, store and exploit a user's locations information through the software on the device." These functions include sensors in the device, as well as settings that are either part of the users' Google account or the Android

OS (e.g., LH, WAA, WiFi and WiFi scanning). Some of the settings, such as WAA, are pre-enabled; by default, Google uses them to collect location data.

Google also collects, stores and exploits location data whenever users interact with Google's apps, products and services. Services such as IPGeo and Oolong collect and exploit location data, even if the user has disabled the location related settings. The State alleges that consumers are not told that they cannot prevent the collection of location information, even if they disable certain location settings.

Google Locations Services (GLS) creates profits through advertisements. Google offers consumers various location services through its apps. In exchange, consumers provide location information to Google, which is used to target advertising. Google "connects" users with ads from advertisers through the services it provides. The State contends that location data is used for nearly all of Google's ad services. Google admits that location information drives its advertising revenue.

**The State's Contention That Google Is Involved in Various Types of Sales and Advertising of Merchandise**

The State urges several reasons why Google's deceptive and unfair conduct and omissions are "in connection with" the sale or advertising of merchandise.[3] Three examples the State discusses in its Response are (1) sales and advertisements of Android smart phones, including pre-loaded apps and software; (2) sales of Google's apps and services, in exchange for users' data; and (3) "transactions" involving the sales of targeted advertising through Google's "two-sided platform".[4]

---

[3] Google's assertion in the Reply that the State's omission theory is untimely is not well taken. Google has long known alleged omissions were a theory in the case. Google even addressed the issue in its Motion to Dismiss at page 13. Further, the Court addressed the omission allegations in the September 25, 2020 ruling on Google's Motion to Dismiss, stating that "the State contends that the Complaint includes numerous allegations to the effect that Google knew that users would rely on the concealment or suppression of material information concerning Google's interference with their ability to control or limit Google's collection of location information."

[4] Google claims that this theory was not pled in the Complaint and cannot be used to defeat summary judgment. A fair reading on the Complaint, however, reflects that this theory was pled. Paragraph 22 of the Complaint contains a non-exhaustive list of the ways in which Google's alleged conduct was "in connection with" a sale. For example, in paragraph 22(d), the State alleged that "Google sells ad placements (i.e., "merchandise") to third parties for consideration (Google's principal business), which advertisements are powered by the fruits of the deceptive and unfair acts and practices alleged herein relating to collection of user location data. Google's acts, practices, representations, and omissions when selling ad placements to purchasers of such ad placements are thus in connection with the sale of merchandise." Although the Complaint does not use the term "two-sided platform," that is the theory being described.

Google's other claim, that various arguments made by the State about Google apps were not pled, is similarly misplaced. For example, the Complaint alleges in paragraph 22 that devices came preloaded with apps that deceptively

First, Google sells smart phones. Google developed a proprietary version of the Android OS, which pre-loads Google software on its devices and other Android devices.[5] As part of the set-up process, a user must either create an account or sign into a pre-existing account to use many of the features on the device. During account set-up, Google presents users a choice to toggle certain location settings "on" or "off." Users must agree to Google's Store Sales Terms before buying a device.

Second, Google provides apps and services (Search, Maps, etc.) to users. In exchange, users agree to certain terms for collecting some personal data. The State contends that this "transaction" is a trade of data for services. Each search by a user is a sale, whereby Google provides a service and receives data in exchange. The State contends that this is an exchange of valuable consideration on an ongoing basis.

Finally, Google's advertising business operates as a two-sided platform. On one side, users receive services through use of Google apps, and Google receives user location data. On the other side, Google sells advertising services, promising it can deliver ads to users in specific locations. The State contends that Google's exchanges with a user on the one side, and an advertiser on the other side, are part of a single, congruent sale.

**Google's Alleged Deception and Omissions**

The State contends that, when Google's apps and Android devices are sold and advertised, Google does not accurately inform the consumer how it collects, stores and exploits location data. For example, Google allegedly fails to disclose that it will collect and exploit that data, no matter what the consumer wants. Various settings do not actually stop Google from doing so, even though the consumer is led to believe that they do.

The State also contends that Google issues misleading disclosures online. These disclosures are available to users before they purchase an Android device, set up a Google account or download Google apps. For example, the State claims that Google deceptively stated on its public "Help" page that "[w]ith Location History off, the places you go are no longer stored." [6]

Google's Privacy Policy (until May of 2018) made no mention of WAA's connection to location. Users setting up a Google account never received any disclosure that WAA collects location data. The State claims that this was a deceptive omission.

---

collected location data. Further, the State has long contended that Google's apps were not "free," but were sold in exchange for location data, as that theory was discussed in the Court's January 20, 2021 ruling at pages 14-15.

[5] Google's services are also offered on iOS (Apple) devices.

[6] Google's Privacy Policy has always informed users that Google collects and uses location data when users interact with Google apps and services.

Users were given the option to disable Location Master ("LM"). The State claims that, in this context, "off" does not actually mean "off." Rather, Google takes user location data, irrespective of how the users' settings are placed. The State claims this is also a deceptive omission.

Google represents to its users that, when they are acquiring or interacting with apps, they can prevent the specific apps from obtaining location information through runtime settings. In reality, the apps have the ability to by-pass the users' preferences and obtain location information anyway. The State contends that this is also deceptive.

## SUMMARY JUDGMENT STANDARD

The burden of proof on a consumer fraud claim is the preponderance of evidence. *Dunlap v. Jimmy GMC of Tucson, Inc.,* 136 Ariz. 338, 343-44 (App. 1983). In deciding a motion for summary judgment, the Court "must view the facts and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 13 (2003). Summary judgment is appropriate when there are no genuine issues of fact and the moving party is entitled to judgment as a matter of law. *Orme School v. Reeves,* 166 Ariz. 301, 305 (1990). If any issue of material fact exists, upon which reasonable people might reach different conclusions, summary judgment is not appropriate. *Id.* at 306. Even if no factual dispute exists, summary judgment is inappropriate when reasonable jurors could draw conflicting inferences from the circumstances. *Northern Contracting Co. v. Allis–Chalmers Corp.*, 117 Ariz. 374, 377 (1977).

## THE APPLICABLE LAW REGARDING THE "IN CONNECTION WITH" A SALE OR ADVERTISEMENT REQUIREMENT

The Complaint contains a single claim alleging a violation of the ACFA. The Act addresses only deceptive or unfair practices employed "in connection with" the sale or advertisement of merchandise. A.R.S. § 44-1522(A).

Under the ACFA, a "sale" is "any sale, offer for sale or attempt to sell any merchandise for any consideration…" A.R.S. § 44-1521(7). "Advertisement" is any oral or written statement "to induce…any person to enter into any obligation or acquire any title or interest in any merchandise." A.R.S. § 44-1521(1). "Merchandise" includes "intangibles and services." A.R.S. § 44-1521(5). Thus, the statute requires a sale of merchandise, or at least an offer or attempt to sell merchandise, and consideration.[7] An exchange of any type is not sufficient. There must be a sale. Gratuitous transfers are not covered. Arizona courts have held that the Act covers situations where

---

[7] The Act applies "whether or not any person has in fact been misled, deceived or damaged thereby…" A.R.S. § 44-1522(A). Even though it is not necessary to establish actual deception, the State argues that Google did in fact deceive users.

consideration, other than money, is exchanged. *Villegas v. Transamerica Fin. Serv. Inc.,* 147 Ariz. 100, 102 (App. 1985).[8]

The Act is "designed to eliminate unlawful practices in merchant-consumer transactions." *Madsen v. Western American Mortgage Co.,* 143 Ariz. 614, 618 (App. 1985). The Act, however, does not require a "direct merchant-consumer transaction." *Watt v. Medicis Pharm. Corp.,* 239 Ariz. 19, 28, ¶ 31 (2016). Rather, the ACFA encompasses conduct "regardless of whether the deceiver is the seller." *State ex rel. Woods v. Sgrillo,* 176 Ariz. 148, 149 (App. 1993). The Act extends liability to any person who "uses" the misrepresentations in connection with the sale of merchandise. *Powers v. Guaranty RV, Inc.,* 229 Ariz. 555, 561, ¶ 19 (App. 2012).

The scope of the ACFA is broad and remedial; it is thus not subject to restrictive interpretations. *People ex rel. Babbitt v. Green Acres Trust*, 127 Ariz. 160, 164 (App. 1980) *superseded by statute on other grounds, as recognized in State ex rel. Corbin v. Pickrell*, 136 Ariz. 589 (1983). Accordingly, the State contends that the Act, and in particular the "in connection with" language, should be read broadly.

Any actionable deceptive practice must be "in connection with" the sale or purchase of merchandise. A.R.S. § 44-1522. The phrase, "in connection with," is not defined in the statute. There is limited guidance on its meaning in Arizona case law.

Arizona courts have, in other contexts, construed the word "connection" to mean a "relationship" or "association." *State v. Bews*, 177 Ariz. 334, 336 (App. 1993). The American Heritage Dictionary defines "in connection with" as "[i]n relation to; with respect to; concerning." Connection, *The American Heritage Dictionary of the English Language* (5th Ed. 2020).[9]

Determining whether a deceptive practice has a sufficient connection to a sale is generally a fact question. *See, e.g., Sgrillo,* 176 Ariz. at 149;[10] *State ex re. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 525-27 (Iowa 2005); *see also McGrath v. Zenith Radio Corp.,* 651 F.2d 458, 466 (7th Cir.), *cert. denied,* 454 U.S. 835 (1981) (question of fact as to whether promises made in connection with employment were in connection with the purchase or

---

[8] In *Villegas*, the defendant mortgage company told plaintiff it would either foreclose on an existing deed of trust or provide plaintiff a new loan. 147 Ariz. at 102. Defendant did not tell plaintiff the new loan would cost twice as much as the first. The court concluded that the offer of a loan could constitute a sale or advertisement under the Act. *Id.*

[9] The Merriam-Webster Dictionary defines "connection" as "causal or logical relation or sequence." "Connection." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/connection. Accessed 3 Jan. 2022.

[10] In *Sgrillo,* the court reversed summary judgment in favor of defendants on the ACFA claim, finding that, if defendants' acts were found to be in connection with the sale of a service to provide low interest credit cards to consumers, the conduct would be covered under the Act.

CV 2020-006219                                                      01/21/2022

sale of a security).[11] As will be explained below, the general rule applies here; it will be up to the fact finder to determine if the alleged deception at issue here was sufficiently connected to a sale.

One federal decision, applying the Act, noted that the alleged deception must generally be "part of the bargaining process." *Rinehart v. Gov't Emps. Ins. Co.,* No. CV-19-01888-PHX-DLR, 2019 WL 6715190, at * 4 (D. Ariz. Dec. 10, 2019). In *Rinehart,* however, the court held that representations at issue, which were made after the consumer had selected GEICO to perform the repair service, did not induce the consumer's original decision to select GEICO and were not alleged to have been connected to any pre-sale conduct. *Id.* In addition, although the court discussed "in connection with," the claim was flawed because plaintiff could not establish reliance, which was an element of the private claim brought in that case. *Id.* Reliance is not an element of the claim brought by the State here.

Google has cited cases where other courts have dismissed claims predicated on statements concerning "actions taken on behalf of merchandise previously purchased." *E.g., Contreras v. Nationstar Mortg. L.L.C.,* No 2:16-CV-00302-MCE-EFB, 2019 WL 688198, at *4 (E.D. Cal. Feb. 19, 2019) (applying ACFA). In *Contreras,* the court rejected the consumer's argument that every charge of an inflated inspection fee was an actionable "sale" and dismissed the claim with leave to amend. *Id. Devore v. Nationstar Mortg. LLC,* No. CV-14-08063-PCT-DLR, 2015 WL 12426151, at *8 (D. Ariz. Mar. 11, 2015), involved misrepresentations made in connection with the modification of the repayment schedule for an existing debt. The court dismissed the ACFA claim because the misstatements did not relate to "the sale or advertisement of merchandise, but instead to modifying the payment schedule for merchandise previously purchased." *Id.* The court noted that plaintiffs failed to plead the sale or advertisement of services because the only payments they made were arrears payments already owed on the existing note. The monies were not paid as consideration for loan restructuring services. *Id.*[12]

*Contreras* and *Devore* are not dispositive here. In those cases, the plaintiffs were not able to identify any tie or connection between post sale conduct and pre-sale conduct. Google has admitted that post sale conduct can be actionable if there is some tie or connection to a sale of a device or service.

---

[11] Both parties have cited various federal and state decisions from other jurisdictions, which of course are not binding on this Court. The Court has considered these cases; some of them will be discussed below. The Court has also considered the Australian decision cited by the State, but given it very little weight. That case involved an Australian statute, materially different from the ACFA. The decision has little, if any, persuasive authority.

[12] The State argues that *Devore, Contreras* and other cases cited by Google are inapplicable because they involved private actions under the ACFA, not claims brought by the AG. The distinction between private actions and State actions is significant, however, only to the issue of whether proof of actual consumer deception is required. The statutory language on the "in connection with" element is the same, irrespective of whether the claim is an AG claim or a private cause of action.

The State contends that the plain language of the ACFA prohibits "the 'use' of any [deceptive or unfair act or practice] in connection with the sale [or advertisement] of merchandise." *Powers*, 229 Ariz. at 561, ¶ 19. The ACFA broadly prohibits deceptive or unfair practices undertaken "in connection with" the sale or advertisement of merchandise. A.R.S. § 44-1522(A). By its plain terms, "[t]his is a broad phrase that goes beyond the moment of sale." *Sands v. Bill Kay's Tempe Dodge, Inc*., No. 1 CA-CV 13-0051, 2014 WL 1118149, *4, ¶ 17 (Ariz. App. Mar. 20, 2014). According to the State, the statute does not necessarily require that the unlawful conduct precede, or directly cause or induce, the transaction. Conduct that occurs prior to or after the consumer's acceptance of merchandise can be actionable. *Dunlap v. Jimmy GMC of Tucson, Inc., 136 Ariz. 338, 342 (App. 1982)*.

The State also argues that Google's contention that the deception must be part of the "bargaining process" is not in the statute. In fact, limiting the Act to deception that occurs only in the bargaining process would, according to the State, essentially insert a reliance element, which is not an element under the Act.

The discussion about the "bargaining process" in *Rinehart* is certainly contrary to plaintiff's position. *Rinehart* did not, however, necessarily preclude a finding that post-sale conduct was actionable, if such conduct had some connection to pre-sale activity. Moreover, *Rinehart* is a federal district court decision, not binding on this Court.

The legislature did not choose to use the word "induce," or any similar wording, in § 44-1522(A). The terms of the Act are broad and are "not subject to restrictive interpretation because the Act is generally to be considered remedial in nature." *Green Acres,* 127 Ariz. at 164. Indeed, Arizona courts have rejected the notion that the Act is limited solely to pre-sale representations. *State ex re. Brnovich v. 6635 N. 19th Ave. Inc.,* No. 1 CA-CV 15-0550, 2016 WL 7368620, at *4, ¶ 17 (Ariz. App. Dec. 20, 2016). In *6635 N. 19th Ave*, the landlord argued that "in connection with" "necessarily limits application of the CFA to [the landlord's] pre-lease representations." *Id*. The court found "no legal support for [this] argument." *Id.* The court cited two earlier decisions that allowed ACFA claims based on post-sale deceptive conduct. *Schmidt v. Am. Leasco*, 139 Ariz. 509, 511 (App. 1983); *Howell v. Midway Holdings, Inc.,* 362 F. Supp. 2d 1158, 1164-65 (D. Ariz. 2005).

In *Schmidt*, the court held that conduct involving the ongoing provision of services under a contract was actionable under the ACFA. 139 Ariz. at 511. After purchasing an RV from defendant, plaintiff entered into a leasing arrangement with defendant to defray the purchase payments. The leasing agreement required defendant to obtain security deposits from renters and perform certain maintenance. Later, plaintiff learned that defendant was not maintaining the vehicle or repairing damage caused by renters. Plaintiff was charged for repairs that should have been covered by security deposits under the terms of the lease agreement. The court upheld the

judgment in favor of plaintiff on the consumer fraud claim because defendant's deceptive practices involved the sale of services under the lease agreement. *Id*. *Schmidt* supports the theory that the use of apps is a consumer "sale" because it involves the ongoing provision of services.

*Howell i*nvolved an ACFA claim based on lessor's alteration of a lease agreement after lessees signed it. The court held there was a fact question whether the alteration of the lease after signing was deceptive conduct covered under the Act. 362 F. Supp. 2d at 1164-65.

In *Dunlap,* the Court of Appeals applied the Act to statements that occurred "prior to, as well as after" the consumer "accept[ed] delivery," which was after the parties signed a binding contract that contained a "disclaimer." 136 Ariz. at 342. The Court of Appeals affirmed a jury verdict in that case, noting that representations were made to the plaintiff before and after the acceptance of delivery. *Id.*

Applying a similar statute, the Iowa Supreme Court rejected the notion that only pre-sale conduct is governed by the statute. *Miller*, 694 N.W.2d at 525-26 (citing cases from other jurisdictions holding the same). In *Miller*, the State's attorney general brought a consumer fraud action on behalf of consumers who had purchased membership interests in a recreational campground. The membership interests obligated the campers to pay club dues in perpetuity. Many years after the sales of the membership interests, the club begin an aggressive campaign to collect dues from members who had not paid dues for years.

The Iowa Supreme Court noted that there was no "bright-line temporal limit" and that the phrase "in connection with" did not mean "prior to" or "at the time of" the sale. *Id.* at 527-28. The Iowa Court concluded that there could be a nexus between the development of the campground and the collection campaign nearly two decades later, if, for example, the trier of fact found that the developer established the scheme at the outset, when memberships were being sold. *Id.* at 528-29.    Thus, in keeping with the policy of interpreting the statute liberally, the court held that the attorney general only needed to show "some relation or nexus" between the unfair practice and the sale. *Id.* at 526.

The *Miller* decision concluded that "(t)he State should get its day in court." *Id.* at 528. Similarly, the trier of fact could find some nexus between the sale of merchandise and Google's post sale practices. *See also Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 58 (Colo. 2001) (holding that Colorado's deceptive practices act applied to an insurer's post-sale unfair or bad faith conduct).

The Missouri Supreme Court, also applying a similar statute, held that enforcing the terms of an ongoing contract was conduct "in connection with" the initial sale. *Conway v. Citimortgage Inc.,* 438 S.W.3d 410, 416 (Mo. 2014). *Conway* held that alleged unfair actions by a mortgage

CV 2020-006219                                                    01/21/2022

servicer in enforcing terms of a mortgage loan were actions taken "in connection with" the loan. The Missouri court reasoned that a mortgage loan creates a long-term relationship in which the borrower and the lender have continuing duties, including making and collecting payments, which extend for years. Thus, because "each party must continue to perform these duties for the life of the loan, the sale continues throughout the time the parties perform their duties. A party's right to collect a loan is part of that sale and is, therefore, 'in connection with' the loan." *Id.* at 415.

A.R.S. § 44-1522(C) provides that "it is the intent of the legislature, in construing [the Act], that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52, and 55(a)(1)." The Federal Trade Commission ("FTC") cases cited by the State do not impose strict temporal limits tied directly to a sale. *See, e.g., In re Sw. Sunsites, Inc.*, 105 F.T.C. 7, *113 (1985), *aff'd* 785 F.2d 1431 (9th Cir. 1986) (finding unfairness where consumers "continue[d] paying substantial amounts for land under their purchase agreements . . . through a variety of continuing misrepresentations" and noting "[c]onsumers could not reasonably have avoided this injury" because defendants' repeated post-purchase misrepresentations "hindered the free exercise of informed consumer decision-making"); *F.T.C. v. Hispanic Global Way, Corp.*, No. 14-22018-CIV, 2014 WL 12531538, at *2 (S.D. Fl. 2014) (defendant's post-sale conduct was covered by the FTC Act, even though "[d]efendants already had the consumer's money for the purchase price payment").

A fairly recent amendment to the Act supports an expansive interpretation of "in connection with," as adopted by other jurisdictions. In 2013, the Act was amended to cover "unfair act(s) or practice(s)." 2013 Ariz. Sess. Laws ch. 143 § 4 (1st Reg. Sess.). In doing so, the Legislature intended to "track[] the standard applicable in federal law and in most other states." 2013 AZ H.B. 2396 (NS). The legislative history explains that adding "unfair" practices "expands" the ACFA's reach to cover "any unfair act or practice." *Id.*

Google cites decisions construing a Maryland consumer protection statute that required deception "in connection with." *E.g., Luskin's v. Consumer Protection Division*, 726 A.2d 702, 713 (Md. 1999); *Pucci v. Annapolis Sailyard, Inc.*, No. JKB-10-2968, 2011 WL 3793762, at *1 (D. Md. Aug. 24, 2011). The Maryland cases, however, are only somewhat helpful to the interpretation of the ACFA because the Maryland statute has a materiality element, which the AFCA does not. These cases emphasized the absence of materiality.[13]

---

[13] In *Luskin's,* the Maryland Supreme Court noted that a practice is "deceptive," in accordance with FTC authorities, if it misleads a consumer in a "material way." 726 A.2d at 713. In other words, it must impact the consumer's choice of a product. *Id.* That decision, however, did not deal with the "in connection with" element and instead addressed materiality. In *Pucci,* the court dismissed claims based on purely post-sale statements, reasoning that such statements could not have affected the plaintiff's choice of a product. *Pucci,* however, also emphasized the materiality requirement, which is not an element under the ACFA. There, plaintiffs alleged that, after the contract of sale had been finalized and the product had been ordered, defendant made misrepresentations about the extent of the damages

CV 2020-006219                                                      01/21/2022

In the context of federal securities law, post-sale conduct, unconnected with the conduct of a sale, is generally not actionable. *See Gavin v. AT&T Corp.*, 464 F.3d 634, 639 (7th Cir. 2006) (something happening after a transaction to make it less worthwhile is not connected with the original sale) *Gavin* also noted, however, that "[i]f what happens is traceable to something that occurred before the sale," it would still be "in connection with" the sale.

The United States Supreme Court has held that deception, one step removed from the sale of securities, is nonetheless "in connection with" a sale. *S.E.C. v. Zandford,* 535 U. S. 813, 815 (2002). The defendant in *Zandford* argued that his post sale conversion of funds was not "in connection with" the sale of securities. The Supreme Court rejected that position, because the defendant's actions were part of the "fraudulent scheme" and "the sales are properly viewed as a 'course of business.'" *Id.* at 820-21. The Ninth Circuit has also construed the Securities Litigation Uniform Standards Act broadly, explaining that "in connection with" simply requires more than a tangential relationship. *Madden v. Cowen & Bo.,* 576 F. 3d 957, 966 (9th Cir. 2009).

**DISCUSSION**

**Introduction**

The essence of Google's position is that the fraud alleged by the State was not part of the bargaining process. *See Rinehart,* 2019 WL 6715190 at *4. In other words, there was no alleged deception during the process of any consumer buying Google products, including smartphones. Rather, according to Google, the alleged deception occurred after the sale transactions were complete. Google argues that the subsequent act of setting up an account and/or using an app cannot be characterized as being "in connection" with the sale of a previously purchased device. Google also points out that users are not even required to set up an account, rendering the connection between the alleged deception and the purported sales even more tenuous.

There is some appeal to Google's argument. The Act was intended to address, at least primarily, situations where an Arizona consumer is misled while purchasing or leasing merchandise. Statements or omissions that occur after the sale or lease arguably have no impact on the consumer's purchasing decision.

---

which would result if plaintiffs reneged on their agreement. The court found plaintiffs had not alleged that any misrepresentation induced them to enter into the contract of sale and that defendant's post-sale conduct was not material to plaintiffs' purchase decision. *See also Shreve v. Sears, Roebuck & Co.,* 166 F. Supp. 2d 378, 417-18 (D. Md. 2001). In *Shreve*, the court affirmed the grant of summary judgment on the consumer protection claim, where alleged misrepresentations in an owner's manual were not the basis of the consumer's bargain because the consumer did not read the manual until after the purchase was made. The court focused on materiality and did not address the "in connection with" element. The court also noted there was no evidence defendant was aware of the alleged product defect; thus, the appropriate claim was for breach of the implied warranty of merchantability.

The ACFA is fairly straightforward. It is customarily a very simple process to determine whether some alleged deceit falls within the Act.

Here, however, the analysis is far from simple. The State's contention that Google's alleged deception is in connection with the sale or advertising of merchandise is, at times, somewhat strained. The fact the State spent 29 pages trying to explain why this case falls within the Act demonstrates the difficulty in trying to establish that conduct that was not directly part of a consumer transaction falls within the Act.

The Court, however, is ultimately convinced that the weight of authority supports the notion that the Act is not limited solely to specific actions taken at or before the purchase or sale of merchandise. The phrase "in connection with" does not have a clear temporal limitation. "In connection with" does not necessarily refer only to the conduct that occurs before or at the time of the sale.

*6635 N. 19th Ave., Schmidt, Howell, Dunlap* and *Miller* all support the notion that the Act can cover post sale conduct. "In connection with" itself is a broad phrase that it not limited to statements made at the time of the sale. *See Sands*, 2014 WL 1118149, *4, ¶ 17. A more expansive view is appropriate to carry out the legislature's intent that the Act cover "any unfair act or practice" in consumer sales transactions. Whether the deception here was in connection with the sale of merchandise is ultimately a fact question to be decided at trial. *See Sgrillo*, 176 Ariz. at 149.

The Complaint does allege deception as part of the process of selling and advertising Google products, including smartphones. The State's theory, at least in part, is that the deception about tracking a consumer's location permeates the consumer's experience with Google's products and apps. [14]The State alleges that devices come pre-loaded at the time of purchase with functions, including sensors and settings within the devices, which Google uses to track consumers' location. The State claims that, at a minimum, there were omissions during the "bargaining process," where Google failed to explain that locations can be tracked, through embedded sensors and pre-programed settings, even if the user turns "off" relevant tracking settlings. The State claims that Google acted deceptively in not explaining to consumers how tracking functions worked, leading consumers to incorrectly believe that they could control when they could be tracked.

Google admits that post sale deceit can be covered by the Act, if such conduct has some connection to the consumer purchasing transaction. The State contends that there is such a

---

[14] During oral argument Google pointed to a slide that the State was going to use at argument, but did not end up using. The slide was a "timeline of user purchase of Android phone." Google argued that the timeline actually demonstrates that any deceit was not in connection with the sale of a smartphone. As the State pointed out in the slide, however, "Google's deceptive disclosures" were "available to users at all times online."

connection here. The post-sale deceit at issue here does, at least arguably, have some connection to the omissions at the time of sale. Indeed, the post-sale deceit would not have been effective had Google honestly explained how its location tracking systems worked at the time of the original sale.

The State also alleges that the deceit is carried out, at least in part, through ongoing transactions, when consumers use Google apps on their devices. *See Conway,* 438 S.W.3d at 415. The consumer, in essence, provides location data in exchange for Google providing the consumer with information. The consumer is allegedly deceived by misleading statements and omissions, suggesting that location cannot be tracked when salient applications are "off."

The Court is constrained to construe the Act broadly, to encompass all consumer deception that is in some way related to the sale or advertising of merchandise. The collection and use of location information is a critical part of the advertising and selling of Google products. The entire "Google model" is, according to the State, dependent on obtaining accurate location history data, which is allegedly obtained in a deceptive manner.

As Google acknowledges, there is no statutory requirement that all of the deception occur at or before the sale of merchandise. Post-sale conduct can be actionable if that conduct has some relationship to pre-sale conduct. There is such a relationship here.

As noted above, the State contends that Google constructs its deceptive scheme in connection with three types of sales:  sales of devices, continuous sales of apps and continuous sales of targeted advertising. The Court finds there are fact questions whether a sufficient nexus exists between Google's alleged deception and the sales of devices and use and "sale" of apps. The Court finds, however, that the State's theory about sales of matching advertising would not, standing alone, provide the basis of a claim. The fact that third party advertising does not give rise to a consumer fraud claim does not necessarily mean, however, that this topic is irrelevant at trial.

**Nexus to the Sale or Advertisement of Preloaded Devices**

The first type of sale is the sale of Google devices, such as Pixel and Nexus phones, and Android devices. According to the State, any deception relating to the sale of these devices is clearly in connection with the sale or advertising of merchandise.

According to the State, Google leads users to believe it will only collect or exploit their location data in certain ways before a consumer buys any service or device. Buyers are not told that they have little or no control over Google's ability to track location. Consumers are not told that there are sensors and settings built into the devices that can track location, even if the consumer disables certain location settings to try to stop such tracking. As such, many users justifiably

believe that they can control the ability of Google to track location. Users wishing to know the terms of these transactions, and understand how locations are tracked, are directed to disclosures concerning WAA, LH and other settings. These disclosures allegedly create a deceptive impression.

In essence, the State argues that Google failed to disclose to consumers purchasing Google products all relevant information about how Google tracks location information. The alleged omissions are direct parts of the bargaining process.

Whether Google can prove that consumers were deceived in connection with the initial purchase of devices is outside the scope of this Motion. The State has, however, alleged and presented evidence of deceptive conduct that is directly in connection with the initial sale of devices. *See Dunlap*, 136 Ariz. at 342. As such, Google is not entitled to summary judgment.

The State further alleges that the deception continues through users' set up of Google accounts after purchasing a device. According to the State, users of Android devices are required to set up a Google account to use even the basic features of the device. As part of the setup process, users are directed to the allegedly deceptive privacy policy and misleading LH and WAA disclosures. Although this process may happen after the completion of the strict "bargaining process," the alleged deception was allegedly "preordained" because it was programed into the devices before being sold to consumers.

Google argues, however, that, to the extent there was deception, it all occurred after the initial consumer transaction. Specifically, Google contends that there can be no deception until after the consumer purchases a device and interacts with the salient apps.

As noted above, however, post-sale conduct can be actionable if connected to pre-sale conduct. The alleged post sale deception at issue here is at least arguably related to Google's alleged deceptive failure to disclose its location tracking capabilities at the time of sale. Such deception could be found by a trier of fact to be "in connection with" the sale of merchandise. *See Miller*, 694 N.W.2d at 525.

In fact, the State argues that Google's deception of consumers extends from when Google first engages with users until a user engages with Google's services. According to the State, this wide-ranging course of deception is all "in connection with" the sale or purchase of the devices. Whether or not all the alleged deceptive practices are sufficiently tied to the sale is a fact question.

Google asserts that deception connected to the merchandise itself, the pre-programmed functions, is not actionable. The Act covers only deceptive sales, not deceptive merchandise.[15]

The pre-programmed functions, however, are simply part of the alleged deceptive sales. The State alleges that Google failed to honestly disclose how all of the functions on the merchandise work. As such, the State's claim is not that the merchandise is deceptive. Rather, Google's failure to accurately and fully disclose how the merchandise works is allegedly deceptive.

The State has alleged more than just post-sale conduct. Moreover, the post-sale conduct has at least an arguable connection to conduct that was part of the sale process. Fact issues are raised; Google's Motion must be denied.

**Nexus to the Sale or Advertisement of Apps**

The second type of sale involves the consumer's ongoing use and interaction with Google's apps and services. According to the State, each time a consumer uses a Google service, like Search or Maps, there is a "sale." The consumer receives the use of the service (the merchandise) in exchange for personal location data (the consideration). Through deceptive disclosures, Google allegedly misleads users into believing that it will only collect and use tracking information data in certain ways and that users have control over what information is collected.

The State contends that these alleged ongoing transactions, which take place every time a consumer interacts with one of Google's apps, should be considered "in connection" with a sale, under a broad construction of the ACFA. *See Schmidt,* 139 Ariz. at 511; *Conway,* 438 S.W.3d at 415. Each time the user interacts with these apps and services, Google allegedly takes more than what users understood they bargained for. *See State ex re. Horn v. AutoZone, Inc.,* 229 Ariz. 358, 36-62, ¶ 14 (2012).

Google contends, however, that, because it provides use of its apps "free" of charge, the transactions are gratuitous and not actionable under the Act. The Act, however, applies to any sale of merchandise or services for "any consideration". A.R.S. § 44-1521(7). There is no requirement that a monetary fee be charged for a transaction to be actionable.

According to the State, Google's apps and services were not actually free; rather, they were "sold" to users, despite ostensibly being "free," because there was an exchange of consideration

---

[15] *Waste Mfg. & Leasing Corp. v. Hambicki*, 183 Ariz. 84, 88-89 (App. 1995), does not support Google here. In that case, the Court of Appeals held that the sale of all the assets of an existing business to another existing business was not a sale of merchandise under the Act. The Court held only that the sale of virtually all of the assets of a business was beyond the intended scope of the Act.

in the form of data collection from users. Providing location data, in exchange for use of apps or other servicers, can certainly be considered valuable consideration under the Act. *See Best Choice Fund, LLC v. Low & Childers, P.C.*, 228 Ariz. 502, 513, ¶ 41 (App. 2011), *as amended* (Jan. 6, 2012) ("'Consideration' is generally defined as 'any benefit to the promisor or detriment to the promisee.'"); *Calhoun v. Google LLC,* 526 F. Supp. 3d 605, 631-32 (N.D. Cal. 2021) (holding that Google's terms of service, including its privacy notice, formed an actionable contract between Google and the users).

Location information is clearly valuable to Google's business model, as Google uses the information to make targeted ad placements, for which advertisers pay a premium. Google's contention that providing location data is not valid consideration, because providing the information is optional, or because users are required to provide the information anyway, raises issues of fact that cannot be resolved on this Motion.

Google compares the provisions of its apps and services to free newspapers, broadcast radio and local television stations, which provide services free to consumers. The comparison is not apt. Freenewspapers and broadcast radio and television are financed through untargeted advertising.[16] Newspapers and broadcast radio do not condition their services on receiving something "back" from the consumer. In contrast, Google allegedly takes user location information in exchange for the use of its apps and services and uses that same information to direct advertising targeted toward specific users. This is arguably an exchange of consideration.

Google's contention that there is no consideration because providing location information is optional raises a fact question for trial. Whether or not providing location information is truly optional must be determined by the trier of fact.

Google also asserts that "not every exchange of consideration" is a "sale" under the Act and argues that "sale" should be limited to situations where property is transferred for a price.[17]

---

[16] Google's argument that the AG's own website is somehow comparable is a huge stretch and not remotely persuasive. The claim against Google is that it deceptively takes information from consumers and monetizes that information by selling targeted advertising. The operation of a government website that provides information about the AG's operations and services to citizens and other interested parties is in no way comparable, even if the website does track IP addresses of its visitors. The State is not taking information from "consumers" and using that information to make profit.

[17] The Texas case cited by Google turned on the issue of reliance. In *Doe v. Boys Clubs of Greater Dallas, Inc.,* 868 S.W.2d 942, 955 (Tex. App. 1994*), aff'd*, 907 S.W.2d 472 (Tex. 1995), the court affirmed the grant of summary judgment on the consumer protection claim, finding no evidence that the minor's grandmother relied on any statements about an investigation. Reliance is not an element of the claim here. Further, *Wheeler v. Sunbelt Tool Co.*, 537 N.E.2d 1332, 1346 (1989), has no relevance here. In *Wheeler,* the court dismissed the consumer fraud claim because the misrepresentation was not the proximate cause of the injury. The quote from *Wheeler* in Google's Reply, that a sale is

Google's argument is contrary to the notion that the Act is remedial and should be broadly construed. *Green Acres* 127 Ariz. at 164.

The Act broadly defines "sale" to mean "*any* sale" of "*any* merchandise for *any* consideration." A.R.S. § 44-1521(7) (emphasis added). "Sale" is not limited to a transfer of title. "Merchandise" includes "intangibles" and "services." A.R.S. § 44-1521(5).[18] As such, the Act can cover transactions involving the exchange of information or data for use of a service, as the State has alleged here.[19]

There is, at a minimum, an issue of fact as to whether use of the apps represents an exchange of consideration and, therefore, a sale. There is a tenable claim that the consumer is provided a service in exchange for information data. Therefore, there is a plausible claim that the exchange is in connection with the sale of merchandise.

**Nexus to Sale of Third-Party Advertisements**

The third type of sale alleged by the State involves Google's sale of targeted advertising to third parties. According to the State, Google makes money by selling advertising and providing that advertising to users of its apps and associated products. The advertising is targeted, based on a user's location. Advertisers bid more for targeted ad placements. The State essentially alleges that Google tricks consumers out of their confidential location information, and then profits from that deception, through its advertising practices. Accordingly, the State contends that the sale of ad placements to third parties based on deceptively obtained location data is part of the actionable deceit at issue.

The State does not claim that Google deceives or acts unfairly with regard to advertisers. Thus, the advertisers are not the people or consumers that are allegedly deceived. Nor is the State alleging that the ads themselves are deceptive. Rather, the State's theory is that Google deceives one group of people—users of its services—about the collection and use of their location data, and then uses that data to secure ad purchases from an entirely separate group of people—advertisers. According to the State, Google deceptively obtains location data and uses that data to sell

---

a "transfer of title in exchange for consideration," is taken out of context. The quote concerned the warranty claim and had nothing to do with the consumer fraud claim. *Id.* at 1339.

[18] *Enyart v. Transamerica Ins. Co.,* 195 Ariz. 71, 78, ¶ 19 (App. 1998), cited by Google, is not helpful. *Enyart*, without discussion or citation to authority, stated only that a settlement agreement was not a sale under the Act. That conclusion has no application here.

[19] The cases Google cites have no relevance to the issue here. *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1130 (W.D. Wash. 2012), and *Wofford v. Apple, Inc.,* No. 11-CV-0034 AJB NLS, 2011 WL 5445054, at *2 (S.D. Cal. Nov. 9, 2011), stated that "free" software updates were not "sales." The question here is not whether free software updates are sales. Rather, the issue is whether an exchange of location information for Google's services provided in apps can constitute consideration for a sale under the Act.

advertising. As such, the deception is allegedly "in connection with" a sale of the advertising. *See Powers*, 229 Ariz. at 561, ¶ 19.

The State claims Google is a matching business. It matches users of its services with targeted third-party advertisers. This "two-sided platform" is, according to the State, one cohesive sale involving the consumer. The sale to the advertiser would not exist, but for the deceitful taking of the location data.

The State has not cited a single case in the consumer fraud or general fraud context that has adopted or even discussed the "two-sided platform" theory. The State relies solely on *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2286 & n.8 (2018), an antitrust case, in which the United States Supreme Court held that the two-sided market for credit card transactions should be analyzed as a single cohesive transaction to determine whether the credit card company's conduct had anticompetitive effects. The Supreme Court stated that two-sided platforms are "best understood as supplying only one product— transactions -- which is jointly consumed by a cardholder and a merchant." In the credit card market, the two-sided platform consists of the cardholder, who uses the payment card, and the merchant, who accepts the card as payment. *Id.*

In the credit card context, the customer and the merchant have direct interaction in the exchange of payment for goods and services. The credit card company facilitates the transaction.

Google does not, however, facilitate a transaction between a user and an advertiser. Device users use Google's apps to obtain desired information through the app, not to enter into a transaction with an advertiser.

Google contends that the State's position that sales to ad purchasers, temporally and factually removed from the deceptive practices concerning consumers, are not actionable. Google argues that the Act requires a direct misstatement in connection with a sale - either from the defendant or about the defendant's products.

Google cites *State Farm Fire & Cas. Co. v. Amazon.com Inc.,* No. CV-17-01994-PHX, 2018 WL 1536390, at *5 (D. Ariz. Mar. 29, 2018), which involved a claim by a subsequent buyer of a home who was not privy to the misrepresentations made to the original buyer. *Amazon,* however, is not directly instructive to the question here, which is whether Google's use of the deceptively obtained data to sell advertising to others is an essential, related part of a consumer transaction.

The State contends that there is a sufficient nexus because Google uses location information in advertising—albeit not advertising of its own products. The State submits that it is not possible to really separate the advertising sales from the alleged deceptive collection of location

data. The alleged deception is necessary, according to the State, to enable location data to be acquired, which is in turn essential to the sale of advertising to third parties.

Indeed, the deception is essential to Google's business model, as up to 95% of its ad business is targeted to location data. The revenue from the advertising allows Google to provide "free" services and apps. In other words, the deceptive collection of location data, through the provision of various apps and services, is integral to Google's business of selling targeted ad placements. One could not exist without the other. Therefore, according to the State, they both must be considered together as a single congruent transaction, in determining whether there has been deception in connection with a sale or advertising.

As the Court has previously stated, the notion that the requisite sale under the ACFA can be a sale to someone other than a consumer is counterintuitive. The purpose of the Act is to protect consumers.

As discussed above, the ACFA does not cover all deceit. Rather, it encompasses only deceit "in connection with" the sale or advertising of merchandise. The fact that Google uses location information, allegedly obtained by deceit, to sell advertising to advertisers, geographically and temporally removed from the consumer transaction, does not render the original consumer transaction to have been "in connection with" the sale or advertising of merchandise.

There is no support for the State's theory in the wording and intent of the Act. The wording of the statute expressly requires the use of deception "in connection with" a sale or advertising, irrespective of whether the claim is brought by the State or a private party. A.R.S § 44-1522(A). Although the Act is intended to be given broad application "to eliminate unlawful practices in merchant-consumer transactions", *Madsen*, 143 Ariz. 614 at 618, no court has expanded it to sales, not even alleged to be deceptive, to someone other than a consumer.

The Court finds that the State's "two-sided platform" theory is not legally or factually plausible in the context of a consumer fraud claim. There is an insufficient nexus between the alleged deceit of consumers and sale of advertising to third parties, as a matter of law.

The "two-sided" platform theory does not give rise to a consumer fraud claim. If there were no fraud or deceit in connection with the original sales to consumers or in connection with the use of apps, then clearly the "two-sided" platform theory would not give rise to a claim, because there would have been no fraud or deceit at all. A "sale" a third party, that involved no deceit, cannot give rise to a claim.

That does not necessarily mean, however, that the sale of advertising to third parties will not be admissible at trial. The sale of advertising to third parties is part of the entire "story" of why

and how Google (allegedly) engages in the deceit. As such, sales of advertising could be relevant at trial. The Court does not make any final ruling on admissibility at this time. Such a determination will have to await pre-trial and trial proceedings.

**DISPOSITION**

Google's Motion for Summary Judgment is granted in part and denied in part. The Motion is granted as to the State's theory that the sale of ad placements to third parties is connected to a consumer sale. The Motion is denied in all other respects. As noted above, the fact that the sale of advertising to third parties does not give rise to a consumer fraud claim does not necessarily mean that it is not relevant.

# EXHIBIT B

ELECTRONICALLY FILED
CLEBURNE COUNTY CIRCUIT COURT
HEATHER SMITH, CIRCUIT CLERK
2024-May-15 12:13:00
12CV-23-65
C16D01 : 15 Pages

## IN THE CIRCUIT COURT OF CLEBURNE COUNTY, ARKANSAS
### CIVIL DIVISION

STATE OF ARKANSAS, ex rel.
TIM GRIFFIN, ATTORNEY                                          **PLAINTIFF**
GENERAL

v.                                     Case No. 12CV-23-65

TIKTOK INC.; TIKTOK PTE.
LTD.; BYTEDANCE INC.; and                                     **DEFENDANTS**
BYTEDANCE LTD.

---

### ORDER DENYING DEFENDANTS'
### MOTION TO DISMISS

---

Before the Court is the Defendants' Motion to Dismiss the State's First Amended Complaint. The matter has been fully briefed, and this Court held a hearing on the Motion on February 7, 2024. For the reasons set forth below, Defendants' Motion to Dismiss the First Amended Complaint is **DENIED**.

### I. PROCEDURAL HISTORY

The State filed its original Complaint on March 28, 2023. On June 13, 2023, Defendants moved to dismiss the State's original Complaint. The State responded to the Defendants' Motion to Dismiss on August 9, 2023. On August 18, 2023, the Defendants filed a Motion for Protective Order, Stay of Discovery, and Extension of Time pending disposition of their Motion to Dismiss.

On October 4, 2023, the State filed its First Amended Complaint. On November 8, 2023, the Defendants moved to dismiss the First Amended Complaint. The State responded to the Defendants Motion to Dismiss the First Amended Complaint on December 1, 2023. The Court held a hearing on the Motion to Dismiss the First Amended Complaint on February 7, 2024. At

the hearing, the Court requested that each party prepare a proposed order concerning Defendants' Motion to Dismiss the First Amended Complaint. The Court also stayed discovery until it ruled on Defendants' pending Motion to Dismiss the First Amended Complaint.

## II. LEGAL STANDARD

When presented with a motion to dismiss, a court must treat the facts alleged in the complaint as true and view them in the light most favorable to the non-moving party. *Perry v. Baptist Health*, 358 Ark. 238, at 244–248, 189 S.W.3d 54, 57–60 (2004). All reasonable inferences must be resolved in favor of the complaint, and the pleadings are to be liberally construed. *Id.* In determining whether to dismiss, it is improper for the court to look beyond the complaint. *Battle v. Harris*, 298 Ark. 241, at 243, 766 S.W.2d 431, 432 (1989); *Smith v. Eisen*, 97 Ark. App. 130, 138–39, 245 S.W.3d 160, 168 (2006). Thus, the court may dismiss only where the complaint fails to include "(1) a statement in ordinary and concise language of facts showing that the court has jurisdiction of the claim and is the proper venue and that the pleader is entitled to relief, and (2) a demand for the relief to which the pleader considers himself entitled." Ark. R. Civ. P. 8(a). Arkansas's appellate courts have further noted that the standard imposed upon the pleading party is "lenient." *Clayton v. Batesville Casket Co., Inc.*, 2015 Ark. App. 361, at 6, 465 S.W.3d 441, 445.

## III. ANALYSIS

Defendants have moved to dismiss on several grounds. First, Defendants argue that this Court does not have personal jurisdiction over each of the Defendants. Second, Defendants argue that the State has not pleaded the essential elements of a violation of the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-101 *et seq.* Third, Defendants argue that Section 230 of the Communications Decency Act bars the State's claims. Finally, Defendants argue that

the State's unjust enrichment claim fails a matter of law. The Court will address each of these arguments in turn.

*I.*      *This Court has specific personal jurisdiction over the Defendants.*

Defendants argue that they have not purposefully availed themselves of doing business in Arkansas. Arkansas courts have personal jurisdiction to the maximum extent allowed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Lawson v. Simmons Sporting Goods, Inc.*, 2019 Ark. 84, at 6, 569 S.W.3d 865, 869–70 (citing Ark. Code Ann. § 16-4-101(A–B)). In order to establish specific personal jurisdiction: (1) the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) the cause of action must arise from or relate to the defendant's contacts with the forum state; and (3) the acts of the defendant or consequences caused by the defendant must have substantial enough connection with the forum state to make the exercise of personal jurisdiction over the defendant reasonable. *Id.* at 9–10, 569 S.W.3d at 871 (citing *Ficarelli v. Champion Petfoods USA, Inc.*, No. 3:18-cv-00361, 2018 WL 6832075, at *3 (M.D. Tenn. Dec. 28, 2018)). The Court finds that the State's First Amended Complaint pleads sufficient facts to establish specific personal jurisdiction over the Defendants.

First, Defendants have purposefully availed itself of the privilege of doing business in Arkansas because Defendants "serve[] a market for a product" in Arkansas, namely, the market for social media applications. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1022 (2021). The TikTok app has been downloaded at least hundreds of thousands of times in Arkansas. First Am. Compl. ¶ 21. Defendants are serving content to and collecting data from all of those devices and accounts located in Arkansas. First Am. Compl. ¶ 21. The State has also alleged that Defendants know and rely on the location of its Arkansas users to target them with

content and advertisements, creating an Arkansas-specific experience inside the TikTok app. First Am. Compl. ¶¶ 22–24. In this way, Defendants have designed its app to encourage Arkansas users to return to the app frequently and for long durations, which increases Defendants' ability to earn advertising revenue. First Am. Compl. ¶¶ 22–23, 48, 51. All this activity is in service of continuing bilateral contractual relationships that Defendants have entered into with at least hundreds of thousands of Arkansas users—relationships that the State alleges many Arkansans would not have agreed to absent the deceptive statements that are the subject of this lawsuit. *See, e.g.*, First Am. Compl. ¶ 13, 31, 62, 66, 69, 218; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985) (finding purposeful availment where a defendant "has created 'continuing obligations' between [it]self and residents of the forum," including when "transacted solely by … wire communications").

In addition, Defendants have availed themselves of the financial rewards of operating within the State of Arkansas. First Am. Compl. ¶ 25. For the period of May 1 through August 31, 2023, Defendant TikTok, Inc. reported to the Arkansas Department of Finance and Administration taxable sales in Arkansas of $1,808,956 and state and local remittances of vendor use taxes totaling $70,313. First Am. Compl. ¶ 26. Defendant TikTok, Inc. also has employees located in Arkansas. First Am. Compl. ¶ 27. In 2021, TikTok, Inc. employed two people in Arkansas with combined wages of $567,874.71. First Am. Compl. ¶ 27 In 2022, TikTok, Inc. employed five people in Arkansas with combined wages of $547,395.32. First Am. Compl. ¶ 27. Defendants are also doing business *with the State of Arkansas*. First Am. Compl. ¶ 32. Over the past five years, Defendants have sold $284,967.06 in advertising to the Arkansas Department of Health that was, in part, estimated to reach 500,000 English-speaking TikTok users ages 13–24 located in the State of

Arkansas in one instance and 300,000 TikTok users ages 16–24 located in the State of Arkansas in another. First Am. Compl. ¶ 32.

Defendants have also targeted Arkansas as a market for TikTok. First Am. Compl. ¶ 34. They have awarded grant money to Arkansas educators as part of their effort to persuade Arkansas parents that TikTok is safe and appropriate for young people. First Am. Compl. ¶ 34. TikTok has internally identified Arkansas as a "Key Market[]," for "pushing our safety narratives among parenting audiences" and "[d]riv[ing] perception among elite audiences of TikTok as a place where parents feel comfortable for their teens, and want to join." First Am. Compl. ¶ 34. An internal TikTok document specifically lists Arkansas as one of the places where TikTok seeks to "[b]uild trust and establish TikTok as a safe and welcoming place for parents, families, and teens to create, share, and watch videos." First Am. Compl. ¶ 34.

Defendants dispute that these contacts constitute "purposeful availment" because in its view, Defendants' allegedly unlawful actions and allegedly deceptive statements and omissions did not occur in Arkansas and did not specifically target Arkansas. Def.'s Br. in Supp. of Mot. to Dismiss at 12–14. Defendants misunderstand the relevant legal test, however, and cannot hide behind the scale of its business operations to evade personal jurisdiction in Arkansas.

"[W]hat matters" for specific personal jurisdiction "is [TikTok's] structuring of its own activities so as to target the [Arkansas] market." *NBA Props., Inc. v. HANWJH*, 46 F. 4th 614, 624 (7th Cir. 2022). The fact that Arkansans have downloaded the TikTok app is not the "result of random, fortuitous, or attenuated contacts." *Id.* (quoting *Burger King Corp.*, 471 U.S. at 475). It is the direct result of Defendants' business and how it has "structured" its operations to "invite" downloads in Arkansas, as detailed above. *NBA Props.*, 46 F. 4th at 625; *see also Doffing v. Meta*, 2022 WL 3357698, at *4 (D. Or. July 20, 2022). Defendants expected, if not encouraged, the

Arkansas contacts that give rise to this case: representations to Arkansas consumers about the safety of the TikTok app and the accessibility of users' digital data. These representations induced Arkansans to enter into continuous bilateral contracts with Defendants that provided the company with the valuable consideration it seeks—user data in exchange for the use of its app. This data allows Defendants to target Arkansans with location-based advertisements, which are central to their business model. Moreover, Defendants' collection of data and targeted advertisements depends on minors' consistent use of the app. Thus, TikTok's alleged addictiveness is also central to its contacts with Arkansans.

Second, the State's claims "relate to" Defendants' contacts with Arkansas. *Ford Motor Co.*, 141 S. Ct. at 1025–26. Arkansans download the TikTok app in the Apple App Store, Google Play Store, or Microsoft Store. *E.g.*, First Am. Compl. ¶ 3–8, 13–17, 52–69. When they do, they are presented with Defendants' allegedly false age-rating representations. *Id.* Every Arkansas user therefore receives this information when they consider whether to download the TikTok app, and that means that these allegedly false and deceptive representations and omissions relate to Defendants' contacts with Arkansas—the thousands of Arkansas user downloads of the TikTok app.

Third, as a global company doing business throughout the United States, it is entirely reasonable for TikTok to expect that it could be haled into court in Arkansas, especially considering TikTok profits handsomely off Arkansas minors. TikTok does not dispute this aspect of the specific personal jurisdiction analysis. Further, Arkansas has a strong interest in providing a forum for the adjudication of claims under the Arkansas Deceptive Trade Practices Act, a broad remedial statute. The Court finds that the State has pleaded sufficient facts to establish specific personal jurisdiction over Defendants.

2.      *The State has pleaded claims under the Arkansas Deceptive Trade Practices Act.*

Defendants claim that the State's ADTPA claims fail for several reasons. First, Defendants claim that their questionnaire responses for the TikTok platform, its age ratings, its public statements, and its statements about Restricted Mode are statements of subjective opinion that cannot lead to liability under the ADTPA. Def.'s Br. in Supp. of Mot. to Dismiss at 22. Defendants also claim the State has not alleged that the questionnaire responses and statements about Restricted Mode are false or misleading in any material respect. *Id.* Defendants further argue that the State's claim based on the platform's addictiveness fails because the State has not alleged a consumer-oriented act that is misleading in a material respect, nor an actionable omission. *Id.* Finally, Defendants claim that all of the State's ADTPA claims must be dismissed because the TikTok app is not a good or service or that Defendants' acts were "consumer-oriented." *Id.* For ease of reference, the Court references the below table that outlines the State's claims.

| Count # | Claim Description | Statutory or Legal Basis |
|---|---|---|
| Count I | Misrepresentation as to Alcohol, Tobacco, and Drug References | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count II | Misrepresentation as to Sexual Content and Nudity | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count III | Misrepresentation as to Mature and Suggestive Themes | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count IV | Misrepresentation as to Profanity and Crude Humor | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count V | Misrepresentation as to 12+ Age Rating in the Apple Store | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |

| Count # | Claim Description | Statutory or Legal Basis |
|---|---|---|
| Count VI | Misrepresentation as to the T for Teen Rating in the Google Play and Microsoft Stores | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count VII | Cumulative Deceptive Representations | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count VIII | Misrepresentation as to Restricted Mode | Ark. Code Ann. § 4-88-107(a)(1), (10) |
| Count IX | Deception and Omission of Material Facts Related to Content and Age Ratings | Ark. Code Ann. § 4-88-108(a)(1–2) |
| Count X | Deception and Omission of Material Facts from TikTok's Community Guidelines | Ark. Code Ann. § 4-88-108(a)(1–2). |
| Count XI | Addictiveness— Unconscionability, Misrepresentations, and Omissions | Ark. Code Ann. § 4-88-107(a)(1), (10), (12) |
| Count XII | Unjust Enrichment | Common Law |

## A.    The TikTok App is a service under the ADTPA.

The ADTPA applies to "services," among other things, and defines "services" as "work, labor, or other things purchased that do not have physical characteristics." Ark. Code Ann. § 4-88-102(7). Notably, the ADTPA does not define "purchase." *See id.* The State has adequately alleged that the TikTok app is a service. Although Defendants do not charge a monetary fee for the use of the TikTok app, users provide valuable consideration to TikTok—their data. First Am. Compl. ¶ 31. Consumers agree, by bilateral contract, to provide their valuable personal data to Defendants in return for their use of the TikTok app. *E.g.*, First Am. Compl. ¶¶ 21–24, 51, 181–89. This

contractual exchange is central to TikTok's business model. *E.g.*, First Am. Compl. ¶¶ 11, 31, 51, 181. The State has adequately pleaded that the TikTok app is a "service" under the ADTPA.

**B.    Defendants' alleged misrepresentations in Counts I through X are actionable under the ADTPA.**

The Court concludes that the State has pleaded sufficient facts to show Defendants' misrepresentations were specific, concrete, and actionable under the ADTPA. Defendants ask this Court to hold that the words "infrequent, frequent, mild, intense, and safe" are inherently subjective and thus constitute non-actionable statements of opinion. Even assuming *arguendo* that some exception for statements of opinion exists in the ADTPA, Defendants' argument is belied by the specific facts alleged in the First Amended Complaint. For example, the State's First Amended Complaint alleges that material such as videos related to "pegging" are rampant on TikTok. *E.g.*, First Am. Compl. ¶ 95. It strains credulity to suggest that minors should view content related to pegging—a point Defendants themselves cannot seriously dispute given the content of their Community Guidelines. Words like "infrequent, frequent, mild, intense, and safe" are not inherently subjective and relative, but instead turn on context and relevant facts. For example, it is a fact, not an opinion, that bleach is not safe for use on hands. *See, e.g., Thompson v. Proctor and Gamble Co.*, No. 18-CV-60107, 2018 WL 5113052, at *2 (S.D. Fla. Oct. 19, 2018). Similarly, the State challenges specific, concrete, and factual representations that Defendants have made about the safety of its product; these representations are central to its business model. Said simply, it is not possible to paint words such as "infrequent, frequent, mild, intense, and safe" in one broad stroke as Defendants request.

The same is true for the age ratings. The State has alleged that the age ratings are important to get minors on its platform and secure Defendants' profits. *E.g.*, First Am. Compl. ¶ 11. Defendants tell people that the TikTok app is safe for minors—specifically, those 12+—through

its age ratings. First Am. Compl. ¶ 12. Yet even Apple itself has told Defendants that TikTok contains frequent or intense mature content. First Am. Compl. ¶ 15. Undoubtedly, any consumer who views the age ratings, which are based on Defendants' own assertions about their product, is entitled to rely on them when they decide what is appropriate for themselves or their children. In fact, the State alleges that Defendants tout their app store age ratings in public statements. First Am. Compl. ¶ 65. In other words, the State alleges that Defendants *want* consumers to treat these age ratings as conveying concrete, factual information on which they can rely.

Defendants also claim that the State must prove just how "frequent" inappropriate content is in order to successfully challenge the alleged misrepresentations. Def.'s Br. in Supp. of Mot. to Dismiss, at 31–32. First, the State has repeatedly alleged that several categories of mature content on TikTok is not "infrequent," as TikTok claims. *See, e.g.*, First Am. Compl. ¶¶ 12, 16–17, 18–19, 20–21. On a motion to dismiss, that allegation is sufficient to establish that Defendants have made a deceptive or false statement. Defendants' objection goes to the *degree* of falsity or deception, which is not necessary for the State to establish at this early stage. This is a motion to dismiss and not a motion for summary judgment. The State is not required to plead this level of detail at this stage of the litigation. Second, because the State challenges Defendants' claim that certain mature content on the TikTok app is "infrequent/mild," the State can show that the inappropriate content is *either* frequent *or* intense to allege deception or falsity. In other words, the State can establish that the inappropriate content is intense regardless of its frequency. The State has pleaded sufficient facts alleging that the TikTok app contains intense content in several mature categories. *E.g.*, First Am. Compl. ¶¶ 80, 94–98. Third, the State has alleged that TikTok places users in filter bubbles that cause some users to be bombarded by a large volume of mature content. First Am. Compl. ¶ 145–148. The overall proportion of mature content on TikTok as a

whole is irrelevant to users who fall into such filter bubbles and see frequent, intense mature content as a result.

Finally, the State has pleaded sufficient facts to show that Defendants' promotion of Restricted Mode deceives Arkansas consumers. *E.g.*, First Am. Compl. ¶¶ 170–177. While Defendants ask this Court to weigh the facts at this stage, it is inappropriate to do so. *See* Def.'s Br. in Supp. of Mot. to Dismiss, at 35–37. Defendants may disagree with the State's assertions in its First Amended Complaint, but they are sufficient to proceed to discovery.

The bottom line is that the State has pleaded sufficient facts to show that Defendants' representations are actionable under the ADTPA and has plausibly stated a claim that Defendants violated the ADTPA. For these reasons, the Court denies Defendants' Motion to Dismiss as to Counts I through X.

### C.     Count XI, the State's addictiveness claim, is actionable under the ADTPA.

Defendants claim that the State's addictiveness claim must be dismissed because "claims of omission" cannot be brought under Ark. Code Ann. § 4-88-107(a). Def.'s Br. in Supp. of Mot. to Dismiss, at 38. Defendants, however, mischaracterize the State's claim. The State clearly pleaded its addictiveness claim under the umbrella of unconscionability, misrepresentation, and omissions. First Am. Compl. ¶ 369. The State pleaded its addictiveness claim under Ark. Code Ann. § 4-88-107(a), not Ark. Code Ann. § 4-88-108. *Id.* Therefore, the Court rejects Defendants' attempt to apply the materiality requirement found in Ark. Code Ann. § 4-88-108 to the State's addictiveness claim. Def.'s Br. in Supp. of Mot. to Dismiss, at 38. Nevertheless, despite Defendants' claims, Ark. Code Ann. § 4-88-107 *et. seq.* covers omissions. *See* Ark. Code Ann. § 4-88-107(a) ("Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, *but are not limited to*, the following. . .").

An act is unconscionable if it affronts the sense of justice, decency, and reasonableness. *Gulfco of Louisiana, Inc. v. Brantley*, 2013 Ark. 367, at 9, 430 S.W.3d 7, 13 (citing *Baptist Health v. Murphy*, 2010 Ark. 358, at 27, 373 S.W.3d 269, 287). The State has pleaded sufficient facts that show Defendants created and marketed a purposefully addictive app that was designed to harm children for its own profit. This is an unconscionable business or trade practice under the ADTPA. *E.g.*, First Am. Compl. ¶¶ 189–90, 363–372.

Moreover, the State has sufficiently pleaded that Defendants misled people about the safety of its app for minors. Despite Defendants' assertions of safety, the State alleges that Defendants know minors are especially susceptible to addiction and the mental health harms associated with addiction to the app. First Am. Compl. ¶¶ 367–69. In addition, despite knowing about the app's addictiveness, Defendants continued tailoring their app to optimize the time users spent using it, including by adopting "many coercive design tactics that detract from user agency such as infinite scroll, constant notifications, and the 'slot machine' effect," and it did so while knowing that minors would be "particularly sensitive" to these features and would have "minimal ability to self-regulate effectively" when confronted with them. First Am. Compl. ¶¶ 181–86. Defendants' assertion that "addiction" cannot be defined rings especially hollow given that Defendants' own documents describe this problem with the TikTok app. First Am. Compl. ¶¶ 188–90.

Finally, the State has pleaded sufficient facts showing Defendants should have disclosed TikTok's addictiveness to minors—a fact that Defendants have internally studied, analyzed, and acknowledged. *E.g.*, First Am. Compl. ¶ 189. These facts, if proven, would affront a sense of justice, decency, and reasonableness. The State has thus plausibly alleged an unconscionable business or trade practice under the ADTPA. *E.g.*, First Am. Compl. ¶¶ 189–90, 363–372. The Court denies Defendants' Motion to Dismiss as to Count XI.

3. *The State has alleged sufficient facts that show Defendants engaged in facilitation that states a claim under Ark. Code Ann. § 4-88-107(a)(12).*

Defendants argue that the State has not alleged sufficient facts that show Defendants engaged in facilitation to state a claim under Ark. Code Ann. § 4-88-107(a)(12). This Court has found that the State has pleaded sufficient facts that show Defendants violated the ADTPA. Therefore, the Court finds that the State has pleaded sufficient facts that show facilitation under the ADTPA.

4. *Section 230 of the Communications Decency Act does not bar the State's claims.*

Defendants argue that they are immune from suit under Section 230 of the Communications Decency Act, 47 U.S.C. § 230, but Section 230 does not bar the State's claims. Section 230 protects providers of Internet services from liability for content created by "*another* information content provider." 47 U.S.C. § 230(c)(1). Under Section 230, an internet service provider like TikTok is not "legally responsible for information that third parties created" and is "liable only for speech that is properly attributable to" it. *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 1997)); *see also Demetriades v. Yelp, Inc.*, 175 Cal. Rptr. 3d 131, 145 (Cal. Ct. App. 2014). Here, Defendants made their age-rating and content representations themselves. The First Amended Complaint is agnostic on whether TikTok should contain frequent and intense content about drugs, alcohol, tobacco, sex, nudity, and profanity. The First Amended Complaint demands only that TikTok be honest with consumers about what content the app contains. That does not come within the purview of Section 230.

Likewise, the State's claims relating to the TikTok app's addictiveness are not barred by Section 230. Defendants represent to consumers that the TikTok app is safe for minors. Yet,

Defendants know from their own studies that the app's addictive nature harms minors. Here again, the State is not attempting to hold Defendants liable for the content on the platform. The State's allegations establish that Section 230 of the Communications Decency Act does not bar the State's claims.

5.    *The State has pleaded sufficient facts to support Count XII, its unjust enrichment claim.*

Defendants claim that the State's unjust enrichment claim should be dismissed because a contract exists between the users of the TikTok app and the Defendants. Def.'s Br. in Supp. of Mot. to Dismiss, at 48. The State has alleged that the alleged contracts, the Terms of Service, were wrongfully induced due to Defendants' misrepresentations about the safety of the TikTok app for minors. Pl.'s Resp. to Def.'s Mot. to Dismiss, at 38. Defendants retort that, even if true, that would make the contracts *voidable*, not void, and an unjust enrichment claim cannot lie where a contract is merely voidable. That question of substantive contract interpretation would require the Court to weigh facts and, ultimately, make a factual determination as to the nature of the contracts between Defendants and Arkansas users. That determination is not appropriate for a motion to dismiss. At this point, given the totality of the allegations in the State's First Amended Complaint, this Court finds that the State has pleaded sufficient facts to support a claim for unjust enrichment. This Court denies Defendants' Motion to Dismiss as to Count XII.

**IV. CONCLUSION**

At this stage, this Court declines to weigh the evidence. This Court must take the State's allegations as true and view them in a light most favorable to the State. The State has pleaded sufficient facts to establish specific personal jurisdiction. Defendants target Arkansas minors and profit substantially off their data. There is nothing unfair or unexpected about Defendants being subject to this Court's jurisdiction. Moreover, the State has pleaded sufficient facts to show that

Defendants violated the ADTPA and to state a claim for unjust enrichment. Finally, Section 230 does not bar the State's claims. Defendants' Motion to Dismiss is denied in its entirety.

**IT IS SO ORDERED.**

THE HONORABLE HOLLY L. MEYER
16th Circuit Judge, Division 1

*May 15, 2024*

Prepared by:
Matthew M. Ford, Ark. Bar No. 2013180
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201-2610
Telephone: (501) 320-3069
Fax: (501) 682-8118
Matthew.Ford@ArkansasAG.gov

*Counsel for Plaintiff*

# EXHIBIT C

### IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| STATE OF IOWA, ex rel. ATTORNEY GENERAL BRENNA BIRD,<br><br>     **Plaintiff,**<br><br>**v.**<br><br>TIKTOK INC., TIKTOK LTD., TIKTOK PTE. LTD., BYTEDANCE LTD., and BYTEDANCE INC.,<br><br>     **Defendants.** | Case No. EQCE089810<br><br><br>**RULING ON DEFENDANT'S MOTION TO DISMISS AND ON PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION** |

### STATEMENT OF THE CASE

On January 17, 2024, the State of Iowa filed this lawsuit against several companies jointly doing business as TikTok, a social media app. The State claimed that defendants are violating the Iowa Consumer Fraud Act (CFA) through misrepresentations, deceptions, false promises, and unfair practices. The State's claims are focused on TikTok's representations that allowed it to receive a 12+ rating on the Apple App Store, which has allowed 13-17 year old Iowans to access content that the State claims is inappropriate for minors. The State seeks injunctive relief, civil penalties, disgorgement of funds and property, court costs, expenses, and attorney fees.

On March 30, 2024, the State filed a motion for temporary injunction. The motion sought to prevent defendants from making certain representations regarding their app during the pendency of this case.

The court held a scheduling conference on April 16, 2024. The parties and the court agreed to a briefing schedule to present the motion for temporary injunction and defendants' expected motion to dismiss. The hearing was on June 16, 2024. The State was represented by Eric Wessan and David Thompson. The defendants were represented by Nicholas Klinefeldt, Emily Ullman, and Neema Sahni.

## STATEMENT OF THE FACTS[1]

According to the petition, defendant TikTok Inc. is incorporated in California and operates a social media application and platform known as TikTok. Defendant TikTok Pte. Ltd. is headquartered in Singapore is nominally listed in the Apple App Store as the "seller" of the TikTok app. Both of those companies are wholly owned by defendant TikTok Ltd., which is incorporated in the Cayman Islands. Defendant ByteDance Ltd., which is incorporated in the Cayman Islands and headquartered in China, is the parent company of TikTok Inc., TikTok Ltd., TikTok Pte. Ltd., and ByteDance Inc. Defendant ByteDance Inc. is incorporated in Delaware and headquartered in California. Because all defendants are related, the court will refer to them jointly as "defendants" and refer to the TikTok application by its trade name.

TikTok is a social media platform that allows users to create and share videos with other users. It was launched globally in 2017 and re-launched in the United States in 2018. TikTok has more than 1 billion users globally. There is a wide variety of content on TikTok, including sports, hobbies, special interests, education, humor, and shared life experiences. Between January 1, 2021 and April 1, 2024, more than 11 billion videos were uploaded on TikTok in the United States alone. Those videos produced more than 33 trillion total views. (Brandenburger declaration, paragraphs 8-14).

The defendants produce revenue through advertising. TikTok Inc. received nearly $4 billion in revenue in 2021 and an estimated $10-12 billion in 2022. Two of the defendants have filed a corporate tax return in Iowa. The State alleged that the defendants can attribute at least millions of dollars in revenue to activities in Iowa. (Petition, paragraphs 16, 20).

---

[1] There is a mix of fact standards because the court is considering a motion to dismiss and a motion for temporary injunction. The motion to dismiss is limited to the facts set forth in the petition. *Haupt v. Miller*, 514 N.W.2d 905, 907 (Iowa 1994). The motion for temporary injunction considers exhibits submitted by the parties. This statement of the facts contains a mix of the two and each will be identified accordingly.

TikTok takes multiple steps to moderate content that is inappropriate. One is through its Community Guidelines which provides guidance as to what is allowed and not allowed on its platform. Among the categories of content not allowed are: "nudity or significant body exposure of young people," "showing or promoting suicide," "physical or psychological abuse of young people," and "harassing and bullying." TikTok also has internal policies called their "playbook rules" to provide guidance to content moderators who enforce the Community Guidelines. (Brandenburger declaration, paragraphs 17-20).

TikTok publishes a quarterly enforcement report documenting the videos removed from the platform. The report for the 4th quarter of 2023 shows that TikTok removed 176,461,963 videos for violating its Community Guidelines during that period. Of those videos, 77.1% were removed before they received any views, 89% were removed within 24 hours of posting, and 96.7% were removed proactively. TikTok also reviews and removes videos that are flagged by users as being in violation the Community Guidelines. Of that group, TikTok removed 92.4% of those videos within two hours of the user's report. (Brandenburger declaration, paragraph 29).

TikTok takes other steps to monitor inappropriate content. It reviews search language that might direct a user to violative content. It tags certain words and phrases to be able to ban links to violative content. It may ban users who violate the Community Standards depending on the number or severity of the violations. It updates its Community Standards and playbook rules periodically to stay up to date on enforcement needs. (Brandenburger declaration, paragraphs 30-35).

TikTok takes the position that its platform is intended for people 13 years of age and older. It employs settings to limit content for people between 13 and 17 years. When people first create an account, they must provide their birthday. If the user is under 13, they are directed to an under 13 platform that contains a limited version of the app. If the user is between 13 and 17, TikTok

3

enables settings to protect them from adult content. There is a Family Pairing feature to allow a parent or guardian to customize safety settings and set a link to their accounts so they can monitor and limit usage and searches. TikTok employs a Content Level system that categorizes content level as appropriate for certain age groups. For example, Level 1 is suitable for all ages. Level 4 may include content containing allusions to sexual activity by adults and is deemed not suitable for minors. TikTok restricts Level 4 content for users between 13 and 17. (Brandenburger declaration, paragraphs 36-43).

A prospective user can download TikTok through third-party app stores, including Apple, Google, and Microsoft.[2] The following images show listings for TikTok on the different app stores.

TikTok on the Google Play Store                    TikTok on the Apple App Store

                    

---

[2] While both parties primarily focus on the Apple App Store, the analysis within this ruling relating to the motion to dismiss also applies to the Google Play Store and Microsoft Store.

TikTok on the Microsoft Store[3]



Apple requires an app developer to respond to an age-rating questionnaire before being accepted to its store. The questionnaire asks the app developer to select the level of frequency for certain content descriptions, including "profanity or crude humor," "mature/suggestive themes," "alcohol, tobacco, or drug use or reference," and "sexual content and nudity." The questionnaire provides three options: 1) none, 2) infrequent/mild, and 3) frequent/intense. Based on the response, Apple assigns one of four age ranges for the app: 4+, 9+, 12+, or 17+. If an app is assigned a 12+ rating, Apple then asks the developer if it nevertheless wants to restrict the app to 17+ users. (Brandenburger declaration, paragraphs 44-46).

TikTok answered "infrequent/mild" to each of the above-referenced content descriptions. Based on the answers, Apple assigned TikTok a 12+ age rating. TikTok did not elect to restrict its app to 17+ users and it was placed in the Apple app store at the 12+ rating. The app store gives the following description of apps in the 12+ rating category:

> Apps in this category may also contain infrequent mild language, frequent or intense cartoon, fantasy, or realistic violence, and infrequent or mild mature or suggestive themes, and simulated gambling, which may not be suitable for children under the age of 12.

The app store gives the following description of apps in the 17+ rating category:

---

[3] Emphasis added to highlight the rating of TikTok on the Apple App Store and the Google Play Store.

> **You must be at least 17 years old to download this app.**
> Apps in this category may also contain frequent and intense offensive language; frequent and intense cartoon, fantasy, or realistic violence; and frequent and intense mature, horror, and suggestive themes; plus sexual content, nudity, alcohol, tobacco, and drugs which may not be suitable for children under the age of 17.

(Brandenburger declaration, paragraphs 44-47; Exhibit 6). TikTok is very popular with users in the 13 to 17 year age group. As of July of 2020, 95% of people with smart phones in that age group had the TikTok app. By comparison, only 51% of the people in the 18 to 24 year age group had the TikTok app. The average user in the 13 to 17 year age group spent 106 minutes per day on TikTok. As of September of 2021, surveys showed that 59 percent of teens felt they needed a screen time management tool even though one existed in the program. (Exhibit 1, ref. 66589; Exhibit 2, ref. 84894).

Beginning October 2, 2023, Alberto Perales, an investigator in the Consumer Protection Division of the Attorney General's Office, began an investigation into TikTok. On that date, he registered as a new TikTok user under the fake name of "Tanner West" with a birthdate of May 5, 2010, which would make him 13 at the time. From October 2-11, 2023, Perales used the TikTok app and conducted searches of topics including profanity, crude humor, sexual content, nudity, alcohol, tobacco, drug use, suicide, depression, self-harm, eating disorders, and other mature themes. Perales compiled videos that he believed to fit these categories and included them in attachments to his affidavit. The court notes that it could not view the videos because the attachment solely consists of a place-holder document stating "Document produced in their native format[.]"  This issue was not discussed by the State at the June 24, 2024.[4]  (Exhibit 7).

---

[4] The parties agreed to the admission of exhibits, so they were largely not discussed or viewed during the hearing. This is often workable in motion hearings or cases tried solely to the court but can be a problem when the judge reviews the record later and questions like this arise. Additionally, there was no exhibit list and the exhibits were not identified during submission, which made exhibit review more challenging. The court considerer bringing this issue to the attention of the parties, but decided to let the record stand as is based on the decisions made in this ruling and the early stage of the proceedings.

The State did play clips of videos at the hearing. These videos and others are quoted or described extensively in the petition, which were taken from the Perales investigation. Jennifer Brandenburger, the defendants' Head of Product Policy, reviewed the videos collected by Perales and offered several responses. First, she noted that Perales collected 204 clips but had viewed 16,600 videos to find them, so the videos collected were a small fraction of those viewed. She agreed that some of the videos violated TikTok's Community Standards and should be removed. She claimed that others met the Community Standards and disagreed they were inappropriate. For example, she pointed out that videos of people discussing struggles with mental health were appropriate to show people discussing "emotionally complex topics in a supportive way." Some of the videos show women singing or lip-syncing songs containing explicit lyrics. TikTok considers such videos to be "mild profanity," even though the language is explicit, because the language is used in an artistic context and the songs themselves are widely available. D0007 at ¶ 55-62, 76-81, 90-94, 99-103. (Exhibit 6A; Brandenburger declaration paragraphs 55-60).

The State contends that TikTok has violated the Iowa Consumer Credit Code by falsely answering questions on the Apple App Store regarding content categories that it classified as mild/infrequent. The State claims TikTok did so to maintain a 12+ rating. Apple has questioned TikTok about this same topic in the past. In December of 2022, Apple informed TikTok that it was out of compliance with its rating system based on a review of some videos accessible to 13-17 year old users during the onboarding process (referring to the process in which a new user creates an account). TikTok responded to Apple's concerns and retained the 12+ rating after modifying its program. The State claims that, while TikTok responded to Apple's concerns, they were limited to onboarding and similar videos are still available on TikTok. (Exhibit 9).

In its motion for temporary injunction, the State requests that the court enjoin TikTok from

7

the following:

> (1) Representing to consumers through their statements to the Apple App Store or elsewhere that the TikTok application contains "none" or only "infrequent/mild" "alcohol, tobacco, or drug references," "sexual content or nudity," "mature/suggestive themes," or "profanity or crude humor;"
>
> (2) Representing to consumers through their statements to the Apple App Store or elsewhere that the TikTok application qualifies for a "12+" age rating;
>
> (3) Stating in the Community Guidelines that TikTok does not allow the promotion of alcohol, tobacco, or drug use.

TikTok contends that the State's request would dramatically impact its brand if forced to represent itself as providing frequent/intense content only appropriate to adults. This would impact its market for users and advertisers. (Motion for temporary injunction; Brandenburger declaration paragraphs 61-69).

The defendants' motion to dismiss argued that this Court lacks personal jurisdiction over the defendants, that the State fails to "allege a cognizable claim for relief" under the CFA, and that the defendants are immune from liability under Section 230 of the Communications Decency Act.

## CONCLUSIONS OF LAW

### I.  **Motion to Dismiss**

#### A.  **Standard of Review**.

In determining whether to grant the motion to dismiss, a court views the well-pled facts of the petition "in the light most favorable to the plaintiff with doubts resolved in that party's favor." *Haupt v. Miller,* 514 N.W.2d 905, 911 (Iowa 1994). A motion to dismiss must succeed or fail exclusively on the contents of the petition. *Id.* "A motion to dismiss admits the allegations of the petition and waives any ambiguity or uncertainty in the petition." *Leuchtenmacher v. Farm Bureau Mutual Ins.,* 460 N.W.2d 858, 861 (Iowa 1990). "The petition should be construed in a light most favorable to the plaintiff with doubts resolved in that party's favor in ruling on the motion." *Sanford*

8

*v. Manternach,* 601 N.W.2d 360, 363 (Iowa 1999).

A motion to dismiss is sustainable only when it appears to be a certainty that the plaintiff would not be entitled to relief under any state of facts that could be proved in support of the claims asserted. *Haupt,* 514 N.W.2d at 911 (citing *Bindel v. Iowa Mfg. Co.,* 197 N.W.2d 552, 555 (Iowa 1972)). Therefore, a motion to dismiss must be on legal grounds. *Robbins v. Heritage Acres,* 578 N.W.2d 262, 264 (Ia. Ct. App. 1998).

### B. **Whether this Court has Personal Jurisdiction.**

It must first be established whether this court has personal jurisdiction to hear this case. A state's ability to exercise jurisdiction over a nonresident is limited by both the Federal Constitution and state law. *Harding v. Sasso*, 2 N.W.3d 260, 264 (Iowa 2023) (citing *Sioux Pharm, Inc. v. Summit Nutritionals Int'l Inc.*, 859 N.W.2d 182, 188 (Iowa 2015)).

Regarding the Federal Constitution, the Iowa Supreme Court has held that the Fourteenth Amendment's due process clause limits a state court's power to exercise jurisdiction over a defendant. *Harding*, 2 N.W.3d at 264 (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021)). A state's authority to exercise jurisdiction over a non-resident is dependent upon the defendant having "contacts" with the forum state, such that the "the maintenance of the suit" is "reasonable, in the context of our federal system of government," and "does not offend traditional notions of fair play and substantial justice." *Id*. (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316-17 (1945)).

Iowa law provides that "[e]very corporation, individual, personal representative, partnership or association that shall have the necessary minimum contact with the state of Iowa shall be subject to the jurisdiction of the courts of this state." Iowa R. Civ. P. 1.306. The Iowa Supreme Court has held that rule 1.306 authorizes the widest possible exercise of personal

jurisdiction allowed under the U.S. Supreme Court's interpretation of the Fourteenth Amendment. *Harding*, 2 N.W.3d at 264; *Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 583 (Iowa 2015); *Sioux Pharm, Inc.*, 859 N.W.2d at 188; *Ostrem v. Prideco Secure Loan Fund, LP*, 841 N.W.2d 882, 891 (Iowa 2014).

There are two kinds of personal jurisdiction: general jurisdiction and specific jurisdiction. *Ford Motor Co.*, 592 U.S. at 358. A state court may exercise general jurisdiction when a defendant is "essentially at home" in the state. *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). The parties agree that this court does not have general jurisdiction.

Specific jurisdiction covers defendants who are not as intimately connected with a state, but it applies to a narrower class of claims. *Harding*, 2 N.W. 3d at 264-65. There do not need to be great contacts to support the exercise of specific jurisdiction the defendant must only take "some act by which [he] purposefully avails [himself] of the privilege of conducting activities within the forum State." *Id.*; *Ford Motor Co.*, 592 U.S. at 358 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The contacts cannot be random, they must be the result of the defendant's own choice. *Ford Motor Co.*, 592 U.S. at 359. When a defendant has sufficient minimum contacts, the forum state has jurisdiction over only a limited set of claims. *Harding*, 2 N.W. 3d at 265. The nonresident defendant can only be sued in the forum state when the claims "arise out of or relate to the defendant's contacts with the forum." *Id.* (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017)).

"If a non-resident defendant has sufficient minimum contacts with the forum state and the claim related to the contact, the court may exercise personal jurisdiction over the defendant." *Id.* Courts may do so only where it would be in accord with notions of "fair play and substantial

justice." *Ostrem*, 841 N.W.2d at 893 (quoting *Cap. Promotions, L.L.C. v. Don King Prods., Inc.*, 756 N.W.2d 828, 834 (Iowa 2008)). When making this determination, the courts focus on the burden of the litigation on the defendant, whether the forum State has an interest in adjudicating the dispute, if the plaintiff has an interest in obtaining convenient and effective relief, the interstate judicial system's interest in efficiently resolving the controversies, and the shared interest of the several states in furthering fundamental substantive social policies. *Id*.

Unlike other grounds for dismissal, however, a court considering a motion to dismiss for lack of personal jurisdiction must make factual findings to determine whether it has personal jurisdiction over the defendant. *Cap. Promotions*, 756 N.W.2d at 832. Those findings are binding if supported by substantial evidence. *Hodges v. Hodges,* 572 N.W.2d 549, 551 (Iowa 1997). It is the plaintiff's burden to make a prima facie showing that the exercise of personal jurisdiction is allowed. *See PSFS 3 Corp. v. Michael P. Seidman, D.D.S., P.C.*, 962 N.W.2d 810, 826 (Iowa 2021). While the plaintiff has the burden to establish jurisdiction may be had over the defendant, "we accept as true the allegations of the petition and the contents of uncontroverted affidavits." *Addison Ins. Co. v. Knight, Hoppe, Kurnik & Knight, L.L.C.,* 734 N.W.2d 473, 476 (2007) (quoting *Aquadrill, Inc. v. Envtl. Compliance Consulting Servs., Inc.,* 558 N.W.2d 391, 392 (Iowa 1997)). After the plaintiff makes a prima facie case showing that personal jurisdiction is appropriate, the burden shifts to the defendant to rebut that showing. *State ex rel. Miller v. Internal Energy Mgmt. Corp.,* 324 N.W.2d 707, 710 (Iowa 1982).

The State claims that the defendants have three sets of purported contacts with Iowa: (1) advertising and making TikTok available to Iowans through various online app stores; (2) "inducing" Iowans who use TikTok to enter ongoing Terms of Service contracts with the defendants; and (3) collecting location data from Iowa users. The court now turns to the due

11

process analysis in order to determine whether the defendants have met such minimum contacts with Iowa to warrant the exercise of specific jurisdiction over it.

### i.      Due process analysis

In order to establish the necessary minimum contacts, the defendant must either purposefully direct activities towards Iowa or purposefully avail itself of the privileges of conducting activities in Iowa. *See AMA Multimedia, LLC v. Wanat,* 970 F.3d 1201, 1208 (9th Cir. 2020), *S. Mach. Co. v. Mohasco Indus., Inc.,* 401 F.2d 374, 381 (6th Cir. 1968). The claim must arise out of or relate to the defendants' Iowa-related activities, and the exercise of jurisdiction must be reasonable. *Id*. "[W]hat matters" for specific personal jurisdiction "is [defendants'] structuring of its own activities so as to target the [Iowa] market." *NBA Props.*, *Inc. v. HANWJH*, 46 F.4th 614, 624 (7th Cir. 2022).

The State argues that the defendants provide Iowa consumers with a highly interactive and customized online experience in Iowa. Through its consumers' assent to the defendants' terms of service ("TOS"), the defendants automatically collect certain information its consumers, including geographical information and IP addresses. Unredacted Pet. at ¶ 14 (1/17/2024). The defendants then use that data to tailor content specifically to Iowans.

The defendants use highly-targeted, data-informed advertisements, including those based on consumers' locations. Consumers on TikTok are served advertisements during their sessions on TikTok, and consumers see these ads multiple times per minute. Viewing ads is a core part of the TikTok experience. The more time a consumer spends on the platform, the more advertising opportunities the defendants can sell, and the more data the defendants collect about the consumer.

### ii.      Purposeful availment

The targeted advertisements toward Iowans indicate that the defendants know about Iowa's

consumer base. Defendants use that information for commercial gain by selling their algorithm's ability for advertisers to target their Iowa-based ads to Iowa consumers on TikTok. Under the defendants' business model, consumers agree to TikTok's TOS, which explains that TikTok shows consumers ads that businesses and organizations pay the defendants to promote. Advertisers tell the defendants their business goal and the type of audience they want to see their ads. The defendants then use consumers' personal data to create categories and charge advertisers to show ads to that category. In this way, the defendants also custom tailor the ad experience of each consumer on TikTok. The defendants are motivated to maximize the time consumers spend on the platform, because the more time a user spends consuming content, the more advertising opportunities the defendants can sell and the more profits they make from the consumer in the form of advertising dollars. Many advertisers on TikTok are willing to pay the defendants for the opportunity to reach consumers in specific geographical markets, like Iowa.

The defendants make several arguments as to why personal jurisdiction is not present in this case.  First, the defendants argue that the operation of a nationally-available entertainment platform is not sufficient to establish specific jurisdiction. D0085, Unredacted Mot. Dismiss at 9 (4/29/2024). The defendants further argue that because Iowans download and use their app that its alleged actions were not purposefully directed at Iowa. The court disagrees. Personal jurisdiction, in this case, does not hinge upon whether the defendants operate nationally and would be susceptible to similar claims elsewhere. Rather, the defendants have purposefully directed their actions at Iowans through their advertising, making TikTok available to Iowans through various online app stores, entrance into ongoing TOS contracts with Iowans, and collection of location data from Iowa users.

Next, the defendants claim their collection and use of geographic data is insufficient to

13

establish specific jurisdiction. D0085 at 11. The State argues that the defendants do more than simply use geographic data to sell advertisements to Iowans, but that TikTok also uses geographic data in its algorithm. D0007, Unredacted Pet. at ¶ 11 (1/17/2024). The State claims that the algorithm is the core of TikTok's experience for users, and that it uses geographic information when determining what videos to recommend to individual users. *Id.* The court agrees that TikTok's use of geographic data and information seems is part of the TikTok experience, and it is not being used to superficially prop up the litigation before this court.

Next, the defendants argue that its contractual relationships in Iowa is not sufficient to establish specific jurisdiction. The defendants emphasize that it is not the mere existence of a contract that is determinative of personal jurisdiction, rather the "negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" are to be considered. *Burger King v. Rudzewicz*, 471 U.S. 462, 479 (1985).

However, the defendants' conduct in Iowa is not a one-time, unlikely-to-be-repeated transaction. "'[P]urposeful availment' is something akin to a deliberate undertaking to do or cause an act or thing to be done in [a state] or conduct which can be properly regarded as a prime generating cause of the effects resulting in [a state], something more than a passive availment of [the state's] opportunities." *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 891 (6th Cir. 2002). In this case, the defendants reasonably expect to conduct a given level of business in Iowa each year through its collection of geographic data and by entering into TOS agreements with Iowans. The defendants have the intent to maintain "continuing relationships and obligations" in Iowa, *Burger King.* 471 U.S. at 476, in a way that its activities here are "continuous and systematic." *Int'l Shoe,* 326 U.S. at 317. The defendants not only expected, but encouraged the Iowa contacts that led to this case via representations to Iowans about the safety of the app and the

14

accessibility of the user's digital and geographic data.[5] This transaction is central to the defendants' business model.

The defendants argued that, if Iowa courts were to find personal jurisdiction exists based on its contractual obligations, it would open the defendants up to litigation in all 50 states. Even if true, it does not matter. The issue for this court concerns the defendants' contacts with Iowa. An Arkansas court examined this same issue and denied a motion to dismiss because "at least hundreds of thousands of Arkansas users—relationships that the State alleges many Arkansans would not have agreed to absent the deceptive statements that are subject of this lawsuit." *Id.* at 4. The same reasoning applies here.

These TOS agreements arise out of and relate to the suit at hand, because the agreements necessarily involve the State's claims regarding age-appropriate content and the defendants' alleged misrepresentations about said content. The State alleged that many Iowans would not have entered into these continuing bilateral contractual relationships but for deceptive statements that are the subject of the present lawsuit. These TOS agreements are central to the suit at hand, and therefore arise out of and relate to said suit.

The defendants' internal communions include specific mention of Iowa's market. Those communications refer to capturing Iowa as a market. This shows that defendants do not simply make TikTok available in all 50 states, but rather develop internal plans to more effectively capture market percentages of, and simultaneously avail themselves in, specific states. This includes Iowa. These internal communications provide some support to the state's claim that personal jurisdiction is present in this case.

---

[5] As stated by a court in Arkansas: "[t]hese representations induced [Iowans] to enter into continuous bilateral contracts with [d]efendants that provided the company with the valuable consideration it seeks – user data in exchange for the use of its app." *State of Arkansas v. TikTok Inc.,* 12CV-23-65, Order Denying Defendants' Motion to Dismiss at 5 (Cir. Ct. Cleburne Cnty. Civ. Div., May 15, 2024).

15

This court also finds that the State properly pled specific jurisdiction against all defendants. Both TikTok Ltd. and TikTok Pte. Ltd. are listed in online app stores offering TikTok to the general public, and the listing of the app in app stores is at the heart of the complaint. TikTok Inc. operates TikTok as listed in app stores. The State does allege lack of separation between ByteDance entities and TikTok entities. The complaint satisfactorily pleads the connection and participation of all defendants in the activities giving rise to the State's claims. Therefore, this court has jurisdiction over all of the defendant entities.

### iii.     Fair play and substantial justice

Finally, the court must determine whether an exercise of specific jurisdiction over the defendants would offend traditional notions of "fair play and substantial justice." *Burger King*, 471 U.S. at 476. The court must analyze the "burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in efficiently resolving controversies, and the shared interest of the states in furthering fundamental substantive social policies." *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 432 (7th Cir. 2010).

This case involves alleged violations of the CFA under Iowa Code Section 714.16(2)(a). That said, most of these factors weigh in favor of allowing this court to exercise specific personal jurisdiction over the defendants. The defendants are a global company. It profits from Iowans' use of its product. Iowans have a strong interest in providing a forum for the adjudication of claims under the CFA, which is a broad remedial statute. Further, the burden on the defendants of defending a lawsuit in Iowa is minimal. The defendants report earning billions of dollars and operate TikTok on a global scale. This litigation does not offend due process.

16

C. **Cognizable Claim under the CFA**

The CFA prohibits the following:

> The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise or the solicitation of contributions for charitable purposes, whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice.

Iowa Code section 714.16(2)(a). The statute also contains the following relevant definitions:

> a. The term "advertisement" includes the attempt by publication, dissemination, solicitation, or circulation to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise.
>
> . . .
>
> e. The term "merchandise" includes any objects, wares, goods, commodities, intangibles, securities, bonds, debentures, stocks, real estate or services.
>
> . . .
>
> i. "Unfair practice" means an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces.

Iowa Code section 714.16 (1).

The State alleged that the defendants advertise merchandise as defined by the statute. It claimed that the TikTok app is an "intangible or service" that it presents for circulation in the Apple App store as well as the Google and Microsoft stores. (Petition paragraph 128). It claimed that the defendants engage in advertising through publication, dissemination, or circulation in those stores. *Id*. The State claimed that the defendants engaged in deception, false promises, and misrepresentations relating to the age rating of its app and by facts regarding its content and features. (Petition paragraph 129). It also claims an unfair practice by displaying "harmful content" to young Iowans despite making assurances that such content is only infrequent/mild.

17

(Petition paragraph 130).

The defendants' primary argument in its motion to dismiss is that its app is free so there is no sale and there is no merchandise. It argued that the age rating is not an advertisement because the age rating is created by the app store and the defendants simply provides information to the app store to receive a rating. Further, it argued that there is no deception, false promises, or misrepresentations because the app store questions are subjective and different people can judge the standards differently.

In order to prove a claim under the statute, the State must show some nexus between the unfair practice to the sale or advertisement of merchandise. *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 526 (Iowa 2005). In most cases, the nexus is relatively clear. For example, in *State ex rel. Miller v. New Womyn, Inc.*, the State showed that the defendant made deceptive claims about a purported breast enlargement device in order to sell the device. 679 N.W.2d 593, 594-97 (Iowa 2004) (referred to in the decision as a "quack device"). In another case, the State showed that the defendant made deceptive claims about a device allegedly designed to electromagnetically treat water for the purpose of sale. *State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 622 (Iowa 1989). In another case, the State showed that the promise to send a "gift card" was deceptive and intended to cause consumers to enter into a costly buying club. *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 35 (Iowa 2013). In each of these cases, there was no question that the defendant had made a sale and/or advertised merchandise, whether products or services.

The State's claim in this case is more nuanced. It first argued that the TikTok app meets the definition of a service or intangible. A dictionary definition of "service" includes "a facility supplying some public demand" e.g. telephone service. Merriam-Webster Online Dictionary

18

(2024). At the least, the petition creates a fact question as to that element.

The State argued that it is not required to show the exchange of money to show a sale. A dictionary definition of the term "sale" is "the transfer of ownership of and title to property from one person to another *for a price*." *See* Merriam-Webster Online Dictionary (2024) (emphasis added). The State's argument as to that point must be denied. The State's backup argument is stronger. The State argued that consumers exchange value through their time and data when they upload and use the TikTok app. In return, TikTok receives advertising revenue totaling billions of dollars globally. This pleading and theory survives the standard for a motion to dismiss.

In any event, the State's primary theory is based on the defendants' advertisement of its app. The statutory definition of "advertisement" does not require a sale, but only an attempt to induce a consumer to acquire title or interest in any merchandise. The defendants admittedly seek to advertise its app as for people 13 years of age and older so that children between the ages of 13 and 17 can acquire title to the app. The State has made a valid claim as to the advertisement element based on the facts alleged in the petition.

The deception, misrepresentation, and unfair practice elements are also sufficiently pled. The defendants are correct that some of the questions posed by Apple are subjective. However, that subjectivity benefits the State's claim that its claim under the CFA survives a motion to dismiss. The answers on the app store questionnaire are used to determine whether the app will be advertised as appropriate for 12+ individuals. The State may not ultimately prevail on these elements of its claim, but the court must consider its cause of action in the light most favorable to the facts alleged. The State meets that standard.

The court notes that it reads the petition as a whole and not just the paragraphs listed under part IV setting forth the State's claims. *See State ex rel. Miller v. Internal Energy Mgmt. Corp.*,

19

324 N.W.2d 707, 712 (Iowa 1982). Considering the petition as a whole, the State has submitted a cognizable claim under the CFA. The motion to dismiss is denied on this ground.

### D. Section 230

The defendants claim immunity under Section 230 of the 1996 Communications Decency Act ("Section 230") in their motion to dismiss. D0085 at 47. Section 230 states that "no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230 defines an information content provider as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C.A. § 230(f)(3). The definitions within Section 230 have been interpreted broadly, including any websites and applications accessed through the internet that host materials created by a third party. VALERIE C. BRANNON, CONG. RSCH. SERV. R46751, SECTION 230: AN OVERVIEW 8 (2024). Generally, Section 230 provides immunity to internet platforms for the majority of third-party content that is hosted or facilitated on their platform.[6] "Thus, Section 230 distinguishes those who create content from those who provide access to that content, providing immunity from suit to the latter group." *Id.* at 4. Under Section 230 the host cannot be held responsible for the content that is created by third parties and hosted on their platform.

Here, the State argued that its claim is based on TikTok's age ratings on app stores, not for videos posted by third-party users. The petition addresses only the age ratings, not the content created by third parties. The petition also does not state if TikTok should or should not contain

---

[6] There are a few exceptions to this section. "A defendant cannot claim Section 230 immunity as a basis to dismiss a federal criminal prosecution or any lawsuit brought under intellectual property laws, state laws that are consistent with Section 230, certain electronic communications privacy laws, or certain sex trafficking laws." *Id.* at 26.

frequent and intense content. Rather, it seeks to hold defendants liable for misleading consumers about the frequency and intensity of certain types of content on TikTok. This type of claim does not fall under Section 230.

The court finds that Section 230 does not apply to these claims by the State and the defendants are not immune from the suit.

## II.      TEMPORARY INJUNCTION

### A.  <u>General standards</u>.

Iowa R. Civ. P. 1.1502 allows for the entry of a temporary injunction under three provisions. The first is when the petition, as supported by affidavit, shows the plaintiff is entitled to relief to restrain an act that would greatly or irreparably injure the plaintiff. The second is when a party is taking an act that is tending to make the judgment ineffectual. The third is in any case specially authorized by statute.

The State requested an injunction pursuant to Iowa Code section 714.16(7), which authorizes the Attorney General to seek a preliminary injunction to prevent a person from continuing or engaging in a practice in violation of section 714.16. Because the State's request for a temporary injunction is authorized by statute, it claimed that it does not need to show great or irreparable harm, as required by Rule 1.1502(1).

This same argument was rejected by the Iowa Supreme Court in *Max 100 L.C. v. Iowa Realty Co.*, 621 N.W.2d 178, 181 (Iowa 2001). In *Max 100*, the district court had granted the application for preliminary injunction without considering great or irreparable harm based on the same argument. The supreme court noted that "the issuance of an injunction invokes the equitable powers of the court and courts apply equitable principles." *Id*. (cite omitted). The equitable standards include the first two cited in the rule along with the following:  3) whether the plaintiff

21

has shown a likelihood of success on the merits, and 4) considering the "circumstances confronting the parties and balance the harm that a temporary injunction may prevent against the harm that may result from its issuance." *Id*.

In *Max 100*, the plaintiff cited to Iowa Code section 553.12(1), which allowed for injunctive relief under the Iowa Competition Law. *See* Iowa Code § 553.1. The statute did not set a separate standard for injunctive relief. The court held that, in the absence of any directive in the statute, traditional equitable requirements apply when considering a temporary injunction. *Id*. The court noted that, if the legislature wanted to limit equitable considerations, it could include such language in the statute. *Id*.

Section 714.16(7) contains some standards when considering injunctive relief. The statute provides that the State does not need to "allege or to prove reliance, damages, intent to deceive, or that the person who engaged in an unlawful act had knowledge of the falsity of the claim or ignorance of the truth." Iowa Code § 714.16(7). There is no language in the statute eliminating any of the traditional equitable requirements. This is in contrast to at least one other statute that expressly eliminated the great or irreparable harm factor. *See* Iowa Code § 543B.49 (allowing injunctive relief for violations of the statute governing real estate brokers). If the legislature had intended to provide the same exclusion in section 714.16(7), it could have explicitly done so. *See Marcus v. Young*, 538 N.W.2d 285, 289-90 (Iowa 1995) (legislative intent is expressed by omission as well as by inclusion). As stated in *Max 100*: "[the courts] should not limit the applicability of equitable principles without a valid and clear legislative mandate." *Max 100*, 621 N.W.2d at 182 (cites omitted).

The supreme court has recently confirmed that section 714.16(7) invokes the court's equitable powers. *State ex rel. Att'y Gen. of Iowa v. Autor*, 991 N.W.2d 159, 165 (Iowa 2023)

(citing with approval *Max 100*, 621 N.W.2d at 181). While *Autor* involved the wholly different question whether defendant had a right to a jury trial in an action by the State under section 714.16(7), the court expressly stated that injunctive relief under section 714.16(7) invokes the court's equitable powers and the courts must apply equitable principles. *Id*. at 165 (quoting *Max 100*). There is no reason to believe that the court would not apply equitable principles to actions under this section. Accordingly, the State must meet the equitable standards before a temporary injunction will be entered.[7]

### B. <u>Irreparable harm – Threshold factor</u>.

The purpose for issuing a preliminary injunction is to "preserve the status quo and to prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1244–45 (N.D. Iowa 1995); *see also Kleman v. Charles City Police Dep't,* 373 N.W.2d 90, 95 (Iowa 1985) ("A temporary injunction is a preventative remedy to maintain the status quo of the parties prior to final judgment and to protect the subject of the litigation."). A court should consider an application for injunction with caution and only grant the request when clearly required. *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines*, 510 N.W.2d 153, 158 (Iowa 1993) (cites omitted).

Ordinarily, courts consider all four equitable factors to determine on balance whether they weigh toward granting injunction. *Curtis 1000*, 878 F.Supp. at 1245-46. In that sense, no single factor is normally considered to be dispositive. *Id*. However, the Eighth Circuit Court of Appeals has held that irreparable harm is a threshold inquiry that must be shown to obtain a preliminary

---

[7] I found one unreported Iowa Court of Appeals decision reaching a contrary conclusion. *State ex rel. Miller v. Grady*, 698 N.W.2d 336 (Iowa Ct. App. 2005) (Table). All decisions of the court of appeals are entitled to respect and unreported decisions are frequently cited by district courts to support of a conclusion. With that said, unreported decisions are controlling authority. Iowa R. App. P. 6.904(2)(c). Considering the reasoning and reported caselaw discussed above, I do not reach the same conclusion in *Grady* and decline to follow that decision.

injunction. *Id*. at 1246 (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 n. 9 (8th Cir. 1981)) (other cites omitted). As stated in *Dataphase*: "the absence of a finding of irreparable injury is alone sufficient ground for [denying] the preliminary injunction." The Eighth Circuit continues to follow this rule. *See, e.g., Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023).

I found no decision from an Iowa court adopting or rejecting the Eighth Circuit rule, but the rule is consistent with Iowa law. The whole point for a temporary injunction is to prevent irreparable harm prior to trial. *See Presto-X-Co. v. Ewing*, 442 N.W.2d 85, 89 (Iowa 1989) (injunctive relief is designed primarily to avoid irreparable damage). If the moving party cannot show irreparable harm, there is no reason to grant an injunction. *See Planned Parenthood of Mid–Iowa v. Maki,* 478 N.W.2d 637, 639 (Iowa 1991) ([a]n injunction "should be granted with caution and only when clearly required to avoid irreparable damage"); *Matlock v. Weets*, 531 N.W.2d 118, 122 (Iowa 1995) (same). And like federal law, the Iowa courts have held that a temporary injunction is a "preventive remedy to maintain the status quo of the parties prior to final judgment[.]" *Kleman v. Charles City Police Dep't,* 373 N.W.2d 90, 95 (Iowa 1985).

The Eighth Circuit rule makes logical sense. Courts do not normally make preliminary findings on the likelihood of success of a case. Rather, cases run their course and are resolved by through dispositive motions or trials. A temporary injunction is a unique remedy because it can impose requirements on the defendant(s) at the beginning of a case rather than after a final decision on the merits. The only reason to consider a preliminary injunction is to prevent irreparable harm. Only when a plaintiff can make that showing, does it then becomes important to consider the plaintiff's likelihood of success on the merits. After all, a finding of irreparable harm is meaningless if a plaintiff cannot show the defendant(s) are likely liable for that harm. But until the

24

plaintiff shows irreparable harm, there is no reason to preview how the judge might decide the case on the merits. The court can consider any equitable remedies following the conclusion of the case, just as it does in essentially every other case that runs through the courthouse.

### C. **Irreparable harm – Evaluation**.

Iowa law does not define irreparable harm in detail. The Eighth Circuit requires a moving party to show that the claimed harm is "certain and great and of such imminence that there is a clear and present need for equitable relief." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012). Iowa cases appear consistent with that general definition. The moving party must present some evidence to support its request. *Kleman v. Charles City Police Dep't*, 373 N.W.2d 90, 96 (Iowa 1985). Conclusory allegations are not sufficient. *Salsbury Lab'ys v. Iowa Dep't of Env't Quality*, 276 N.W.2d 830, 837 (Iowa 1979).

As an example, the supreme court found irreparable harm in a case in which a woman sought an injunction to prevent contact by a former boyfriend. *Matlock v. Weets*, 531 N.W.2d 118, 122 (Iowa 1995). She submitted evidence showing numerous instances of the defendant following, pursuing, harassing, and writing to her without legitimate purpose and in a manner designed to cause her fear for her personal safety and deterioration of her mental health. *Id*. The supreme court found that the evidence supported the finding of irreparable harm and the entry of a temporary injunction to prevent further contact. *Id*.

While the cause of action in this case is much different than *Matlock*, *Matlock* is important because it distinguished between claims of harm that were definitive versus those that are speculative. The plaintiff in *Matlock* made a preliminary showing that the defendant took numerous actions that had already impaired her mental health. She also showed that his conduct was likely to continue and cause additional harm without an injunction. Her claim was not

25

speculative or conclusory – it was supported by actual evidence.

In this case, the State produced evidence of videos from TikTok that contain offensive language and potentially offensive topics. It has not produced any evidence to show an Iowan has been viewed and harmed by such videos. The State claimed at page 66 of its reply brief that defendants' statements that their content only contains infrequent and mild deceived Iowa parents into allowing their minor children to see and interact with content that is only appropriate for adults. Even if true, this does not show irreparable harm. The argument is both speculative and conclusory. There is no evidence that any Iowan has been harmed. There is not even any evidence that any Iowan has complained to the Attorney General that they have been harmed. The State presented no evidence of any form to show irreparable harm.

Defendants also argued that irreparable harm is undermined by the State's failure to promptly seek injunctive relief. A delay may undermine a finding of irreparable harm. *See Ng*, 64 F.4th at 998. The reasonableness of a delay is "context dependent." *Id*. In *Ng*, the plaintiff sought to enjoin his university from disbanding the men's gymnastics program of which he was a member. *Id*. at 995. The program was scheduled to end at the end of the upcoming season. *Id*. The plaintiff did not seek a preliminary injunction until 13 months after learning the decision. *Id*. at 998. By that point, the final gymnastics season had ended and most of the coaches and athletes had left the university. *Id*. The court, noting that one of the purposes of a preliminary injunction is to preserve the status quo, found the delay unreasonable and defeated the plaintiff's goal of preventing irreparable harm. *Id*.

In this case, defendants claim that the State: 1) began its investigation by August of 2023, 2) filed suit in January of 2024, and 3) filed its motion for temporary injunction in March of 2024. The parties agreed to an extended briefing schedule with hearing on June 24, 2024. Defendants

26

added that the State has hired the same law firm that conducted a prior investigation and litigation in Indiana, so the claims and theories were not novel. In response, the State argued that it needed to conduct a reasonable investigation and that it would likewise be criticized if it had brought the action and motion on a rushed investigation. This is a fair point. Still, one of the points in *Ny* was that, by delaying action, the plaintiff had allowed the status quo to flip from his favor (before the team was disbanded) to the university's favor (after the team was disbanded and most coaches and athletes were gone).

Defendants asserted in their brief that TikTok has been available in Iowa with the same age ratings for five years. The State did not rebut that claim. Even giving the State some time to conduct an investigation, the status quo clearly favors defendants. It may be that the State will prove statutory violations and the court will ultimately enter some manner of remedy and/or relief. That can be done at the conclusion of the case following discovery and a trial or dispositive motions. The State cannot show irreparable harm to justify injunctive relief at this stage of the proceedings. There is no reason to impact the status quo.

## RULING

The defendants' motion to dismiss is denied. The State's motion for preliminary injunction is denied.



State of Iowa Courts

**Case Number**          **Case Title**
EQCE089810               STATE OF IOWA EX REL AG BRENNA BIRD VS TIKTOK
                         INC ET AL
**Type:**                OTHER ORDER

So Ordered

Jeffrey Farrell, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2024-08-26 15:37:28

# EXHIBIT D



| | | |
|---|---|---|
| **STATE OF LOUISIANA** | | **Case:** *000000184754* |
| *Vs.* | | *Division: A* |
| | | *21ˢᵗ Judicial District Court* |
| *TIKTOK INC* | | *Parish of Livingston* |
| | | *State of Louisiana* |

**MARIO GUADAMUD**
**LOUISIANA OFFICE OF ATTORNEY**
**GENERAL**
**1885 NORTH THIRD STREET**
**BATON ROUGE, LA 70802**

**DOUGLAS J MOORE**
**IRVIN FRITCHIE URQUHART MOORE &**
**DANIELS LLC**
**400 POYDRAS STREET**
**SUITE 2700**
**NEW ORLEANS, LA 70130**

**GREG MURPHY**
**GORDON MCKERNAN ATTORNEY AT LAW**
**163 DEL ORLEANS**
**DENHAM SPRINGS, LA 70726**

Please find attached a certified copy of the Judgment signed by the Honorable JEFF JOHNSON on October 16, 2025.

I do hereby certify that on October 17, 2025 a copy of the foregoing notice was mailed by me to the counsel of record for all parties and to such of the litigants, if any, who are not represented by counsel, and the notices were addressed to them respectively at their last known address with postage prepaid.

Clerk of Court
21ˢᵗ Judicial District
Parish of Livingston

_____
Deputy Clerk of Court

[ SERVICE ]

FILED 10-16-25 AT 2:33 PM.

_____ DEPUTY CLERK

# TWENTY-FIRST JUDICIAL DISTRICT COURT
## PARISH OF LIVINGSTON
## STATE OF LOUISIANA

NUMBER: 184754

DIVISION: CLS

## STATE OF LOUISIANA

versus

## TIKTOK, INC., ET AL.

FILED: _____    DY. CLERK: _____

## REASONS FOR JUDGMENT

This matter came before the Court on September 29, 2025, on Defendant TikTok, Inc.'s ("TikTok"), Motion to Stay and Peremptory Exception of No Cause of Action. The Court heard oral argument and denied the Motion to Stay for the reasons stated from the bench. The Exception of No Cause of Action was taken under advisement.

Having heard the arguments of counsel, and after consideration of the opinions of this Court's brethren on state and federal court benches across the country, the Court now rules as follows:

This suit is part of a national wave of suits filed against TikTok based upon the app's alleged implications to minors. Petitioner, the State of Louisiana ("the State"), filed this suit against TikTok urging TikTok violated the LA Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1401 *et seq.*, and the Louisiana False Advertising Law, La. R.S. 51:411 *et seq.*, by misrepresenting that its app is safe and appropriate for children. Specifically, the State alleges TikTok misrepresented its content as containing only "Infrequent/Mild" "Alcohol, Tobacco, and Drug References," "Sexual Content or Nudity," "Mature/Suggestive Themes," and "Profanity or Crude Humor," so as to qualify the app for a 12+ age rating upon which parents and users rely. Further, the State claims TikTok targets the app to young people and purposefully designed the app to be addictive.

In response to the allegations, TikTok filed the present Peremptory Exception of No Cause of Action. The Exception first challenges the applicability of LUTPA and the Louisiana False Advertising Law to these facts claiming there has been no economic harm; TikTok is free of charge to download.

The Court finds LUTPA and the Louisiana False Advertising Law apply in this instance. While application of these statutes to an app downloaded free of charge is an issue of first impression in Louisiana, courts across the country are allowing analogous claims to advance under similar consumer protection laws. *See, In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, Nos. 4:23-cv-05448-YGR, 4:23-cv05885-YGR, 2024 WL 4532937, at *44 (N.D. Cal. Oct. 15, 2024). TikTok offers use of its content to its users and contractually gains use of the consumer's data. This is used to generate advertising for TikTok resulting in billions of dollars of profit for the corporation. The Court is of the opinion LUTPA, and the Louisiana False Advertising Law, modeled against the Federal Trade Commission Act, are sufficiently broad to regulate and protect Louisianians from the practices alleged in the Petition: Entities conducting business in this state profiting from intentional misrepresentations. *See, Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633 (La. 4/23/10), 35 So.3d 1053, 1057, which expanded standing to bring claims under LUTPA to include non-consumers and non-business competitors:

> LUTPA grants a right of action to any person, natural or juridical, who suffers an ascertainable loss as a result of another person's use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Although business consumers and competitors are included in the group afforded this private right of action, they are not its exclusive members.

TikTok next urges even if LUTPA and/or the Louisiana False Advertising Law apply, the State's claimed misstatements do not communicate facts but are rather subjective opinions unlikely to mislead consumers given disclosures made by TikTok. On an exception of no cause of action a court must accept the facts pled in the petition as true, which, in the case at bar, allege TikTok misrepresented the age appropriateness and safety of its app with an intent to gain an age rating supporting a wider customer base.

TikTok's argument that these alleged misrepresentations are merely TikTok's subjective opinions requires of this Court, on an Exception of No Cause of Action, to determine whether their statements regarding age appropriateness, illicit content, and the frequency of such content on their app are unfair or immoral under LUPTA

2

or untrue, deceptive, or misleading under the Louisiana False Advertising Law. These are fact questions which must be borne out through discovery. The Court, pursuant to Louisiana law governing exceptions of no cause of action, has considered whether the facts alleged in this Petition, accepted as true, support a cause of action under existing law. In this instance, the Court finds they do.

Finally, TikTok asserts the State's claims are barred under the federal Communications Decency Act ("CDA"), Section 230(c)(1) and the First Amendment. As to immunity under the CDA, both the pleadings and the Court's own research reveal the prevailing and most binding authority on this issue is the federal Third Circuit case of *Anderson v. TikTok*, 116 F.4th 180 (3d Cir. 2024). The court held TikTok's algorithm, which decides whether third-party speech is included or excluded from a compilation, was TikTok's own expressive activity, i.e. "first-party speech" falling outside the immunity extended by the CDA. *Id.* While TikTok's first-party speech undeniably captures third-party speech, *Anderson* found the curation of compilations of other's content via TikTok's algorithm amounts to first-party speech. *Id.* at 184.

In considering whether the State's claims are barred under the First Amendment, the Court acknowledges the United States Supreme Court decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), cited by TikTok in support of First Amendment protection. However, the language relied upon by TikTok from the *Moody* decision is merely dicta, as that case involved a facial challenge to statutes.

Further, the First Amendment does not protect knowing misrepresentations, and, as stated above, this issue of TikTok's knowledge and intent through its statements and design decisions is not ripe for decision on an exception of no cause of action. For these reasons, the Exception of No Cause of Action is denied.

A judgment conforming to this ruling will be signed upon submission.

Livingston, Louisiana, this __16th__ day of __October__, 2025.

_____
Honorable Jeffrey S. Johnson
Judge, CLS

*Please send notice to all parties*

21st JUDICIAL DISTRICT
PARISH OF LIVINGSTON, LA
A true copy of the original
this __10-17-25__ 20____

_____
Deputy Clerk of Court

3

# EXHIBIT E

Alex L. Fugazzi, Esq.
Nevada Bar No. 9022
Christian P. Ogata, Esq.
Nevada Bar No. 15612
SNELL & WILMER L.L.P.
1700 S. Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 784-5200
Facsimile: (702) 784-5252
Email: afugazzi@swlaw.com
        cogata@swlaw.com

Jonathan Blavin, Esq.
*(Admitted Pro Hac Vice)*
Munger, Tolles & Olson LLP
560 Mission Street
San Francisco, CA 94105
Telephone: 415-512-4011
Email: jonathan.blavin@mto.com

Jessica Davidson, Esq.
*(Admitted Pro Hac Vice)*
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
One Manhattan West
New York, NY 10001-8602
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
Email: jessica.davidson@skadden.com

*Attorneys for Defendant
Snap Inc.*

# DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| STATE OF NEVADA,<br><br>Plaintiff<br><br>v.<br><br>SNAP, INC.,<br><br>Defendant | CASE NO.    A-24-886113-C<br><br>DEPT. NO.    25<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SNAP INC.'S MOTION TO DISMISS AND DENYING PLAINTIFF'S COUNTERMOTION TO FILE AMENDED COMPLAINT** |

The Court, having considered defendant Snap Inc.'s ("Snap") motion to dismiss [Doc. No. 10] and exhibits in support of that motion [Doc. No. 11]; the State of Nevada's opposition and counter-motion for leave to amend and for jurisdictional discovery [Doc. No. 19] and exhibits in support of that opposition and counter-motion [Doc. No. 20]; Snap's reply [Doc. No. 28]; the parties' notices of supplemental authority and responses [Doc. Nos. 49, 51, 56, 57]; the pleadings on file; the arguments of counsel; and good cause appearing, enters the following order:

Snell & Wilmer
L.L.P.
LAW OFFICES
1700 South Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
702.784.5200

## I. Findings

1. The State of Nevada has sued Snap in both a statutory capacity and a *parens patriae* capacity on behalf of the Citizens of Nevada, alleging that Snap's communications platform is addictive to users.[1]

2. Snap is not a resident of Nevada.

3. The State brought claims for violation of Nevada's Deceptive Trade Practices Act (NDTPA), N.R.S. §§ 598.0903 through 598.0999 (counts 1 and 2); product liability (counts 3 and 4); negligence (count 5); and unjust enrichment (count 6).

4. Snap moved to dismiss all claims against it, arguing that: (1) Snap is not subject to personal jurisdiction in this Court; (2) Section 230 of the Communications Decency Act, 47 U.S.C. § 430, immunizes Snap from the State's claims because they are based on the publication of third-party content; (3) the First Amendment prohibits the State from holding Snap liable for exercising its editorial discretion; (4) the State does not have standing to assert common law claims against Snap; and (5) the State's claims are otherwise not cognizable or are inadequately pled.

## II. Order

1. The Court grants Snap's motion in part and finds that the State's product liability and unjust enrichment claims are inadequately pled, are not cognizable under Nevada law and are therefore dismissed without prejudice.

2. The Court denies Snap's motion in part and finds that the Court can exercise specific personal jurisdiction over Snap, Section 230 does not bar the State's claims on the pleadings, the First Amendment does not bar the State's claims on the pleadings, and the State has adequately pled claims at this stage for negligence and violation of the Nevada Deceptive Trade Practices Act.

### A. Snap's motion to dismiss under Rule 12(b)(2).

3. Nevada Rule of Civil Procedure 12(b)(2) permits a court to dismiss claims against a non-resident defendant for lack of personal jurisdiction.

4. "Jurisdiction over a nonresident defendant is proper only if the plaintiff shows that

---

[1] *See, e.g.*, Doc. No. 1 at ¶¶ 1-5 (complaint).

- 2 -

Snell & Wilmer
L.L.P.
LAW OFFICES
1700 S. Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
702.784.5200

the exercise of jurisdiction satisfies the requirements of Nevada's long-arm statute and does not offend principles of due process." *Viega GmbH v. Eighth Jud. Dist. Ct.*, 130 Nev. 368, 374, 328 P.3d 1152, 1156 (2014).

5. To overcome a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden to "make a prima facie showing with 'competent evidence of essential facts' that, if true, would support jurisdiction." *Viega GmbH*, 130 Nev. at 374, 328 P.3d at 1156 (citation omitted).

6. A court may exercise either general or specific personal jurisdiction over a non-resident defendant. The parties do not dispute that this Court lacks general jurisdiction over Snap.[2]

7. In Nevada, a court may exercise specific jurisdiction over a nonresident defendant only if (1) the defendant purposely availed itself of the privilege of acting in Nevada or purposely directed its conduct to Nevada; (2) the claims arise out of or relate to the defendant's contact with Nevada; and (3) the exercise of jurisdiction "does not offend the traditional notions of fair play and substantial justice." *Ford Motor Company v. Montana Eighth Judicial District Court*, 592 U.S. 351, 358-59 (2021); *Tricarichi v. Cooperative Rabobank, U.A.*, 135 Nev. 87, 91 (2019). The State bears the burden under the first two factors, and Snap bears the burden under the third factor. *See Trump v. Eighth Judicial District Court*, 109 Nev. 687, 700 (1993) ("[W]here a defendant who purposely has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.") (citation and quotations omitted).

8. The State alleges that Snap has purposefully availed itself of the privilege of acting in Nevada due to the collective impact of advertising in Nevada at different events, hotels, and conventions; hosting "communities" tied to high schools and colleges in Nevada on the platform; requiring Nevada users to accept a set of terms of service that provides for the use of their data; allowing Nevada residents to download and save the app to their electronic devices; sending content, messages and notifications to devices in Nevada; and benefiting from users' data in Nevada.

---

[2] Doc. No. 62 at 19:8-11 (transcript of hearing on September 25, 2024).

9. The State, in its opposition to Snap's Motion to Dismiss, also presented evidence in the form of affidavits detailing various connections between Snap and the State.[3]

10. Based on these allegations and evidence presented by the State, the Court finds that Snap targets Nevada citizens, Nevada minors specifically, profits from those consumers' data, and there is nothing unfair or unexpected regarding Snap being subject to Nevada jurisdiction or held into jurisdiction in the State of Nevada. As a result, the Court finds that Snap maintains sufficient minimum contacts with the State of Nevada to support the exercise of specific personal jurisdiction over Snap in this Court and that such exercise is reasonable.[4]

**B.** **Snap's motion to dismiss under Rule 12(b)(5)**

11. Under NRCP 12(b)(5), a court will dismiss a plaintiff's complaint for failure to state a claim "only if it appears beyond a doubt that it could prove no set of facts, which, if true, would entitle it relief." *Buzz Stew, LLC v. City of North Las Vegas*, 124 Nev. 224, 228, 181 P.3d 670, 672 (2008). "All factual allegations of the complaint must be accepted as true," and courts "must construe the pleading liberally and draw every fair intendment in favor of the [non-moving party]." *Vacation Village, Inc. v. Hitachi America, Ltd.*, 110 Nev. 481, 484, 874 P.2d 744, 746 (1994).

12. Snap moves to dismiss the State's claims, claiming that they each fail as a matter of law under Section 230 of the Communications Decency Act and the First Amendment; that Snap is not a product and therefore the State cannot state a product-liability claim against it; and that the State's unjust enrichment and negligence claims are inadequately pled and no set of facts could remedy the pleading deficiencies.

13. Snap also argues that because individuals may bring claims on their own behalf, the State lacks *parens patriae* authority to assert its product-liability, negligence, and unjust enrichment

Snell & Wilmer
L.L.P.
LAW OFFICES
1700 S. Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
702.784.5200

---

[3] Doc. No. 20, Appendix of Exhibits to Plaintiff State of Nevada's Opposition to SNAP, Inc's Motion to Dismiss Plaintiffs Complaint.

[4] Doc. No. 61 at 3:12-22 (transcript of hearing on October 1, 2024).

- 4 -

claims.[5]

14. As noted below, the Court grants the motion under Rule 12(b)(5) in part and denies it in part.

### *Section 230*

15. Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." This section serves to immunize website operators and Internet service providers from liability for third-party content, material, or speech that may be posted on their website. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). Immunity under Section 230 extends to claims that seek to hold a service provider liable based on its exercise of "traditional editorial functions," *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003). Section 230 therefore requires dismissal of a claim where (1) the defendant is a "provider . . . of an interactive computer service"; (2) allegedly harmful content was "provided by another information content provider" and not the defendant; and (3) the claim at issue seeks to treat the defendant as a "publisher or speaker" of that content. 47 U.S.C. § 230(c)(1); *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019). Nevertheless, providers of interactive computer services like Snap are not immunized from liability for their *own* actions when designing their platforms as long as that liability is supported independent of their role as a publisher of third-party content. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021).

16. The crux of the parties' dispute here is whether the State's claims stem from Snap's publication of third-party content or Snap's own conduct and content.

17. Snap argues that the State's claims about Snap's design choices are inextricably linked to Snap's decisions about the publication of third-party content.

18. The Court finds that some of the State's allegations as pled are based on Snap's own

---

[5] Although the Court finds that the State has authority to bring the common-law claims asserted against Snap, that conclusion is not dispositive to its decision of Snap's motion. Doc. No. 61 at 10:17-20 (transcript of hearing on October 1, 2024).

conduct and not the publication of third-party content and therefore Section 230 does not preclude the State's claims in their entirety on the pleadings.

### *First Amendment*

19.     The First Amendment protects "the creation and dissemination of information," *Sorrell v. IMS Health Inc.*, 564 U.S. 522, 570, and "exercise of editorial control and judgment" in deciding how and whether to publish content. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). These First Amendment protections also apply to online platforms and the editorial decisions those platforms make about how to edit and compile third-party speech. *Moody v. Netchoice, LLC*, 144 S. Ct. 2383, 2409 (2024) (*citing Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 570 (1995)).

20.     Snap argues that the State's claims seek to hold it liable for not only the publication of third-party content, but also Snap's editorial control and judgment over that content.

21.     The Court finds that some of the State's allegations do not "arise because of how [the challenged design elements] are purportedly used to amplify, encourage, or present speech." Mot. at p. 17.

22.     Because the Court finds that the State's allegations as pled can be construed as being based on conduct other than expressive conduct protected by the First Amendment, the Court finds that the First Amendment does not bar the totality of the State's claims on the pleadings.

### *Product Liability Claims (Counts 3 and 4)*

23.     The State brings two theories of product liability against Snap: (1) that Snap maintains a design defect that renders it unreasonably dangerous (Count 3);[6] and (2) that Snap failed to warn its users about those alleged dangers (Count 4).[7]

24.     In Nevada, strict liability claims are limited to those who "sell[] any product in a defective condition unreasonably dangerous to the user or consumer." *Elley v. Stephens*, 104 Nev.

---

[6] Doc. No. 1 at ¶ 250.

[7] Doc. No. 1 at ¶ 257.

Snell & Wilmer
L.L.P.
LAW OFFICES
1700 S. Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
702.784.5200

413, 418 n.3, 760 P.2d 768, 771 n.3 (1988) (per curiam) (quoting Restatement (Second) of Torts § 402A(1) (1965)). Courts distinguish between "products," like tires and automobiles, and "services" for purposes of strict-liability claims like the State's here. *See, e.g.*, *Ziencik v. Snap, Inc.*, No. CV 21-7292-DMG (PDx), 2023 WL 2638314, at *4 (C.D. Cal. Feb. 3, 2023).

25.     Even construing all of the State's factual allegations as true, the Court finds that Snapchat is a service and not a product that could give rise to a strict liability claim.

26.     Thus, the Court dismisses the State's product-liability claims without prejudice.

### Unjust Enrichment Claim

27.     To plead a claim for unjust enrichment, a plaintiff must plead facts that, taken as true, show that the plaintiff conferred a benefit on the defendant, which the defendant appreciated and accepted, and that retention of the benefit would be inequitable.

28.     The State contends that the young users of Snap have conferred a benefit by being a "monetizable audience."[8]

29.     The Court finds that an "opportunity" to "sell advertisements" and acquire personal data is not a cognizable benefit conferred by users sufficient to state an unjust enrichment claim. Nor are there sufficient allegations capable of showing that consumers expected to be compensated by Snap. Thus, the Court dismisses the State's unjust enrichment claim without prejudice.

### Nevada Deceptive Trade Practices Act Claim

30.     The State brings two claims under Nevada's Deceptive Trade Practices Act: (1) the first alleges that Snap made false representations and omissions of material facts;[9] and (2) the second alleges that Snap committed unconscionable trade practices in designing and deploying certain elements of Snapchat.[10]

31.     First, Snap argues that this Court should assess the State's NDTPA claims under the heightened pleading standard found in NRCP 9(b) instead of the ordinary pleading standard found in NRCP 8. It follows, Snap argues, that the State's Complaint fails to adequately plead sufficient

---

[8] Doc. No. 1 at ¶ 274.

[9] Doc. No. 1 at ¶ 212.

[10] Doc. No. 1 at ¶ 236.

Snell & Wilmer
L.L.P.
LAW OFFICES
1700 S. Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
702.784.5200

facts to meet the heightened particularity standard under NRCP 9(b).

32. The State argues that, under *Besinger v. D.R. Horton, Inc.*, 126 Nev. 162, 165 (2010); *Poole v. Nevada Auto Delaership Invs., LLC*, 135 Nev. 280, 286-87 (Ct. App. 2019); and *R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct.*, 138 Nev. Adv. Op. 55 (2022), NDTPA claims are subject to the ordinary pleading standard in NRCP 8.

33. Construing all factual allegations in favor of the State (as the Court must at the motion to dismiss stage), the Court finds that Snap's inclusion of allegedly addictive and harmful design features in its platform, as alleged in the State's Complaint, takes advantage of the lack of knowledge, ability, experience or capacity of Snap's Young Users to a grossly unfair degree, and therefore constitute "unconscionable practices" actionable under the NDTPA, N.R.S. § 598.0923(1)(e). Likewise, the Court finds that under the correct standard of review Snap's statements about the safety of its platform for Young Users and allegedly material omissions about the nature of risks of harm posed to Young Users, as alleged in the State's Complaint, constitute "deceptive acts or practices" actionable under the NDTPA, N.R.S. § 598.0915(15); N.R.S. § 598.0923(2).

34. Next, Snap argues that the State's NDTPA Claims (Counts I and II) must be dismissed because the Snap platform is offered to users for "free," and therefore does not fall under the ambit of the NDTPA. The NDTPA applies to deceptive or unconscionable acts occurring in connection with "goods or services for sale or lease." N.R.S. §§ 598.0915, 598.0923. Under the NDTPA, a "'Sale' includes any sale, offer for sale or attempt to sell *any property* for *any consideration*." N.R.S. § 598.094 (emphasis added).

35. The State argues that Snap's alleged conduct satisfies these requirements based on the allegation that users provide consideration to Snap in the form of their user data in exchange for license to use the Snap platform. According to the State, a user's license to use the Snap platform is not "free," because it comes only in return for the user's data. The State argues that this transaction is governed by Snap's terms of service, which the State contends are a contractual agreement allowing users to use the Snap platform in exchange for Snap obtaining user data. The State argues that this exchange of data for the use of the platform meets the definition of "any

consideration" under the NDTPA, and brings use of the Snap platform within the scope of transactions regulated by the NDTPA.

36. The State further contends that Snap's sale of advertising space to advertisers is also the type of sale of property for consideration that falls within the scope of the NDTPA. Those transactions, the State argues, are connected to Snap's design of its platform and its user features, and public statements about its safety, because Snap's sale of advertising is predicated on its collection of data from those users. *See R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct.*, 138 Nev. Adv. Op. 55, (2022) (explaining that "the plain language of the NDTPA contemplates situations in which liability may be found even when . . . an individual did not actually purchase or use the product.").

37. The Court finds that the State has sufficiently pled that Snap's alleged conduct occurred in connection with "goods or services for sale or lease." N.R.S. §§ 598.0915, 598.0923.

### *Negligence*

38. To establish a claim for negligence, a plaintiff must allege that "(1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, (3) the breach was the legal cause of the plaintiff's injuries, and (4) the plaintiff suffered damages." *Sadler v. PacifiCare of Nev.*, 130 Nev. 990, 995, 340 P.3d 1264, 1267 (2014) (citation omitted).

39. Snap argues that the State fails to allege any facts that, taken as true, would establish either actual or proximate causation because there is no allegation that the harms suffered by young users would not have occurred but for Snap's acts.

40. The Court disagrees. The State has alleged sufficient facts that, if proven, would support a viable claim for negligence. At this stage, any dispute as to the viability of such a claim would constitute factual analysis, which is inappropriate. The Court therefore finds that at this stage of the proceedings, the State's allegations are sufficient to state a negligence claim.

///

///

///

- 9 -

## ORDER

IT IS HEREBY ORDERED that **Snap's motion to dismiss is GRANTED IN PART**. The State's claims for product liability (counts 3 and 4) and unjust enrichment (count 5) are **DISMISSED WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND AT THIS TIME**.

IT IS FURTHER ORDERED that because the Court finds that it may exercise personal jurisdiction over Snap in this matter, the State's counter-motion for jurisdictional discovery is **DENIED AS MOOT**.

IT IS FURTHER ORDERED that the State's counter-motion for leave to amend is **DENIED**.

IT IS SO ORDERED.

Respectfully submitted by:

SNELL & WILMER L.L.P.

/s/ Alex L. Fugazzi
Alex L. Fugazzi (NV Bar No. 9022)
Christian P. Ogata (NV Bar No. 15612)
1700 South Pavilion Center Drive, Suite 700
Las Vegas, NV 89135

Jessica Davidson, Esq.
(Admitted *Pro Hac Vice*)
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001-8602

Jonathan Blavin, Esq.
(Admitted *Pro Hac Vice*)
Munger, Tolles & Olson LLP
560 Mission Street
San Francisco, CA 94105

*Attorneys for Defendant Snap Inc.*

**Dated this 13th day of February, 2025**

**68D 2E1 B651 4242**
**Kathleen E. Delaney**
**District Court Judge**

Snell & Wilmer
L.L.P.
LAW OFFICES
1700 S. Pavilion Center Drive, Suite 700
Las Vegas, Nevada 89135
702.784.5200

**CSERV**

DISTRICT COURT
CLARK COUNTY, NEVADA

| | |
|---|---|
| The State of Nevada, Plaintiff(s) | CASE NO: A-24-886113-C |
| vs. | DEPT. NO. Department 25 |
| Snap, Inc., Defendant(s) | |

### AUTOMATED CERTIFICATE OF SERVICE

This automated certificate of service was generated by the Eighth Judicial District Court. The foregoing Order was served via the court's electronic eFile system to all recipients registered for e-Service on the above entitled case as listed below:

Service Date: 2/13/2025

| | |
|---|---|
| Christopher Turtzo | turtzo@morrissullivanlaw.com |
| MSL Odyssey | wiznet@morrissullivanlaw.com |
| Jon Jones | r.jones@kempjones.com |
| Alex Fugazzi | afugazzi@swlaw.com |
| Michael Gayan | m.gayan@kempjones.com |
| Monique Lunnon | m.lunnon@kempjones.com |
| Docket Docket | docket_las@swlaw.com |
| MSL Mandatory Back-up Email | nvmorrissullivanlemkul@gmail.com |
| Dominique Rocha | rocha@morrissullivanlaw.com |
| Nicole McLeod | n.mcleod@kempjones.com |
| Christian Barton | barton@morrissullivanlaw.com |

Don Springmeyer        d.springmeyer@kempjones.com

Christian Ogata        cogata@swlaw.com

Anna Huffman        Huffman@morrissullivanlaw.com

Katrina Stark        k.stark@kempjones.com

Ernest Figueroa        Efigueroa@ag.nv.gov

Mark Kruegar        mkrueger@ag.nv.gov

Raquel Fulghum        rfulghum@ag.nv.gov

Anthony Walsh        ajwalsh@ag.nv.gov

Christine Brady        cbrady@ag.nv.gov

Perla Hernandez        phernandez@ag.nv.gov

Dorianne Potnar        dpotnar@ag.nv.gov

Majed Nachawati        mn@ntrial.com

Brian McMath        bmcmath@ntrial.com

Philip Carlson        pcarlson@ntrial.com

David Slade        slade@wh.law

Lynse Ashcroft        lashcroft@swlaw.com

Ali Lott        a.lott@kempjones.com

Gale Pearson        gpearson@ntrial.com

Pamela McAfee        p.mcafee@kempjones.com

Joseph Laurita        j.laurita@kempjones.com

Joy Aguirre        jaguirre@swlaw.com

Naomie Saint-Sume        nsaintsume@ntrial.com

Michaela Hohwieler        mhohwieler@ntrial.com

Brian Moore                          bmoore@ntrial.com

Michael Gorwitz                      mgorwitz@ntrial.com

Veronica McNeme                      vmcneme@ntrial.com

Laura Rios                           l.rios@kempjones.com

Jessica Davidson                     jessica.davidson@skadden.com

Jonathan Blavin                      jonathan.blavin@mto.com

Francesca Bergeret-Simpson           f.bergeret-simpson@kempjones.com

Sam Feeley                           sfeeley@ag.nv.gov

Debbie Shuta                         dshuta@swlaw.com

Milli Hansen                         milli.hansen@skadden.com

Christopher Cox                      christopher.cox@skadden.com

William Sykes                        wsykes@claggettlaw.com

Michelle Rivas                       michelle@claggettlaw.com

Richard Hy                           richard@claggettlaw.com

Michael Gayan                        mike@claggettlaw.com

Matthew Bush                         mbush@ntrial.com

Sidney Jing                          sjing@ntrial.com

ONvJ Media                           media@ournevadajudges.com

Bonan Link                           blink@ntrial.com

Kevin Parish                         kparish@ntrial.com



EXHIBIT F

# The State of New Hampshire

**MERRIMACK COUNTY**                    **SUPERIOR COURT**

THE STATE OF NEW HAMPSHIRE

v.

META PLATFORMS, INC. and INSTAGRAM, LLC

Docket No.: 217-2023-CV-00594

## ORDER

The plaintiff, the State of New Hampshire, brings this suit against the defendants, Meta Platforms, Inc. and Instagram, LLC for violations of the Consumer Protection Act ("CPA"), products liability, and negligence. The State's claims arise out of Meta's use of certain design features and the impact of those features on children in New Hampshire. Meta moves to dismiss. The State objects. The Court held a hearing on this matter on June 13, 2024. The parties submitted notices of supplemental authority following the hearing. For the following reasons, Meta's motion is DENIED.

## I.    Standard

In reviewing a motion to dismiss, the Court "assume[s] the truth of the facts as alleged in the plaintiff's pleadings and construe[s] all reasonable inferences in the light most favorable to the plaintiff." Barufaldi v. City of Dover, 175 N.H. 424, 427 (2022). The Court "need not assume the truth of statements in the plaintiff's pleadings, however, that are merely conclusions of law." Sanguedolce v. Wolfe, 164 N.H. 644, 645 (2013). "The standard of review in considering a motion to dismiss is whether the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery."

1

This is a Service Document For Case: 217-2023-CV-00594
Merrimack Superior Court
12/11/2024 8:52 AM

Barufaldi, 175 N.H. at 427. "This threshold inquiry involves testing the facts alleged in the pleadings against the applicable law." Id. "The trial court may also consider documents attached to the plaintiff's pleadings, or documents, the authenticity of which are not disputed by the parties, official public records, or documents sufficiently referred to in the complaint." Id. The Court will grant the motion "if the facts pled do not constitute a basis for legal relief." Id.

## II. Background

Meta is a Delaware corporation. (Compl. ¶ 19.) Meta owns and operates the social media platform, Facebook, and owns and operates the social media platform, Instagram, through its wholly-owned subsidiary, Instagram, LLC. (Id. ¶ 20.) Instagram, LLC is also a Delaware corporation. (Id. ¶ 21.) The Court refers to the defendants collectively as "Meta" and to Facebook and Instagram as the "Social Media Platforms" or the "Platforms."

### A. Usage of the Social Media Platforms

In 2023, Facebook had over 226 million active monthly users in the United States, representing 68% of the population, including over ten million of those users under eighteen. (Id. ¶ 49.) Nearly one million of those users lived in New Hampshire, representing 68% of residents, including 34,063 users under eighteen, representing 13.49% of the under-eighteen population. (Id. ¶¶ 27, 49.) That same year, Instagram had over 192 million active monthly users in the United States, over 58% of the population, with 32,389,032 under eighteen. (Id. ¶ 50.) 733,019 of those users lived in New Hampshire, representing over 52% of residents, including 89,339 users under eighteen, representing 35% of the under-eighteen population. (Id. ¶¶ 27, 50.) In April

2

2023, Meta's internal data showed that 55,885 New Hampshire teenagers were active daily Instagram users.  (Id. ¶ 52.)  In 2022, 62% of teenagers reported using Instagram.  (Id. ¶ 51.)  The rate is higher for teenage girls.  (Id.)  Almost half of those teenagers reported checking Instagram at least once a day, 27% reported checking it several times a day, and 10% reported checking it almost constantly.  (Id.)

B.  Meta's Advertising

To fully access the Social Media Platforms, users must agree to Meta's Terms of Use.  (Id. ¶ 35.)  By doing so, users consent to Meta collecting and using their data for monetization and creation of personalized algorithms.  (Id.)  Meta then sells advertising space to marketers and, utilizing user data, allows them to target users by location, demographics, interests, and behaviors.  (Id. ¶ 29.)  Meta also allows advertisers to target "designated market areas," which include Manchester, New Hampshire.  (Id. ¶ 30.)  In 2023, Meta derived $542,835,568 from advertisement revenue from users with ties to New Hampshire.  (Id.)  In addition to paying for advertisements, advertisers directly contract with "content creators," including children, to promote their products on Instagram.  (Id. ¶ 47.)

Meta's monetization centers on maximizing the amount of time users spend on the app and the amount of data collected from each user.  (Id. ¶ 33.)  Meta intentionally designs its Social Media Platforms to maximize user engagement, and, thus, maximize profits.  (Id.)  Meta monetizes user data by (1) selling targeted advertising and (2) feeding users personalized algorithms to maximize their time spent on the app.  (Id. ¶ 34.)

Meta is financially motivated to attract and maintain children on its Social Media Platforms because teenagers are "one of the most valuable advertising demographics." (Id. ¶ 42.) Since at least 2015, Meta has focused on increasing the time teens spend on its Social Media Platforms. (Id.) In 2019, one of Instagram's quarterly goals was to hit two million hours of teen watch time on IGTV (Instagram's former long-form video feature). (Id. ¶ 44.) Further, an internal email circulated in September 2018 revealed that Meta discusses its youngest users in terms of their "lifetime value" to the company. (Id. ¶ 45.) However, Meta has publicly denied placing monetary value on children. (Id. ¶ 46.) In 2021, Senator Amy Klobuchar asked Antigone Davis, Meta's Global Head of Safety, what Meta believed the lifetime monetary value of children users was, to which Ms. Davis responded, "that's just not the way we think about it" and "[t]hat's just not how we think about building products . . . for young people." (Id.) Instagram has become Meta's most successful social media platform in attracting and retaining child users. (Id. ¶ 48.) Because of that, the State alleges that "Meta intentionally includes manipulative design features in its Social Media Platforms that it knows are particularly effective in increasing compulsive and excessive use in teens." (Id. ¶ 53.)

C. Alleged Addictive Features

The State alleges that "Meta intentionally includes manipulative design features in its Social Media Platforms that it knows are particularly effective in increasing compulsive and excessive use in teens." (Id. ¶ 53.) Thus, the State asserts that Meta employs these design features to trick children into spending as much attention and time as possible on its Social Media Platforms and maximize Meta's profits. (Id. ¶ 56.) The United States Surgeon General has identified certain harmful design features that

4

overlap with those included in the State's complaint, including personalization algorithms, alerts, infinite scroll, and Reels.  (Id.)

i.  Personalization Algorithms

Meta uses personalization algorithms across its Social Media Platforms, including on Instagram's Main Feed (the scrolling presentation of content immediately visible upon opening the app) and Explore Feed (another scrolling presentation of algorithmically curated content that can be optionally guided by a user's input of text in a search box).  (Id. ¶ 57.)  In 2016, Meta changed Instagram's user feeds to incorporate personalization algorithms.  (Id. ¶ 58.)  Previously, users' feeds were in reverse chronological order.  (Id.)

The personalization algorithms serve users categories of content based on a sequencing method psychologists refer to as "variable reinforcement schedules" or "variable reward schedules."  (Id.)  Variable reward schedules work by periodically delivering types of content in an unpredictable pattern that trigger a release of dopamine in the user.  (Id. ¶ 60.)  Dopamine is a neurotransmitter released in anticipation of a potential reward and is associated with pleasure.  (Id.)  However, dopamine neurons only fire for a relatively short period of time and, afterwards, an individual may become "disheartened and disengaged."  (Id.)  Meta's personalization algorithms manipulate the dopamine responses in its child users, inducing them to engage repeatedly with Meta's products.  (Id. ¶ 61.)

The State alleges that personalization algorithms are particularly effective on, and dangerous to, children because they have incomplete brain maturation, lack of impulse control, and reduced executive functions.  (Id. ¶ 63.)  The personalization

algorithm's ability to learn more about the user as they scroll allows it to display more of what will keep the user hooked, known as "presence amplification," pushing them into a "rabbit hole" of increasingly more extreme content. (Id. ¶¶ 65, 67.) When a user experiences preference amplification the absence of other, more moderate information makes it difficult for the user to get out of a rabbit hole. (Id. ¶ 68.) In 2021, Meta internally acknowledged how Instagram's personalization algorithms take children "into negative spirals & feedback loops that are hard to exit from." (Id.)

### ii. Alerts

When a user installs the Instagram app on their phone, Instagram employs a range of alerts in response to certain in-app activities. (Id. ¶ 70.) Alerts are delivered to a user's phone via vibrations, visuals, sounds, in-app notifications, and emails. (Id. ¶ 71.) These alerts are designed to increase children's engagement by taking advantage of neurological and psychological phenomena to trigger sudden dopamine releases. (Id.) The alerts allow Meta to disrupt its users at any time to encourage them to return to the Social Media Platforms. (Id. ¶ 72.) The notifications trigger users' fear of missing out ("FOMO") and leads to them consistently checking the Social Media Platforms. (Id. ¶ 77.)

Alerts are harmful for children and Meta knows that "smartphone notifications cause inattention and hyperactivity among teens, and they reduce productivity and well-being." (Id. ¶ 74 (brackets omitted).) Research has shown teenagers check their phone on average 51 times per day, with some teens checking their phone over 400 times per day. (Id. ¶ 76.) During that period, the teenagers received a median of 237 notifications on their phones per day, with some users receiving as many as 4,500 in a day. (Id.)

6

While users are able to disable notifications, they are enabled by default and the addictive elements of the Social Media Platforms are a barrier for children to take the step to disable them.  (Id. ¶¶ 71, 77.)

### iii.  Infinite Scroll and Autoplay

In 2016, Instagram debuted "infinite scroll."  (Id. ¶ 78.)  Infinite scroll is a method of content delivery that partially displays additional content at the bottom of the user's screen, such that the user is typically unable to look at a single post in isolation, and automatically loads new content as the user scrolls.  (Id.)  This format makes it difficult for children to disengage with the Social Media Platform because there is no natural end point.  (Id. ¶ 79.)  Meta does not allow users to turn off infinite scroll.  (Id. ¶ 80.)  Similarly, Meta uses an "autoplay" feature on Instagram "Stories," which keeps the user watching unless the user takes affirmative action to disengage.  (Id. ¶ 81.)  Facebook users are able to turn off autoplay but disabling the feature on Instagram is difficult for users.  (Id. ¶ 82.)

### iv.  Ephemeral Content

In 2016, Meta started implementing ephemeral content features in its Social Media Platforms.  (Id. ¶ 84.)  Ephemeral content is only temporarily available to users with notifications and visual design cues indicating that the content will soon disappear forever.  (Id. ¶ 85.)  This type of content encourages users to frequently check the Social Media Platforms and induces a sense of FOMO in children.  (Id. ¶¶ 84–85.)  Two examples of ephemeral content are Instagram's "Stories," which contains content that is only available for a short time, and "Instagram Live," which contains content only available while the creator is live-streaming.  (Id. ¶¶ 87–88.)  Meta informs users of

7

Instagram Live content by sending a push notification to users that reads, "[@user] started a live video.  Watch before it ends!"  (Id. ¶ 89.)  An executive summary circulated internally in 2016 indicated that the goals of live content were to increase the time users spent watching these videos, specifically teenagers.  (Id. ¶ 90.)

### v.  Reels

In 2020 and 2021, Meta introduced "Reels" which present short-form videos based on data collected from each user.  (Id. ¶ 92.)  Similar to infinite scrolling, Reels automatically plays as the user swipes the screen to the next video.  (Id. ¶ 93.)  As of April 2023, Reels were limited to 15 to 90 second video clips.  (Id.)  The short nature of the videos and the frameless way it fills a user's screen ensure the user will not get bored and close the app.  (Id.)  Meta's investment in Reels was specifically designed to attract and increase youth engagement.  (Id. ¶ 94.)

### D.  Use of the Social Media Platforms and Corresponding Harm to Children

The State alleges that the harms the Social Media Platforms cause all users are particularly acute in children.  (Id. ¶ 101.)  During adolescence, children's risk-taking behavior is at its peak and their self-esteem is vulnerable.  (Id. ¶ 102.)  Children's brain regions associated with a desire for risk-taking, attention, peer feedback, and reinforcement are sensitive and regions associated with maturity and impulse control are not fully developed.  (Id.)  For these reasons, teenagers are more susceptible to misinformation, peer pressure, and false images on social media.  (Id.)  The United States Surgeon General has recognized that "the current body of evidence indicates that while social media may have benefits for some children and adolescents, there are ample indicators that social media can also have a profound risk of harm to the mental

8

health and well-being of children and adolescents." (Id. ¶ 104.)  Meta has considered but rejected design changes after finding that those changes would decrease the danger of harm to children, but also decrease engagement.  (Id. ¶ 105.)

Children who use social media for at least five hours per day are many times more likely to have clinically relevant symptoms of depression than non-users.  (Id. ¶ 106.)  During the same period in which social media use increased, the rate of teenagers suffering from severe mental health problems and suicide, both nationally and in New Hampshire, also increased by significant margins.  (Id. ¶¶ 116–17, Figures 2 and 3.)  Frequent social media use has been associated with distinct changes in the developing brain in the amygdala, which is vital for impulse control and emotional regulation and could increase adolescent sensitivity to reward and punishment.  (Id.)  These brain changes track the changes experienced by people who become addicted to gambling or drugs.  (Id. ¶ 107.)  Frequent social media use is also linked to disruptions in children's sleep, which can cause or worsen depression and anxiety.  (Id. ¶ 109–10.)  Meta has been aware since 2019 that excessive social media use is correlated with sleep problems.  (Id. ¶ 111.)  In 2021, more than 75% of New Hampshire teenagers reported getting fewer than eight hours of sleep on an average school night, with more than 20% reporting getting five or fewer hours of sleep.  (Id. ¶ 113.)

E.  Meta's Knowledge of the Harms Caused by its Social Media Platforms

The State alleges that Meta is aware that a majority of its users suffer from problematic use of Social Media Platforms and that such use has a serious effect on users' sleep, relationships, mental health, and general well-being.  (Id. ¶¶ 100, 111.)  The State alleges that Meta is aware that teenagers are more susceptible to its

9

addictive design features and are more likely to excessively use its Platforms.  (Id. ¶¶ 122–25.)

Meta's internal data supports these allegations.  In 2020, internal Meta statistics showed that teenagers are 40% more likely to spend five or more hours per day, and at least 28 hours per week, on Instagram than non-teenagers.  (Id. ¶ 123.)  Meta's internal research concluded,

> Teen brains are much more sensitive to dopamine, one of the reasons that the risk of drug addiction is higher for adolescents and it's the same thing that keeps them scrolling and scrolling.  Due to the immature brain, they have a much harder time stopping even though they want to—our own product foundation research has shown teens are unhappy with the amount of time they spend on our app.

(Id. ¶ 125.)  In 2020, Meta started a project to better understand teenagers, including their brain development.  (Id. ¶ 126.)  Meta's research resulted in similar conclusions to those outlined supra Section D.  (See generally id. ¶¶ 126–38.)

While the Social Media Platforms have "time-management tools," including notifications and reminders to stop scrolling, most users dismiss them.  (Id. ¶ 140.) Meta knows those tools are ineffective at counteracting compulsive and excessive use. (Id.)  Meta has considered but rejected design changes after finding that those changes would decrease the danger of harm to children, but also decrease engagement.  (Id. ¶¶ 105, 141.)

F.  Meta's Alleged Misrepresentations

Meta, through its own publications, public statements, and testimony of corporate officers, has stated that well-being of its users is a top priority.  (Id. ¶¶ 144 ,150.) However, the State alleges these public statements are at odds with Meta's internal surveys, research, and reports, and, in some cases, with its own officers' testimony.  (Id.

10

¶¶ 144-229.)  Specifically, the State alleges Meta has made misrepresentations regarding the safety of the Social Media Platforms, (id. ¶¶ 144–46, 165,) Meta's intention to prioritize well-being over user engagement, (id. ¶¶ 205–29,) and the prevalence of user exposure to harmful and predatory content served by Meta's algorithms, (id. ¶¶ 146–64.)

## III.    Analysis

The State brings claims against Meta for violations of the CPA (RSA 358-A:2) for unfair acts or practices for its manipulative and addictive design features (Count I), violations of the CPA (RSA 358-A:2) for deceptive practices (Count II), strict products liability for defective design (Count III), strict products liability for failure to warn (Count IV), and negligence (Count V).  Meta moves to dismiss all claims, arguing that this Court lacks personal jurisdiction over it, Section 230 of the federal Communications Decency Act and the First Amendment of the United States Constitution bar the State's claims, the two CPA counts fail to state a claim, and the State lacks standing to pursue its common law claims for strict products liability and negligence and does not state a viable claim under those theories.  The Court addresses each argument in turn.

### A. Personal Jurisdiction

The standard of review on a motion to dismiss for lack of personal jurisdiction varies according to the case's procedural posture.  Seward v. Richards, 174 N.H. 401, 406 (2021).  "While the general rule applicable to motions to dismiss is that all facts properly pleaded by the plaintiff are deemed true . . . when those facts relate to personal jurisdiction, the plaintiff must offer affirmative proof."  Staffing Network, Inc. v. Pietropaolo, 145 N.H. 456, 457 (2000).  In the absence of an evidentiary hearing, the

11

Court applies a prima facie standard to determine whether personal jurisdiction is met. Id.

"Determining whether a court may exercise personal jurisdiction over a defendant contemplates a two-part analysis." Seward, 174 N.H. at 407. "First, the State's long-arm statute must authorize such jurisdiction. Second, the requirements of the federal Due Process Clause must be satisfied." Id. New Hampshire's long-arm statute, RSA 510:4, authorizes the exercise of personal jurisdiction to the extent permissible under the Due Process Clause. Id. Accordingly, the Court's analysis depends upon due process. Id.; RSA 510:4, I.

"Under the Federal Due Process Clause, a court may exercise personal jurisdiction over a non-resident defendant if the defendant has minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Seward, 174 N.H. at 407. "Minimum contacts is not necessarily a numbers game; in order to be subject to the jurisdiction of the forum state, a nonresident need only have one contact with the forum, so long as the contact is meaningful." Id. "Jurisdiction can be 'general,' where the defendant's contacts with the forum State are continuous and systematic, or 'specific,' where the cause of action arises out of or relates to the defendant's forum-based contacts." Id. Here, the parties solely address whether the Court can exercise specific personal jurisdiction over Meta. Accordingly, the Court focuses its analysis on that inquiry.

"To determine whether exercising specific personal jurisdiction over the defendant[] comports with due process, [the Court] examine[s] whether: (1) the contacts relate to the cause of action; (2) the defendant[] ha[s] purposefully availed [itself] of the

protection of New Hampshire's laws; and (3) it would be fair and reasonable to require the defendant[] to defend the suit in New Hampshire." Seward, 174 N.H. at 407–08. "Each factor must be evaluated on a case-by-case basis, and all three factors must be satisfied for the exercise of jurisdiction to be constitutional." Id. at 408. "Questions of specific jurisdiction are always tied to the particular claims asserted." Id.

The Court begins with the relatedness factor. "To satisfy the relatedness factor, there must be more than just an attenuated connection between the contacts and the claim; the defendant's in-state conduct must form an important, or at least material, element of proof in the plaintiff's case." Id. at 409. "The relatedness test is a flexible, relaxed standard, and the court's assessment of relatedness is informed by the concept of foreseeability." Id. For tort claims, the relatedness inquiry "focuses on whether the defendant's in-forum conduct caused the injury or gave rise to the cause of action." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 622 (1st Cir. 2001). Further, to satisfy specific personal jurisdiction, "a plaintiff must link the defendant's suit-related conduct to the forum. Mere market exploitation will not suffice." Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 324 (5th Cir. 2021).

Meta argues that the State's claims do not relate to Meta's contacts with New Hampshire. The State's claims arise out of Meta's alleged addictive design features and its misrepresentations and omissions. Meta contends that this conduct did not occur in New Hampshire and, therefore, it cannot serve as a basis for personal jurisdiction. Meta rejects any attempt by the State to rely on its advertising and marketing to support personal jurisdiction because its advertising and marketing does not serve as a basis for the State's claims. (Id.) The State responds that its claims

13

arise directly out of Meta's contacts with New Hampshire, namely; its relationships with hundreds of thousands of New Hampshire residents, including children; the design features it implements on Social Media Platforms used by New Hampshire residents; and its deceptive conduct which has played a role in inducing New Hampshire residents' use of the Platforms.

In Walden v. Fiore, 571 U.S. 277, 279 (2014), the Supreme Court held that a Nevada court could not "exercise personal jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada" where "the defendant had no other contacts with Nevada." The Walden Court noted that its holding was consistent with Calder v. Jones, 465 U.S. 783 (1984). Walden, 571 U.S. at 289–90. In Calder, the Court held that a California court could exercise personal jurisdiction over Florida defendants whose "intentional, and allegedly tortious, actions were expressly aimed at California." 465 U.S. at 785–86. Under Walden and Calder, the proper inquiry is not merely whether New Hampshire residents suffered an injury but whether Meta's conduct connects it to New Hampshire in a "meaningful way." Walden, 571 U.S. at 290.

The Supreme Court has referred to the following as a "paradigm example": the defendant "extensively promoted, sold, and serviced" vehicles in the forum states and the plaintiffs resided in the forum states, used the allegedly defective vehicles in the forum states, and suffered injuries in the forum states. Ford Motor Co. v. Mont Eighth Jud. Dist. Ct., 592 U.S. 351, 366 (2021). These facts created an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place." Id. at 370.

Meta's contacts with New Hampshire relate to the State's claims alleging harm caused by Meta's implementation of features on its Social Media Platforms used by New Hampshire residents and Meta's misrepresentations which have induced New Hampshire residents to use its Social Media Platforms. In coming to this conclusion, the Court relies on the following facts pleaded by the State. Meta offers an interactive Social Media Platform accessible to New Hampshire citizens. While users need not pay to use the Platforms, Meta harvests users' personal data. (Compl. ¶ 34.) Meta then sells targeted advertising, based on that collected data, and employs addictive features on the Platforms to increase the amount of user time spent, increasing the amount of data Meta can collect and sell advertising for. (Id.) It is this core business model which is alleged to have harmed New Hampshire children. Meta's contacts with New Hampshire—its service agreements with users, collection of personal data, and sale of advertising based on that data—are inherently connected with the use of addictive design features at issue in this matter which further its business model. In a similar manner to Ford Motor Co., Meta extensively promotes its Platforms in the forum state, enters service agreements and collects data of residents of the forum state, and those residents use Meta's Platforms in the forum state and suffered injuries in the forum state. Cf. 592 U.S. at 366.

The Court disagrees with Meta that its geographically targeted advertising and marketing are unrelated to the State's claims. Meta permits advertisers to target designated market areas, including Manchester, New Hampshire, and otherwise target users based on their location, demographics, interests, and behaviors. (Compl. ¶¶ 29–30, 38–39.) Meta is able to offer targeting advertising by harvesting users' data. (Id.)

15

This incentivizes Meta to keep users on its Platforms for the maximum amount of time to increase the amount of data harvested. To keep users on its Platforms, Meta employs the addictive design features that form the basis of the State's claims. This distinguishes the State's claims from matters in which a plaintiff's claims in no way relate to a defendant's use of geographically targeted advertising. See Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 321 (5th Cir. 2021) (holding that the defendant's use of geographically targeted advertising did not relate to the plaintiff's libel claim).

Put simply, Meta derives its profits from users viewing and interacting with advertisements on its Social Media Platforms. To drive engagement, Meta designs and employs the addictive design features that form the basis of the State's claims. For this reason, Meta's targeted advertising efforts are not only related but integral to the State's claims.

For the foregoing reasons, assuming the facts alleged in the State's complaint as true and construing all inferences in the State's favor, the State has demonstrated the relatedness factor of the specific personal jurisdiction test.

The Court next turns to the purposeful availment prong of the specific personal jurisdiction test. "The second prong of the due process analysis considers whether the defendants have purposefully availed themselves of the protection of New Hampshire's laws." Seward, 174 N.H. at 411–12. "To satisfy the second requirement, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protection of that state's laws and making the defendant's involuntary presence before the state's

16

courts foreseeable." Id. ¶ 412. "Purposeful availment requires both foreseeability and voluntariness." Id. "Voluntariness requires that a defendant's contacts with the forum state proximately results from actions by the defendant." Id. "The contacts must be deliberate and not based on the unilateral actions of another party, and cannot be merely fortuitous, but rather, the defendants must have purposefully directed actions at New Hampshire." Id. "Foreseeability requires that the contacts must be of a nature such that a defendant could reasonably anticipate being haled into court here." Id.

Meta argues that its alleged conduct does not demonstrate that it purposefully availed itself of the protection of New Hampshire's laws because the conduct was not specifically directed at New Hampshire. The State responds that Meta purposefully directed commercial activities to New Hampshire by, (1) advertising, marketing, and distributing its Social Media Platforms to New Hampshire consumers and making substantial profits from selling user data, (2) entering into contracts with each of its New Hampshire users, and (3) encouraging children in New Hampshire to use its products.

In Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 773–74 (1984), the Court found that there was specific jurisdiction over the defendant publisher where it had no employees or offices in the forum, did not expressly aim its publication or conduct at the forum, and magazine sales in the forum made up only a small fraction of the defendant's total sales, but the defendant circulated 10,000 to 15,000 copies of its magazine to subscribers in the forum each month. The Court reasoned that the defendant "continuously and deliberately exploited" the forum's market. Keeton, 465 U.S. at 781. Because the defendant produced "a national publication aimed at a nationwide audience," there was "no unfairness in calling it to answer for the contents of

17

that publication wherever a substantial number of copies are regularly sold and distributed." Id.

The Keeton Court's reasoning applies here, despite Meta's arguments distinguishing operating the Social Media Platforms from physically distributing magazines. Meta's Platforms are accessible to New Hampshire users. More than that, in exchange for the use of the Platforms, Meta harvests users' personal information and sells it to advertisers, which advertise on the Platforms. See uBID, Inc. v. GoDaddy, Inc., 623 F.3d 421, 427–28 (7th Cir. 2010) (determining that website operator defendant had minimum contacts with the forum because it exploited the forum's market and engaged in extensive national advertising, despite the fact that it did not specifically target forum residents through advertising). Like the publisher in Keeton, Meta has specific connections with New Hampshire and furthers those connections each time it contracts with users to offer its Platforms in exchange for their data. This is voluntary contact with the forum state and its citizens. See Seward, 174 N.H. at 412. While Meta argues that its contacts with New Hampshire are based on the unilateral activity of New Hampshire users, its harvesting and sale of New Hampshire users' data causes the Court to disagree. For these reasons, it is foreseeable that Meta's contacts with New Hampshire are such that it should reasonably anticipate being haled into court here. See id.

The parties dispute the applicability of the sliding scale framework outlined by Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997). The Court need not rely on Zippo's sliding scale framework because, as discussed, Meta has done more than operate a website accessible in the forum. This is not a case where the

18

defendant operates a website simply visible in the forum, see McBee v. Delica Co., Ltd., 417 F.3d 107, 124 (1st Cir. 2005), or an interactive website, see Gullen v. Facebook.com, Inc., No. 15 C 7681, 2016 WL 245910, at *3 (N.D. Ill. Jan. 21, 2016).[1] Rather, the State alleges that Meta designed an addictive application, collects personal data from New Hampshire users, sells that personal data to advertisers, and profits from advertisers' ability to target their advertisements to New Hampshire users based on their location and preferences learned from the data collected by Meta. (Compl. ¶¶ 36–38.) This is conduct directly targeted to New Hampshire. Meta's engagement in similar conduct elsewhere does is irrelevant to this Court's analysis. Therefore, the Court concludes that Meta has purposefully availed itself of jurisdiction in New Hampshire courts.

Lastly, the Court addresses the fairness and reasonableness of exercising jurisdiction over Meta. The third and final prong of the specific personal jurisdiction test asks, "whether it would be fair and reasonable to require the defendants to defend the suit in New Hampshire." Seward, 174 N.H. at 413. "For this determination, [the Court] examine[s] the five so-called 'gestalt factors,' which are: the burden on the defendant; the forum state's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies." Id.

---

[1] While Facebook.com was the defendant in Gullen, there were no similar facts, as are present in the State's complaint, about the defendant's profits derived from the forum, its collection of data for the purposes of advertising, or its sale of that data to advertisers.

Meta argues that forcing it to litigate in New Hampshire is unfair because its place of business in California is an appreciable distance from New Hampshire and attorneys general from 33 other states are pursuing similar litigation in a consolidated action in California (the "MDL Litigation").  See In re Social Media Adolescent Addiction/Personal Injury Prod. Liability Litig., No. 4:23-cv-05448-YDR, 4:23-cv-05885-YGR (N.D. Cal. Oct. 15, 2024).  Meta asserts that efficiency calls for litigating the State's claim with the others in California.  The State contends that the burdens of modern travel are minimal and that it is not unfair to require Meta to defend itself in the forum wherein the State seeks to protect hundreds of thousands of forum consumers.

The Court begins with the first gestalt factor: the burden on the defendant.  While Meta is headquartered in California, it is a large corporation capable of defending itself anywhere.  Meta's Social Media Platforms, Facebook and Instagram, had over 418 million combined users in the United States in 2023.  "Because suit in a foreign jurisdiction always burdens a foreign company, the defendant must establish that the Court's exercise of jurisdiction would be onerous in a special, unusual, or other constitutionally significant way."  State v. N. Atlantic Refining Ltd., 160 N.H. 275, 286 (2010).  The Court cannot say, with Meta's vast reach including into New Hampshire as outlined supra, that exercising jurisdiction would be special, unusual, or constitutionally significant.  With respect to the second factor, New Hampshire has a strong interest in obtaining relief in its courts for harms allegedly committed against its citizens.  See Benitez-Allende v. Alcan Aluminio do Brasil, S.A., 857 F.2d 26, 31 (1st Cir. 1988).  Further, "New Hampshire also has a strong interest in protecting the legitimacy of its court judgments."  Seward, 174 N.H. at 413.  The third factor also weighs in favor of

exercising jurisdiction because the State's interest in obtaining convenient and effective relief is furthered by providing it a means to pursue redress in its home courts. The fourth factor weighs against exercising jurisdiction because the most efficient resolution is the consolidated litigation of other similar suits in the multi-district litigation venued in California district court. Finally, exercising jurisdiction supports the "shared interest of the several states in furthering fundamental substantive social policies." The states have an interest in protecting their citizens from harm and obtaining relief in their own courts.

Accordingly, having considered the gestalt factors, the Court determines it is fair and reasonable to exercise jurisdiction over Meta.

Altogether, the Court determines it can exercise specific personal jurisdiction over Meta because it has purposefully availed itself of the Court's jurisdiction, its contacts with New Hampshire are related to the conduct underlying the State's claims, and it is fair and reasonable to exercise jurisdiction here. Seward, 174 N.H. at 407. Having found that the Court may exercise personal jurisdiction over Meta, the Court turns to Meta's arguments on the merits.

B. Section 230 of the Communications Decency Act

Meta argues that Section 230 of the Communications Decency Act ("Section 230") bars the State's claims because they treat Meta as a publisher of third-party content. Because Section 230 is an affirmative defense, dismissal is only proper if Meta's immunity is evident from the face of the complaint. Teatotaller, LLC v. Facebook, Inc., 173 N.H. 442, 449 (2020) (quoting Force v. Facebook, Inc., 934 F.3d 53, 63 n. 15 (2d Cir. 2019)).

21

In 1996, Congress enacted Section 230 "to promote the continued development of the Internet" and "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material," among other policies. 47 U.S.C. § 230(b)(1), (4). To achieve these goals, Section 230 immunizes interactive computer service providers, like Meta, from legal claims that treat them as a publisher or speaker of third-party content. See 47 U.S.C. § 230(c)(1), (e)(3). While courts have interpreted Section 230 to "broadly immunize internet companies from liability . . . this immunity is not limitless." Calise v. Meta Platforms, Inc., 103 F.4th 732, 736 (9th Cir. 2024).

To determine whether Section 230 immunity applies to a given case, courts employ a three-prong test. Under this test, Section 230 only protects "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." Teatotaller LLC, 173 N.H. at 450 (quoting Universal Commc'n v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007)); see also Calise, 103 F.4th at 740; Lemmon v. Snap, Inc., 995 F.3d 1085, 1091 (9th Cir. 2021); Barnes v. YAHOO!, Inc., 570 F.3d 1096, 1100–01 (9th Cir. 2009).

It is undisputed that Meta is a provider of an interactive computer service and therefore satisfies the first prong. To analyze the second and third prongs, the Court must determine whether it is evident from the face of the complaint that each of the State's claims treat Meta as a publisher or speaker of third-party content. This determination rests upon the State's theory of liability in each count. See Teatotaller,

22

LLC, 173 N.H. at 451; Calise, 103 F.4th at 740 (stating that courts must "examine each claim to determine whether a plaintiff's theory of liability would treat a defendant as a publisher or speaker of third-party content") (emphasis in the original). Thus, the Court must examine Meta's duty under the State's theories of liability. As explained by the Ninth Circuit in Calise,

> We must therefore examine two things in looking at duty. First, what is the "right" from which the duty springs? If it springs from something separate from the defendant's status as a publisher, such as from an agreement, or from obligations the defendant has in a different capacity, then [Section 230] does not apply. Second, we ask what is this duty requiring the defendant to do? If it obliges the defendant to "monitor third-party content"—or else face liability—then that too is barred by [Section 230].

Id. (cleaned up).

In Lemmon, the Ninth Circuit examined the duty of social media companies to design reasonably safe products. There, the parents of two boys who died in a high-speed car accident sued Snap, Inc. ("Snap"), alleging that Snap negligently designed its social media platform, Snapchat. Lemmon, 995 F.3d at 1087. Like Instagram and Facebook, Snapchat is a social media platform that allows users to share photos and videos with other Snapchat users. See id. at 1088. To promote user engagement, Snapchat provides users with rewards such as "trophies, streaks, and social recognitions," but does not tell users how to earn these rewards. Id. At the time, Snapchat had developed a "speed filter," which allowed users to superimpose their real-life speed atop user-created content. Id. The plaintiffs alleged Snapchat knew or should have known that its users believed that Snapchat would reward them for posting a "snap" at 100 miles per hour or over. Id. at 1089. While Snapchat warned users not to use the filter while driving, the warnings proved ineffective. Id. at 1090. The trial

court dismissed the plaintiffs' amended complaint, ruling that Section 230 barred their claim. Id.

On appeal, the Ninth Circuit reversed the trial court's decision and concluded that the plaintiffs' claim did not treat Snap as a publisher or speaker of third-party content because the cause of action focused on Snap's duty, as a manufacturer, to design a reasonably safe product. Id. at 1091–92. The court explained,

> [The plaintiffs'] negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing a product (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter). Thus, the duty that Snap allegedly violated "springs from" its distinct capacity as a product designer. This is further evidenced by the fact that Snap could have satisfied its "alleged obligation"—to take reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate. Snap's alleged duty in this case thus "has nothing to do with" its editing, monitoring, or removing of the content that its users generate through Snapchat.

Id. at 1092 (cleaned up). In its analysis, the court conceded that Snap, in some capacity, acted as a publisher or speaker of third-party content, but concluded that was not enough to confer immunity under Section 230. Id. The court explained,

> That Snap allows its users to transmit user-generated content to one another does not detract from the fact that the [plaintiffs] seek to hold Snap liable for its role in violating its distinct duty to design a reasonably safe product. As in Internet Brands, Snap "acted as the 'publisher or speaker' of user content by" transmitting [the boys'] snap, "and that action could be described as a 'but-for' cause of [the boys'] injuries." This is unsurprising: Snap "is an internet publishing business. Without publishing user content, it would not exist. But though publishing content is "a but-for cause of just about everything" Snap is involved in, that does not mean that the [plaintiffs'] claim, specifically, seeks to hold Snap responsible in its capacity as a "publisher or speaker." The duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content."

Id. at 1092–93 (citing Doe v. Internet Brands, Inc., 824 F.3d 846, 853 (9th Cir. 2016)).

24

The Court finds this reasoning persuasive and applicable here. While the State's complaint alleges that New Hampshire children are exposed to harmful content while using the Social Media Platforms, the thrust of the State's allegations in Counts I, III, and V are based on Meta's duty as a manufacturer to design reasonably safe products and allege that Meta's own conduct regarding the design of those products is defective.[2] This duty is independent of Meta's role as a publisher of third-party content. While the Northern District of California decided differently in the MDL Litigation, wherein Meta is a defendant, see In re: Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F.Supp.3d 809, 830–33 (N.D. Cal. 2023), the Court finds its decision today to be consistent with persuasive authority, as well as the language and purpose of Section 230, see 47 U.S.C. § 230(b)(3), (4); Calise, 103 F.4th at 736 (reasoning that immunity under Section 230 is not limitless); Lemmon, 995 F.3d at 1092–93 (holding that Section 230 did not bar negligent design claim); Internet Brands, 824 F.3d at 853 (holding that Section 230 did not bar failure to warn claim).

To be clear, Section 230 protects Meta against any claims where the alleged harm arises from the substance of third-party content posted on the Social Media Platforms. See Force, 934 F.3d at 66 (finding Facebook was protected under Section 230 for harm resulting from Hamas content); Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1098 (9th Cir. 2019) (finding the defendant was protected under Section 230 when a user died from fentanyl toxicity after purchasing fentanyl from another user on the defendant's online service). However, the State alleges that Meta's product design features, in and of themselves, are harmful to New Hampshire children regardless of the

---

[2] The Court separately analyzes whether the Social Media Platforms are "products" in Section V, infra, regarding products liability.

25

substance of the third-party content displayed. (Compl. ¶¶ 238, 241-44, 249, 281-84, 301, 315.) Thus, the Court determines that Section 230 does not bar the State's claims within Counts I, III, and V.

To the extent that Meta argues that Section 230 immunizes them against aspects of Counts II, IV, and V involving Meta's alleged misrepresentations and failures to warn, the Court disagrees. These counts are not based on Meta's role as a publisher of third-party content. Rather, the duty alleged to be breached arises out of Meta's knowledge that its products harm New Hampshire children. Thus, Section 230 does not bar these claims. See Doe v. Internet Brands, Inc., 824 F.3d 846, 852–53 (finding that Section 230 does not bar failure to warn claims); In re Social Media Adolescent Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d 809, 834 (N.D. Cal. 2023) (same); Hiam v. HomeAway.com, Inc., 267 F. Supp. 3d 338, 346–47 (D. Mass 2017); aff'd, 887 F.3d 542 (1st Cir. 2018) (reasoning that claims based on publisher's own speech are not barred by Section 230).

IV.    First Amendment

Meta contends that the First Amendment and Part I, Article 22 of the New Hampshire Constitution protect its editorial discretion to disseminate third-party speech and, thus, bar the State's claims. The State contends that its claims are not barred because the conduct challenged is not protected speech but, rather, Meta's implementation of addictive design features. However, Meta argues that because its "content publication algorithms and other design choices are simply the means by which Meta presents and arranges speech, they 'fall squarely within the core of the First

26

Amendment security.'"  (Def.'s Memo. ISO Mot. to Dismiss at 16) (citing Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, 515 U.S. 557, 570 (1995)).

Like Section 230, the First Amendment protects publishers' discretion to disseminate third-party speech and categorically protects publishers from liability for injuries arising out of that speech.  See Miami Hearld Pub'g Co. v. Tornillo, 418 U.S. 241, 258 (1974); Moody v. NetChoice, LLC, 144 S.Ct. 2383, 2393 (U.S. 2024) (comparing social media company's content moderation to traditional publishers' editorial choices, which "also select and shape other parties' expression into their own curated speech products").  Many courts, including the MDL court, have held that certain publishing decisions made by social media companies trigger First Amendment scrutiny.  See In re Social Media Adolescent Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d at 836 (applying First Amendment protection to the timing and clustering of notifications of Meta's own content); NetChoice, LLC v. Florida, 34 F.4th 1196, 1203–04, 1210 (11th Cir. 2022) (finding that social media companies engaged in protected speech when they expressed their political views through content moderation practices).

Thus, the First Amendment, like Section 230, immunizes Meta against any claims alleging harm arising from the substance of third-party content, as that conduct falls within a traditional publishing role.  See Tornillo, 418 U.S. at 258; Reno v. ACLU, 521 U.S. 844, 870 (1997).  However, because the Court has concluded that the thrust of the State's claims seeks to hold Meta accountable for the harm caused by the alleged addictive design features themselves, regardless of the substance of the third-party content disseminated, the Court similarly finds that the First Amendment does not bar

27

the State's claims.  See In re Social Media Adolescent Addiction/Personal Injury Pro.

Liability Litigation, 702 F. Supp. 3d at 836 (stating that Meta's briefing ignored that

"much of the conduct alleged by plaintiff does not constitute speech or expression" and

"d[id] not explain how holding them liable in that context would be akin to making them

liable for speech").

## V.    Consumer Protection Act

The State asserts two claims alleging that Meta violated New Hampshire's

Consumer Protection Act ("CPA"), RSA 358-A:2.  In the first, Count I, the State alleges

that Meta violated the CPA by intentionally incorporating addictive design features and

algorithms into its Social Media Platforms despite its knowledge of the harm children

suffer from those features.  (Compl. ¶ 238.)  The State also alleges, in Count II, that

Meta violated the CPA by engaging in deceptive acts or practices, in particular: (1)

deceptively representing that the Social Media Platforms are safe and failing to disclose

and/or concealing information indicating the Platforms are not safe; (2) misrepresenting

that the Social Media Platforms are not designed to hook children; and (3)

misrepresenting that Meta prioritizes user well-being over profits.  (Compl. ¶¶ 260–62.)

Meta moves to dismiss both CPA claims on the following grounds: (1) the State

failed to identify unlawful conduct that took place in New Hampshire; (2) Meta is exempt

from CPA liability because it falls under the CPA's publisher exception; (3) the alleged

unfair or deceptive practices are not alleged to have occurred in the conduct of trade or

commerce; (4) both counts fail to state a claim; and (5) the State is not entitled to

restitution.  The Court addresses each argument in turn.

28

a.  Conduct in or Directed at New Hampshire

Meta contends that the State's CPA claims must fail because the State has not alleged that the underlying conduct occurred in New Hampshire.  Meta cites the fact that its principal place of business is in California and the State does not allege that Meta maintains offices, employees, or assets in New Hampshire.  The State responds that the "offending conduct" occurred within New Hampshire because Meta's alleged misrepresentations were received by New Hampshire consumers and Meta's design features affected New Hampshire users.

RSA 358-A:2 makes unlawful the use of "any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  "Trade" and "commerce" include "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state."  RSA 358-A:1, II; LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 96 (2007) (emphasizing the broad sweep of the CPA indicated by the language, "any trade or commerce directly or indirectly affecting the people of this state").  "The limitation in RSA 358-A:2 to 'conduct of any trade or commerce within this state' has been interpreted to mean that the statute only applies to offending conduct that took place in New Hampshire."  Environamics Corp. v. Ferguson Enter., Inc., No. Civ. 00-579-JD, 2001 WL 1134727, at *4 (D.N.H. Sept. 24, 2001).

The following decisions demonstrate a spectrum of whether a defendant's conduct satisfies the "within this state" element of the CPA.  In LaChance, the New

29

Hampshire Supreme Court held that the plaintiffs, who were purchasers of smokeless tobacco products from retail stores across New Hampshire, could bring a CPA claim against the defendants, who manufactured smokeless tobacco products and marketed them through in-store displays. 156 N.H. at 89 (addressing whether the plaintiff's claims satisfied the "trade or commerce" requirement, not specifically addressing the territorial requirement). In Environamics, the court determined that the "within this state" requirement was satisfied where the defendant shipped a contaminated product to New Hampshire. 2001 WL 1134727, at *4. Alternatively, the Precourt Court ruled that the defendant's conduct was not within the State of New Hampshire where it shipped its beef to a New York company which then incorporated the defendant's beef into another product which it distributed to New Hampshire. Precourt v. Fairbank Reconstruction Corp., 856 F. Supp. 2d 327, 344 (D.N.H. 2012).

The Court determines that the State's allegations support that the conduct underlying the claims against Meta has a sufficient New Hampshire nexus. The Court begins with the State's claims arising out of Meta's design features. In 2023, Facebook and Instagram had 34,063 and 89,339 New Hampshire users under eighteen, respectively. (Compl. ¶¶ 49–50.) Meta also derived $542,835,568 from ad revenue sourced from New Hampshire users in 2023. (Id. ¶ 40.) Further, as explained above, supra Section A, Meta's algorithms are influenced by the data collected from New Hampshire users. To say that Meta's alleged unfair or deceptive act or practice of incorporating addictive design features and algorithms into its Social Media Platforms used by tens of thousands of New Hampshire children is not conduct within this state is not credible. Turning to the State's claims arising out of Meta's alleged

30

misrepresentations, the Court determines that the conduct likewise occurred "within this state" because New Hampshire children are alleged to have suffered from the impacts of Meta's misrepresentations and omissions. (See id. ¶¶ 32, 261.) Certain alleged misrepresentations are included on Meta's website, accessed by the tens of thousands of New Hampshire child users and New Hampshire adult users on a regular basis. (See id. ¶ 145.) For these reasons, the Court views the State's allegations as similar to those in LaChance and Environamics, satisfying the CPA's territorial requirement at the pleading stage.

The Court's decision is in accord with other jurisdictions that determined the CPA's territorial requirement was satisfied on a claim alleging a nationwide scheme under which New Hampshire citizens have suffered despite the conduct not directly occurring in New Hampshire. See In re Niaspan Antitrust Litig., 42 F. Supp. 3d 735, 761 (E.D. Penn. 2014); In re Chocolate Confectionary Antitrust Litig., 749 F. Supp. 2d 244, 234–35 (M.D. Penn. 2010); In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012).

b. Publisher Exemption Under RSA 358-A:3, IV

Meta contends that it is exempt from liability under RSA 358-A because it is a publisher under RSA 358-A:3, IV. The State argues that the exemption is inapplicable because the State seeks to hold Meta liable for its use of addictive design features and for its misrepresentations, not as a publisher of third-party content.

RSA 358-A:3 exempts certain persons or conduct from liability under RSA 358-A. One of those exceptions, RSA 358-A:3, IV, exempts from liability, "[p]ublishers, broadcasters, printers, or other persons engaged in the dissemination of information or

31

reproduction of printed or pictorial matter who publish, broadcast, or reproduce material without knowledge of its deceptive character." Cf. Karpinski v. Union Leader Corp., No. 18-cv-1214-PB, 2019 WL 3203144, at *8 (D.N.H. July 16, 2019) (analyzing RSA 358-A:3, IV where the suit arose out of the substance of an article published by the defendant newspaper).

The Court agrees with the State. For similar reasons outlined, supra Section B, addressing Meta's Section 230 arguments, the State seeks to hold Meta liable not for its publishing of certain content, but rather for the addictive features it implements into its Social Media Platforms and for the alleged misrepresentations it has made to the public. The State's CPA claims do not arise out of Meta's publishing of deceptive material. For that reason, RSA 358-A;3, IV does not apply.

c. Conduct of Trade or Commerce

Meta argues that its alleged conduct does not constitute "conduct in any trade or commerce" because the State does not, and cannot, allege that users pay to use the Social Media Platforms. The State responds that Meta has engaged in "trade or commerce" in New Hampshire by exchanging the use of its Social Media Platforms for users' personal data.

"To determine whether the [CPA] applies to a particular transaction, [the Court] analyze[s] the activity involved, the nature of the transaction, and the parties to determine whether a transaction is a personal or business transaction." Hughes v. DiSalvo, 143 N.H. 576, 578 (1999) (declining to extend to the CPA to isolated sales of property by owners). The CPA defines "trade" and "commerce" as, "the advertising,

32

offering for sale, sale, or distribution of any services or any property . . . ." RSA 358-A:1. The Court must engage in statutory interpretation of the term "sale" in the CPA.

When engaging in statutory interpretation, the Court "first look[s] to the language of the statute itself, and, if possible, construe[s] that language according to it plain and ordinary meaning." State v. Doyle, 176 N.H. 594, 597 (2024). The Court "give[s] effect to every word of a statute whenever possible and will not consider what the legislature might have said or add language that the legislature did not see fit to include." Id. The Court "construe[s] all parts of a statute together to effectuate its overall purpose" and attempts to construe all parts "in harmony with the overall statutory scheme." Id.

"Sale" is defined as "[t]he action or an act of selling or making over to another for a price; the exchange of a commodity for money or other valuable consideration." Oxford English Dictionary, "Sale," July 2023; Matter of Carter, 2024 N.H. 30, ¶ 9 ("When a term is not defined in a statute, [the Court] look[s] to its common usage, using the dictionary for guidance."). It is also defined as, "[t]he transfer of property or title for a price." Black's Law Dictionary, "Sale," (12th ed. 2024). Upon review of the plain meaning of "sale," the Court cannot say that it requires an exchange of money. The Court declines to read words into the statute the legislature did not see fit to include. See Doyle, 176 N.H. at 597. Rather, a sale could be an exchange wherein consumers are able to access Meta's Social Media Platforms in exchange for a price—Meta's collection of their personal data. While Meta does not charge for its product, it receives valuable consideration in the form of person information. The State has alleged such an exchange, satisfying the "trade or commerce" element of the CPA at the pleading stage. (See Compl. ¶ 34.) The Court's conclusion is in accordance with the purpose of the

CPA: "to ensure an equitable relationship between consumers and persons engaged in business." Hughes, 143 N.H. at 578.

The Court notes that Meta originally relied upon a trial court decision from an Indiana court interpreting a similar state statute. See Indiana v. Tiktok, Inc., No. 02D02-2212-PL-400, 2023 WL 8481303, at *6 (Ind. Ct. Super. Nov. 29, 2023). That court determined that Tiktok's operation of an app, free to users, was not a "consumer transaction" under Indiana's comparable consumer protection act because users did not exchange money for use of the app. Id.; see also Ind. Code § 24-5-0.5-2(1) (defining a "consumer transaction" as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible"). The Court of Appeals of Indiana reversed the trial court's decision, determining that Tiktok's business model of exchanging access to its content library for end-user personal data was a "consumer transaction." State v. Tiktok, Nos. 23A-PL-3110, 23A-PL-3111, 2024 WL 4340387, at *8–9 (Ind. Ct. App. Sept. 30, 2024). The court concluded that, "the plain and ordinary definition of the word 'sale,' which is not otherwise defined in the DCSA, includes any consideration to effectuate the transfer of property, not only an exchange of money." Id. at *9 (noting that an interpretation limiting the definition of the word "sale" to exchanges for money narrows the scope of the act beyond its plain terms, contrary to its requirement of liberal interpretation). The Court adopts a reasoning similar to that of the Indiana Court of Appeals, here.

d. Failure to State a Claim

Meta argues that the State fails to state a claim under either of its CPA counts. It contends that the State has failed to allege facts demonstrating the "rascality" of Meta's

34

conduct or that New Hampshire citizens suffered substantial injury from Meta's acts. The State responds that its allegations of Meta's conduct meet New Hampshire's rascality test and that the alleged harms to New Hampshire children's mental health suffices as substantial injury.

The CPA proscribes unfair and deceptive trade practices in general, RSA 358-A:2, and sets forth a list of specific types of conduct that qualify as unfair or deceptive trade practices, RSA 358-A:2, I–XVIII. Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 24 (2017). Although the general provision is broadly worded, the New Hampshire Supreme Court has recognized that not all conduct in the course of trade or commerce falls within the scope of the CPA. Id.

"In determining which commercial actions not specifically delineated are covered by the act," the Court employs the "rascality" test. Id. "Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. In addition to the rascality test, New Hampshire courts look to the federal courts' interpretation of the Federal Trade Commission Act for guidance. Id. The Federal Trade Commission considers: "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . ." Id. The New Hampshire Supreme Court has found the rascality test unmet when a defendant was alleged to have engaged in conduct

35

common in the particular industry in which the parties engaged.  See Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363, 371 (2009).

      i.    Count I

In Count I, the State alleges that Meta committed unfair acts in violation of the CPA by intentionally incorporating addictive design features and algorithms into its Social Media Platforms despite knowledge of the harms suffered by child users of those features.  (Compl. ¶ 238.)  Meta contends that the State fails to state a claim on Count I because Meta's alleged manipulative and addictive design features are not unique to its Social Media Platforms and the State has not alleged a "substantial injury."  The State disagrees that Meta's design features need to be unique to be actionable under the CPA.  The State further asserts that non-monetary harm can suffice as a substantial injury, establishing an unfair act or practice.

Meta's contention that its design features do not satisfy the rascality test because they are well known to the public and other social media services use similar features is unpersuasive to the Court.  Of note, the fact that other social media services use similar features is not a fact pleaded in the complaint.  For that reason, the Court cannot consider it.  See Barufaldi, 175 N.H. at 427; Hair Excitement, Inc., 158 N.H. at 371 (reviewing the trial court's decision of the plaintiff's CPA claim on the merits, not at the motion to dismiss stage).  Further, while Meta's design features may be well known, the State alleges that Meta misrepresented and omitted information about the design features' addictive nature.  Accordingly, in viewing the facts in the light most favorable to the State, the Court cannot rule that the addictive nature of Meta's design features is known and understood by the public.

Therefore, the Court is left with the State's allegations that Meta intentionally incorporated addictive design features and algorithms into its Social Media Platforms. The State alleges Meta did so with an understanding of the harms suffered by children using the Platforms. Finally, the State alleges that Meta's acts and omissions have exploited children's psychological vulnerabilities for Meta's financial gain. The knowing exploitation of children's health for financial gain rises to "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Hair Excitement, Inc., 158 N.H. at 369.

The Court next addresses Meta's argument that the State has not alleged a substantial injury. Relying on the Federal Trade Commission's test to determine whether conduct is unfair or deceptive, the New Hampshire Supreme Court requires a showing that the conduct causes substantial injury to consumers. Fat Bullies Farm, Inc., 170 N.H. at 24. The Court is unaware of precedent from the New Hampshire Supreme Court substantively analyzing the meaning or scope of "substantial injury." Accordingly, the Court turns to other jurisdictions' interpretations of the Federal Trade Commission Act.

In 1985, the Court of Appeals for the District of Columbia relied on a policy statement from the Federal Trade Commission which stated, "in most cases substantial injury would involve monetary harm and that 'ordinarily' emotional impact and other more subjective types of harm would not make a practice unfair." Am. Fin. Serv. Ass'n v. F.T.C., 767 F.2d 957, 972 (D.C. Cir. 1985). Further, the Commission's policy statement clarified that it is "not concerned with trivial or merely speculative harms." Id. The Commission also noted in correspondence with United States senators that it does

37

not "cover subjective examples of harm such as emotional distress or offenses to taste or social belief." Id. at n.18. However, an act or practice can cause 'substantial injury' by doing "a small harm to a large number of people, or if it raises a significant risk of concrete harm." Id.; F.T.C. v. Neovi, Inc., 604 F.3d 1150, 1157 (9th Cir. 2010).

The State has alleged harm sufficing to establish substantial injury under the CPA. The State alleges that use of Meta's Social Media Platforms "results in psychological and health harms among children, including increased rates of major depressive episodes, anxiety, sleep disturbances, suicide, and other mental health concerns." (Compl. ¶ 99.) The State also alleges that frequent social media use has been associated with distinct changes in the amygdala region of a developing brain. (Id. ¶ 106.) Even accepting a classification of the harms alleged by the State as "emotional distress," such allegations establish a substantial injury. The harm suffered by New Hampshire child users of the Social Media Platforms is not subjective or trivial. Rather, the State alleges that use of the Platforms causes serious injury to teenagers' health. This alleged harm is sufficiently concrete, see Neovi, Inc., 604 F.3d at 1157 (requiring that an injury be "concrete" to satisfy the substantial injury test), and serious to constitute substantial injury. See District of Columbia v. Meta Platforms, Inc., No. 2023-CAB-6550, at *34 (D.C. Super Ct. Sept. 9, 2024) (holding that the District alleged a substantial injury by alleging that Meta's addictive design features significantly increase rates of major depressive episodes anxiety, sleep disturbances, and other mental health disorders, including suicide, among children); F.T.C. v. Accusearch, Inc., No. 06-CV-105-D, 2007 WL 4356786, at *8 (D. Wy. Sept. 28, 2007) (ruling that, "while the substantial injury requirement may not *ordinarily* be met from emotional impact that

38

is 'trivial or merely speculative,' the evidence presented to the Court demonstrates a host of emotional harms that are substantial and real and cannot be fairly classified as either trivial or speculative").  Further, were the Court to accept the proposition that the harm alleged by the State is "small," which the Court is disinclined to do, a large number of people suffer from the harm, and, thus, the State has alleged a substantial injury.  See id.

Accordingly, the State has stated a claim upon which this Court may grant relief on Count I of its complaint.

ii.     Count II

In Count II, the State alleges that Meta made misrepresentations to consumers, specifically: (1) deceptively representing that the Social Media Platforms are safe and failing to disclose and/or actively concealing information that they are not; (2) misrepresenting that the Social Media Platforms are not designed to hook children; and (3) misrepresenting that Meta prioritizes user well-being over profits.  (Compl. ¶ 262.) Meta argues that its subjective, generalized statements about the safety of the Social Media Platforms are statements of opinions or goals and cannot form the basis for a deceptive practices claim.  Meta also contends that Count II fails because the State did not allege with specificity that its misrepresentations were false or misleading, the State's allegations about Meta's prioritization of time spent are not material, and Meta's statements to Congress are not actionable.  The State disagrees, arguing that it alleged Meta's misrepresentations and omissions with sufficient specificity based on actionable deceptions.

First, the Court addresses Meta's argument that the State's deceptive practices claim must be pleaded with specificity. Meta relies on a New Hampshire superior court decision from 1999, a decision from the District Court for the District of New Hampshire, and a New Hampshire Supreme Court decision. First, the superior court order only briefly addresses the plaintiff's CPA claim and does not set out a standard of review separate from the plaintiff's claim for fraud. See Nichols v. Gen. Motors Corp., No. 99-C-566, 1999 WL 33292839, at *4–5 (N.H. Super. Ct. Dec. 13, 1999). Second, the federal court's decision applied a heightened pleading standard to the plaintiff's CPA claim after determining that a federal procedural rule required such standard for claims sounding in fraud. Micronics Filtration Holdings, Inc. v. Miller, No. 18-cv-303-JL, 2018 WL 4845749, at *6 (D.N.H. 2018). This Court need not consider rulings from other courts applying federal procedural rules rather than the rules this Court is bound by. Finally, Meta's reliance on Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46–47 (1987), is misplaced because that decision specifically addresses the standard of review for claims of fraud, and does not discuss broader applicability of the standard to claims such as CPA claims.

Consequently, the Court applies the traditional standard of review on a motion to dismiss to Meta's motion to dismiss Count II of the State's complaint. See LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 93–100 (2007) (employing the typical motion to dismiss framework to resolve an appeal of a trial court's grant of the defendant's motion for judgment on the pleadings—which are treated like motions to dismiss in New Hampshire—of the plaintiff's CPA claim); Snierson v. Scruton, 145 N.H. 73, 80–81 (2000) (applying a specificity test to the plaintiff's fraud and negligent

40

misrepresentation claims and then ruling that the plaintiff's CPA allegations "support[ed] a claim of unfair or deceptive trade practices" and not mentioning a specificity requirement).

The Court turns to Meta's argument that the State's claims arising out of alleged misrepresentations regarding the Social Media Platforms' safety are non-actionable statements of opinion, not misstatements of fact.  The Court disagrees.  Accepting the State's allegations as true, Meta's statements about the Social Media Platforms' safety went beyond mere puffery.  See Hughes v. Panasonic Consumer Elecs. Co., Civ. Act. No. 10-846, 2011 WL 2976839, at *12 (D.N.J. July 21, 2011) (finding that alleged statements regarding "industry leading" characteristics were mere puffery insufficient to satisfy federal pleading standards).  Rather, Meta is alleged to have known of the specific harms the Platforms caused child users and yet Meta reiterated the safety of the Platforms.  Similarly, Meta prioritized users' time spent on the Platforms, knowing of the harm extended use of the Platforms caused, while making statements of its prioritization of safety and well-being.  This goes beyond statements of corporate optimism.  The Court finds these statements actionable because Meta is alleged to have known of specific harms, omitted the information from its public statements, and represented the opposite.  Such conduct is subject to liability under the CPA.

The cases Meta cites are inapposite.  See Morris v. Princess Cruises, Inc., 236 F.3d 1061, 1067–68 (9th Cir. 2001) (ruling that the plaintiff's claim for negligent misrepresentation was non-actionable where the plaintiff denied discussing the quality or nature of medical care on the cruise ship; the central issue of the claim).  In particular, the Court finds decisions related to car manufacturers or ride-sharing

41

application companies' statements about the safety of their products distinct.[3] A reasonable consumer understands the inherent danger in operating a car and receiving a car ride from a stranger. However, the same is not true for use of social media applications. The State alleges that Meta knew about dangers posed by the Social Media Platforms and misrepresented or omitted key facts about the Platforms' safety. For that reason, a reasonable consumer does not have the same understanding of the dangers of social media as they might of the dangers of cars. To put it plainly, the dangers posed to users by Meta's addictive design features are far less visible or obvious than those posed by riding in cars with strangers. The Court also notes that several of the cases cited by Meta involve securities actions in which the analysis focused on the understanding of a reasonable investor. Here, the Court must determine whether a reasonable consumer may have been misled by Meta's statements. Viewing the State's allegations in the light most favorable to it, the Court concludes a reasonable consumer may have been so misled. Accordingly, the Court is not persuaded by Meta's arguments and finds the State's allegations actionable.

Meta breaks down the rest of its argument into categories of statements related to: (1) prevalence of harmful content; (2) Project Daisy; (3) filters; (4) Meta's prioritization of time spent; and (5) other allegations generally alleging that Meta "deceived" and "misled" the public, consumers, and external researchers and regulators. The State responds that particular statements or practices can deceive

---

[3] See In re Lyft Inc. Sec. Litig., 484 F. Supp. 3d 758, 770 (N.D. Cal. 2020); Azoulai v. BMW of N. Am. LLC, No. 16-cv-00589-BLF, 2017 WL 1354781, at *8 (N.D. Cal. 2017); In re Ford Motor Co. Sec. Litig., Class Action, 381 F.3d 563, 571 (6th Cir. 2004); Greater Houston Trans. Co. v. Uber Tech., Inc., 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015); XYZ Two Way Radio Serv., Inc. v. Uber Tech., Inc., 214 F. Supp. 3d 179, 183–84 (E.D.N.Y. 2016).

while being vague or technically true. The State asserts that it has alleged a concerted, global effort to deceive through Meta's various statements about certain aspects of the Social Media Platforms. The State refers to similar allegations made against tobacco companies related to statements about the health hazards posed by consumption of their products. See King v. Philip Morris, Inc., No. 990C0856, 2000 WL 34016358, at *10 (N.H. Super. Ct. Nov. 2, 2000).

The Court is inclined to agree with the State that the proper approach is to view Meta's statements as a whole to determine whether the State has stated a claim that the statements are misrepresentations violative of the CPA. The Court concludes that the State has done so. The State has alleged that Meta's statements about the Social Media Platforms were designed to minimize the harmful effects Meta was aware the Platforms had on child users. (Compl. ¶ 4.) The Court's analysis is whether Meta's conduct attained "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Fat Bullies Farm, LLC, 170 N.H. at 24. Meta's statements, whether they concerned the prevalence of harmful content, Project Daisy, filters, its prioritization of time spent on the Platforms, or more general deceiving or misleading statements, aimed to conceal the negative impacts of social media use on children, portray the Platforms as safe for children and indicate that Meta prioritized child safety. These statements are misleading such that they reach the required level of rascality at the pleading stage.

The Court lastly addresses Meta's arguments regarding statements it is alleged to have made in testimony to Congress. Meta contends that it cannot be liable for such statements because the First Amendment bars claims based on efforts to petition the

43

government, including congressional testimony, and any statements made to Congress were not made "in the conduct of any trade or commerce" as required by RSA 358:A-2.

Meta's first argument relies on the <u>Noerr-Pennington</u> doctrine which is "rooted in the Petition Clause of the First Amendment" and protects "an attempt to persuade the legislature or the executive to take particular action with respect to a law." <u>United States v. Philip Morris USA Inc.</u>, 566 F.3d 1095, 1123 (D.C. Cir. 2009). The doctrine only covers activity "genuinely intended to influence government action." <u>Id</u>. Additionally, neither the doctrine nor the First Amendment protect petitions predicated on fraud or deliberate misrepresentation. <u>Id</u>. (collecting cases). Because the State has stated a claim that Meta's statements were misrepresentations, in violation of the CPA, they are not entitled to protection under <u>Noerr-Pennington</u>. The Court assumes the truth of the State's allegations: that Meta made statements to Congress which it knew were false or misleading. Accordingly, neither the <u>Noerr-Pennington</u> doctrine nor the First Amendment protect Meta's statements because they constitute deliberate misrepresentation.[4] <u>See</u> <u>id</u>.

The Court is likewise not persuaded by Meta's argument that the statements it made to Congress were not within "trade or commerce," and, consequently, are not actionable under the CPA. The CPA applies to "persons engaged in trade or commerce." <u>Hughes v. DiSalvo</u>, 143 N.H. 576, 578 (1999) (quoting <u>Chase v. Dorais</u>, 122 N.H. 600, 601 (1982)). "Remedies under the [CPA] are not available where the transaction is strictly private in nature, and is in no way undertaken in the ordinary

---

[4] The Court assumes, without deciding, that the <u>Noerr-Pennington</u> doctrine applies in this context as a defense to the State's CPA claim. However, the Court recognizes that some courts, <u>see, e.g.</u>, <u>Andrx Pharm., Inc. v. Elan Corp., PLC</u>, 421 F.3d 1227, 1233 (11th Cir. 2005), have limited the applicability of the doctrine to antitrust actions (where the doctrine originated).

course of a trade or business." Id. (cleaned up). Assuming all of the facts in the State's complaint as true, and construing all inferences in the State's favor, Meta's statements to Congress were a part of its overall scheme to conceal known harm stemming from children's use of the Social Media Platforms. (Compl. ¶ 143–44, 188, 205–06.) As discussed, this is a key aspect of Meta's business model. Therefore, the State has pleaded sufficient facts to state a claim under the CPA arising from Meta's statements about the Platforms' safety.

### e. Restitution

Finally, Meta alleges that the State is not entitled to restitution on its CPA claims because no user is alleged to have paid to use Meta's services. The State disagrees, arguing that restitution need not be compensatory but may also be used to disgorge wrongdoers of funds unlawfully obtained.

RSA 358-A:4, III(a) permits the attorney general to bring suit against any person the attorney general has reason to believe has committed a violation of RSA 358-A. In that suit, the attorney general "may petition the court for an order of restitution of money or property to any person or class of persons injured thereby." RSA 358-A:4, III(a).

The New Hampshire Supreme Court has not addressed the scope of restitution under RSA 358-A:4, III(a). In certain actions, New Hampshire has recognized the broader reach of restitution, including the disgorgement of the benefit derived by a defendant. See In re Haller, 150 N.H. 427, 430 (2003) ("Restitution is an equitable remedy typically applied to contracts implied in law to disgorge the benefit of unjust enrichment."). In the criminal context, the legislature has specifically defined restitution as "money or service provided by the offender to compensate a victim for economic loss

45

. . . ." RSA 651:62, V. Black's Law Dictionary defines "restitution" as "an ambiguous term, sometimes referring to the disgorging of something which has been taken and at times referring to compensation for injury done." RESTITUTION, Black's Law Dictionary (12th ed. 2024).

In the Court's view, this determination requires an understanding of whether Meta has wrongfully received revenue from third-party advertisers from the increased time youth users spent on the Social Media Platforms as a result of Meta's alleged violations of the CPA. The State's allegations indicate this inquiry would be answered in the affirmative, but the Court cannot definitively rule from the face of the complaint. Accordingly, it declines to resolve this dispute at this juncture.

VI.  Products Liability and Negligence

The State alleges that Meta is liable for the defective design of its Social Media Platforms (Count III), its failure to warn about the risks associated with use of the Social Media Platforms (Count IV), and its negligence in its design, manufacturing, marketing, distributing, and labeling of its Social Media Platforms (Count V). Meta moves to dismiss all three state common law claims, arguing that the State lacks standing to pursue such claims and each count fails to state a claim as a matter of law. The State contends it has parens patriae standing to pursue its claims and it stated a claim under each theory. Meta also argues that the State's strict products liability claims fail as a matter of law because the Social Media Platforms are not "products," that the State's negligence claim fails because the State has not alleged that Meta violated a duty of care, and that all of the State's common law claims fail because it did not sufficiently allege proximate causation. The Court addresses each issue in turn.

46

a. Standing

"Parens patriae literally means 'parent of the country,' and refers traditionally to the role of the state as sovereign and guardian of persons under legal disability." State v. City of Dover, 153 N.H. 181, 185 (2006). The theory is "a concept of standing utilized to allow the state to protect 'quasi-sovereign' interests such as health, comfort and welfare of its citizens, interstate water rights, and the general economy of the state." Id. at 185–86. To satisfy parens patriae standing, "[f]irst, the state must assert an injury to a 'quasi sovereign' interest, an interest apart from the interests of particular private parties. Second, the state must allege injury to a 'substantial segment' of its population." Id. at 186. The Court addresses each inquiry in turn.

"Quasi-sovereign" interests are those "that the State has in the well-being of its populace," which must be "sufficiently concrete to create an actual controversy between the State and the defendant." Id. (citing Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 602 (1982)). For example, states have a quasi-sovereign interest "in the abatement of public nuisances, instances in which the injury to the public health and comfort is graphic and direct." Id. Courts have "generally interpreted the health and well-being category of quasi-sovereign interests broadly." Id. "A state also has a quasi-sovereign interest in preventing any injury or potential injury to the general health and well-being of its residents." Id.

In Dover, the New Hampshire Supreme Court ruled that "the State has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply." Id. The Court reasoned that "[t]he control and elimination of water pollution is a subject clearly within the scope of

47

the State's constitutional police power." Id. The Court also relied on the State's interest, as articulated by RSA 481:1, in providing "careful stewardship over all the waters lying within its boundaries." Id. Thus, the Court concluded that the State had a quasi-sovereign interest in protecting its waters from methyl tertiary butyl ether contamination. Id.

The State contends it has a quasi-sovereign interest in protecting children from Meta's operation of the Social Media Platforms which the State has alleged causes significant harm to New Hampshire children. The State has a quasi-sovereign interest in the health of its citizens. Id. The State has alleged that Meta's Social Media Platforms harm children. (Compl. ¶¶ 104–117.) In New Hampshire, 13.49% of the under-eighteen population are active monthly Facebook users and 35% are active monthly Instagram users. (Id. ¶¶ 49–50.) Teenagers in New Hampshire have also suffered from declining mental health since 2011. (Id. ¶¶ 118–19.) The State has an interest in protecting the mental health of its youngest population. The Court sees no reason to distinguish between physical and mental health in this context. See Dover, 153 N.H. at 186 (stating that the state has a quasi-sovereign interest in the physical health of its citizens); Snapp, 458 U.S. at 607 (same). Therefore, the Court determines that the State has pleaded sufficient facts to satisfy the quasi-sovereign interest prong of the parens patriae standing test.

The second inquiry is "whether a sufficiently substantial segment of the population is affected by the challenged conduct." Dover, 153 N.H. at 187. In Dover, 13.2% of the statewide water supplies were contaminated, corresponding to hundreds of public water systems and approximately 40,000 private water supplies. Id. The

48

Court determined that the foregoing data demonstrated that the contamination directly affected a substantial portion of the population of New Hampshire. Id. The Court noted that the State "clearly" met the substantial segment test. Id.

Over a third of minors in New Hampshire are active Instagram users and 13% actively use Facebook. While there is no particular number which satisfies the substantial segment prong, see People v. Peter & John's Pump House, Inc., 914 F. Supp. 809, 812 (N.D.N.Y. 1996) ("There is no numerical talisman to establish parens patriae standing . . . ."), the proportion of New Hampshire citizens impacted by Meta's Social Media Platforms exceeds the proportion impacted in Dover. If the State "clearly" met the prong in Dover, then the State has met the same prong under the facts alleged here. Further, while the State alleges teenage usage of the Social Media Platforms in 2023, future users will also be impacted by the same alleged products liability and negligence, increasing the segment of the population affected. See New York, by James v. Niagara-Wheatfield Central Sch. Dist., __ F.4th __, __, No. 22-2178-cv, 2024 WL 4487669, at *7 (2d Cir. Oct. 15, 2024) (permitting consideration of future individuals who may be injured by the defendant's actions in the analysis of the substantial segment prong of the parens patriae test); Com. of Massachusetts v. Bull HN Info. Sys., Inc., 16 F. Supp. 2d 90, 97 (D. Mass. 1998) (recognizing the state's quasi-sovereign interest in preventing potential injury to the general health and well-being of its residents). Accordingly, the Court determines that the State has pleaded sufficient facts to satisfy the substantial segment of the parens patriae standing test.

Some jurisdictions consider a third prong to the parens patriae test, requiring the State show that individuals could not obtain complete relief through private suits. See

49

<u>Dover</u>, 153 N.H. at 187.  The reasoning underlying the third prong is to ensure that the state's interest is "sufficiently severe and generalized, it must stand apart from the interests of particular parties–in other words, the controversy must in substance implicate the state's interest in economic supervision, and not merely affect the fortunes of a limited class of her citizens."  <u>New York v. Facebook, Inc.</u>, 549 F. Supp. 3d 6, 22 (D.D.C. 2021) (citing <u>Snapp</u>, 458 U.S. at 607).  However, the New Hampshire Supreme Court has not applied this prong in its consideration of whether the State has standing.  <u>See</u> <u>Dover</u>, 153 N.H. at 187 (declining to place the burden on the State to show whether the cities could obtain complete relief through the State's suit).  The Court has only employed the test when determining what types of damages the State may recover in a <u>parens</u> <u>patriae</u> suit.  <u>See</u> <u>State v. Hess Corp.</u>, 161 N.H. 426, 436–37 (2011) (ruling on an interlocutory transfer of a partial motion for summary judgment).

The Court declines to apply the third prong to the preliminary determination of the State's <u>parens</u> <u>patriae</u> standing at the motion to dismiss stage.  Therefore, because the State has met the two prongs of the <u>parens</u> <u>patriae</u> standing test, the State may pursue its common law claims against Meta on behalf of its citizens.

b.  <u>Whether the Social Media Platforms are "Products"</u>

Meta argues that the State's strict products liability claims fail because the Social Media Platforms are not products and the harm the State alleges stems from intangible information and ideas, not products.  The State contends that categorizing the Social Media Platforms as products is a better reasoned approach, the Platforms are more appropriately considered products in the products/services dichotomy, and the harm the State alleges arises from design elements of the Platforms, not third-party content.

50

The New Hampshire Supreme Court has not defined what a product is under strict products liability.  However, it has adopted the Restatement (Second) of Torts to analyze other questions under strict products liability.  See Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 831 (2005).  The parties both rely on the Restatement (Third) of Torts which specifically addresses what constitutes a product.  The Court likewise relies on the Restatement (Third) of Torts because of the New Hampshire Supreme Court's previous reliance on the Restatement's approach, the Restatement (Second) of Torts' silence on the issue of defining a product, and the parties' joint reliance on the Restatement (Third) of Torts.

The Restatement (Third) of Torts defines a product as, "tangible personal property distributed commercially for use or consumption."  Restatement (Third) of Torts: Prod. Liab. § 19 (1998).  Further, "[s]ervices, even when provided commercially, are not products."  Id.  However, items such as electricity are products "when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules state in the Restatement."  Id.

Given the nature of the State's claims, the Social Media Platforms are products.  The State alleges that the Platforms' design features harm users.  Meta's business model is operating social networking applications which allow users to share and view content and communicate with other users.  (Compl. ¶ 20.)  However, the Social Media Platforms are the vehicle through which Meta effectuates that business model.  Meta designs, develops, programs, markets, distributes, and profits from the Social Media Platforms.  (Id. ¶ 299.)  For this reason, the Platforms are akin to the distribution and

51

use of tangible property.  See Restatement (Third) of Torts: Prod. Liab. § 19 (1998).

Further, the Platforms are not services.  While users may experience a customized

display when engaging with the Platforms, the design features are uniform.

Consequently, Meta is not performing a unique service for every user of its Platforms.

Other jurisdictions are in accord with the Court's analysis.  In Brookes v. Lyft Inc.,

the court ruled that the Lyft application was a product because, while Lyft's business

model was a transportation network company in which it connects riders with drivers,

Lyft designed and distributed the Lyft application to carry out that business model.  No.

50-2019-CA-004782-MB, 2022 WL 19799628, at *3 (Fla. Cir. Ct. Sept. 30, 2022).  The

court also noted that the plaintiff's claim was based on the design of the application

which Lyft designed, distributed, and placed into the stream of commerce.  Id. at *4; see

also In re Uber Technologies, Inc., Passenger Sexual Assault Litig., __ F. Supp. 3d __,

__, No. 3084 CRB, 2024 WL 4211217, at *23 (N.D. Cal. Aug. 15, 2024) (finding the

Uber application a product because the alleged defects in the application have similar

plausible analogues in tangible products); T.V. v. Grinder, LLC, No. 3:22-cv-864-MMH-

PDB, 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024) (recommending a finding that

the defendant social networking application is a product because it designed its app for

its business, made design choices for the app, placed the app in the stream of

commerce, distributed the app in the global marketplace, marketed the app, and

generated revenue and profits from the app); cf. In re Social Media Adolescent

Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d at 849 (adopting a

defect-specific approach to determine whether the challenged functionalities of the

defendants' social media were products).  But see Social Media Cases, No. JCCP 525,

52

22STCV21355, 2023 WL 6847378, at *16 (Cal. Super. Oct. 13, 2023) (determining that social media was not a product because applying the doctrine of products liability to social media does not align with the goals of the doctrine and interactions between social media companies and their users are different from traditional product sales).

The Court does not address at length Meta's argument that the State only alleges harm from intangible information delivered by the Social Media Platforms. As discussed supra, Section B, the State's claims are based on the Social Media Platforms' alleged defective and dangerous features, not the information contained therein. Accordingly, the State's products liability claim is based on harm caused by the product: the Social Media Platforms themselves.

### c. Duty of Care

Meta argues that the State's negligence claim fails because it does not allege a duty of care that Meta violated. The State responds that Meta owes a duty to everyone, and in particular its users, to exercise reasonable care not to subject others to an unreasonable risk of harm. Specifically, the State points to the duty to design reasonably safe products and the duty to warn of foreseeable risks in the chosen design.

"To recover for negligence, the plaintiff must demonstrate that the defendant owes a duty to him, that the defendant breached that duty, and that the breach proximately caused injury to him." Robinson v. 1 Bouchard Street Realty, ___ N.H. ___, ___, 2024 N.H. 59, ¶ 7. "Absent a duty, there is no negligence." Id. "Whether a duty exists in a particular case is a question of law." Id. "When charged with determining whether a duty exists in a particular case, [the Court] necessarily encounter[s] the

53

broader, more fundamental question of whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." Grady v. Jones Lang LaSalle Constr. Co., 171 N.H. 203, 207 (2018). "In making this determination, [the Court] consider[s] whether the societal importance of protecting the plaintiff's interest outweighs the importance of immunizing the defendant from extended liability." Id.

"A person injured by a product may proceed against the seller or manufacturer of the product under a theory of negligence." 8 McNamara, New Hampshire Practice: Personal Injury — Tort and Insurance Practice § 8.09 (2024) (citing State v. Exxon Mobil Corp., 168 N.H. 211, 233–36 (2015)). "A manufacturer has a duty to act in a reasonable way in designing and manufacturing a product." Id. Thus, because Meta has designed a product, placed that product in the stream of commerce, marketed it, and profited from it, Meta has a duty to reasonably design the Social Media Platforms.

Meta argues that interactive communication services like the Platforms do not owe a duty of care for content publication or consumption. Meta also contends that it does not owe a duty to prevent harm caused by third parties. The Court's review of the State's claim for negligence, (see Compl. ¶¶ 314–20), indicates that the State bases its negligence claim on Meta's alleged design, manufacture, marking, distribution, and labeling of the Social Media Platforms and the resulting compulsive and excessive use of the Platforms. The claim does not mention harm caused by Meta's publication or users' consumption of content or harm caused by third parties. Accordingly, the Court finds Meta's arguments irrelevant. However, to the extent the State seeks to hold Meta liable for content it publishes on its Social Media Platforms, such liability is barred by Section 230, see supra Section III(B). On the other hand, for the reasons articulated

54

throughout this order, Meta can be held liable for its implementation of certain design features.

### d. Proximate Causation

Meta argues that all of the State's common law claims fail because it does not sufficiently allege proximate causation. The State contends that its allegations—that (1) Meta's use of addictive design features causes users, particularly teenagers, to engage with the Social Media Platforms compulsively and excessively; and (2) compulsive and excessive use of the Platforms causes harm to children's mental health—suffice to establish proximate causation. The State acknowledges that its theory is broad but argues that it has provided detailed factual support.

"Proximate causation requires a court to determine whether the defendant should be legally liable for what he has caused." Fish v. Homestead Woolen Mills, Inc., 134 N.H. 361, 364 (1991). "Liability for negligence is imposed only for injuries resulting from the particular hazard against which the duty of due care required protection to be given." Id. Generally, proximate causation is a question of fact. Cecere v. Loon Mountain Recreation Corp., 155 N.H. 289, 295 (2007).

The Court determines that, in viewing the facts alleged in the light most favorable to the State and taking all reasonable inferences in its favor, the State has alleged proximate causation. In its complaint, the State has laid out how social media impacts young users' mental health, (Compl. ¶¶ 104–117), that New Hampshire teenagers use the Social Media Platforms, (id. ¶¶ 49–50), and that New Hampshire teenagers' mental health has declined since 2011, corresponding with Meta's acquisition of Instagram, (id. ¶¶ 98, 118–19). The State has alleged that Meta is aware of the addictive nature and

55

harmful impacts of the design of its Platforms.  (Id. ¶¶ 69, 78, 111, 122, 125, and 136.)

Viewing these allegations together, the State has sufficiently pleaded that Meta's

alleged design and implementation of addictive and dangerous features and

misrepresentations and omissions about the safety of the Platforms proximately caused

the worsening of teenage mental health in New Hampshire.

## VII.    Conclusion

For the foregoing reasons, Meta's motion to dismiss is DENIED.

**SO ORDERED.**

December 10, 2024
_____
**Date**

_____
**John C. Kissinger, Jr.
Presiding Justice**

Clerk's Notice of Decision
Document Sent to Parties
on   12/11/2024

56

# EXHIBIT G

# The State of New Hampshire

**MERRIMACK COUNTY**                                      **SUPERIOR COURT**

THE STATE OF NEW HAMPSHIRE

v.

TIKTOK INC.

Docket No.: 217-2024-CV-00399

## ORDER

The plaintiff, the State of New Hampshire, brings this action against the defendant, TikTok, Inc. ("TTI"), arising out of the alleged harms suffered by New Hampshire citizens from TTI's design and operation of the social media platform, TikTok ("TikTok" or the "App"). TTI moves to dismiss. The State objects. The Court held a hearing on April 11, 2025. The parties filed notices of supplemental authority before and after the hearing. For the following reasons, TTI's motion to dismiss is GRANTED as to Count VI but otherwise DENIED.

## I.     Standard

In reviewing a motion to dismiss, the Court "assume[s] the truth of the facts as alleged in the plaintiff's pleadings and construe[s] all reasonable inferences in the light most favorable to the plaintiff." Barufaldi v. City of Dover, 175 N.H. 424, 427 (2022). The Court "need not assume the truth of statements in the plaintiff's pleadings, however, that are merely conclusions of law." Sanguedolce v. Wolfe, 164 N.H. 644, 645 (2013). "The standard of review in considering a motion to dismiss is whether the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery."

1

Barufaldi, 175 N.H. at 427.  "This threshold inquiry involves testing the facts alleged in the pleadings against the applicable law."  Id.  The Court will grant the motion "if the facts pled do not constitute a basis for legal relief."  Id.

## II.      Background

The Court derives the following facts from the State's amended complaint.

TTI runs the application, TikTok.  (Am. Compl. ¶ 4.)  TTI is incorporated in California with its principal place of business also in California.  (Id. ¶ 31.)  TTI is a subsidiary of the Chinese company ByteDance, Ltd. ("ByteDance").  (Id. ¶ 4.)  TikTok is one of the most popular and fastest-growing social media platforms in the world.  (Id.)  TikTok allows users to create, upload, and/or view 15 to 60-second-long videos.  (Id. ¶ 53.)

### A.  TTI's Connections with New Hampshire

In New Hampshire, there are over 1.2 million registered TikTok accounts (close to 90% of the state's population).  (Id. ¶¶ 5, 36.)  More than a quarter of all registered accounts in New Hampshire belong to users under the age of 23 and over 92,000 of the accounts belong to children aged 13 to 17.  (Id.)  Of the accounts registered to New Hampshire users, 620,404 of them are "content creators," meaning users who actively publish videos and livestreams.  (Id. ¶ 36.)  Nationwide, TTI has reached a market penetration of 95% of users under the age of 17.  (Id. ¶ 63.)

TTI promotes TikTok in New Hampshire through running television commercials designed to get New Hampshire residents to use the App.  (Id. ¶ 37.)  Between August 1, 2020 and December 31, 2023, TTI spent $1,112,651 on advertising and promoting

TikTok in New Hampshire.  (Id. ¶ 42.)  From 2020 to 2023, the number of New Hampshire users boomed from 417,105 to over 1.2 million.  (Id.)

TTI sells advertising space to marketers and allows them to tailor advertising to New Hampshire consumers.  (Id. ¶ 43.)  Between June 2022 and November 2023, TTI generated profits of $221,015 from advertisements that businesses, including New Hampshire entities, selected to show only to New Hampshire users.  (Id. ¶¶ 43–44.)

TTI also allows users, including New Hampshire users, to purchase products directly from the App.  (Id. ¶ 45.)  In September 2023, TTI launched the TikTok Shop, an e-commerce feature where consumers can find and purchase products.  (Id.)  TTI charges a service fee for each transaction.  (Id.)  The State alleges that TTI's collection of service fees is connected to the following cycle: TTI implements addictive design features, TTI's deceptive representations entire more New Hampshire children to use the App, the design features and misrepresentations encourage child users to spend more time on the App, which leads to them viewing more advertisements and engaging in e-commerce, which results in additional service fees TTI collects.  (Id.)  Between March 2022 and October 2023, TTI made $1,676,645 from New Hampshire TikTok Shop sales.  (Id. ¶ 47.)  TTI also profited from New Hampshire sales through TikTok LIVE, totaling $5,159,291 from March 2022 to October 2023.  (Id. ¶ 48.)

TTI has also paid New Hampshire content creators a total of $884,667 between September 2023 and November 2023.  (Id. ¶ 50.)

TTI has built connections with New Hampshire entities including by awarding grants to Parent Teacher Associations in Derry, providing funding to Nashua public

3

services through the CDC, and consulting with the University of New Hampshire.  (Id. ¶ 51.)

B.  TikTok

When a user signs up for a TikTok account, in exchange for access to the platform, the user must agree to TikTok's Terms of Services, including TikTok's Privacy Policy.  (Id. ¶ 6.)  The Privacy Policy alerts users to the fact that TikTok will show the user suggestions, promote the Platform, and customize the user's ad experience, using the user's information.  (Id.)

TTI collects users' data while they use the App.  (Id. ¶ 7.)  The more time a user spends on the App, the more data TTI collects, and the more money TTI makes.  (Id.)  TikTok's design features exploit children's underdeveloped psychological and neurological controls to compel them to spend more time on TikTok.  (Id. ¶ 11.)  TikTok's addictive design features deliberately alter the physical brain chemistry of New Hampshire's child users.  (Id. ¶ 39.)  Children's dopamine systems' particular sensitivity coupled with the unfinished development of the prefrontal cortex makes 13 to 17-years-old TikTok users highly susceptible to risky behaviors, temptations, and manipulations of their reward system.  (Id. ¶ 67.)  The U.S. Surgeon General has warned that unchecked use of social media like TikTok has "a profound risk of harm to the mental health and well-being of children and adolescents."  (Id. ¶ 16.)

Children aged 13 to 17 report using social media at a near universal rate and 30% of them characterize their usage as excessive.  (Id. ¶ 13.)  Specific to TikTok, users 13 to 17-years-old check the App nearly 17 times per day and spend, on average, almost 2 hours a day on TikTok.  (Id. ¶¶ 14, 60, 75 (similar data for New Hampshire

4

users).)  Many users are spending 4 or more hours on the App daily.  (Id. ¶ 14.)  In 2021, over 37% of New Hampshire high schoolers reported 5 hours or more of screen time on an average school day.  (Id. ¶ 16.)  The compulsive and prolonged use of TikTok increases the chances of experiencing poor mental health outcomes, including symptoms of depression and anxiety and experiencing lower life satisfaction.  (Id. ¶¶ 70, 72–73.)  In 2019, users aged 14 and under consumed more videos per user per day than any other age group on TikTok.  (Id. ¶ 299.)

At the same time TikTok launched and grew, New Hampshire children's mental health declined.  (Id. ¶ 74.)  In 2021, almost half of New Hampshire's high school students self-reported feeling persistently sad or hopeless, which was a 75% increase from 2011 and a 57.8% increase from 2017.  (Id.)  Similarly, between 2017 and 2021, the percentage of New Hampshire high school students who reported seriously considering suicide jumped from 16.1% to 24.7%.  (Id.)  Lastly, the percentage of New Hampshire high school students who reported attempting suicide increased from 5.9% to 9.8%.  (Id.)

Late night usage among child users is also problematic.  Among TikTok users, more than 20% of children are active on TikTok late at night (between 12:00 a.m. and 5 a.m.), preventing sleep critical to healthy development.  (Id. ¶¶ 15, 75.)  In New Hampshire, children aged 13 to 17 spend over 2 hours a day on the App, with the average daily session time peaking at 3:00 a.m. to 4 a.m.  (Id.)  The use of technology, especially social media, within one hour of bedtime is associated with sleep disruptions and insufficient sleep is associated with interruptions to neurological development in adolescent brains.  (Id. ¶ 71.)

TTI employs certain design features to manipulate users into staying on the App. (Id. ¶ 8.)  Those features include: (1) algorithms that leverage user data to feed them personalized content recommendations; (2) infinite scroll; (3) push notifications with built in vibrations and "buzzes"; (4) filters and effects that create idealizations of unattainable appearances for users; and (5) a virtual currency system known as "TikTok Coins" that incentivizes spending and does not implement anti-money laundering safeguards.  (Id.) TTI acknowledges how features like these are "powerful coercive design tactics that [it realized] tend to benefit companies and advertisers more than users."  (Id. ¶ 77.)

TikTok's design features exploit children's underdeveloped psychological and neurological controls to compel them to spend more time on TikTok.  (Id. ¶ 11.) TikTok's addictive design features deliberately alter the physical brain chemistry of New Hampshire's child users.  (Id. ¶ 39.)  Children's dopamine systems' particular sensitivity coupled with the unfinished development of the prefrontal cortex makes 13 to 17-years-old TikTok users highly susceptible to risky behaviors, temptations, and manipulations of their reward system.  (Id. ¶ 67.)

i.    Recommendation Engine

TTI uses the data it collects from users to further its personalization algorithms to create a unique customized experience for each user.  (Id. ¶ 38.)  No two TikTok users have the same experience.  (Id.)  This customized recommendation engine is known as the "For You" feed.  (Id. ¶ 79.)  The recommendation engine collects data from the user and uses that data to rank content based on how likely a user is to engage with it and curates a personalized stream of videos to keep the user engaged.  (Id.)  TikTok's recommendation engine is "content neutral," meaning it does "not understand content"

6

and functions by "predict[ing] the likelihood of different user engagements with a video." (Id. ¶ 80.)  The goal of the recommendation engine is to find videos a user is most likely to watch to the end, like, or comment on, keeping them hooked on the App for as long as possible and coming back for more.  (Id. ¶ 82.)  A side effect of the recommendation engine is filter bubbles created when the engine learned a user's video preferences and reinforces those preferences by recommending increasingly more extreme versions of those videos.  (Id. ¶ 85.)

TTI knows that the App's Recommendation Engine promotes LIVE streams where users make sexual content in exchange for gifts.  (Id. ¶ 25.)  Despite TTI knowing that the Recommendation Engine "incentivizes sexual content," it allows such incentivization because "[t]ransactional sexual content hits most of [TTI's] business metrics of success & is pushed to TopLives."  (Id.)

### ii.    Infinite Scroll

TikTok employs "infinite scroll," which continuously previews and suggests new content.  (Id. ¶¶ 90, 92.)  This feature provokes children's fear of missing out ("FOMO") by building anticipation of discovering something new which creates a feeling that others might be having rewarding experiences on the App when one is absent.  (Id. ¶ 92.)  The feeling of FOMO can trigger anxiety and result in sleep deprivation.  (Id.)  TTI has internally admitted that it wants to "create FOMO" because it generates "acquisition" and is therefore good for business.  (Id. ¶ 93.)

### iii.    Push Notifications

Push notifications alert users of new messages, updates about "in-app news," and new videos.  (Id. ¶ 94.)  TTI acknowledges that these notifications "encourage

users to open the App and stay longer." (Id.)  The push notifications use haptics which employ vibrations, buzzes, and light sounds to draw users' attention back to the App. (Id. ¶ 95.)  TTI has described these notifications as "an effective marketing tool as it helps to recall users." (Id.)  The notifications drive users into checking the App routinely at all hours of the day. (Id.)  In particular, TTI has stated that it "send[s] notifications to users during the school day and in some cases, up until midnight, which could interfere with sleep." (Id. ¶ 96.)

### iv.  Filters and Effects

TikTok offers "filters" and "effects" that alter a user's appearance by lightening and smoothing their skin, changing their eye color, enlarging their lips, and modifying their facial features by creating a skinnier face or smaller nose. (Id. ¶ 99.)  The filters use artificial intelligence to cosmetically reshape a user's face in a hyper-realistic way, blurring the line between what is real and fake. (Id.)  TikTok features hundreds, if not thousands, of these filters and, in some instances, turns them on for users and minors by default, without their consent. (Id. ¶ 103.)

Beauty filters pose a significant risk of causing severe psychological harm to minors. (Id. ¶ 102.)  TTI has acknowledged that the filters have a "high risk of harming U18 [under 18 year old] users." (Id.)  This is because teenagers are "more susceptible to harm when it comes to the usage and consumption of beauty filters as they are developing their self-image, are at a critical period for developing body dysmorphia and eating disorders, and are more easily pressured by the opinions of others." (Id.)  TTI has also acknowledged that default beauty filters have a "high potential from a research

8

perspective to lead to negative body image and body dysmorphia symptoms, especially among teenage girls." (Id. ¶ 104.)

TikTok's filters in particular increase young female users' risk for eating disorders, depression, anxiety, low self-esteem, and negative body image. (Id. ¶ 107.) The American Society of Plastic Surgeons has noted that platforms like TikTok are driving the popularity of plastic surgery overall and that there is a rise in teenagers seeking medical intervention to alter their appearance. (Id. ¶ 110.) TikTok's recommendation engine is known to push plastic surgery videos and body altering videos to young users within minutes of using the App. (Id. ¶ 111.)

### v. Currency System and TikTok LIVE

TikTok LIVE is a feature that allows a user (host) to begin a livestream with the touch of a button, offering live interaction with any user watching the livestream (followers). (Id. ¶ 18.) LIVE videos are not saved thus inducting a sense of urgency in children. (Id. ¶ 239.) By 2022, 20% of the 83 million daily TikTok users watched LIVE every day. (Id. ¶ 251.) In 2023, TTI netted 1.7 billion dollars in one quarter from LIVE with an expectation that it could capture up to 77 billion dollars a year from LIVE alone by 2027. (Id.)

The minimum age requirement to go LIVE and receive gifts is currently 18 years old but was formerly 16 years old until 2022. (Id. ¶ 243.) However, because users can provide a false birthdate when creating their account, minors are able to access LIVE. (Id.) Users 13 or older have always been able to view LIVE videos but, after 2019, only users 18 or old are able to purchase and send gifts on LIVE. (Id. ¶ 244.)

9

During a livestream, followers can send virtual gifts to the host using TikTok Coins.  (Id. ¶¶ 18, 241.)  Coins are an unmonitored and unregistered virtual currency purchased with U.S. dollars for use on the App.  (Id.)  TTI takes up to a 50% commission on these virtual gifts.  (Id. ¶¶ 20, 253.)  In 2023, TTI netted $1.7 billion globally in a single quarter from LIVE.  (Id. ¶¶ 20, 253.)  TTI's 2022 internal investigation revealed that LIVE "enable[d the] exploitation of live hosts" and that TTI profited significantly from allowing users to use its virtual currency system for "transactional gifting" involving nudity and sexual activity.  (Id. ¶ 24.)

TTI conducted an internal investigation which confirmed that users under the minimum age requirement could host LIVE sessions on TikTok, TTI received "significant revenue from "transactional gifting" generated through transactions for sexual content, and TikTok's algorithms were optimized to amplify gifting for sexual content.  (Id. ¶¶ 234, 270–71.)  The LIVE feature leads to financial harm, encourages addiction and impulsive purchasing, and exposes minors to repeated sexualized content.  (Id. ¶ 235.)  TTI has conceded that it is not able to age-gate livestreams because it lacks the functional capacity to do so.  (Id. ¶ 246.)

Children also financially suffer from LIVE through predatory "giftbaiting" wherein LIVE hosts coerce users to purchase and donate digital gifts to the host in exchange for some future action the host never takes.  (Id. ¶ 261.)  The use of gifting through LIVE has also been linked to money laundering because criminals can use the gifting feature to engage in cross border capital transfers.  (Id. ¶¶ 264, 278, 281.)

vi.    <u>Time Management and Parental Controls</u>

TTI has marketed time control features as useful ways to keep users' usage of the App in control despite its awareness of the ineffectiveness of those features.  (<u>Id</u>. ¶ 113.)  Since at least October 2019, TTI deployed the "You're In Control" feature, described as an educational video series that presents TikTok's safety and privacy controls in an accessible and easy to understand fashion.  (<u>Id</u>. ¶ 114.)  One of the controls, "Take a Break," is a screen time tool that allows users to schedule a video reminder to take a break from using TikTok.  (<u>Id</u>. ¶ 115.)  TTI has internally acknowledged that the feature "has very low friction involved with it" and it "allows users to easily skip past it and not be mindful of their time spent on TikTok."  (<u>Id</u>.)  TTI knows that only 12% of users actually close TikTok within 5 minutes of watching a Take a Break video, while 55% of users stay longer than 45 minutes after seeing one.  (<u>Id</u>. ¶ 117.)

TTI has also implemented parental controls into the App, including one called "Restricted Mode" which TTI markets as a way for parents to "limit the appearance of content that may not be appropriate for all audiences."  (<u>Id</u>. ¶ 120.)  Restricted Mode allows parents to enter a personal passcode to ensure their children are viewing content TTI represents as more age-appropriate.  (<u>Id</u>.)  However, TikTok feeds users under Restricted Mode content that is "often still too mature for that space" including material tagged for "Sexy Themes" and "Profanity."  (<u>Id</u>. ¶ 121.)  Further, users under Restricted Mode can "still search for and follow links that would be filtered out of the FYP [For You Page] by Restricted Mode."  (<u>Id</u>. ¶ 122.)  Those users also have access to live streams with mature content.  (<u>Id</u>.)  Another parental control feature, "Family Pairing" is intended

to allow parents to link their own TikTok account to their teens' to set controls.  (Id. ¶ 123.)  But, teen users can disable the feature without a PIN code.  (Id. ¶ 124.)

### C. Allegations of Harm and Misrepresentations

TTI publishes Community Guidelines on its website, and they are available to users through the Terms of Service.  (Id. ¶ 133.)  The Community Guidelines assure users and the parents of minor users that TikTok is designed as a safe environment for all users.  (Id.)  Since TikTok's launch in the United States, the Community Guidelines have represented that TTI "takes child safety with the utmost seriousness" and is "deeply committed to TikTok being a safe and positive experience for people under the age of 18."  (Id. ¶¶ 133, 195.)  The Community Guidelines state that content in violation thereof will be removed, including content "showing, promoting, or engaging in youth sexual or physical abuse or exploitation," content "that may put young people at risk of exploitation, or psychological, physical, or developmental harm," content "showing, promoting, or sharing plans for suicide or self-harm," content "showing or promoting disordered eating and dangerous weight loss behaviors," content featuring "dares, games, tricks, inappropriate use of dangerous tools, and eating substances that are harmful to an individual's health," and content "showing, possessing, or using drugs." (Id. ¶ 135.)

TTI has made public statements, including through articles and posts published on its "Newsroom," in TikTok's Community Guidelines and in testimony to Congress about TikTok's moderation processes and their effectiveness (id. ¶¶ 136–39, 154), the prevalence of child sexual abuse material ("CSAM") (id. ¶¶ 169, 171) and content about drugs (id. ¶ 224), its efforts to quash predatory and grooming behavior toward child-

users (id. ¶ 182), the safety of its recommendation system (id. ¶ 195), its efforts to curb filter bubbles (id. ¶ 200), its disallowance of dangerous challenges (id. ¶¶ 204, 207, 210), and the effectiveness of its age-gating (id. ¶¶ 213–15, 218).

Despite these statements, TTI knows that gaps and flaws in its enforcement and detection system including policy grey areas, lack of time and resources for moderators, and lack of training for context in moderation, result in inconsistent and unequal application of the Community Guidelines. (Id. ¶ 143; see also id. ¶¶ 144–46, 149–50.) This leads to the availability of content on TikTok promoting dangerous weight-loss activities (id. ¶¶ 155–58), featuring sexually explicit activities (id. ¶¶ 159–60), including hateful or harassing behavior (id. ¶¶ 166–68), featuring CSAM (id. ¶¶ 169–81), featuring child predatory behavior (id. ¶¶ 183–194), promoting dangerous challenges (id. ¶¶ 207–212), and depicting drugs or other controlled substances (id. ¶¶ 225–29). In particular, exploitative CSAM has a 26% leakage rate, or, in other words, 1 in 4 violative content appears on the App and is not caught by the moderation processes. (Id. ¶ 173.) TikTok has also failed to curb the presence of filter bubbles, resulting in the presentation of graphic, violent, and distressing content to children. (Id. ¶¶ 199–202.)

TikTok also fails to meaningfully enforce its age restrictions. (Id. ¶ 213.) When users sign up for the App, they must self-report their date of birth before gaining access. (Id. ¶ 216.) By relying on the user, the App incentivizes child users to input a false date of birth. (Id.) TTI is aware that up to 70% of users aged 13 to 15 report their age at 18 or older to avoid the age-gating feature. (Id. ¶ 217.) Until 2022, young users could also bypass the age verification process by using their Facebook or Google credentials to set up an account. (Id. ¶¶ 308, 313.) Between September 2020 and March 2022, TTI

13

removed 71,021,950 accounts suspected to belong to users under the age of 13.  (Id. ¶ 307.)  TTI is aware of other accounts belonging to users under the age of 13.  (Id. ¶¶ 310–12 318–25.)

One impact of TikTok's ineffective age verification is TikTok's collection of data from users under the age of 13.  (Id. ¶¶ 27, 289.)  TTI collects personal data, including the name, address, email address, persistent identifiers, geolocation information, advertising information, and photographs or videos from users.  (Id. ¶ 287.)  Since March 2019, two versions of the App have existed: (1) "Kids Mode" for the use of children who report their age to be under 13; and (2) the standard version of the App.  (Id. ¶ 293.)  Kids Mode is designed for younger users and features limited content, no access to direct messages, no ability to comment, and no ability to upload content.  (Id.)  TTI collects data from users on both versions of the App.  (Id. ¶ 294.)  TTI does not seek parental consent before collecting personal from users on the standard version of the App.  (Id.)  Because, as discussed above, users under 13 years old are able to access the standard version of TikTok, TTI collects their personal data without parental consent.  (Id. ¶¶ 324, 338–341.)

TTI likewise allegedly misleads New Hampshire consumers by passing itself off as an American company.  (Id. ¶¶ 28, 347–48.)  In TikTok's terms of service, it states that it is a "myth" that decisions about TikTok are made in Beijing and that TikTok is not available in mainland China and it has established Los Angeles and Singapore as headquarters.  (Id. ¶ 348.)  TTI's CEO has also stated to Congress that TTI has never shared, or received a request to share United States user data with China.  (Id. ¶ 349.)  However, ByteDance originally developed the source code for TikTok's

recommendation engine.  (Id. ¶¶ 86, 356.)  Further, ByteDance, which is headquartered in Beijing retains heavy control over TTI.  (Id. ¶ 351.)  ByteDance still directs TTI's budget, operates its internal document storage platform, and handles media criticism directed at TikTok.  (Id. ¶ 353.)  The United States government has cited the risk that ByteDance and TikTok may pose to national security because China may coerce them to covertly manipulate TikTok's recommendation engine to shape the information received by Americans, including children.  (Id. ¶ 87.)

## III.  Analysis

The State brings claims against TTI for six counts of Violations of the Consumer Protection Act ("CPA"), two counts of strict products liability, and one count of negligence.  TTI moves to dismiss, arguing the Court lacks personal jurisdiction over it, Counts I–III and VII–IX must be dismissed because they seek to hold TTI liable for expressive conduct, and the State's claims fail to state a cause of action.

### A.  Personal Jurisdiction

The standard of review on a motion to dismiss for lack of personal jurisdiction varies according to the case's procedural posture.  Seward v. Richards, 174 N.H. 401, 406 (2021).  "While the general rule applicable to motions to dismiss is that all facts properly pleaded by the plaintiff are deemed true . . . when those facts relate to personal jurisdiction, the plaintiff must offer affirmative proof."  Staffing Network, Inc. v. Pietropaolo, 145 N.H. 456, 457 (2000).  In the absence of an evidentiary hearing, the Court applies a prima facie standard to determine whether personal jurisdiction is met.  Id.

"Determining whether a court may exercise personal jurisdiction over a defendant contemplates a two-part analysis." Seward, 174 N.H. at 407. "First, the State's long-arm statute must authorize such jurisdiction. Second, the requirements of the federal Due Process Clause must be satisfied." Id. New Hampshire's long-arm statute, RSA 510:4, authorizes the exercise of personal jurisdiction to the extent permissible under the Due Process Clause. Id. Accordingly, the Court's analysis depends upon due process. Id.; RSA 510:4, I.

"Under the Federal Due Process Clause, a court may exercise personal jurisdiction over a non-resident defendant if the defendant has minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Seward, 174 N.H. at 407. "Minimum contacts is not necessarily a numbers game; in order to be subject to the jurisdiction of the forum state, a nonresident need only have one contact with the forum, so long as the contact is meaningful." Id. "Jurisdiction can be 'general,' where the defendant's contacts with the forum State are continuous and systematic, or 'specific,' where the cause of action arises out of or relates to the defendant's forum-based contacts." Id. The State asserts a theory of specific personal jurisdiction over TTI. Accordingly, the Court focuses its analysis on that inquiry.

"To determine whether exercising specific personal jurisdiction over the defendant[] comports with due process, [the Court] examine[s] whether: (1) the contacts relate to the cause of action; (2) the defendant[] ha[s] purposefully availed [itself] of the protection of New Hampshire's laws; and (3) it would be fair and reasonable to require the defendant[] to defend the suit in New Hampshire." Seward, 174 N.H. at 407–08.

16

"Each factor must be evaluated on a case-by-case basis, and all three factors must be satisfied for the exercise of jurisdiction to be constitutional." Id. at 408. "Questions of specific jurisdiction are always tied to the particular claims asserted." Id.

TTI disputes that the first two factors—relatedness and purposeful availment—are met.

### i. Purposeful Availment

To satisfy the purposeful availment prong of the test, "the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protection of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." Id. at 412. "Purposeful availment requires both foreseeability and voluntariness." Id. "Voluntariness requires that a defendant's contacts with the forum state proximately results from actions by the defendant." Id. "The contacts must be deliberate and not based on the unilateral actions of another party, and cannot be merely fortuitous, but rather, the defendants must have purposefully directed actions at New Hampshire." Id. "Foreseeability requires that the contacts must be of a nature such that a defendant could reasonably anticipate being haled into court here." Id.

TTI argues that, by making an interactive website generally accessible to users worldwide, it has not purposefully availed itself to the jurisdiction of New Hampshire in particular. The State responds that TTI purposefully directs commercial activities to New Hampshire, as evidenced by its ubiquitous presence in the State—over one million New Hampshire users representing nearly 90% of New Hampshire residents—and its customization of the App for each of those users combined with its cultivation and

17

exploitation of user data to target advertising to those users.

In Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 773–74 (1984), the Court found that there was specific jurisdiction over the defendant publisher where it had no employees or offices in the forum, did not expressly aim its publication or conduct at the forum, and magazine sales in the forum made up only a small fraction of the defendant's total sales, but the defendant circulated 10,000 to 15,000 copies of its magazine to subscribers in the forum each month. The Court reasoned that the defendant "continuously and deliberately exploited" the forum's market. Keeton, 465 U.S. at 781. Because the defendant produced "a national publication aimed at a nationwide audience," there was "no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." Id.

The Keeton Court's reasoning applies here, despite the digital, rather than physical, nature of TTI's connections with New Hampshire. TTI does not just operate an online platform accessible to New Hampshire residents. In exchange for access to the App, TTI harvests users' personal information, sells that information to advertisers, who then use it to advertise on the App. See uBID, Inc. v. GoDaddy, Inc., 623 F.3d 421, 427–28 (7th Cir. 2010) (determining that website operator defendant had minimum contacts with the forum state because it exploited the forum's market and engaged in extensive national advertising, even though it did not specifically target forum residents through advertising). Like the defendant publisher in Keeton, TTI has specific connections with New Hampshire and furthers those connections each time it contracts with users to offer its App in exchange for their data. This is voluntary contact with the

18

forum state and its residents.  See Seward, 174 N.H. at 412.  It should have been foreseeable to TTI that such contact with New Hampshire would cause it to be haled into court here.  See id.

The decisions TTI relies on to distinguish this matter from the Court's order in State of New Hampshire v. Meta, Inc., 217-2023-CV-00594, Doc. 58 (Dec. 10, 2024) (Kissinger, J.)[1] do not feature the type of engagement with the forum state as alleged here.  See (TTI's Memo. iso Mot. to Dismiss at 10); Hasson v. FullStory, Inc., 114 F.4th 181, 190 (3d Cir. 2024) (allegation that the defendant "knowingly armed its website with software that initiates a broad-spectrum wiretap" did not establish purposeful availment because the defendant targeted a national audience and the defendant simply operated a website accessible in the forum state); Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 320 (5th Cir. 2021) (allegation that the defendant operated a universally accessible website and residents of the forum state visited the site, clicked ads, and bought things from the site, did not establish purposeful availment); Rosenthal v. Bloomigdales.com, LLC, 101 F.4th 90, 97 n.1 (1st Cir. 2024) (same).  As stated, rather than just operating an interactive website in the forum, as was alleged in the cases TTI relies upon, TTI reached further into the forum by harvesting the personal data of its New Hampshire users, profiting from the sale of that data, and permitting advertisers to complete the cycle by using that data to advertise on the App based on users' preferences.

One of the decisions TTI relies upon warrants additional discussion.  TTI cited

---

[1] State of New Hampshire v. Meta, Inc., involves similar claims by the State against Meta for harms impacting New Hampshire children allegedly caused by Meta's social media platforms.  The Court's December 10, 2024 Order addressed many of the same arguments raised in the briefing on TTI's motion to dismiss, and, for that reason, is cited by the parties in this matter.

19

AMA Multimedia, LLC v. Wanat, 970 F.3d 1201, 1211 (9th Cir. 2020) for the proposition that, in the online context, an alleged practice of collecting user data in a state and then selling advertisements to third parties does not show purposeful direction toward a forum. However, the Ninth Circuit overruled the relevant portion of AMA since TTI filed its memorandum. See Briskin v. Shopify, Inc., 135 F.4th 739, 756–58 (9th Cir. 2025). In Briskin, the plaintiff alleged that the defendant targeted forum consumers to "extract, collect, maintain, distribute, and exploit for its own profit," consumer payment information and "all other personal identifying information that it extracts." Id. at 755–56. In overruling AMA's "forum-specific focus" and "differential targeting" concepts, the Ninth Circuit ruled that "an interactive program 'expressly aims' its wrongful conduct toward a forum state when its contacts are its 'own choice and not random, isolated, or fortuitous,' Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021), even if that platform cultivates a 'nationwide audience for commercial gain,'" id. at 758. The Briskin Court acknowledged that its analysis could result in personal jurisdiction in all 50 states: "[R]equiring differential targeting would have the perverse effect of allowing a corporation to direct its activities toward all 50 states yet to escape specific personal jurisdiction in each of those states for claims arising from or relating to their relevant contacts in the forum state that injure that state's residents." Id.

The Court agrees with the Briskin Court's reasoning. TTI's cyclical relationship with New Hampshire users—offering access to the App, operating it in such a way to keep users present on the App, harvesting users' data, selling that data, and allowing advertisements targeted to users based on that data—is not "random, isolated, or fortuitous." Id.

20

Accordingly, the State has alleged sufficient facts to meet the purposeful availment prong of the specific personal jurisdiction test.

ii. Relatedness

"To satisfy the relatedness factor, there must be more than just an attenuated connection between the contacts and the claim; the defendant's in-state conduct must form an important, or at least material, element of proof in the plaintiff's case." Seward, 174 N.H. at 409. "The relatedness test is a flexible, relaxed standard, and the court's assessment of relatedness is informed by the concept of foreseeability." Id. For tort claims, the relatedness inquiry "focuses on whether the defendant's in-forum conduct caused the injury or gave rise to the cause of action." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 622 (1st Cir. 2001). To satisfy specific personal jurisdiction, "a plaintiff must link the defendant's suit-related conduct to the forum. Mere market exploitation will not suffice." Johnson, 21 F.4th at 324.

In Walden v. Fiore, 571 U.S. 277, 279 (2014), the Supreme Court held that a Nevada court could not "exercise personal jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada" where "the defendant had no other contacts with Nevada." The Walden Court noted that its holding was consistent with Calder v. Jones, 465 U.S. 783 (1984). Walden, 571 U.S. at 289–90. In Calder, the Court held that a California court could exercise personal jurisdiction over Florida defendants whose "intentional, and allegedly tortious, actions were expressly aimed at California." 465 U.S. at 785–86. Under Walden and Calder, the proper inquiry is not merely whether

21

New Hampshire residents suffered an injury but whether TTI's conduct connects it to New Hampshire in a "meaningful way." Walden, 571 U.S. at 290.

The Supreme Court has referred to the following as a "paradigm example": the defendant "extensively promoted, sold, and serviced" vehicles in the forum states and the plaintiffs resided in the forum states, used the allegedly defective vehicles in the forum states, and suffered injuries in the forum states. Ford Motor Co., 592 U.S. at 366. These facts created an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place." Id. at 370.

TTI argues that the State's claims arise out of alleged national contacts, rather than New Hampshire-specific contacts. It contends that the State's claims do not arise out of contacts TTI has directed to New Hampshire. The State explains that TTI's contacts with New Hampshire are directly related to the State's claims because TTI's purpose is to profit off of advertisement sales. To maximize that profit, TTI implements business practices designed to keep users on the App as long as possible to be able to show them more advertisements. The State argues that TTI's connections with New Hampshire—harvesting user data, selling it to advertisers, and then showing users advertisements based on that data—is intertwined with the alleged addictive design features and misrepresentations and omissions which are designed to keep child users on the App.

Generally, the State's claims against TTI arise out of TTI's alleged implementation of addictive design features which are harmful to children and TTI's alleged misrepresentations and omissions which entice young users to use the App and parents to authorize such use. In a similar manner to Ford Motor Co., TTI extensively

22

promotes TikTok in the forum state, enters service agreements and collects residents' data of the forum state, and those residents use the App in the forum state and suffered injuries in the forum state.  Cf. 592 U.S. at 366.  While TTI might use the same methods nationwide, it uses them in New Hampshire which is alleged to have harmed New Hampshire residents.  Accordingly, TTI's in-state conduct is connected to the State's claims in a "meaningful way," Walden, 571 U.S. at 290, and forms an important, element of proof in the State's case, Seward, 174 N.H. at 409.

### iii.  Reasonableness

The third and final prong of the specific personal jurisdiction test asks, "whether it would be fair and reasonable to require the defendants to defend the suit in New Hampshire."  Seward, 174 N.H. at 413.  Because TTI does not argue that this prong is unmet, the Court need not address it in substance.

Having found TTI's arguments on personal jurisdiction unpersuasive, its motion to dismiss on that ground is DENIED.

### B.  Section 230 of the Communications Decency Act

TTI argues that Section 230 of the Communications Decency Act ("Section 230") bars Counts I–III and VII–IX because they treat TTI as a publisher of third-party content. Because Section 230 is an affirmative defense, dismissal is only proper if TTI's immunity is evident from the face of the complaint.  Teatotaller, LLC v. Facebook, Inc., 173 N.H. 442, 449 (2020) (citing Force v. Facebook, Inc., 934 F.3d53, 63 n.15 (2d Cir. 2019)).

In 1996, Congress enacted Section 230 "to promote the continued development of the Internet" and "to remove disincentives for the development and utilization of

23

blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material," among other policies. 47 U.S.C. § 230(b)(1), (4). To achieve these goals, Section 230 immunizes interactive computer service providers, like TTI, from legal claims that treat them as a publisher or speaker of third-party content. See 47 U.S.C. § 230(c)(1), (e)(3). While courts have interpreted Section 230 to "broadly immunize internet companies from liability . . . this immunity is not limitless." Calise v. Meta Platforms, Inc., 103 F.4th 732, 736 (9th Cir. 2024).

To determine whether Section 230 immunity applies to a given case, courts employ a three-prong test. Under this test, Section 230 only protects "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." Teatotaller, LLC, 173 N.H. at 450 (quoting Universal Commc'n v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007)); see also Calise, 103 F.4th at 740; Lemmon v. Snap, Inc., 995 F.3d 1085, 1091 (9th Cir. 2021); Barnes v. YAHOO!, Inc., 570 F.3d 1096, 1100–01 (9th Cir. 2009).

TTI does not dispute that it is a provider of an interactive computer service (TikTok). Consequently, the Court must determine whether the State's claims treat TTI as a publisher or speaker of information provided by another information content provider. See Teatotaller, LLC, 173 N.H. at 450. This determination rests upon the State's theory of liability in each count. See id. at 451; Calise, 103 F.4th at 740 (stating that courts must "examine each claim to determine whether a plaintiff's theory of liability would treat a defendant as a publisher or speaker of third-party content") (emphasis in

24

the original).  The Court must examine TTI's duty under the State's theories of liability.  As the Ninth Circuit explains in Calise,

> We must therefore examine two things in looking at duty.  First, what is the "right" from which the duty springs?  If it springs from something separate from the defendant's status as a publisher, such as from an agreement, or from obligations the defendant has in a different capacity, then [Section 230] does not apply.  Second, we ask what is this duty requiring the defendant to do?  If it obliges the defendant to "monitor third-party content"—or else face liability—then that too is barred by [Section 230].

Id. (cleaned up).

In Lemmon, the Ninth Circuit examined the duty of social media companies to design reasonably safe products.  The parents of two boys who died in a high-speed car accident sued Snap, Inc. ("Snap"), alleging that Snap negligently designed its social media platform, Snapchat.  Lemmon, 995 F.3d at 1087.  Like Instagram and Facebook, Snapchat is a social media platform that allows users to share photos and videos with other Snapchat users.  See id. at 1088.  To promote user engagement, Snapchat provides users with rewards such as "trophies, streaks, and social recognitions."  Id.  At the time, Snapchat had developed a "speed filter," which allowed users to superimpose their real-life speed atop user-created content.  Id.  The plaintiffs alleged Snapchat knew or should have known that its users believed that Snapchat would reward them for posting a "snap" at 100 miles per hour or over.  Id. at 1089.  While Snapchat warned users not to use the filter while driving, the warnings proved ineffective.  Id. at 1090.  The trial court dismissed the plaintiffs' amended complaint, ruling that Section 230 barred their claim.  Id.

On appeal, the Ninth Circuit reversed the trial court's decision and concluded that the plaintiffs' claim did not treat Snap as a publisher or speaker of third-party content

because the cause of action focused on Snap's duty, as a manufacturer, to design a reasonably safe product. Id. at 1091–92. The court explained,

> [The plaintiffs'] negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing a product (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter). Thus, the duty that Snap allegedly violated "springs from" its distinct capacity as a product designer. This is further evidenced by the fact that Snap could have satisfied its "alleged obligation"—to take reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate. Snap's alleged duty in this case thus "has nothing to do with" its editing, monitoring, or removing of the content that its users generate through Snapchat.

Id. at 1092 (cleaned up). In its analysis, the court conceded that Snap, in some capacity, acted as a publisher or speaker of third-party content, but concluded that was not enough to confer immunity under Section 230. Id. The court explained,

> That Snap allows its users to transmit user-generated content to one another does not detract from the fact that the [plaintiffs] seek to hold Snap liable for its role in violating its distinct duty to design a reasonably safe product. As in Internet Brands, Snap "acted as the 'publisher or speaker' of user content by" transmitting [the boys'] snap, "and that action could be described as a 'but-for' cause of [the boys'] injuries." This is unsurprising: Snap "is an internet publishing business. Without publishing user content, it would not exist. But though publishing content is "a but-for cause of just about everything" Snap is involved in, that does not mean that the [plaintiffs'] claim, specifically, seeks to hold Snap responsible in its capacity as a "publisher or speaker." The duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content."

Id. at 1092–93 (citing Doe v. Internet Brands, Inc., 824 F.3d 846, 853 (9th Cir. 2016)).

The Court finds this reasoning persuasive and applicable here. While true that the State's allegations discuss New Hampshire children's exposure to harmful content on the App, the thrust of the State's allegations in Counts I, II, VII–IX is its contention that TTI designed an unsafe product and provided it to children, causing harm. The State points to features such as the recommendation engine, push notifications, infinite

scroll, and TikTok LIVE, not in the way they publish certain content, but in the way they manipulate young minds causing addiction, FOMO, and other psychological effects. TTI has a duty to design a reasonably safe product. The State alleges that it failed this duty. TTI's duty to design a reasonably safe product is independent from its role as a publisher of third-party content. While the Northern District of California decided differently in the MDL Litigation, see In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F. Supp. 3d 809, 830–33 (N.D. Cal. 2023), the Court's decision is consistent with persuasive authority, as well as the language and purpose of Section 230, see 47 U.S.C. § 230(b)(3), (4); Calise, 103 F.4th at 736 (reasoning that immunity under Section 230 is not limitless); Lemmon, 995 F.3d at 1092–93 (holding that Section 230 did not bar negligent design claim); Internet Brands, 824 F.3d at 853 (holding that Section 230 did not bar failure to warn claim).

To be clear, Section 230 protects TTI against any claims where the alleged harm arises from the substance of third-party content posted on TikTok. See Force, 934 F.3d at 66 (finding Facebook was protected under Section 230 for harm resulting from Hamas content); Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1098 (9th Cir. 2019) (finding the defendant was protected under Section 230 when a user died from fentanyl toxicity after purchasing fentanyl from another user on the defendant's online service). However, the State alleges that the App's product design features, in and of themselves, are harmful to New Hampshire children regardless of the substance of the third-party content displayed. (Am. Compl. ¶¶ 366–75, 379, 392, 402, 497–500, 503–06, 517–20, 530.) The State makes this clarification in its complaint. (Id. ¶ 382 ("While users may also suffer other harms from third-party content on TikTok's App, the harms

27

to children in New Hampshire . . . result, at least in part, from TikTok's unilateral and intentionally addictive design choices, and not from third-party content on the App."). The Court determines that Section 230 does not bar Counts I, II, VII, VIII, and IX.

The State's other claims, Counts III, V, VI, arise out of TTI's alleged misrepresentations and omissions, or, in the case of Count IV, how TTI collects certain data. These counts are not based on TTI's role as a publisher of third-party content. Thus, Section 230 does not bar these claims. See Internet Brands, Inc., 824 F.3d at 852–53 (finding that Section 230 does not bar failure to warn claims); In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F. Supp. 3d at 834 (same); Hiam v. HomeAway.com, Inc., 267 F. Supp. 3d 338, 346–47 (D. Mass 2017); aff'd, 887 F.3d 542 (1st Cir. 2018) (reasoning that claims based on publisher's own speech are not barred by Section 230).

C. First Amendment

TTI argues that the First Amendment of the United States Constitution and Part I, Article 22 of the New Hampshire Constitution bar the State's claims by protecting TTI's editorial discretion to disseminate third-party speech. The State disputes TTI's argument, clarifying that its claims relate to TTI's implementation of addictive design features and misrepresentations and omissions about the safety of those features. The State contends that such claims do not seek to impose liability for TTI's First Amendment protected activity. TTI argues that the State's claims for alleged deception and failure-to-warn are constitutionally barred because they essentially seek to compel TTI's speech by warning users about the alleged risks and harms of the App.

Like Section 230, the First Amendment protects publishers' discretion to disseminate third-party speech and categorically protects publishers from liability for injuries arising out of that speech. See Miami Herald Pub'g Co. v. Tornillo, 418 U.S. 241, 258 (1974); Moody v. NetChoice, LLC, 603 U.S. 707, 713 (2024) (comparing social media company's content moderation to traditional publishers' editorial choices, which "also select and shape other parties' expression into their own curated speech products"). Many courts, including the MDL court, have held that certain publishing decisions made by social media companies trigger First Amendment scrutiny. See In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F. Supp. 3d at 836 (applying First Amendment protection to the timing and clustering of notifications of Meta's own content); NetChoice, LLC v. Florida, 34 F.4th 1196, 1203–04, 1210 (11th Cir. 2022) (finding that social media companies engaged in protected speech when they expressed their political views through content moderation practices).

The First Amendment, like Section 230, immunizes TTI against any claims alleging harm arising from the substance of third-party content, as that conduct falls within a traditional publishing role. See Tornillo, 418 U.S. at 258; Reno v. ACLU, 521 U.S. 844, 870 (1997). TTI has a First Amendment right to decide what content to include, exclude, moderate, filter, label, restrict, or promote. O'Handley v. Padilla, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022). However, because the Court has concluded that the thrust of the State's claims seeks to hold TTI accountable for the harm caused by the alleged addictive design features themselves, regardless of the substance or organization of the third-party content disseminated, the Court similarly finds that the First Amendment does not bar the State's claims. See In re Social Media

29

Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F. Supp. 3d at 836 (stating that Meta's briefing ignored that "much of the conduct alleged by plaintiff does not constitute speech or expression" and "d[id] not explain how holding them liable in that context would be akin to making them liable for speech").

The First Amendment likewise does not bar the State's deception and failure-to-warn claims. There is no First Amendment protection for false, misleading, or unlawful commercial speech. See Fla. Bar v. Went For It, Inc., 515 U.S. 618, 623–24 (1995) ("[T]he government may freely regulate commercial speech that concerns unlawful activity or is misleading."). Under this principle, TTI has no First Amendment protection for its allegedly misleading statements, misrepresentations, or omissions.

Turning to TTI's argument that the State's failure-to-warn claim seeks to compel TTI's speech in violation of the First Amendment, the Court disagrees. TTI relies on NetChoice, LLC v. Bonta, 113 F.4th 1101, 1117 (9th Cir. 2024) for the proposition that businesses cannot be compelled to "opine on potential harm to children" caused by its product. In Bonta, the defendant challenged a state law requirement mandating covered entities create reports for each online service, product, or feature likely to be accessed by children and identifying "any risk of material detriment to children that arise from the data management practices of the business." Id. at 1116. Because the law compelled specific speech, the Ninth Circuit concluded that it triggered First Amendment review and that the report requirement likely failed strict scrutiny. Id. at 1121.

The State's allegations and failure-to-warn claim are distinct from the law at issue in Bonta. The State does not seek to compel TTI to opine about the potential harm to

children caused by their use of the App.  The State alleges that TTI is liable because there are foreseeable harms which could have been reduced or avoided by providing reasonable warnings, omission of those warnings rendered the App not reasonably safe, and TTI's failure to warn caused children serious harm.  (Am. Compl. ¶¶ 521–24.)  In its prayer for relief, the State does not seek to compel any particular speech from TTI.  (See id. at 146.)  A First Amendment bar to a claim like the State's would essentially bar all failure-to-warn claims.  The Court finds no support in the law for such an application.  See Social Media Cases, No. JCCP5255, 22STCV21355, 2025 WL 1364052, at *10–11 (Cal. Jan. 8, 2025) ("The First Amendment does not bar the Plaintiffs' duty to warn claims based on dangers allegedly created by Defendants in the operation of their platforms.").

For these reasons, dismissal of the State's claims on First Amendment grounds is not appropriate.

D.  Consumer Protection Act

TTI moves to dismiss the State's claims under the CPA, RSA 358-A (Counts I-VI), arguing: (1) the State fails to allege a business or commercial transaction; (2) Counts I and II fails because the App can reasonably be avoided by users; (3) Count III and VI fail because the State does not allege actionable deception with particularity; and (4) Counts IV and V fail because they are preempted by federal law.  The Court addresses each argument in turn.

i.  Commercial or Business Transaction

TTI argues that the State's CPA claims fail because the CPA applies only to business or commercial transactions, and the State does not allege any such

"transaction." TTI bases its argument on the fact that the App is free to users—in that it does not charge a fee for use. The State responds that there is a transaction between TTI and users: TTI provides use of the App in exchange for users' personal data. The State contends that the App is not truly "free."

"To determine whether the [CPA] applies to a particular transaction, [the Court] analyze[s] the activity involved, the nature of the transaction, and the parties to determine whether a transaction is a personal or business transaction." Hughes v. DiSalvo, 143 N.H. 576, 578 (1999) (declining to extend to the CPA to isolated sales of property by owners). The CPA defines "trade" and "commerce" as, "the advertising, offering for sale, sale, or distribution of any services or any property . . . ." RSA 358-A:1. The Court must engage in statutory interpretation of the term "sale" in the CPA.

When engaging in statutory interpretation, the Court "first look[s] to the language of the statute itself, and, if possible, construe[s] that language according to it plain and ordinary meaning." State v. Doyle, 176 N.H. 594, 597 (2024). The Court "give[s] effect to every word of a statute whenever possible and will not consider what the legislature might have said or add language that the legislature did not see fit to include." Id. The Court "construe[s] all parts of a statute together to effectuate its overall purpose" and attempts to construe all parts "in harmony with the overall statutory scheme." Id.

"Sale" is defined as "[t]he action or an act of selling or making over to another for a price; the exchange of a commodity for money or other valuable consideration." Oxford English Dictionary, "Sale," July 2023; Matter of Carter, 2024 N.H. 30, ¶ 9 ("When a term is not defined in a statute, [the Court] look[s] to its common usage, using the dictionary for guidance."). It is also defined as, "[t]he transfer of property or title for a

32

price." Black's Law Dictionary, "Sale," (12th ed. 2024).  Upon review of the plain meaning of "sale," the Court cannot say that it requires an exchange of money.  The Court declines to read words into the statute the legislature did not see fit to include. See Doyle, 176 N.H. at 597.

A sale could be an exchange wherein consumers are able to access the App in exchange for a price—TTI's collection of their personal data.  See In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 753 F. Supp. 3d 849, 909–10 (N.D. Cal. 2024) ("A social media company cannot exempt itself from consumer-protection law because its consumers exchange their personal data and time for a product or service rather than cash for goods"); State v. Meta Platforms, Inc., No. 23-cv-4453, 2024 WL 3741424, at *15 (Vt. Sup. Ct. July 28, 2024) ("Instagram is clearly engaging in commerce when it provides Instagram to Vermonters").  While TTI does not charge for its product, it receives valuable consideration in the form of personal information.  The State has alleged such an exchange, satisfying the "trade or commerce" element of the CPA at the pleading stage.  (See Am. Compl. ¶ 494.)  To exclude in-kind transactions such as that between TikTok users and TTI from the definition of "sale" would be to ignore the reality of modern transactions.  The Court's conclusion is in accordance with the purpose of the CPA: "to ensure an equitable relationship between consumers and persons engaged in business."  Hughes, 143 N.H. at 578.

ii.  "Unfair" Act or Practice

TTI argues that the State fails to state a claim under the CPA for Counts I and II. The State responds that its allegations of TTI's profiting from its purposeful

implementation of addictive design features which harm child users support its CPA claims.

The CPA proscribes unfair and deceptive trade practices in general, RSA 358-A:2, and sets forth a list of specific types of conduct that qualify as unfair or deceptive trade practices, RSA 358-A:2, I–XVIII. Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 24 (2017). Although the general provision is broadly worded, the New Hampshire Supreme Court has recognized that not all conduct in the course of trade or commerce falls within the scope of the CPA. Id.

"In determining which commercial actions not specifically delineated are covered by the act," the Court employs the "rascality" test. Id. "Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. In addition to the rascality test, New Hampshire courts look to the federal courts' interpretation of the Federal Trade Commission Act for guidance. Id. The Federal Trade Commission considers: "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . ." Id. The New Hampshire Supreme Court has found the rascality test unmet when a defendant was alleged to have engaged in conduct common in the particular industry in which the parties engaged. See Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363, 371 (2009).

TTI contends that the State's allegations fail the rascality test because they "boil down to the fact that [the State] does not like the [App] and would prefer that younger users spend less time on it." (TTI's Memo. iso Mot. to Dismiss at 31.)  TTI misconstrues the State's allegations and ignores the standard the Court must apply on a motion to dismiss.  Viewing all inferences in the State's favor, it alleges that TTI knowingly implemented addictive design features attractive to minors, ignored the psychological impacts on minor users, and profited from minors' continued and obsessive use of the App while their mental health suffered as a result of the use.  The State's allegations go far beyond that it does not like the time children spend on the App.  This conduct reaches a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  Fat Bullies Farm, 170 N.H. at 24; cf. Beer v. Bennett, 160 N.H. 166, 171 (2010) (defendant's acts met the rascality test where "he made representations, knowing he lacked sufficient knowledge to substantiate them, to induce the plaintiff's purchase").  The profiting off of children to their detriment offends public policy, satisfying the first prong of the FTC considerations.  See id.

TTI also argues that the State cannot meet the second prong of the FTC considerations because TTI's conduct was not coercive.  To the extent the second prong requires coercion, the State has alleged it here.  There is no doubt, as TTI argues, that users voluntarily download and sign up to use the App.  However, once they begin using the App, construing all inferences in favor of the State, they are coerced to continue using the App by the addictive design features that prey on minor users' psychological vulnerabilities.  For this reason and those articulated previously, TTI's alleged conduct is immoral, unethical, oppressive, and/or unscrupulous.  See id.

Finally, the Court turns to the third FTC consideration: whether TTI's conduct causes substantial injury to consumers.  TTI argues that any injury sustained by TikTok consumers was reasonably avoidable and, therefore, the State's CPA claim fails.  See 15 U.S.C. § 45(n) (". . . act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves . . .").  "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice."  In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 753 F. Supp. 3d at 896.  The cases TTI relies upon do not involve minors and their unique susceptibility to addictive designs.  It is not whether New Hampshire children could have avoided the alleged harm by never downloading and signing up for TikTok.  It is whether they could have avoided the harms posed by prolonged and obsessive use of the App, which, as alleged by the State, TTI induces them into with addictive design features.  Construing all inferences in favor of the State, it is not reasonable to conclude that New Hampshire child users could have avoided the harms caused by the App.

For the foregoing reasons, the State has alleged sufficient facts to satisfy the "rascality" test under the CPA.  See Fat Bullies Farm, 170 N.H. at 24.

### iii.   Deceptive Act or Practice

TTI contends that dismissal of Counts III and VI[2] is appropriate because the State failed to satisfy the heightened pleading standards for fraud, the relevant statements are not actionable because they are general, aspirational, corporate puffery, or non-verifiable statements of opinion, and the State's own allegations undercut and

---

[2] TTI refers to "Count 8" which the Court infers as a typographical error.  (See Def.'s Memo. iso Mot. to Dismiss at 36.)

contradict the contention that TTI acted deceptively.

First, the Court is not persuaded that the State's CPA claims must be alleged with particularity.  TTI cites no authority wherein courts have applied a particularity pleading standard to CPA claims.  The way in which the New Hampshire Supreme Court has treated CPA claims does not indicate to this Court that it would apply a heightened pleading standard.  See LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 93–100 (2007) (employing the typical motion to dismiss framework to resolve an appeal of a trial court's grant of the defendant's motion for judgment on the pleadings—which are treated like motions to dismiss in New Hampshire—of the plaintiff's CPA claim); Snierson v. Scruton, 145 N.H. 73, 80–81 (2000) (applying a specificity test to the plaintiff's fraud and negligent misrepresentation claims and then ruling that the plaintiff's CPA allegations "support[ed] a claim of unfair or deceptive trade practices" and not mentioning a specificity requirement).

Regarding Count III, the State has sufficiently alleged a violation of the CPA.  It lays out the representations TTI has made about the safety of the App.  (Am. Compl. ¶ 416 (a)–(j).)  The State alleges statements TTI has made in the App's Community Guidelines, (id. ¶¶ 128, 133–35, 142), on its website, (id. ¶¶ 129, 136), and through its officers including its CEO, (id. ¶¶ 130, 137–39).  The State then alleged, by category of information, how TTI's representations were misrepresentative of the truth.  (See generally id. at 48–75.)  TTI's statements were not "mere puffery."  See Private Jet Serv. Grp., Inc. v. Sky King, Inc., No. 05-cv-98-JD, 2006 WL 2864057, at *5 (D.N.H. Oct. 4, 2006) ("Mere puffery that does not represent that the company adheres to particular standards or requirements is not actionable under [the New Hampshire

37

CPA].”); (Am. Compl. ¶¶ 135 (TTI's statements affirmatively asserting what content it does not allow), 136 (TTI's statements making promises and announcements about the App's safety), 137 (TTI's CEO discussing TTI's strict prohibitions and removal policies). TTI's alleged statements were specific and assertive. Taken as true, the State's allegations are sufficiently specific and actionable under the CPA.

Briefly, regarding TTI's arguments that the State's allegations undercut its own claims, such arguments rely on information outside the scope of the amended complaint, (TTI's Memo. iso Mot. to Dismiss at 42–43), or fail to construe the State's allegations in its favor, as the Court must when ruling on a motion to dismiss, see Barufaldi, 175 N.H. at 427. For those reasons, the Court finds TTI's arguments unavailing.

Turning to Count VI, the Court is not persuaded that the State's allegations state a claim under the CPA. In Count VI, the State alleges that TTI violated the CPA by "deceiv[ing] users about the geographic origin of its products . . . by misrepresenting in this State that [TTI] is a company located, controlled, and/or headquartered in the United States when it continues to be controlled by its China-based parent company, ByteDance." (Am. Compl. ¶ 480.) The State does not allege a specific misrepresentation from TTI about its "geographic origin." The State alleges that TikTok's Terms of Service state that the App "is provided by TikTok Inc. in the United States," that TikTok is not available in mainland China, that TTI's headquarters are in Los Angeles and Singapore, and that TTI has never shared, or received a request to share, United States user data with the Chinese government and its data centers are located outside of China. (Id. ¶¶ 348–49, 358.) The State alleges that these statements

38

are deceptive because TTI remains heavily controlled by ByteDance, TTI instructs its employees to downplay ByteDance and "the China association, and TTI relies on access to ByteDance's resources, expertise, and code to operate. (Id. ¶¶ 350–52.)

The State's allegations are insufficient to allege that TTI misrepresented its geographic origin. TTI may have made efforts to publicly disentangle itself from ByteDance and the Chinese government. However, its efforts to appear independent do not go as far as actionable misrepresentations about its corporate connection to ByteDance, and through it, the Chinese Government. The State does not allege that TTI's statements about the App being provided by TikTok Inc. in the United States, TikTok not being available in mainland China, TTI's headquarters in Los Angeles and Singapore, and that TTI has never shared, or received a request to share, United States user data with the Chinese government, are false. Without specific representations tied with facts supporting the falsity of those representations, the State does not have an actionable CPA claim against TTI regarding its geographic origin. See Fat Bullies Farm, 170 N.H. at 24

For that reason, Count VI is DISMISSED.

### iv. COPPA Preemption

TTI moves to dismiss the State's CPA claims (Counts IV and V) arising out of TTI's alleged improper collection of data from users under 13 years old because such claims are preempted by the federal Children's Online Privacy Protection Act ("COPPA"). TTI argues that the State's claims are "inconsistent" with COPPA and, thus, preempted. TTI also contends that the State's claims are barred because COPPA specifically authorizes states to bring actions in federal court to enforce its provisions.

The State responds that its claims, brought under the CPA but which reference COPPA, are consistent with the COPPA scheme and, because they are CPA claims, may be brought in state court.

The Court agrees with the State in both respects. First, the State's claims are not "inconsistent" with COPPA. Under COPPA and its regulations, companies that operate websites and online services marketed toward children must provide certain disclosures about their data collection activities and must safeguard the confidentiality, security, and integrity of the children's personal online information. 15 U.S.C. § 6501–06; 16 C.F.R. §§ 312.1–13; see also Jones v. Google LLC, 73 F.4th 636, 641 (9th Cir. 2023). While COPPA does not provide a private right of action, it permits state attorneys general, who must notify the Federal Trade Commission ("FTC"), to bring civil actions in federal court as parens patriae. 15 U.S.C. § 6504(a). COPPA's preemption provision states: "No State or local government may impose any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in this chapter that is inconsistent with the treatment of those activities or actions under this section." Id. § 6502(d).

The State's CPA claims referring to COPPA are not preempted because they are not "inconsistent" with COPPA's requirements, but rather track them. Jones, 73 F.4th at 642 (reading the term "inconsistent" in the preemption context "to refer to contradictory state law requirements, or to requirements that stand as obstacles to federal objectives"). The Jones Court held that "COPPA's preemption clause does not bar state-law causes of action that are parallel to, or proscribe the same conduct forbidden by, COPPA." Id. at 644. Because the State's claims seek to hold TTI liable for conduct

40

COPPA hold companies liable for, the claims are substantively consistent with COPPA and, thus, not preempted.

The Court turns to TTI's argument that, because COPPA specifically outlines a procedure for state attorneys general suing in parens patriae to enforce COPPA, the State's suit, which does not comply with those requirements, is inconsistent with and, thus, preempted by COPPA. The Court disagrees. The State's CPA claims rely on TTI's alleged violations of COPPA to demonstrate TTI's allegedly unfair acts. (See Am. Compl. ¶¶ 433, 435–36, 444, 460, 470.) The State is not seeking to enforce COPPA or obtain relief under the Act. Thus, it need not comply with Section 6504(a)'s requirements, including filing in federal court and notifying the FTC. Again, permitting states to use COPPA violations as evidence supporting violations of state law is not inconsistent with COPPA. See Jones, 73 F.4th at 642 ("[P]reemption clauses did not bar state tort or contract laws imposing obligations similar or identical to the substantive federal requirements.").

Accordingly, COPPA does not preempt Counts IV and V.

E. Products Liability

TTI moves to dismiss the State's claims for strict and negligent products liability (Counts VII–IX) arguing the State lacks standing to pursue these claims and that the App is not a "product." The Court addresses its arguments in turn.

i. Standing

The State brings this suit under parens patriae standing. "Parens patriae literally means 'parent of the country,' and refers traditionally to the role of the state as sovereign and guardian of persons under legal disability." State v. City of Dover, 153

41

N.H. 181, 185 (2006).  The theory is "a concept of standing utilized to allow the state to protect 'quasi-sovereign' interests such as health, comfort and welfare of its citizens, interstate water rights, and the general economy of the state."  Id. at 185–86.  To satisfy parens patriae standing, "[f]irst, the state must assert an injury to a 'quasi sovereign' interest, an interest apart from the interests of particular private parties.  Second, the state must allege injury to a 'substantial segment' of its population."  Id. at 186.  The Court addresses each inquiry in turn.

"Quasi-sovereign" interests are those "that the State has in the well-being of its populace," which must be "sufficiently concrete to create an actual controversy between the State and the defendant."  Id. (citing Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 602 (1982)).  For example, states have a quasi-sovereign interest "in the abatement of public nuisances, instances in which the injury to the public health and comfort is graphic and direct."  Id.  Courts have "generally interpreted the health and well-being category of quasi-sovereign interests broadly."  Id.  "A state also has a quasi-sovereign interest in preventing any injury or potential injury to the general health and well-being of its residents."  Id.

In Dover, the New Hampshire Supreme Court ruled that "the State has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply."  Id.  The Court reasoned that "[t]he control and elimination of water pollution is a subject clearly within the scope of the State's constitutional police power."  Id.  The Court also relied on the State's interest, as articulated by RSA 481:1, in providing "careful stewardship over all the

42

waters lying within its boundaries." Id. Thus, the Court concluded that the State had a quasi-sovereign interest in protecting its waters from contamination. Id.

The State argues it has a quasi-sovereign interest in protecting the interests of New Hampshire children suffering from the consequences of TTI's alleged addictively designed App and its misrepresentations and omissions about the App. TTI contends that the State's interest is indistinguishable from those of the individual New Hampshire residents who could bring suit on the same grounds and that the State has not suffered unique damages but, rather, is seeking to collect damages for harms done to third parties (New Hampshire minor users of the App).

The State has a quasi-sovereign interest in the health of its residents, including mental health. The facts the State alleges support a quasi-sovereign interest in the mental health consequences experienced by minors using social media, including TikTok. Almost half of New Hampshire teenagers (44.2%) reported symptoms of clinical depression and feeling persistently sad or hopeless. (Am. Compl. ¶ 3.) This represented a 57.8% increase from 2017. (Id.) Also between 2017 and 2021, the percentage of New Hampshire high school students who reported seriously considering suicide increased by 53.4% and the amount who actually attempted suicide increased by 66.1%. (Id.) The total amount of TikTok users in New Hampshire increased from 417,105 in 2020 to over 1.2 million in 2023. (Id. ¶ 42.) As of 2023, 92,481 of those New Hampshire users were aged 13 to 17. (Id. ¶ 36.) The compulsive and prolonged use of TikTok that minors exhibit, (id. ¶ 69), increases the risk of experiencing poor mental health outcomes, including depression and anxiety, (id. ¶ 70).

43

The State has an interest in protecting the mental health of its youngest population. The Court sees no reason to distinguish between physical and mental health in this context. See Dover, 153 N.H. at 186 (stating that the State has a quasi-sovereign interest in the physical health of its citizens); Alfred L. Snapp & Son, Inc., 458 U.S. at 607 (same). The health and well-being category of quasi-sovereign interests has been interpreted broadly. Dover, 153 N.H. at 186. The State's interest is especially heightened when it is suing on behalf of children. See Dist. of Columbia v. ExxonMobil Oil Corp., 172 A.3d 412, 442 n.13 (D.C. 2017) (Easterly, J., dissenting) (referring to the general proposition that states have a common law parens patriae authority over children). TTI's argument that the State does not have a quasi-sovereign interest in the health of its citizens is antithetical to New Hampshire precedent. See Dover, 153 N.H. at 186. Therefore, the Court determines that the State has pleaded sufficient facts to satisfy the quasi-sovereign interest prong of the parens patriae standing test.

The second inquiry is "whether a sufficiently substantial segment of the population is affected by the challenged conduct." Dover, 153 N.H. at 187. In Dover, 13.2% of the statewide water supplies were contaminated, corresponding to hundreds of public water systems and approximately 40,000 private water supplies. Id. The Court determined that the foregoing data demonstrated that the contamination directly affected a substantial portion of the population of New Hampshire. Id. The Court noted that the State "clearly" met the substantial segment test. Id.

More than a quarter of all registered accounts in New Hampshire belong to users under the age of 23 and over 92,000 of the accounts belong to children aged 13 to 17. (Id. ¶¶ 5, 36.) While there is no particular number which satisfies the substantial

44

segment prong, see People v. Peter & John's Pump House, Inc., 914 F. Supp. 809, 812 (N.D.N.Y. 1996) ("There is no numerical talisman to establish parens patriae standing . . . ."), the number of New Hampshire children using TikTok exceeds the number of New Hampshire residents impacted in Dover, see 153 N.H. at 187 (contamination impacted approximately 40,000 water supplies). If the State "clearly" met the prong in Dover, then the State has met the same prong under the facts alleged here. Further, while the State alleges minors' usage of the App in 2023, future users will also be impacted by the same alleged products liability and negligence, increasing the segment of the population affected. See New York, by James v. Niagara-Wheatfield Central Sch. Dist, 119 F.4th 270, 282–83 (2d Cir. 2024) (permitting consideration of future individuals who may be injured by the defendant's actions in the analysis of the substantial segment prong of the parens patriae test). Accordingly, the Court determines that the State has pleaded sufficient facts to satisfy the substantial segment of the parens patriae standing test.

TTI has asks the Court to consider a third prong of the parens patriae test, requiring the State to show that individuals could not obtain complete relief through private suits. Some jurisdictions include this additional step to determine whether standing is established. See Dover, 153 N.H. at 187. The reasoning underlying the third prong is to ensure that the State's interest is "sufficiently severe and generalized, it must stand apart from the interests of particular parties—in other words, the controversy must in substance implicate the state's interest in economic supervision, and not merely affect the fortunes of a limited class of her citizens." New York v. Facebook, Inc., 549 F. Supp. 3d 6, 22 (D.D.C. 2021) (citing Snapp, 458 U.S. at 607). However, the New

Hampshire Supreme Court has not applied this prong in its consideration of whether the State has standing. See Dover, 153 N.H. at 187 (declining to place the burden on the State to show whether the cities could obtain complete relief through the State's suit). The Court has only employed the test when determining what types of damages the State may recover in a parens patriae suit. See State v. Hess Corp., 161 N.H. 426, 436–37 (2011) (ruling on an interlocutory transfer of a partial motion for summary judgment). The Court declines to apply the third prong of the parens patriae test at the motion to dismiss stage. While the State's ability to recover certain categories of damages might ultimately be limited, those potential limitations do not impact the State's standing to pursue its products liability claims.

In sum, the Court concludes that the State has parens patriae standing to pursue its strict and negligent products liability claims.

ii. "Product"

Lastly, TTI argues that the App is not a "product" and, thus, TTI cannot be subject to products liability claims arising out of the design of the App. The State responds that treating social media as a product is consistent with New Hampshire law and the Restatement.

The New Hampshire Supreme Court has not defined what a product is for purposes of strict products liability. However, it has adopted the Restatement (Second) of Torts to analyze other questions under strict products liability. See Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 831 (2005). Both parties additionally rely on the Restatement (Third) of Torts which specifically addresses what constitutes a product. The Court likewise relies on the Restatement (Third) of Torts because of the New

Hampshire Supreme Court's previous reliance on the Restatement's approach, the Restatement (Second) of Torts' silence on the issue of defining a product, and the parties' joint reliance on the Restatement (Third) of Torts.

The Restatement (Third) of Torts defines a product as, "tangible personal property distributed commercially for use or consumption." Restatement (Third) of Torts: Prod. Liab. § 19 (1998). Further, "[s]ervices, even when provided commercially, are not products." Id. However, items such as electricity are products "when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules state in the Restatement." Id.

Given the nature of the State's claims, TikTok is a product. The State alleges that the App's design features harm minor users. TTI's business model is operating TikTok which is a social media platform that allows users to create, upload, and view 15 to 60-second videos. (Am. Compl. ¶ 53.) However, the App is the vehicle through which TTI effectuates that business model. TTI designs, develops, programs, markets, distributes, and profits from the App. (Id. ¶ 495.) For this reason, the App is akin to the distribution and use of tangible property. See Restatement (Third) of Torts: Prod. Liab. § 19 (1998). TTI's argument that products are limited to tangible, physical items, is contrary to the law. See id. Further, the App is not a service. While users may experience a customized display when engaging with it, the design features themselves are uniform. Consequently, TTI is not performing a unique service for every user of the App. Because the Restatement distinguishes between services and products, TTI is thus more likely a product.

Other jurisdictions are in accord with the Court's analysis.  In <u>Brookes v. Lyft Inc.</u>, the court ruled that the Lyft application was a product because, while Lyft's business model was a transportation network company in which it connects riders with drivers, Lyft designed and distributed the Lyft application to carry out that business model.  No. 50-2019-CA-004782-MB, 2022 WL 19799628, at *3 (Fla. Cir. Ct. Sept. 30, 2022).  The court also noted that the plaintiff's claim was based on the design of the application which Lyft designed, distributed, and placed into the stream of commerce.  <u>Id</u>. at *4; <u>see also</u> <u>In re Uber Technologies, Inc., Passenger Sexual Assault Litig.</u>, 745 F. Supp. 3d 869, 905 (N.D. Cal. Aug. 15, 2024) (finding the Uber application a product because the alleged defects in the application have similar plausible analogues in tangible products); <u>T.V. v. Grinder, LLC</u>, No. 3:22-cv-864-MMH-PDB, 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024)[3] (recommending a finding that the defendant social networking application is a product because it designed its app for its business, made design choices for the app, placed the app in the stream of commerce, distributed the app in the global marketplace, marketed the app, and generated revenue and profits from the app); <u>cf.</u> <u>In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.</u>, 702 F. Supp. 3d at 849 (adopting a defect-specific approach to determine whether the challenged functionalities of the defendants' social media were products).  <u>But see</u> <u>Social Media Cases</u>, No. JCCP 525, 22STCV21355, 2023 WL 6847378, at *16 (Cal. Super. Oct. 13, 2023) (determining that social media was not a product because applying the doctrine of products liability to social media does not align with the goals of the doctrine and interactions between social media companies and their users are

---

[3] <u>Grinder</u> is an unadopted report and recommendation to which the defendant objected before the parties stipulated to dismissal with prejudice.

48

different from traditional product sales).

To the extent TTI argues that the State's claims arise out of harm caused by intangible information produced by third parties onto the App, which is then seen by New Hampshire minor users, the Court has already discussed and disagreed with that argument supra, Sections B and C. The State's claims are based on the App's alleged defective and dangerous features, not the information contained therein. Accordingly, the State's products liability claim is based on harm caused by the product: TikTok itself.

## IV.    Conclusion

For the foregoing reasons, TTI's motion to dismiss is GRANTED as to Count VI but is otherwise DENIED.

**SO ORDERED.**

 July 8, 2025
_____
**Date**

_____
**John C. Kissinger, Jr.**
**Presiding Justice**

49

# EXHIBIT H

**FIRST JUDICIAL DISTRICT COURT**
**COUNTY OF SANTA FE**
**STATE OF NEW MEXICO**

STATE OF NEW MEXICO, EX REL.,
RAÚL TORREZ, ATTORNEY GENERAL,

     Plaintiff,

v.                              NO. D-101-CV-2023-02838

META PLATFORMS, INC.; INSTAGRAM, LLC;
META PAYMENTS, INC.; META PLATFORMS
TECHNOLOGIES, LLC; and
MARK ZUCKERBERG,

     Defendants.

## ORDER DENYING THE
## META DEFENDANTS' MOTION TO DISMISS

This matter comes before the Court on the Motion to Dismiss (the "Motion") filed by

Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms

Technologies, LLC (collectively, "Meta" or the "Meta Defendants"). The Meta Defendants filed

the Motion on March 1, 2024, along with Declarations of Nicholas Wong and Bradley W. Davis

in support of the Motion. Plaintiff State of New Mexico (the "State") filed its opposition brief on

March 19, 2024, along with several attachments. The Meta Defendants filed their reply brief on

April 8, 2024. The Meta Defendants filed a Notice of Supplemental Authority on May 24, 2024,

and the State filed a Notice of Supplemental Authority on May 28, 2024. The Court heard oral

argument on the Motion on May 30, 2024.

Having reviewed and considered the Motion and attached declarations, the opposition

brief and attachments thereto, the reply brief, the arguments of counsel and all authority cited by

the parties both in their briefs, in their notices of supplemental authority and at oral argument, the

Court **DENIES** the Motion in its entirety for the reasons that follow:

1

1.      The Court finds that based on Rule 1-012(B)(6) and notice pleading standards the Motion is **DENIED**.

2.      With respect to Meta's arguments concerning *personal jurisdiction*, the Court finds that there are sufficiently pled activities in New Mexico in terms of data harvesting, advertisements, apps on phones and targeting of New Mexico consumers to render the Complaint inappropriate for dismissal on Rule 1-012(B)(6) grounds.

3.      With respect to Meta's arguments concerning application of *Section 230*, the Court understands that there are considerable issues related to the difference between design and other non-publisher activities and publisher activities, such as decisions about content, curation, and the like. Applying the standards applicable to a Rule 1-012(B)(6) motion, the Court DENIES Meta's Motion.

4.      With respect to Meta's arguments concerning application of the *First Amendment*, Meta's counsel pointed out at oral argument that the issues largely overlap with the Section 230 arguments and analysis, and there is ambiguity concerning whether Meta's conduct constitutes a decision or judgment related to content or product design non-speech issues. Applying the standards applicable to a Rule 1-012(B)(6) motion, the Court DENIES Meta's Motion.

5.      With respect to Meta's arguments concerning the elements of *public nuisance*, the Court notes that a spectrum exists between Judge Mathew's analysis in *State of New Mexico ex rel. Balderas v. Purdue Pharma L.P.*, No. D-101-CV-2017-02541 (1st Jud. Dist. June 15, 2022), and, for example, the decision of the Oklahoma supreme court in *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 724-25 (Okla. 2021), concerning the existence of a public right. Applying the standards applicable to a Rule 1-012(B)(6) motion, the Court DENIES Meta's Motion.

6.      With respect to Meta's arguments concerning the *Unfair Practices Act*, at the Rule 1-012(B)(6) level the State has pled sufficient facts to state a claim, including facts alleging contracts for use and data-versus-use exchange and other things that are pled, which are sufficient to render dismissal inappropriate. Applying the standards applicable to a Rule 1-012(B)(6) motion, the Court DENIES Meta's Motion.

7.      At the conclusion of the Court's announcement of this ruling, counsel for Meta requested inclusion of language pursuant to NMSA 1978 § 39-3-4 (1999) sufficient to permit an interlocutory appeal of the Court's order on personal jurisdiction. The Court DENIES that request. The Court will move forward with the litigation and see if there are other decisions that warrant inclusion of such language, but, at this point, the delay attendant to an interlocutory appeal does not warrant inclusion of such language.

It is so **ORDERED** this 21st day of June, 2024.

_____
**HON. BRYAN BIEDSCHEID**

Submitted and Approved by:

**RAÚL TORREZ**
**ATTORNEY GENERAL OF NEW MEXICO**

*/s/ James W. Grayson*
**JAMES W. GRAYSON**
**CHIEF DEPUTY ATTORNEY GENERAL**
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
Phone: (505) 218-0850
Email: jgrayson@nmag.gov

3

**SERENA R. WHEATON**
**ASSISTANT ATTORNEY GENERAL**
New Mexico Department of Justice
Consumer & Environmental Protection Division
201 Third St. N.W., Suite 300
Albuquerque, NM 87102
Phone: (505) 490-4846
Email: swheaton@nmag.gov

**LINDA SINGER** (*pro hac vice*)
**DAVID I. ACKERMAN** (*pro hac vice*)
**MOTLEY RICE LLC**
401 9th St., NW, Suite 630
Washington, D.C. 20004
Phone: (202) 232-5504
Email: lsinger@motleyrice.com
Email: dackerman@motleyrice.com

*Attorneys for Plaintiff the State of New Mexico*


Approved as to form:

**COVINGTON & BURLING LLP**

By: *Approved as to Form via Email 06/18/24 @ 1:00pm MT*
Nathan E. Shafroth (*pro hac vice*)
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Tel: (415) 591-7053
nshafroth@cov.com

Timothy C. Hester (*pro hac vice*)
One City Center
850 Tenth Street, NW
Washington, DC 20002-4956
Tel: (202) 662-5324
thester@cov.com

- and –

**HOLLAND & HART LLP**
John C. Anderson
Olga M. Serafimova
110 North Guadalupe, Suite 1
Santa Fe, New Mexico 87501
Tel: 505.988.4421
jcanderson@hollandhart.com
omserafimova@hollandhart.com

*Attorneys for Defendants*

# EXHIBIT I

# IN THE DISTRICT COURT OF OSAGE COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA, *ex rel.,*    )
GENTNER DRUMMOND,    )
ATTORNEY GENERAL OF    )
OKLAHOMA,    )
    )
    Plaintiff,    )  NOV 2 0 2024
vs.    )    **Case No. CJ-2023-180**
    )    **Judge Stuart Tate**
META PLATFORMS, INC. f/k/a    )
FACEBOOK, INC., and    )
INSTAGRAM, LLC,)    )
    )
    Defendants.    )

## ORDER ON DEFENDANTS' MOTION TO DISMISS

The State filed its Petition on October 24, 2023 ("Petition" or "Pet."), alleging that Defendants Meta Platforms, Inc. f/k/a Facebook, Inc., and Instagram, LLC ("Meta") intentionally designed their Facebook and Instagram Platforms ("Platforms") to be addictive to adolescent users. The State alleges that the design itself, as well as Meta's various misrepresentations and omissions regarding the Platforms, amounted to unfair and deceptive trade practices prohibited by the Oklahoma Consumer Protection Act ("OCPA"), 15 O.S. §§ 751-763. Meta filed a motion to dismiss on January 25, 2024 ("Motion") raising four issues for determination by the Court: (1) whether Oklahoma has specific personal jurisdiction over Meta; (2) whether the State's claims are barred by Section 230 of the Communications Decency Act; (3) whether the State's claims are barred by the First Amendment of the United States Constitution; and (4) whether the State pled facts sufficient to set out cognizable claims for relief under the OCPA. The purpose of a Motion to Dismiss "is to test the law that governs the claim, not the underlying facts." *Fox v. Mize*, 2018 OK 75. "The court examines only the controlling law, not the facts." *Wilson v. State ex rel. State Election Bd.*, 2012 OK 2, ¶ 4, 270 P.3d 155, 157. "At the motion to dismiss stage, a court must "take all factual allegations in the petition as true

and draw all reasonable inferences therefrom." *Cates v. Integris Health Inc.*, 2018 OK 9. Motions to Dismiss are generally viewed with disfavor. *Lockhart v. Loosen*, 1997 OK 103. A Plaintiff is required neither to identify a specific theory of recovery nor to set out the correct remedy or relief to which it may be entitled. *Darrow v. Integris Health, Inc.*, 2008 OK 1. "If relief is possible under any set of facts that can be gleaned from the petition, the motion to dismiss should be denied." *Id.*, ¶ 7, 412 P.3d at 101. *Fox v. Mize*, 2018 OK 75. Unless the Court finds Oklahoma can prove no set of facts which warrant relief without doubt the Motion to Dismiss may not be sustained. *Nicholson v. Stitt*, 2022 OK 35. Relief is appropriate only when no cognizable legal theory will support the claims or that there are insufficient alleged facts to support any cognizable legal theory. *Id.* A petition may be dismissed for two reasons as a matter of law. First, when there is a lack of any cognizable theory, and second, when there are insufficient facts under a cognizable theory. See *Ridings v. Maze*, 2018 OK 18, and *Wilson v. State ex rel. State Election Board*, 2012 OK 2. It is proper to challenge the sufficiency of the petition asserting failure to give fair notice of the factual basis for jurisdiction. When challenging jurisdiction in a motion to dismiss, the plaintiff need only make a prima facia showing of personal jurisdiction. *Powers v. District Court of Tulsa County*, 2009 OK 91.

Having considered the parties' written submissions and oral argument, the Court finds as follows:

## I.     Oklahoma Has Specific Personal Jurisdiction Over Meta.

General jurisdiction is not at issue in this case. Oklahoma is not the state of incorporation or principal place of business of Meta. See *Daimler AG v. Bauman*, 571 US 117 (2014). The U.S. Supreme Court decided the case of *International Shoe Co. v. Washington*, 66 S. Ct. 154 in 1945. This decision significantly shaped the concept of personal jurisdiction in the United States. Prior to *International Shoe*, courts primarily relied on a strict territorial approach, requiring physical presence within the state for jurisdiction to apply. However, *International Shoe* introduced a new standard based on "minimum

2

contacts." The central idea behind *International Shoe* is that a court can assert personal jurisdiction over an out-of-state defendant if that defendant has sufficient minimum contacts with the forum state. These contacts must be such that it is fair and reasonable to subject the defendant to the state's jurisdiction. The Court emphasized that due process considerations under the Fourteenth Amendment require a connection between the defendant and the forum state. Thus began the idea of hailing litigants into a jurisdiction – not their home state – to answer claims. Post *International Shoe*, Courts could exercise specific jurisdiction over a defendant when the lawsuit arises from the defendant's contacts with the forum state. The evolution of the limits of jurisdiction since 1945 reveal whether jurisdiction over Meta is appropriate in this case. In response to *International Shoe*, states enacted "long-arm statutes." These statutes extend the personal jurisdiction of state courts over non-residents who engage in certain activities within or related to the state, even if they lack physical presence there. Jurisdiction is proper in Oklahoma on any basis consistent with the Constitution of this state and the Constitution of the United States. 12 O.S. §2004(F). Oklahoma courts may exercise specific personal jurisdiction over a non-resident defendant so long as: (1) the defendant "purposefully directed its activities at the residents of the forum"; (2) the claims asserted "arise out of or relate to" those activities; and (3) the exercise of personal jurisdiction would not "offend traditional notions of substantial justice and fair play." *Montgomery v. Airbus Helicopters, Inc.*, 2018 OK 17, ¶ 16, 414 P.3d 824, 829; *see also Galier v. Murco Wall Prod., Inc.*, 2022 OK 85, 528 P.3d 293, *cert. denied*, 143 S. Ct. 1086 (2023). The burden of proof rests on the State as plaintiff, but the State need only make a prima facie showing. *Id.*

### A. Meta Purposefully Directed Its Activities at Oklahoma Residents.

Meta argues that it does not purposefully direct its activities to Oklahoma residents, but rather it merely offers Oklahomans access to its Platforms, as it does for users in any state. The State alleges Meta had extensive and purposeful contacts with Oklahoma residents. For instance, the State alleges

3

that Meta: (1) enters into Terms of Service contracts with millions of Oklahomans to use its Platforms[1]; (2) collects the personal data of Oklahoma users and uses that information to sell targeted advertising to those Oklahomans[2]; (3) registered to do business in Oklahoma and interacts with Oklahoma political subdivisions, school districts, and health and fire departments to expand its reach into Oklahoma; (4) recruited and employs Oklahomans to work in the functional areas of Meta that are directly implicated in the State's allegations; and (5) solicited and paid Oklahoma users to create content on its Platforms to increase user engagement, maximize the amount of personal data Meta collects, and maximize Meta's ability to monetize that data by selling targeted advertisements. The State further alleges that Meta's sales of targeted advertisements using Oklahomans' personal data has exceeded $560,000,000, with more than $28,000,000 of those ad sales targeting minors.

The Court finds the State's allegations are sufficient to show that Meta "purposefully directed its activities" to Oklahoma residents. Meta's "contacts with Oklahoma were not random, isolated, or fortuitous[,]" but rather Meta "chose to reach out...and deliberately exploit the market in Oklahoma[.]" *Galier*, 2022 OK 85, ¶ 18, 528 P.3d at 299.

**B. The State's Claims Arise Out of or Relate to Meta's Contacts with Oklahoma.**

Meta argues that the State's claims are unrelated to Meta's contracting with, advertising to, and collecting data from Oklahoma residents. The Court finds this argument unpersuasive. As alleged by the State, Meta's business model is driven by offering highly targeted, data-driven advertising using massive databases of information collected from consumers, including Oklahomans, who use its Platforms[3]. Pet., ¶¶ 67-70. The State further alleges that Meta seeks to capture and retain the attention

---

[1] It is estimated in 2020 Meta had reached 80% of Oklahomans under 35 years old. From 2019 to 2021 Meta showed a growth from 800,000 daily active users to more than 1,200,000 active users.

[2] Meta collected data for Instagram usage by Oklahoma users including the amount of time daily active teens spent on Instagram per day, teen "penetration" data, the ratio of teens who were active daily versus monthly, story participation rates, amount of "feed media" consumed per day by daily active teen users, "stories" active teen daily users consumed every day, market saturation reports for users under 35, percentage of Facebook Android monthly active users who are also on Instagram, and the reduction in monthly active users over a two month period.

[3] Oklahoma alleges the customized user experience is specific enough to target Osage County citizens with Osage County Tourism Department and Fairfax Community Foundation advertisements.

4

of adolescent users in particular, including those in Oklahoma, because that demographic is its most profitable. *Id.,* ¶¶ 75-87. Meta has allegedly (1) made this a priority despite knowing of the myriad harms that compulsive use can cause, (2) misled the public about the safety of its Platforms, and (3) concealed information about their harmful effects.

In short, the State alleges that Meta targeted adolescent Oklahomans who used its Platforms for those users' advertising value and did so in ways that violated the OCPA. It remains to be seen if the State can prove its allegations, but it has sufficiently pled that its claims arise out of Meta's contacts with Oklahoma residents. *See, e.g., Galier,* 2022 OK 85, ¶ 24, 528 P.3d at 300 (quoting *Ford Motor Co. v. Montana Eighth Judicial District Court,* 141 S. Ct. 1017, 1027 (2021)).

### C. The Court's Exercise of Personal Jurisdiction Over Meta Does Not Offend Traditional Notions of Substantial Justice and Fair Play.

Finally, the Court finds that exercising specific personal jurisdiction over Meta is fair and reasonable under the circumstances of this case. Meta has entered into contracts with millions of Oklahomans to use its Platforms in exchange for their personal data. As a result, Meta earned more than half a billion dollars from targeted ad sales. Meta has recruited and employed Oklahomans, some of whom may have personal knowledge of the facts underlying the claims and defenses in this litigation. Based on its significant contacts with Oklahoma, Meta could reasonably anticipate being haled into court in Oklahoma and any burden associated with defending itself in Oklahoma court would be minimal. *See Galier,* 2022 OK 85, ¶ 27, 528 P.3d at 301.

As a result of the foregoing, the Motion is denied as it pertains to personal jurisdiction.

### II. The State's Claims Are Not Precluded by 47 U.S.C. § 230.

Meta argues that it is entitled to immunity pursuant to Section 230 of the federal Communications Decency Act ("Section 230"), which provides in pertinent part that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). For Meta to

5

benefit from Section 230 immunity against the State's claims, it must meet three elements. "First, immunity is available only to a provider or user of an interactive computer service. Second, the liability must be based on the defendant's having acted as a publisher or speaker. Third, immunity can be claimed only with respect to information provided by another information content provider." *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1196 (10th Cir. 2009) (internal citations omitted).

Meta has provided the Court with several cases that find immunity under Section 230. Those cases are distinguishable and relate clearly to third-party content. Oklahoma is not attempting to hold Meta responsible for any third-party content in this suit. Therefore, the second element is dispositive here. The State has made clear that it is not seeking to treat Meta as "publisher or speaker" of information. Instead, it is seeking to hold Meta accountable for unlawfully designing its Platforms in a manner Meta knew to be harmful—for example, to induce compulsive use among adolescents in particular—and then presenting its Platforms as safe for adolescent use[4]. As the Arkansas Circuit Court correctly held in denying a similar motion to dismiss by Meta: "If that is ultimately proven to be true, the nature of the content shared on the platforms is irrelevant. This case is properly understood as a dispute over whether the design features of Meta's platforms harm adolescents."[5] While not dispositive, it is worth noting that other state courts faced with this same argument in cases brought by state Attorneys General have, without exception, reached the same conclusion, as reflected in the record before the Court. Meta misunderstands the fundamental difference between functioning as a conduit serving the digital social ether and the hugely influential and impactful digital platforms over which Meta has deliberate and exclusive design control, the design of which is at issue here. Accordingly, the Court finds that Meta has failed to establish the second element of immunity under 47 U.S.C. § 230 as a matter of law, and the Motion is therefore denied.

---

[4] Oklahoma alleges numerous internal communications acknowledging the platform designs themselves were harmful and efforts to address the design elements by individuals or groups of individuals within Meta were discounted, dismissed, or stopped.

[5] "Ruling on Defendants' Motion to Dismiss First Amended Complaint," *Arkansas v. Meta Platforms, Inc. et al.*, Circuit Court of Polk County, Arkansas Case No. 57CV-23-47 ("Arkansas Ruling").

## III. The State's Claims Are Not Precluded by the First Amendment.

Meta suggests that the State's claims are barred by the First Amendment. But the First Amendment does not shield a company from liability related to making intentional misrepresentations. *See, e.g., Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) ("Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly."). Further, the State's claims related to design of the Platforms involve Meta's conduct, not speech. As its claims are pled, the State seeks hold Meta liable for its design of the Platforms, regardless of the content served to their users, and for its alleged misrepresentations and omissions about that design. As with Meta's Section 230 argument discussed above, state courts have been unanimous in rejecting this argument as well, as reflected in the record before the Court.

The U.S. Supreme Court's decision in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 219 L. Ed. 2d 1075 (2024), does not change the analysis. *Moody* involved Florida and Texas laws restricting social media companies' ability to censor or otherwise disfavor posts on their platforms. Here, the State is not seeking to put any restrictions on content delivered on the Platforms. And in any event, the Supreme Court in *Moody* vacated "both decisions for reasons separate from the First Amendment merits, because neither Court of Appeals properly considered the facial nature of NetChoice's challenge." *Id.* at 2394. The Supreme Court also made clear that: "We... do not deal here with feeds whose algorithms respond solely to how users act online giving them the content they appear to want, without any regard to independent content standards." *Id.* at 2404 n. 5. Here, the State's claims relate to Meta's algorithms and various design elements built to induce compulsive use by young users. Therefore, by the Supreme Court's own words, *Moody* is inapplicable.

Accordingly, Meta has failed to establish that the State's claims are barred by the First Amendment as a matter of law, and the Motion is denied.

## IV.    The State Has Sufficiently Pled Facts Supporting Its Claims Under the OCPA.

Meta moves to dismiss the State's claims on five grounds specific to the OCPA. Meta argues that (1) it simply publishes third-party content and is therefore not subject to the OCPA under 15 O.S. § 754, (2) its conduct did not occur "primarily and substantially" in Oklahoma, (3) the use of Meta's Platforms does not involve a "consumer transaction," (4) the State's claims were brought outside the applicable statute of limitations, and (5) the State failed to allege deceptive conduct on Meta's part.

With the understanding that "the OCPA is remedial in nature" and therefore "is to be liberally construed to effectuate its underlying purpose," *Patterson v. Beall*, 2000 OK 92, ¶ 28, 19 P.3d 839, 846, the Court finds Meta's arguments unpersuasive at this stage.

### A.  The OCPA Exemption for Publishers Does Not Apply to Meta's Conduct.

By its terms, the OCPA does not apply to publishers or others whose otherwise unlawful conduct "involves information that has been disseminated or reproduced on behalf of others without knowledge that it is an unlawful practice[.]" 15 O.S. § 754. Meta argues that the State is attempting to hold it liable for disseminating third-party content, which is specifically excluded from the OCPA. But this argument mischaracterizes the State's claims. Oklahoma's claims are content indifferent and focused on the design of Meta's platforms. The State alleges that Meta designed its own Platforms to be addictive and that it deceptively promoted them as safe for adolescents despite internal research showing otherwise. *E.g.*, Pet., ¶¶ 197, 214, 230. The claims as alleged by the State focus on Meta's own wrongful conduct rather than any unlawful practices by users of its Platforms.

### B.  Meta's Conduct Occurred Primarily and Substantially in Oklahoma.

The OCPA applies to unlawful practices that occur in Oklahoma. However, if the location of the unlawful practice is difficult to pinpoint or occurs in multiple states, then it must occur "primarily and substantially" in Oklahoma to be actionable under the OCPA. *See Cont'l Res., Inc. v. Wolla Oilfield*

8

*Servs., LLC*, 2022 OK 40, 510 P.3d 175. It is unclear from the record where the actual design of the Platforms took place, to the extent that can be ascertained at all. What is clear is the State alleges that Meta sought young Oklahomans to become Platform users, that those users were affected by Meta's design choices, and that Meta made misrepresentations and omissions about the safety of its Platform design. At the pleading stage, the State has sufficiently alleged that this conduct, as it relates to Meta's consumer transactions with young Oklahomans, took place primarily and substantially in Oklahoma.

## C. Use of Meta's Platforms Involves a Consumer Transaction Under the OCPA.

The OCPA is intended to proscribe unlawful conduct in the context of a "consumer transaction," defined broadly as the "advertising, offering for sale or purchase, sale, purchase, or distribution of any services or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever located, for purposes that are personal, household, or business oriented." 15 O.S. § 752(2). Meta argues that the use of its Platforms does not involve a consumer transaction because its Platforms are used free of charge. However, while users do not pay money to Meta, they must allow Meta to collect vast amounts of personal data in exchange for using the Platforms. Pet., ¶¶ 55-64. While a typical consumer transaction likely involves the payment of money, there is no such requirement in the OCPA. Accordingly, this bargained-for exchange to use Meta's Platforms satisfies the broad definition of "consumer transaction." *Accord State of Indiana v. TikTok Inc., et al.,* ___ N.E.3d ___, 2024 WL 4340387, *8-9, Case Nos. 23A-PL-3110 & 3111 (Ct. App. Ind. Sept. 30, 2024).

## D. The State's Claims Are Not Barred by a Statute of Limitations.

Meta argues that the State's claims are barred by a one-year statute of limitations found in 12 O.S. § 95(A)(4). The Court disagrees.

### 1. *A General Statute of Limitations Does Not Apply Against the State Acting in Its Sovereign Capacity to Enforce a Public Right.*

Oklahoma law has long recognized that general statutes of limitations do not apply to actions brought by the State in its sovereign capacity to vindicate public rights. *See, e.g., State ex rel. Cartwright v. Tidmore*, 1983 OK 116, 674 P.2d 14. There is no dispute that the State brings these claims in its sovereign capacity. Meta argues only that the State's claims affect a class of individuals—users of Meta's Platforms—rather than the public generally. The State counters that it enforces the OCPA to protect all Oklahoma citizens from being targeted by unfair and deceptive trade practices, a clear public right.

The Court is persuaded that through these claims the State seeks to vindicate a public right. The Attorney General has exclusive authority to enforce the OCPA as *parens patriae* to protect the integrity of the marketplace in Oklahoma. *See State, ex rel., Edmondson v. BP America Inc., et al.*, CIV-09-0945, 2009 WL 10695372, at *2 (W.D. Okla. Oct. 29, 2009) ("Specifically, the Court finds that the [OCPA] provides enforcement mechanisms, not available to any particular citizen of Oklahoma, which allows the State to vindicate public rights in its quasi[-]sovereign capacity."). The fact that certain citizens might benefit more than others from the State's claims does not transform this public right into something less. *See State v. LG Electronics, Inc.*, 375 P.3d 636, 642-43 (Wash. 2016) (en banc) (rejecting limitations periods on state actions "merely because private individuals would benefit").

### 2. *Even if a Statute of Limitations Applies, the State's Claims Are Timely.*

In addition, the Court finds that the State's claims are timely even if a limitations period applies. First, the State sufficiently alleges that Meta's unlawful conduct is ongoing to this day. Pet., ¶¶ 28, 270, 346. Second, the State and Meta agree that they entered a tolling agreement going back to December 20, 2020. The Petition includes multiple allegations of unlawful conduct that occurred after this date. *E.g., id.*, ¶¶ 267, 282, 286, 290, 298, 325, 326, 335.

10

## D. The State Has Alleged Actionable Deceptive Conduct Under the OCPA.

Under the OCPA, an unlawful deceptive trade practice is "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person." 15 O.S. § 752(13). Meta contends that its alleged misrepresentations regarding the safety and design of its Platforms do not rise to this level, but instead are mere opinions or "puffery". In response, the State points to specific representations—and material omissions—as alleged in the Petition. For instance, the State alleges, *inter alia*, that Meta falsely claims that it does not build its products to be addictive (Pet. ¶ 375), that it does not direct people toward content that promotes eating disorders (Pet. ¶ 328), and that it does not allow its teams to set goals around increasing time spent on the Platforms (Pet. ¶¶ 339–340).

Motions to dismiss for failure to state a claim are "generally disfavored and granted only when there are no facts consistent with the allegations under any cognizable legal theory or there are insufficient facts under a cognizable legal theory." *Wilson v. State ex rel. State Election Bd.*, 2012 OK 2, ¶ 4, 270 P.3d 155, 157. At this point in the proceedings, the Court must take as true all of the State's allegations along with all reasonable inferences that can be drawn therefrom. *Id.* With this in mind, as well as the requirement that the OCPA be "liberally construed," *see Patterson v. Beall*, 2000 OK 92, ¶ 28, 19 P.3d at 846, the Court concludes that the State's allegations have sufficiently met the standard required to plead a deception claim under the OCPA.

For the foregoing reasons, Meta's Motion is DENIED.

Dated: November 19, 2024

_____

JUDGE OF THE DISTRICT COURT

11

CERTIFICATE OF MAILING

I hereby certify that on the 30th day of November, 2024 I mailed by first class mail postage prepaid a copy of the foregoing instrument to:


Megan Rodgers
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112


Robert G. McCampbell
Nicholas ("Nick") V. Merkley
GABLEGOTWALS
BOK Park Plaza
499 West Sheridan Avenue, Suite 2200
Oklahoma City, OK 73102

Mark W. Mosier
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956


Robert J. Carlson
Caleb J. Smith
Oklahoma Office of the Attorney General
15 West 6th Street, Suite 1000
Tulsa, OK 74119


Ethan A. Shaner
OKLAHOMA OFFICE OF THE
ATTORNEY GENERAL
313 N.E. 21st Street
Oklahoma City, OK 73105

Brenda Quillin
Bailiff

12

# EXHIBIT J

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

| | |
|---|---|
| STATE OF SOUTH CAROLINA )<br>)<br>COUNTY OF RICHLAND )<br>)<br>THE STATE OF SOUTH CAROLINA ex )<br>rel. Alan Wilson, in his official capacity as )<br>Attorney General of the State of South )<br>Carolina, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TIKTOK INC., TIKTOK LLC, TIKTOK )<br>PTE. LTD., TIKTOK LTD., BYTEDANCE )<br>INC., and BYTEDANCE LTD., )<br>)<br>Defendants. )<br>) | IN THE COURT OF COMMON PLEAS<br>FIFTH JUDICIAL CIRCUIT<br><br><br>Civil Action No.  2024-CP-40-06018<br><br><br>**OPINION AND ORDER** |

This case is one of nearly two dozen filed by state attorneys general against TikTok Inc. and other related corporate entities alleging violations of state consumer protection laws. The TikTok Defendants (hereafter, "Defendants") filed a Motion to Dismiss the Complaint filed by the State of South Carolina, by and through its Attorney General Alan M. Wilson (hereafter, the "State). For the reasons below, the Court **DENIES** Defendants' Motion to Dismiss.

## LEGAL STANDARDS

To prevail on a motion to dismiss for failure to state a cause of action, a defendant must "demonstrate[] the plaintiff has failed 'to state facts sufficient to constitute a cause of action.'" *Williams v. Condon*, 347 S.C. 227, 232–33, 553 S.E.2d 496, 499 (Ct. App. 2001) (quoting S.C. R. Civ. P. 12(b)(6)). "The question to be considered is whether in the light most favorable to the plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Cowart v. Poore*, 337 S.C. 359, 364, 523 S.E.2d 182, 184–85 (Ct. App. 1999). "When

1

considering such motion, the court must regard all properly pleaded factual allegations as admitted." *Falk v. Sadler*, 341 S.C. 281, 286, 533 S.E.2d 350, 353 (Ct. App. 2000).

South Carolina Rule of Civil Procedure 12(b)(2) permits a motion to dismiss for "lack of jurisdiction over the person." In South Carolina, the "case law is settled that 'at the pre-trial stage of proceedings, the plaintiff need only make a prima facie showing" that personal jurisdiction exists, and that "[t]here is no 'other evidence' requirement for personal jurisdiction where the complaint itself demonstrates jurisdiction." *Mid-State Distributors, Inc. v. Century Importers, Inc.*, 310 S.C. 330, 332, 426 S.E.2d 777, 779 (S.C. 1993).

## ANALYSIS

### I.    Defendants Are Subject to Personal Jurisdiction in South Carolina

Defendants are subject to specific personal jurisdiction in South Carolina. "Because South Carolina treats its long-arm statute as coextensive with the due process clause, the sole question" in assessing jurisdiction is "whether the exercise of personal jurisdiction would violate due process." *Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005). "[D]ue process mandates that the defendant possess sufficient minimum contacts with the forum state, so that he could reasonably anticipate being haled into court there." *Id*. at 491–92, 611 S.E.2d at 508. Then, specific personal jurisdiction exists so long as the plaintiff's claims "arise out of *or relate to* the defendant's contacts with the forum" state, regardless of whether a "strict causal relationship" exists. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (citation omitted).

Here, both parts of the specific personal jurisdiction test are satisfied.

Defendants have created minimum contacts with South Carolina in at least three independent ways. First, Defendants have intentionally cultivated a significant, continuing, and

2

immensely profitable line of business in South Carolina by marketing and making its product available here. Second, Defendants enter into a contract with every South Carolinian who signs up for the TikTok app, and those ongoing contracts convey rights and impose obligations on both sides of the contract. Third, Defendants then collect consumer data pursuant to those contracts and uses that data to profit from South Carolina consumers by targeting third-party advertising at them.

These extensive and intentional business contacts with South Carolina are at least as significant as the contacts that the U.S. Supreme Court held established specific personal jurisdiction in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480 (1985). There, the Court held that one of Burger King's franchisees was subject to personal jurisdiction in Burger King's home state of Florida because he had entered into a contract with Burger King (the franchise agreement) that created an ongoing "relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." *Id.* at 480. While "an individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts," the Court explained, when the defendant "has created continuing obligations between himself and residents of the forum," then "he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 476, 478 (cleaned up). Similarly, the South Carolina Court of Appeals "has held South Carolina has jurisdiction over a party who entered into a contract that was to be partly performed within the State." *Cribb v. Spatholt*, 382 S.C. 490, 502, 676 S.E.2d 714, 720–21 (Ct. App. 2009).

These holdings control this case. Like the franchisee in *Burger King*, Defendants have "reach[ed] out" into South Carolina, by advertising its application in the State, making it available here, and entering contracts with numerous South Carolinians that "create continuing relationships

3

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

and obligations" with them. 471 U.S. at 473 (citation omitted). Defendants and each of their South Carolina customers knew from the beginning that their "contract . . . was to be partly performed within the State," because in exchange for providing each user ongoing access in South Carolina to the content it hosts, Defendants have received the continuous right to collect their data and use it to target them every day with South Carolina-specific ads. *Cribb*, 382 S.C. at 502, 676 S.E.2d at 720–21. Defendants thus exploit the "continuing relationships and obligations" it has forged with South Carolina consumers *every minute* that they use the application. *Burger King*, 471 U.S. at 473 (citation omitted).

Additionally, Defendants do a substantial volume of business in South Carolina, which independently supports specific personal jurisdiction. *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 773–74 (1984). Where a publisher sold an allegedly defamatory book in "approximately 315 bookstores in South Carolina," the Court of Appeals held that the publisher "has directed its activities at the residents of South Carolina, and it must reasonably anticipate being haled into court here in a libel action based on the contents of one of its publications." *Moosally v. W.W. Norton & Co.*, 358 S.C. 320, 335–36, 594 S.E.2d 878, 886 (Ct. App. 2004); *see also Cockrell*, 363 S.C. at 493, 611 S.E.2d at 509 (favorably citing *Moosally*). Similarly, the federal circuit courts have held in several cases that personal jurisdiction exists when a company engages in the "deliberate exploitation of the market in the forum state." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423 (7th Cir. 2010); *see also NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 624–25 (7th Cir. 2022).

Third, Defendants are independently subject to personal jurisdiction here because they craft a South-Carolina-specific product that is targeted at South Carolina residents. Defendants actively target content and advertisements to South Carolina users based on their location. Compl. ¶ 19.

4

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

Where a company not only generally does business in a State but *specifically crafts a unique product* for that State and then sells it there, there can be no question that it has "'purposefully directed' [its] activities at residents of the forum" in a way that satisfies due process. *Burger King*, 471 U.S. at 472 (quoting *Keeton*, 465 U.S. at 774).

These connections to South Carolina supply sufficient minimum contacts for specific personal jurisdiction. That is why the overwhelming weight of authority from other jurisdictions supports states exercising jurisdiction over Defendants. An appellate court in Indiana recently "h[ad] little trouble concluding that Indiana's judiciary has specific personal jurisdiction over TikTok," reasoning that TikTok's "engagement with [its] end-users [in the forum state] is neither passive nor fleeting—TikTok uses the internet, to which its app is connected, to knowingly and repeatedly transmit data to and from each of those . . . end-users each and every hour of each and every day." *Indiana v. TikTok Inc.*, 245 N.E.3d 681, 690 (Ind. Ct. App. 2024); *see also* Pls'. Opp'n to Mot. to Dismiss at 17–18 ("State's Br.") (collecting cases).

This case also relates to Defendants' contacts with the State and so comports with the requirements of due process. *Ford*, 592 U.S. at 362. The State is challenging Defendants' representations about the age-appropriateness of its product—representations that are displayed when South Carolina consumers initially acquire the app. That connection *does* create a strict causal relationship between Defendants' actions and the State's claims, even though precedent instructs that a lesser "relating to" test is what applies. *Id*. Additionally, Defendants' large volume of South Carolina business plausibly "relates to" its alleged misrepresentations in South Carolina and the alleged design of its product to be intentionally addictive. Accordingly, specific personal jurisdiction exists over Defendants in this case.

5

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

Defendants' personal jurisdiction counterarguments are unavailing. It is irrelevant that Defendants may have established the same types of minimum contacts with other states as they have with South Carolina. The Due Process Clause protects defendants by limiting *the types of contacts* that support jurisdiction, not by limiting *the raw number of states where jurisdiction exists*. If Hustler magazine is "a national publication aimed at a nationwide audience," *Keeton*, 465 U.S. at 781, and if Ford "markets, sells, and services its products across the United States," *Ford*, 592 U.S. at 355, the fact that these contacts would support jurisdiction in many states—or even equally *in every state*—is obviously no reason to deny jurisdiction *in any state*. To hold otherwise would effectively eliminate specific personal jurisdiction for nationwide companies, forcing those wronged by such companies to sue only where the *company* is "essentially at home" and subject to general jurisdiction. *Id*. at 358 (quotation marks and citation omitted). That is not the law. Instead, due process prevents unfairness by limiting jurisdiction to those states where the defendant genuinely has minimum contacts and where the case relates to those contacts. That standard is satisfied here, and so it comports with the Constitution's due process guarantee for Defendants to be subject to jurisdiction in South Carolina for this case.

Nor is it true, as Defendants claim, that "the downloading actions of South Carolina residents" are the mere "unilateral activity of [ ]other part[ies]" and "insufficient" under the Due Process Clause to establish jurisdiction. Defs'. Mot. to Dismiss at 9 ("MTD") (quoting *Pitts v. Fink*, 389 S.C. 156, 165, 698 S.E.2d 626, 631 (Ct. App. 2010)). Jurisdiction here is based on *Defendants'* purposeful acts, not a third party's unilateral one. Given that Defendants have taken steps to market its application in South Carolina, make it available here, and profit from South Carolina consumers' use of it by collecting their data and targeting them with ads, the hundreds of thousands of resulting "downloading actions of South Carolina residents" are plainly not

6

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

"unilateral" at all. *Id.* These South Carolina residents did not decide to use Defendants' app out of the blue. And having "structured its sales activity in such a manner as to invite orders from [South Carolina] and developed the capacity to fill them," Defendants "cannot now point to its customers in [South Carolina] and tell us, 'It was all their idea.' " *NBA Props.*, 46 F.4th at 625 (cleaned up).

Defendants also claim that geo-targeting advertisements alone cannot confer personal jurisdiction, but that proposition is both not established as a legal matter, *see Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc*., 751 F.3d 796, 803 (7th Cir. 2014), and irrelevant given the numerous *other* contacts also present here. Defendants do more than merely target ads at South Carolina users: they also tailor their experience of the TikTok platform as a whole based on their location data.

Specific personal jurisdiction exists over Defendants in this case.

## II.     The Court Also Has Jurisdiction Over All Defendants' Corporate Affiliates.

Specific personal jurisdiction exists over *all* of the TikTok corporate defendants in this case based on the State's allegations that the six entities (TikTok Inc., TikTok LLC, TikTok Ltd., TikTok Pte Ltd., ByteDance Ltd., and ByteDance Inc.) are closely intertwined and "are all intimately involved in operating the TikTok Platform." Compl. ¶ 52. Because the Complaint alleges that each of the defendant entities "has actively formulated, participated in, approved, directed, or otherwise controlled the acts or practices" giving rise to the State's claims, *id.* ¶ 37, even where one of the entities was formally acting alone, it was allegedly serving as an agent for the others, making its conduct attributable to them. And "[t]he principle is firmly established that a foreign corporation doing business in this State through an agent is subject to in personam jurisdiction as if the corporation itself was doing business." *Engineered Prods. v. Cleveland Crane & Eng'g*, 262 S.C. 1, 7–8, 201 S.E.2d 921, 924 (1974).

7

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

**III.     SCUPTA Applies to Defendants' Conduct.**

SCUTPA bars "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," S.C. Code. Ann. § 39-5-20(a), and it defines "trade" or "commerce" to include "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State." *Id*. § 39-5-10(b). The phrase applies broadly to "[e]very business occupation carried on for subsistence or profit and involving the elements of bargain and sale, barter, exchange, or traffic," *Health Promotion Specialists, LLC v. South Carolina Bd. of Dentistry*, 403 S.C. 623, 639, 743 S.E.2d 808, 816 (2013) (quoting *Trade or Commerce*, Black's Law Dictionary (9th ed. 2009)).

Here, the State reasonably alleges that "trade" or "commerce" encompasses Defendants' highly profitable distribution of its app, an "intangible" "service[ ] [or] . . . property." S.C. Code. Ann. § 39-5-10(b). In so holding, this Court also endorses the persuasive reasoning of the U.S. District Court for the Northern District of California in an analogous case about the Facebook and Instagram apps. That court held that the "exchange of users' use of Meta's platforms for their personal data" occurs "in the conduct of" Meta's " 'trade or commerce,' regardless of whether Meta's users pay for use of Facebook or Instagram," and that SCUTPA (along with eighteen other similarly worded state laws) thus applied to the alleged unfair or deceptive acts by Meta in that case. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, Nos. 4:23-cv-05448-YGR, 4:23-cv-05885-YGR, 2024 WL 4532937, at *44 (N.D. Cal. Oct. 15, 2024). The same reasoning applies here.

8

**IV.    Defendants' Alleged Unfair and Deceptive Acts Are Actionable Under SCUPTA.**

Defendants claim that the actions the State alleges to have violated SCUPTA are not "unfair or deceptive acts or practices" under that Act, but that is not so. A deceptive act or practice under the statute is "a claim or representation that had the capacity or effect or tendency to deceive," *Clarkson v. Orkin Exterminating Co.*, 761 F.2d 189, 191 (4th Cir. 1985) (quoting *State ex rel. McLeod v. C&L Corp.*, 280 S.C. 519, 525, 313 S.E.2d 334, 338 (Ct. App. 1984)), and an unfair act or practice is one "which is offensive to public policy or which is immoral, unethical, or oppressive," *Wright v. Craft*, 372 S.C. 1, 23, 640 S.E.2d 486, 498 (Ct. App. 2006) (citation omitted).

The State alleges that Defendants deliberately designed their app to be highly addictive to younger users through particular features that prey upon children's well-known physiological and psychological features, and that Defendants did so despite knowing that these features were likely to cause a variety of significant, negative health effects for children. Compl. ¶¶ 150–59. Taking this allegation as true, the State has plausibly pled that this conduct is offensive to public policy.

Defendants' argument that the bulk of their alleged misrepresentations are not barred because SCUPTA reaches only "misstatements of fact rather than misstatements of opinion," MTD at 18 (quoting *Gilbert v. Mid-S. Mach. Co.*, 267 S.C. 211, 220, 227 S.E.2d 189, 193 (1976)) is unsupported by the law. That limitation does not exist in SCUTPA's text or the caselaw interpreting it.

Defendants also claim that SCUPTA does not apply to mere omissions, but precedent is to the contrary. Where a seller "[i]s aware" of a defect in its product and undertakes efforts "to conceal the severity of the defect," that establishes "circumstances or nature of dealings that give rise to a duty to speak" with at least enough plausibility to get past a motion to dismiss. *Harrell v.*

9

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

*BMW of N. Am., LLC*, 517 F. Supp. 3d 527, 540 (D.S.C. 2021) (cleaned up). The State's complaint alleges all of these things. *See, e.g.*, Compl. ¶¶ 11, 77–85.

Finally, the State has also adequately alleged that Defendants' statements touting their "Algo Refresh" feature were deceptive, based on the actual effects of that feature. *Id*. ¶¶ 244, 253. The complaint plausibly alleges that Defendants' promise to users of a "fresh start" was illusory, since they may "quickly [be] back in the same rabbit hole again even after using the Refresh feature." *Id*. ¶¶ 249, 258.

## V. The Communications Decency Act Does Not Bar the State's Claims.

Section 230 of the Communications Decency Act ("CDA") states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1); *see also id.* § 230(e)(3). The CDA "protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!*, 570 F.3d 1096, 1100–01 (9th Cir. 2009).

Here, the State sufficiently alleges that it is *not* seeking to hold Defendants accountable for the content created by "another information content provider" but instead for their own allegedly unfair and deceptive statements and acts. This is true with regard to the alleged addictiveness of the TikTok platform. Defendants are also not entitled to CDA immunity for their claims related to the age-appropriateness of the content available on its app. Those alleged misrepresentations are Defendants' "own acts," not protected by the CDA. *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1094 (9th Cir. 2021) (citation omitted); *see Demetriades v. Yelp, Inc.*, 175 Cal. Rptr. 3d 131, 145 (Cal. Ct. App. 2014) ("Nowhere does plaintiff seek to enjoin or hold Yelp liable for the statements of

10

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

third parties (i.e., reviewers) on its Web site. Rather, plaintiff seeks to hold Yelp liable for its own statements regarding the accuracy of its filter.").

At argument, Defendants cited two decisions so recent they could only be cited in the reply brief supporting this motion. The Court has considered these cases, but they do not change the direction of the relevant precedent. Rather, they are merely applications of the CDA consistent with prior caselaw. Both *Doe v. Grindr Inc.*, No. 24-475, 2025 WL 517817 (9th Cir. Feb. 18, 2025), and *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 526 (4th Cir. 2025), apply the settled principle that when the harm the plaintiff complains of *comes from third-party content*, the CDA applies. Other cases had previously held the same. *See*, *e.g.*, *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016); *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019). Here, however, the harm alleged is plausibly in Defendants' own content that is separate from third-party content, and Defendants' more recent citations do not change that.

Even if Defendants were to be treated as a publisher with regard to the addictiveness count, it would not entitle them to CDA immunity. "[A] website may lose immunity under the CDA by making a material contribution to the creation or development of content." *Kimzey v. Yelp!*, 836 F.3d 1263, 1269 (9th Cir. 2016); *see also Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008). In other words, Defendants lose any CDA protections they might otherwise have "whenever [its] actions cross the line into substantively altering the content at issue in ways that make it unlawful." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 129 (4th Cir. 2022). Here, Defendants are alleged to have done just that. It is not the nature of any third-party content itself that allegedly violates SCUTPA, but rather Defendants' use of that content to feed its addiction-inducing algorithms, beauty filters, and the

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

other challenged features. Defendants' addictive design features alter the third-party content in a material (and harmful) way, removing any CDA immunity it might otherwise have had.

## VI. The First Amendment Does Not Bar the State's Claims.

The First Amendment does not bar any of the State's claims.

First, the foreign defendants are not entitled to First Amendment rights. "[F]oreign organizations operating abroad . . . possess no rights under the First Amendment." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020). The U.S. Supreme Court recently applied this rule unanimously to one of the foreign defendants here: "To the extent that ByteDance Ltd.'s asserted expressive activity occurs abroad, that activity is not protected by the First Amendment." *TikTok Inc. v. Garland*, Nos. 24-656, 24-657, 2025 WL 222571, at *4 n.2 (U.S. Jan. 17, 2025).

Second, Defendants' allegedly addictive design features are not speech but *conduct* Defendants undertake, and the First Amendment protects only inherently expressive conduct. *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 65–66 (2006). Defendants' design features, however, do not convey any message or express any viewpoint. Many courts around the country have already held as much, *see* State's Br. at 44 (collecting cases), and this Court agrees.

Third, the First Amendment does not protect knowing misrepresentations in commerce, which is what the State alleges here. "[C]ommercial speech is not protected by the First Amendment unless it concerns lawful activity and is not misleading." *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 414 S.C. 33, 68, 777 S.E.2d 176, 194 (2015); *see also Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995) ("[T]he government may freely regulate commercial speech that concerns unlawful activity or is misleading."); State's Br. at 46 (collecting cases).

12

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

The First Amendment does not protect Defendants from the State's Complaint.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **DENIED**.

_____
The Honorable Daniel M. Coble
Chief Administrative Judge

April __, 2025
Columbia, South Carolina

13

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018

ELECTRONICALLY FILED - 2025 May 06 3:34 PM - RICHLAND - COMMON PLEAS - CASE#2024CP4006018



Richland Common Pleas

**Case Caption:**    State Of South Carolina , plaintiff, et al vs   Tiktok Inc , defendant, et al

**Case Number:**    2024CP4006018

**Type:**    Order/Other

So Ordered

s/ Daniel Coble, 2774

Electronically signed on 2025-05-06 13:30:25    page 14 of 14



EXHIBIT K



IN THE THIRD JUDICIAL DISTRICT COURT

SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| UTAH DIVISION OF CONSUMER PROTECTION,<br><br>               Plaintiff,<br><br>vs.<br><br>TIKTOK INC.<br><br>               Defendant. | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br><br>Case No. 230907634<br><br>Honorable Richard Daynes<br><br>Tier III |

On September 10, 2024, the Court held a hearing on Defendant TikTok, Inc.'s ("TikTok") Motion to Dismiss the Complaint. This Court took the matter under advisement, and now issues its written opinion. For the reasons set forth below, the Court DENIES TikTok's Motion to Dismiss in full.

## BACKGROUND

On October 10, 2023, the Division of Consumer Protection of the State of Utah (the "Division") filed a three-count Complaint against TikTok Inc. alleging violations of the Utah Consumer Protection Act ("UCSPA"). Count One alleges "Unconscionable Acts or Practices Concerning Underage Consumers, Violation of Utah Consumer Sales Practices Act, Utah Code § 13-11-5." Count Two alleges "Deceptive Acts or Practices, Violation of Utah Consumer Sales

Practices Act, Utah Code § 13-11-4," basically stating that TikTok has deceptively misrepresented the actions it has taken to keep the application safe for children and persons of all ages. Count Three alleges, "Deceptive Acts or Practices, Violation of Utah Consumer Sales Practices Act, Utah Code § 13-11-4," principally stating that TikTok represents itself to be a company located, controlled and headquartered in the United States when it continues to be controlled by its China-based parent company, ByteDance.

On December 20, 2023, TikTok filed a motion to dismiss the Complaint, citing lack of both general and specific personal jurisdiction; that section 230 of the Communications Decency Act ("CDA") protects TikTok from liability; that application of UCSPA as alleged in the Complaint violates the First Amendment to the U.S. Constitution; that the UCSPA is impermissibly vague; and that the Complaint fails to state a claim of unconscionability. TikTok also asserts the challenged statements are not made in connection with a consumer transaction and do not constitute acts or practices.

## MOTION TO DISMISS STANDARD OF REVIEW

In Utah, pursuant to Utah Rules of Civil Procedure 12(b)(6), a Motion to Dismiss may be granted when there is a "failure to state a claim upon which relief can be granted," meaning the Court must assess whether the plaintiff's complaint, when viewed in the light most favorable to the plaintiff, contains sufficient factual allegations to state a viable legal claim under applicable law. Essentially, the court may only dismiss a case if the complaint demonstrates a complete lack of a legal basis for the claim, even if the facts alleged are accepted as true. *See St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991). "A dismissal is a severe measure and should be granted . . . only if it is clear that a party is not entitled to relief under any state of facts which could be proved in support of its claim." *Am. W. Bank Members, L.C. v. State*, 2014 UT

2

49, ¶ 13, 342 P.3d 224. The Court must construe the complaint as pled under both Rules 8 and 12 of the Utah Rules of Civil Procedure liberally in favor of the plaintiff, meaning any doubts about the sufficiency of the claim will be resolved in favor of allowing the case to proceed. *Russell v. Standard Corp.*, 898 P.2d 263, 264 (Utah 1995) ("[W]e accept the factual allegations in the complaint as true and consider them and all reasonable inferences to be drawn from them in a light most favorable to the plaintiff."); *Gill v. Timm*, 720 P.2d 1352, 1353 (Utah 1986) ("Rule 8(a) is to be liberally construed when determining the sufficiency of a plaintiff's complaint."). Mack v. Utah State Dep't of Com., Div. of Sec., 2009 UT 47, ¶ 17, 221 P.3d 194, 200, (referring to the Utah Rules of Civil Procedure; *see also*, Utah R. Civ. P. 1, (stating, The Rules of Civil Procedure "shall be liberally construed and applied to achieve the just, speedy and inexpensive determination of every action.")

## I.     THE COURT HAS SPECIFIC PERSONAL JURISDICTION OVER TIKTOK.

### A. General Personal Jurisdiction

The Division has not argued for **general personal jurisdiction** as to this matter and so this Court has generally only reviewed the case for specific personal jurisdiction. Nevertheless, TikTok is not incorporated in the State of Utah and Utah is not the home forum state for TikTok. Hence, there is no general personal jurisdiction over TikTok. However, as set forth below, the Court does find specific personal jurisdiction.

### B. Specific Personal Jurisdiction

"[T]he evaluation of specific jurisdiction in Utah mandates a three-part inquiry: '(1) the defendant's acts or contacts must implicate Utah under the Utah long-arm statute; (2) a 'nexus' must exist between the plaintiff's claims and the defendant's acts or contacts; and (3) application of the Utah long-arm statute must satisfy the requirements of federal due

3

process.'" *Soma Medical Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1297 (10th Cir.1999) citing *Arguello v. Industrial Woodworking Mach. Co.*, 838 P.2d 1120, 1122 (Utah 1992), quoting *National Petroleum Mkt'g, Inc. v. Phoenix Fuel Co.*, 902 F.Supp. 1459, 1465 (D.Utah 1995)(citation omitted).

1.  Utah's Long Arm Statute:

To have specific personal jurisdiction, Utah's long-arm statute must apply and allow its courts to reach out-of-state defendants. Additionally, the submission of jurisdiction must still comply with the Due Process Clause of the U.S. Constitution. Utah's long arm statute states:

> 78B-3-205. Acts submitting person to jurisdiction.
> Notwithstanding Section 16-10a-1501, any person or personal representative of the person, whether or not a citizen or resident of this state, who, in person or through an agent, does any of the following enumerated acts is subject to the jurisdiction of the courts of this state as to any claim arising out of or related to:
>
> (1) the transaction of any business within this state;
>
> (2) contracting to supply services or goods in this state;
>
> (3) the causing of any injury within this state whether tortious or by breach of warranty.... .

In this case, as alleged in the Complaint by the Division, all three of these elements set forth within Utah's long arm statute have been met. "[T]ransaction of business" is defined by Utah's long arm statute as "activities of a non-resident person, his agents, or representatives in this state which affect persons or businesses within the state of Utah." Utah Code Ann. § 78-27-23. TikTok intentionally transacts business within the state of Utah. TikTok sells advertising which is directed at Utah residents. TikTok enters agreements with the users of its app and provides individualized targeted content to each Utah customer. The Complaint

4

alleges injury to thousands of residents of Utah, and specifically children targeted by TikTok to continuously engage in using its application.

Utah's long arm statute applies in this circumstance to the extent that Due Process under the U.S. Constitution would allow. According to Utah Code § 78-27-22, Utah's long arm statute is intended "to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." Due process should therefore be the next consideration in reviewing the jurisdictional element.

2. Due Process Evaluation:

To meet the requirements of due process, a court may assert specific jurisdiction if the following conditions are met: i) Purposeful Activities: The defendant has deliberately engaged in activities targeting the forum state or has otherwise established connections there. ii) Nexus: A nexus exists between the purposeful activities and the defendant's Utah contacts, iii) Reasonableness: Exercising personal jurisdiction over the defendant is reasonable and fair under the circumstances. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-478 (1985). A lack of physical presence cannot defeat personal jurisdiction. *Id.* at 476.

    i.    Purposeful Activities and ii Nexus:

In this case the Court finds that, as alleged in the Complaint, TikTok has purposefully conducted activity within the State of Utah and those activities relate to the claims set forth by the Division in its Complaint and response to the Motion to Dismiss. As alleged in the Complaint, the Division's claims "relate to" TikTok's profitable multi-billion-dollar business because TikTok designs its app to carefully cultivate user attention, allowing TikTok to

5

collect personal user data—including from Utahns—which in turn enables TikTok to offer more targeted and profitable advertisements. [Complaint] ¶¶ 3, 15–16.

TikTok makes its money selling ads— and TikTok makes more money when more users spend more time on its app, creating an incentive to increase the time that Utah users spend on its app. *Id.* TikTok has responded to that incentive by adding features that addict and consume the attention of Utah's children to the detriment of their well-being. *Id.* ¶¶ 2–4.

TikTok's alleged misrepresentations about the safety of and origin of its app are also intimately related to its forum contacts because the Complaint alleges that those statements targeted Utah children and their parents to maximize their use of TikTok's app and to keep them coming back. These claims go to the central claims in the Division's Complaint and are sufficient to find purposeful activity in Utah and a nexus. *See Inconnu Lodge v. Commbine.com LLC*, 214 F. Supp. 2d 1204, 1208–09 (D. Utah 2002) (finding that a domain name purchased by an out-of-state resident in order to extort money from Utah resident demonstrated defendants' efforts to "direct" their activity towards Utah).

The allegations, as argued and set forth in the Complaint, are sufficient to satisfy this requirement. The Court agrees with the Division that the Division's claims arise out of or relate to TikTok's contacts with Utah. *See Hood v. Am. Auto Care*, LLC, 21 F.4th 1216, 1222 (10th Cir. 2021); see also, *Burger King, Inc.* at 472.

## 3. Fairness and Reasonableness:

Even if there are sufficient contacts within the state, to satisfy due process a court must also confirm that asserting jurisdiction comports with "fair play and substantial justice." *Burger King Corp.*, at 476 (citation omitted). This involves considering several factors to

decide if it is suitable to proceed in the forum state. The factors to review include, first, whether it is an unreasonable burden on the Defendant to litigate in Utah. Second, the interest of the state in having the case heard in the forum-state. Third, the interest of the plaintiff in having the case heard in the forum-state. And finally, the court must also consider judicial efficiency and the interests of the interstate system.

1) It is not an unreasonable burden to have TikTok litigate in Utah. TikTok has failed to show that litigating in Utah would place it at a "severe disadvantage." *Burger King*, 471 U.S. at 478 (citation omitted). TikTok does not face any special burden in defending in Utah. By its own self-descriptions, it conducts a worldwide business and offers services throughout the United States. It has substantial yearly revenues, conducts significant business in Utah, and has signed up hundreds of thousands of Utah residents as its consumers. There is no reason to think that California, the state of TikTok's listed incorporation, has any special interest in litigating this matter there. The victims and many witnesses would be located in Utah and Utah law is the applicable law to be applied. It is not unfair to cause TikTok to defend itself in the jurisdiction of Utah where the central issues of the case involve the protection of hundreds of thousands of TikTok consumers which TikTok has cultivated in Utah.

Further, a denial of jurisdiction on due process grounds is only appropriate where litigation in the forum is so gravely difficult that it puts the defendant at a severe disadvantage. The Court does not find that circumstance to be present here based on the evidence presented. *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990). As a sophisticated technology company, TikTok is surely aware that many litigation burdens are eliminated entirely by modern technology. *See, e.g., World-Wide Volkswagen Corp. v. Woodson*, 444

7

U.S. 286, 293 (1980) ("[M]odern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." (citation omitted)); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005).

Another factor to consider is the forum state's Interest and the plaintiff's interest in litigating the claim. *See Sher* at 1365. The Court finds that it is in the state of Utah's interest in resolving this dispute. The Complaint itself arises from claims of injury towards Utah residents in enforcing Utah's Consumer Sales Practices Act. The alleged victims of the defendant's conduct apparently includes hundreds of thousands of Utah citizens. Those citizens are alleged to use the TikTok application within the state of Utah. Thus, the case has been brought by the Division and it is in the Division's interest specifically to enforce Utah laws and to protect and seek recourse for Utah residents from the alleged unlawful activities of TikTok directed individually to each of those residents.

Finally, the court must also consider judicial efficiency and the interests of the interstate system. This involves assessing how efficiently the legal matter can be resolved and ensuring that the choice of forum does not unnecessarily complicate the legal proceedings. By examining these factors, the court ensures that asserting jurisdiction aligns with principles of fair play and substantial justice, which are core to due process under the Constitution. There is nothing here that would delay or cause issues with the interstate system of justice. While TikTok has alleged that forcing it into Utah's judicial system to litigate these claims could subject it to every jurisdiction in the U.S., the fact that TikTok has similar substantive contacts with virtually every jurisdiction does not sway this Court to

8

believe that judicial efficiency or the interests of interstate should free TikTok from specific personal jurisdiction.

According to the Complaint, TikTok has purposefully directed its activities toward Utah and established contacts with the forum state. TikTok knowingly and deliberately has entered into hundreds of thousands of contracts with its Utah users. Compl. ¶ 15. Thus, the Division has established the minimum contacts of TikTok required by the due process clause of the Fourteenth Amendment. *First Mortgage Corp. v. State Street Bank and Trust Co.*, 173 F. Supp.2d 1167, 1175 (D. Utah 2001) quoting *Harnischfeger*, 883 F.Supp. at 617-18. "[P]ersonal jurisdiction is established when 'a defendant clearly does business over the Internet,' such as entering into contracts which require the "knowing and repeated transmission of computer files over the Internet." *Patriot Systems, Inc. v. C-Cubed Corp.*, 21 F.Supp.2d at1324 (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1123-24 (W.D.Pa.1997)). The Court therefore finds that the claims alleged in the Complaint sufficiently arise from TikTok's interactions with Utah, thereby justifying specific personal jurisdiction over the defendant. Additionally, exercising personal jurisdiction in Utah is considered reasonable and fair to TikTok. Therefore, the motion to dismiss for lack of personal jurisdiction is denied. Exercise of specific jurisdiction is appropriate in this context. The contacts are substantial and related to the suit sufficient to establish personal jurisdiction over defendant TikTok.

## II. The Division's Claim Under the UCSPA Does Not Fail to State a Claim.

TikTok has argued that the UCSPA does not apply in this case because there was no money exchanged and therefore this cannot be deemed a "consumer" transaction. For the

9

reasons listed below, the Court finds the conduct as alleged does meet the definition of a

"consumer transaction." This issue is therefore without merit.

The UCSPA defines a "consumer transaction" stating:

(2) (a) "Consumer transaction" means a sale, lease, assignment, award by chance, **or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible** (except securities and insurance) **to, or apparently to, a person for:**

(i) **primarily personal, family, or household purposes; <u>or</u>**

(ii) purposes that relate to a business opportunity that requires:

(A) expenditure of money or property by the person described in Subsection <u>(2)(a)</u>; and

(B) the person described in Subsection <u>(2)(a)</u> to perform personal services on a continuing basis and in which the person described in Subsection <u>(2)(a)</u> has not been previously engaged.

Utah Code § 13-11-3(2)(a).

TikTok argues that since its use of the application is provided for free, this is not a

"consumer transaction." TikTok cites the Court to the definition as found in the MERRIAM-

WEBSTER DICTIONARY (11th ed. 2020), arguing plain meaning. However, this definition

does not comport with the legal definition as defined in the UCSPA. TikTok also cites to cases

referring to the Indiana statute which has similar language to the UCSPA. Ind. Code Ann. § 24-

5-0.5-2(1). Nevertheless, the UCSPA and Indiana's consumer protection statutes are not

identical and the Utah Legislature has included the word "transfer" in the definition of a

"consumer transaction," while Indiana's legislature did not. In reviewing this another court has

found that, "in enacting the UCSPA the Utah Legislature eschewed the language of the model

act's definition of 'consumer transaction' in favor of a **broader** definition." *Iadanza v. Mather*, 820 F. Supp. 1371, 1380 (D. Utah 1993)(emphasis added).

The Utah Legislature has defined a "consumer transaction" to include a "written or oral **transfer** or disposition of goods, services or other property, both tangible and intangible." Such "transfer" requires no "expenditure of money" if those goods, services, or other property are provided for "primarily personal, family, or household purposes." *See* Utah Code § 13-11-3(2)(a).

Notwithstanding the legal definition as found in the UCSPA, a consumer transaction generally includes the transfer of any form of value in a transactional relationship. This is consistent with the Division's proffered definition of the term "Sale" under Webster's Third New International Dictionary 2003 (3d ed. 2002) which includes "a contract transferring . . . ownership of property from one person or corporate body to another for a price (as a sum of money **or any other consideration.**" (emphasis added). Further, the Utah Legislature has indicated that this Act should be "construed liberally..." Utah Code § 13-11-2. This Court is not convinced after a review of the definition under the UCSPA that the Utah Legislature intended to exclude transactions that did not include the exchange of money or involved an actual sale based on the language used to define a "consumer transaction."

During oral argument on the Motion to Dismiss, a great amount of emphasis was placed on the wording, of "or other written or oral transfer..." *Id.* TikTok has argued that the use of the word "or other" was intended therefore to refer back to the language "sale, lease, assignment, award by chance..." indicating therefore it must be for an exchange of money. The Court disagrees with this reading of the statute especially where the very next subparagraph refers specifically to "the expenditure of money." Under Utah Code § 13-11-3(2)**(a)(ii)**, the Utah

11

Legislature defined the term "consumer transaction" to include the "expenditure of money" when referring to the second alternative definition of a "consumer transaction." It defines this subsection as referring to "purposes that relate to a business opportunity that requires... **expenditure of money or property** by the person described in Subsection (2)(a)" *Id.* Had the Utah Legislature intended (2)(a)(i) to also include "expenditure of money," an "exchange of money" or some other specific exchange, to be apply equally under 13-11-3(2)(a)(i), they would have included that in the definition. The Legislature did not include this requirement, and the absence of this language indicates it was meant to be more broadly construed.

As alleged in the Complaint, TikTok makes millions of dollars in value from its consumers through its advertising revenue. See Compl. ¶ 16. TikTok therefore receives great value directly from its hundreds of thousands of Utah users in the form of personal data, information regarding their individual interests, and their time as they are engaged in the use of the TikTok application. The time, data, and information provided by the Utah consumers are documented and collected by TikTok which then uses that value to sell advertising space to marketers. See Compl. ¶ 15.

## III. The Division's Claims Are Not Foreclosed by Section 230 of the CDA

TikTok has argued that they are immune from suit under Section 230 of the Communications Decency Act, 47 U.S.C. § 230 passed in 1996 ("CDA"). The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," and provides "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). Together, these provisions mean that a

company like TikTok is protected from liability when a plaintiff "seeks to treat [it], under a state law cause of action, as a publisher or speaker" of content posted on its app by a third party. *Id.*

TikTok contends under Section 230 that this Complaint targets TikTok in its role in publishing third-party content. However, when the Complaint is viewed in a light most favorable to the Division, the claims do not fail. The claims of the Division are not attempting to hold TikTok accountable as a publisher of user-generated content, but rather seeking recourse for the harmful algorithms that are causing injury to the application's users. It is therefore content neutral and not governed by Section 230 of the CDA. "It is not enough that third-party content is involved," and courts have "rejected use of a 'but-for' test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content." *HomeAway.com, Inc. v. City of Santa Monica,* 918 F.3d 676, 682 (9th Cir. 2019); *see also Henderson v. Source for Pub. Data,* L.P., 53 F.4th 110, 122–23 (4th Cir. 2022).

Although TikTok distributes third-party content, the Division's claims are based on the Defendant's own actions employing features and practices that target children, resulting in excessive usage of their platforms, and making misleading statements about the safety of those platforms. The Complaint taken on its face alleges that TikTok used features under "a dopamine-inducing algorithm that spoon-feeds users a steady diet of highly personalized short-form videos, making it difficult for children to unplug, which TikTok amplifies with a series of manipulative features designed to keep users on the app." Compl. ¶ 27. These and other features give children the illusion of control, hide any effective tools to limit time spent on the app, and further amplify and incentivize compulsive, repeated use, which is especially unhealthy for kids whose brains are not yet fully formed." Compl. ¶37. The use of these features is alleged to have amounted to a violation of Utah law.

13

Similar to the Court's finding in *Utah Division of Consumer Protection v. Meta Platforms, Inc. and Instagram, LLC*, Case No. 230908060 (Order Denying Defendant's Motion To Dismiss, July 25, 2024), Judge Holmberg found in that case involving Meta and Instagram that it is possible this analysis could change if it becomes clearer that after further discovery in the case, that it is actually the content and not the algorithm that is at issue, then this issue may be addressed again in a motion for summary judgment or at trial. Judge Holmberg stated:

> The Court can envision situations where Defendant may be exactly right and that the algorithms, disruptive notification, or infinite scroll, et cetera, may be nothing more than publishing activity, but the Complaint alleges that they are not focused on publishing activity. In a motion for summary judgment where the facts are in front of the Court, these features might qualify for Section 230 immunity. But at this stage, the Court must treat the allegations of a Complaint as true and the Division is alleging that these features, including algorithms, disruptive notifications, and more, amount to a violation of Utah law. At least as alleged, Section 230 does not foreclose the Division's claims at this stage. TikTok may renew its Section 230 arguments at summary judgment or at trial.

Similarly here, there may be specific facts presented by TikTok that could change the analysis on whether this is a content-based rather than algorithm based harm. If these facts become clear, the defendant could present the issue once more in a motion for summary judgment or at trial, but at this stage, the Court must treat the Division's Complaint in a light most favorable to the plaintiff and as true, and therefore the motion to dismiss on this basis is denied.

## B. Count One is not barred by the First Amendment and the Free Speech Clause of the Utah Constitution.

The defendant also asserts that Count One infringes on TikTok's First Amendment rights. However, Count One does not seek to curtail any speech but rather to curtail the addictive features challenged. Count One does not seek to prevent or convey any message or viewpoint. The allegations in the Complaint are content-neutral. This means that the Complaint does not

14

target or criticize the specifics or nature of any third-party content available on the platform. Instead, it focuses on the actions taken by the Defendant regarding the addictive design features of the platform and their own misleading statements about its safety. Essentially, the issue isn't about the type of content shared on TikTok, but rather about TikTok's practices and representations that impact how the platform is used.

The Court therefore agrees with the Division in its memorandum that TikTok's use of these features is conduct, not speech, and "First Amendment doctrine permits regulating the conduct of an entity that hosts speech." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 455 (5th Cir. 2022), *cert. granted in part sub nom. Netchoice, LLC v. Paxton*, 216 L. Ed. 2d 1313 (U.S. 2023).

## C. The UCSPA provision at issue in Count One is not impermissibly vague and is not in violation of the Due Process Clause and the First Amendment.

While TikTok asserts that that the UCSPA's prohibition on "unconscionable act[s] or practice[s]" is unconstitutionally vague, this Court disagrees. See Mot. at 16 (citing Utah Code § 13-11-5). TikTok relies on a Colorado case, *Trail Ridge Ford, Inc. v. Colo. Dealer Licensing Bd.*, 543 P.2d 1245 (Colo. 1975). This Court finds the *Trail Ridge Ford, Inc.* case distinguishable and while it may be difficult for the Division to eventually establish these causes of action with the facts as alleged, this does not make it unconstitutionally vague. Other state courts have held that a ban on unconscionable consumers acts or practices is not unconstitutionally vague. *See State ex rel. Bryant v. R & A Inv. Co.*, 985 S.W.2d 299, 302 (Ark. 1999) (consumer protection statute's bar on "unconscionable" acts or practices not too vague). *See, e.g., Trade Comm'n v. Skaggs Drug Ctrs., Inc.*, 446 P.2d 958, 965 (Utah 1968) ("[W]e disagree with the trial court decision that the terms 'unfairly diverting trade from a competitor' and 'injuring a competitor' are vague and

15

ambiguous. The terms may present difficulties in application, but such difficulty is not sufficient to hold the Act unconstitutional.").

The Court therefore agrees that unlike the licensing statute in Trail Ridge, the bar on unconscionable practices in the UCSPA, a general consumer protection statute, is appropriate because the legislature "could not be expected to envision every conceivable violation" of the statute. *Bryant*, 985 S.W.2d at 302; see also Scott, 430 N.E.2d at 1018 ("[E]ffective regulation requires that the concept be flexible, defined on a case-by-case basis, in view of the futility of attempting to anticipate and enumerate all the unfair methods and practices that fertile minds might devise." (quotations, citations, and alterations omitted)). The Court therefore finds that the provision is not unconstitutionally vague.

## D. The Division's claim of unconscionability does not fail to state a claim under the UCSPA on the merits.

TikTok next argues that Count One has failed to sufficiently allege an unconscionability claim and has not alleged any conduct that would rise to the level of "extreme unfairness" required for a claim of unconscionability. TikTok argues that unconscionability requires an absence of meaningful choice, gross inequality in bargaining power, oppression, unfair surprise, or overall imbalance. Mot. at 18.

In response, the Division has alleged in its memorandum that in the Complaint it states that TikTok has exploited children's neurological limitations using addictive design features to hook them into spending unhealthy amounts of time on the app. Compl. ¶¶ 5, 27. In reviewing the Complaint there is sufficient detail regarding these addictive features, which include personalized algorithms designed to manipulate dopamine releases in children's brains, use of an infinite scroll feature that makes it difficult for children to disengage, and push notifications sent

16

at all times of day and night. Id. ¶¶ 28–44. The allegations of manipulating children in these ways to maximize time spent on the app (and thus advertising revenue generated) meet the definition of unconscionable.

While TikTok argues that the motion to dismiss should be granted because there should be an "absence of meaningful choice" or "gross inequality in bargaining power." At this time there are sufficient facts pled by the Division to allow this count to proceed.

"[D]ismissal is a severe measure and should be granted . . . only if it is clear that a party is not entitled to relief under any state of facts which could be proved in support of its claim." *Am. W. Bank Members*, 2014 UT 49, ¶ 13, 342 P.3d 224 (citation omitted). Under the UCSPA, "[i]f it is claimed or appears to the court that an act or practice may be unconscionable, the parties shall be given a reasonable opportunity to present evidence as to its setting, purpose, and effect to aid the court in making its determination." Utah Code § 13-11-5(2). Based on the reasons as set forth above the Court declines to dismiss the UCSPA claim on the pleadings for failure to allege unconscionability.

## IV. The Division Does Not Fail to State a Claim in Count Two that TicTok Deceived Users about Its Safety and Content Moderation Practices.

After a review of the Complaint and the briefs filed in this matter the Court agrees with the Division and finds that Count Two does state a claim under the UCSPA and there are sufficient facts pled to sustain this count alleging deceptive conduct. To allege deceptive conduct, "a party must state with particularity the circumstances constituting [the deceptive conduct]." Utah R. Civ. P. 9(c); *see also Williams v. State Farm Ins. Co.*, 656 P.2d 966, 972 (Utah 1982). Rule 9(c) must be read consistently with "the fundamental purpose of our liberalized pleading rules [which] is to afford parties 'the privilege of presenting whatever legitimate contentions they

17

have pertaining to their dispute,' . . . subject only to the requirement that their adversary have 'fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved.'" *Williams*, 656 P.2d at 971 (citations omitted).

Rule 9(c) should be applied "with great liberality in sustaining the sufficiency of allegations stating a cause of action." *Id.* Thus, a complaint is sufficient if it "describe[s] the nature or substance of the acts or words complained of." *Id.*

Here, the Division's Complaint satisfies this requirement. The Complaint alleges numerous areas of deception, including as an example that TikTok represents that it proactively removes harmful content that violates its guidelines but further explains how these representations are deceptive because TikTok's approach is reactive, not proactive, and is completely ineffectual. Id. ¶¶ 68–111. Furthermore, these alleged misrepresentations are not just vague statements, but rather the Division identifies numerous examples of verifiable factual misrepresentations. For these reasons, the Court finds that the Division does state a claim in Count Two that TicTok deceived its users about its safety and content moderation practices and the motion to dismiss this allegation is denied.

## V. The Division Does Not Fail to State a Claim in Count Three that TikTok Deceived Users About the "Geographical Origin or Location" of Its Business.

Count Three, alleges that TikTok misrepresents itself as an independent U.S. company. While this may also be difficult to prove factually, based on the Complaint, this does state a claim under the UCSPA and should not be dismissed. The Division alleges that TikTok portrays itself as independent of its Chinese parent company, ByteDance, that "TikTok's CEO has claimed that he is responsible for all business operations and strategic decisions for TikTok," that TikTok states that it is a "myth" that "[d]ecisions about TikTok are made in Beijing," and that

18

TikTok encourages its employees and spokespeople to downplay its association with ByteDance and China. Compl. ¶¶ 139–42. The Division alleges those representations are deceptive because TikTok remains heavily controlled by, and cannot operate independently from, ByteDance.

TikTok argues that the Division's claims do not fall within the purview of UCSPA section 13-11-4(2)(w), which makes "misrepresent[ing] the geographical origin or location of the supplier's business" a deceptive practice. TikTok argues that "geographical origin" and "location" as used in the statute "simply mean the defendant's actual location." Mot. at 26–27. But the Court agrees with the Division that TikTok's argument improperly reads the word "origin" out of the statute. *See Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 12, 284 P.3d 600. Thus, even if TikTok's "location" is in California, Compl. ¶ 10, the "origin" of its business—the locus of control—is alleged to be in China. As to TikTok's allegation that these facts may not be proven to be true or false, this is not the appropriate stage of the case to raise issues of fact and the Court accepts all facts as set forth in the Complaint as true and liberally construes this in the favor of the Plaintiff. As to whether this would be material to a reasonable customer, this is also an inappropriate time to raise this as an issue of fact and this should be allowed to move forward and give the Division a chance to establish those facts as alleged. The Division having alleged sufficient facts and allegations to support Count Three, the motion to dismiss this count is denied.

## Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss is hereby DENIED in full. The case will proceed to trial for a full examination of the material facts and legal issues presented.

**It is so ordered.**

## CERTIFICATE OF NOTIFICATION

I certify that a copy of the attached document was sent to the following people for case 230907634 by the method and on the date specified.

MANUAL EMAIL: ISIUWA MABATAH MABATAHJ@BALLARDSPAHR.COM

MANUAL EMAIL: KEVIN HEINER KHEINER@WSGR.COM

MANUAL EMAIL: CONSTANDINOS HIMONAS DHIMONAS@WSGR.COM

MANUAL EMAIL: ALEXANDER H SOUTHWELL asouthwell@gibsondunn.com

MANUAL EMAIL: WINSTON YAW WEN CHAN wchan@gibsondunn.com

MANUAL EMAIL: BLAINE H EVANSON bevanson@gibsondunn.com

MANUAL EMAIL: PEISHEN ZHOU PEISHENZHOU@AGUTAH.GOV

MANUAL EMAIL: DOUGLAS CRAPO CRAPO@AGUTAH.GOV

MANUAL EMAIL: EMILY PENKOWSKI PEREZ epenkowski@edelson.com

MANUAL EMAIL: JIMMY ROCK jrock@edelson.com

MANUAL EMAIL: THEO BENJAMIN tbenjamin@edelson.com

MANUAL EMAIL: SHANTEL CHAPPLE KNOWLTON schappleknowlton@edelson.com

MANUAL EMAIL: CARINA WELLS SSHEPHERD@AGUTAH.GOV

MANUAL EMAIL: ROGER PERLSTADT rperlstadt@edelson.com

MANUAL EMAIL: JOHN FEENEY COYLE jfeeneycoyle@edelson.com

MANUAL EMAIL: TAYLOR MOSOLF TMOSOLF@AGUTAH.GOV

11/12/2024                    /s/ CHARLENE MARTIN

Date: _____      _____

                                      Signature

# EXHIBIT L

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

- - - - - - - - - - - - - - x
DISTRICT OF COLUMBIA,          : Docket Number:  2024 CAB 006377
                               :
          vs.                  :
                               :
TIK TOK, INC.,                 :
                               :
          Defendant.           : Monday, February 24, 2025
- - - - - - - - - - - - - - x Washington, D.C.


        The above-entitled action came on for a Motion

hearing before the HONORABLE EBONY M. SCOTT, Judge, in

Courtroom Number 219.


            APPEARANCES:

            On Behalf of the Plaintiff:

            JIMMY R. ROCK, Esquire
            BRITTANY N. NYOVANIE, Esquire
            KEVIN VERMILLION, Esquire
            Washington, D.C.


            On Behalf of the Defendant:

            JOHNATHAN D. HACKER, Esquire
            MARTHA F. HUTTON, Esquire
            ANN MARCHITELLO, Esquire
            Washington, D.C.


                                            25-00870



# T A B L E   O F   C O N T E N T S

## M I S C E L L A N Y

FINDINGS OF THE COURT                                         61

DEFENDANT'S MOTION TO DISMISS IS DENIED                       93

FINDINGS OF THE COURT                                        154

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 2 DENIED               156

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 7 DENIED               156

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 10 DENIED              157

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 28 DENIED              158

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 30 PARTIALLY

GRANTED                                                      158

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 33 DENIED              161

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 44 PARTIALLY

GRANTED                                                      162

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 57 GRANTED             162

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 69 GRANTED             163

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 91 GRANTED             163

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 108 DENIED             164

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 123 DENIED             164

DEFENDANT'S REQUEST TO SEAL PARAGRAPH 128 DENIED             166

PLAINTIFF'S REQUEST TO UNSEAL PARAGRAPH 148 GRANTED          166

PLAINTIFF'S REQUEST TO UNSEAL PARAGRAPH 155 GRANTED          167



P R O C E E D I N G S

THE COURT: Yeah. Okay. We can call the case.

THE DEPUTY CLERK: Calling the matter of District of Columbia versus TikTok Inc., 2024 CAB 6377. Parties, please state your name for the record starting with plaintiff.

MR. ROCK: Good morning, Your Honor. Jimmy Rock, on behalf of the District.

THE COURT: Good morning.

MS. NYOVANIE: Good morning, Your Honor. Brittany Nyovanie, on behalf of the District.

THE COURT: Good morning.

MR. VERMILLION: Good morning, Your Honor. Kevin Vermillion, also on behalf of the District.

THE COURT: Good morning.

MR. HACKER: Good morning, Your Honor. Jonathan Hacker, on behalf of defendant TikTok, Inc.

THE COURT: Good morning.

MS. HUTTON: Good morning, Your Honor. Martha Hutton, also on behalf of defendant TikTok, Inc.

THE COURT: Good morning.

MS. MARCHITELLO: Good morning. Anne Marchitello, also on behalf of defendant TikTok, Inc.

THE COURT: Okay. Good -- I'm sorry, I interrupted you.



MS. MARCHITELLO: Oh, no.

THE COURT: State your name one more time.

MS. MARCHITELLO: Anne Marchitello.

THE COURT: All right. Good morning to you, Ms. Marchitello. Be seated. So we have quite a few things to do today, and we'll finish them all. Let me tell you the order that I'm going to go in so that you all can think about maybe how one ruling might affect the other. I am going to ask whether or not the parties have reached any additional agreement, particularly when it comes to the protective order. Why don't I hear that now? Has there -- I know that the District submitted an amended protective order or amended proposed protective order. Have the parties reached any further consensus since that?

MR. ROCK: No, Your Honor. The parties have not reached agreement. So the basically six issues that are laid out in the reply brief to the District's motion for protective order are still ones for the Court to address today.

THE COURT: Okay. Anything to add?

MS. HUTTON: Your Honor, I'm not sure our math quite matches up. It's either five or six. We have not progressed beyond the reply. I think Exhibit 5 to that is the District's current proposal --

THE COURT: Yes.

MS. HUTTON: -- and 7 is TikTok's.

THE COURT: Okay. Well, we'll get there. Here's the order that we're going to go. We're going to pick up on the motion to dismiss. Then we'll go to defendant's opposed motion for protective order, the one filed on November the 22nd. And then we'll go to the unopposed motion to seal the complaint filed on October 30th, and then the opposed motion to seal the confidential portions of the motion to dismiss filed on November 22nd and then fifth, the opposed motion for leave to file under seal confidential portions of certain briefing. That was filed on January the 9th. And then lastly, the oppose motion for protective order.

And so the Court did hear argument to the motion to dismiss the last time that we convened. And the Court has had an opportunity to consider the arguments made by both parties. And I only have one question. Otherwise, the Court has no further questions. The Court did receive the supplemental authority. That was filed, I believe, perhaps over the weekend. So I have one question. One moment. And this is to TikTok. Okay. This is on the motion to dismiss.

So with respect to the CPPA claims for unfair acts and practices, how -- the argument is that there is -- or that the users are informed, but how informed of



a choice can the users of the platform make when they don't understand the dangers and the risk as alleged by the plaintiff?

MR. HACKER: So two points if I could, Your Honor, in response to that.

THE COURT: Okay.

MR. HACKER: The first is, and I think I may just be answering as I did at the last hearing, which is their own allegation, again, operating within the confines of the complaint, is that the risks they are talking about have been discussed. We don't agree that there's risks, but those risks, alleged risks, have been disclosed and discussed in various forms of public commentary for a long time. And so based on that allegation, accepting that allegation as true, we think it's just the inference isn't permissible on this complaint that the users don't -- aren't aware of those risks. Right?

That's the -- again, drawing from their complaint. The second point I would make sort of goes to, I think, the substance of the misrepresentation claim, and not just the CPPA, but also the 230 and the First Amendment defense and the Utah case that they submitted and the *Grindr* case that we submitted. And if I could, Your Honor, you know, I know Your Honor had a question. I would just like to take a couple of minutes as the moving



party to provide some thoughts in rebuttal to the argument we heard last week. And I won't take more than --

THE COURT: You may, you may.

MR. HACKER: -- four or five minutes, if that's okay. And I'll get into that precise point --

THE COURT: Okay.

MR. HACKER: -- because I think it's very important in response to their -- the misrepresentation argument. But I'll just go through and I'm going to stick to the form of rebuttal. I'm not going to make new arguments and points, but I want to work backwards a little bit from the complaint, starting with the money transmitter claims, Counts IV and V. And I understand them to have made three arguments really at the last hearing. The first point -- and I'm starting with those because I think it's -- they're the easiest to just deal with and to deal with right at the threshold.

Their first point was to accuse TikTok of lacking familiarity with the three tier enforcement scheme in the District, as if under all statutes, the enforcement scheme is always three tiers, no matter what. And the problem is that's just obviously not true under the language of the statute. The plain language of this statute, 26-1021, unambiguously limits the OAG's power. Right? It just says what the AG can do, and what it says

is they can enforce amounts owing already, liquidated amounts, and that's all they can do.

The other side, the District says, look, if you limit the AG's power here, that's going to limit all these other statutes, too. But those statutes, if you look at them, 28-3909, 32-1306, they have broad powers on the Attorney General, like all the powers, you know, a government might have or are conferred in those statutes, not in this statute. But the limited power here, Your Honor, does not mean that the Attorney General lacks all power. It has the power that the statute provides. And what that means -- and my next point is to clarify, I think, an exchange that we had last week.

The jurisdiction -- the issue really here is that DISB's power jurisdiction is primary versus the Attorney General's power when the same entity is being examined by DISB. At least under those circumstances, which is what we have here, that specific entity,  think the best way to describe the jurisdiction is primary. And that's what's different among the things that's different about the *Harmon* case. They weren't looking at the same entity, the same person at all. Right? It was like a many years old commentary on a website about a different set of facts and a different actor. And in that situation, in a criminal prosecution, the Court said, I

don't have to defer to that website because there's no action taken. There's no letter. And so it's really a primary jurisdiction situation.

But the simplest answer, Your Honor, is I don't think you even need to decide whether it's primary jurisdiction or exclusive or ripeness, all of those things. The simplest answer is simply to stay this claim until we get an answer from DISB, and then we see what DISB says. And then Your Honor, with briefing from the parties, can determine what the jurisdictional effect of whatever it is DISB says. And interestingly enough, I think the District agrees with that.

Here's what they said at the last hearing, page 75 of the transcript, Your Honor asked, well, DISB may opine while this transaction, this live coin collection transaction, that's different. And our rules do not contemplate licensure for such activity. Therefore, TikTok is not required to have such a license. That's Your Honor hypothesizing what DISB could do. Mr. Rock says. Yeah. The Court then says, how then can OAG proceed without? And Mr. Rock says, well, it's going to depend on how DISB answers that question and whether they actually answer that question of whether TikTok needs a license and has always needed a license.

And Your Honor, we agree. It's going to or



could depend on what DISB says and does. And I think given that common agreement between the parties, the simplest answer is to pause Counts IV and V until DISB acts. And then we can all brief and argue what the effect of that is on this case going forward.

THE COURT: Even if the Court were to accept the argument that the OAG has broad power, but DISB is the primary jurisdiction -- even if the Court were to accept that as true, the Court is unclear as to whether or not DISB has actually initiated an administrative proceeding, or if DISB has simply said, we're looking into this.

Now, I asked at the last hearing what was the status of that particular hearing or that inquiry, and the Court was advised that there had been nothing -- that DISB sent the letter, that TikTok responded to DISB, and DISB may start its own informal investigation, but there have been no further activity. And so why then, should the Court stay the proceedings here when the Court is not even sure that there is an administrative action pending or anticipated by DISB?

MR. HACKER: So I think the record is a little clearer than the District was representing. I think they acknowledged there hadn't been communication between the OAG and DISB itself. The record is the letter you saw, which was not the, with respect, the kind of informal

escribers

www.escribers.net | 800-257-0885

inquiry that had been involved with respect to somebody else in *Harmon*. It was quite a formal request for information and response from TikTok. TikTok did respond in writing. And the fact that there hasn't been a subsequent, you know, formal action, I don't think there's any reason to infer from that that DISB is not conducting exactly the inquiry that that letter said they were going to initiate. That doesn't mean there's been the formal enforcement action. That's what this inquiry, what DISB says in the letter, you know, is inquiring into whether there should be that.

THE COURT: So an informal enforcement action suffices here?

MR. HACKER: Well, I guess what I would say --

THE COURT: Assuming that there's no formal, because what I have here is that DISB is conducting a review. And so let's assume that this is where it begins and ends. There's a review. I don't know if this means it's a statutory undertaking, an administrative undertaking. But let's assume here is what we have. This is enough to stay the proceedings?

MR. HACKER: I would say the answer is a qualified yes. It's enough at this stage to say --

THE COURT: Okay.

MR. HACKER: -- because I think it's incumbent



on all of us to, you know, give DISB the respect of that they are acting in good faith, doing what they say in the letter, that they're conducting an inquiry. At this point, there hasn't been, I think, sufficient time to conclude what the OAG would assert, which is that DISB is, like, doing nothing. I don't think there's any basis for that.

So I think -- I think the precise answer is a stay is exactly what's appropriate, not a determination that the Court lacks jurisdiction, but just to stay for another period of time, you know, until DISB -- until there's more evidence of what it is that DISB is doing and its determination by DISB as to whether or not it's going to initiate that formal enforcement action. Or on the other hand, issue a formal letter saying it doesn't need to because it has concluded, as a matter of law under the District's Money Transmitter Act, that no license is necessary. We just need more information from DISB is all I'm saying.

THE COURT: Sure. Is there anything in the MTA that requires a stay or that precludes a parallel proceeding? I understand your arguments to be one of efficiency and respecting the entity with the primary jurisdiction. Putting that aside, is there anything in the statute that requires civil or criminal enforcement to

be stayed pending determination?

MR. HACKER: So a couple of points. There's the *Savoy* case, which is not from the statute, which just is that efficiency and prudence that a court should exercise, a sort of judicial modesty.

THE COURT: I understand that point.

MR. HACKER: But the other point is the statute -- there's no provision in the statute that says, you know, here's when stays are appropriate, here's when they're not appropriate. The relevant statutory provisions, I would say, are the ones that describe what the powers that DISB has under the statute. And then literally the next paragraph, I think is 1021, describes the Attorney General's power, and it's limited to, you know, collection of amounts due or amounts owing, I think is the phrase. And so under those circumstances, you just compare those two powers.

I think that's what, by inference, by necessary inference, compels, again, as a matter of prudence, the Court's stay to determine what DISB's doing. Allow DISB the space it needs as an administrative agency with the primary enforcement authority to determine if and what DISB should do. We don't know right now what DISB will do. And with respect, Your Honor, I think the appropriate thing is to allow that administrative agency with

escribers
www.escribers.net | 800-257-0885

unambiguous enforcement authority to do the work that it has told us it is doing. And not to assume, as I think OAG would assume, that it's not doing anything and they should be allowed to proceed.

They can proceed under their statutory authority when -- if and when there's something to proceed on. And I would submit right now we just don't have a basis for that. And what we do have a basis for is DISB telling us that it is conducting an inquiry. And that it's not informal in the way that the kind of inquiry that was at issue in *Harmon* was, which was not even an inquiry into the same entity. I think this is precisely the scenario Your Honor hypothesized in the question to the District to which the District answered, again, it's going to depend on how DISB answers that question and whether they actually answer that question.

I fully agree. Let's give DISB the space to do the work that it is statutorily assigned to do. That's our principle submission.

THE COURT: Okay.

MR. HACKER: Okay. On the -- so now starting at the beginning of Count I and Count II and then Count III. So Count I is the unfairness claims. The District's core argument we heard last week or the last hearing was that under Section 230 at least, even if the design elements

qualify as publishing under the Barnes second factor, the harm here, they say, is not from viewing content, but it's from TikTok's own conduct, and putting it in quotes "own conduct" because it's such a critical issue here. The through line you'll see from the Meta case we talked about and the recent Utah decision that the District submitted, and other cases that have allowed these claims to go forward, is that just because selecting videos is the platform's, quote, "own conduct", the Government has a free hand to regulate the video selection method that is the platform's "own conduct".

And that through line, we think, is the most fundamental error running through all of those decisions. And the reason it's an error to focus on the fact that they challenged the platform's, quote, "own conduct" is that the harm that's at issue from that "own conduct" of the platform is still the speech that that conduct selects. And I'm going to explain that. And that "own conduct", that selection, is itself expressive publishing activity protected by the First Amendment.

So they make three points that are all related, Your Honor. I'll just briefly touch on each. The first point is that while the harm is from the recommendation algorithm, not from viewing the conduct, but again, the platform's "own conduct" is the publishing choices about

escribers
www.escribers.net | 800-257-0885

what speech to show each viewer, the alleged trap that they talk about and I think Your Honor asked about. The trap for the viewers occurs, allegedly, because the algorithm is selecting for each viewer videos that are so engaging of the viewer. And they're very, very clear about this, Your Honor. It's so important to avoid confusion on this.

Paragraph 67 summarizes their complaint about the recommendation engine. Here's what it says.

When users first open TikTok, they are immediately greeted by the "For You" feed, a stream of videos that plays automatically. This flagship feature provides content recommended for each user by TikTok's algorithms, here collectively called TikTok's recommendation engine or engine. Algorithmic recommendation systems are designed to rank content based on how likely a user is to engage with it by collecting data on user behavior; the recommendation engine curates a personalized video stream to keep users scrolling endlessly, and then they reiterate the point.

The problem -- the way it works on paragraph 72. One technique the recommendation engine uses is -- to keep users on the app is by trapping them. This is where their allegation about trapping comes from, trapping them in, quote, "filter bubbles" or rabbit holes of similar

escribers
www.escribers.net | 800-257-0885

content. These bubbles learn a user's video preferences and then reinforce them by recommending even more and often increasingly extreme versions of those videos. Right, the videos that the users prefer. That's the alleged problem here.

It's much like, Your Honor, a music app, Spotify, you know, the music app. When it generates a playlist, the way it generates a playlist for a given user is to look at the user's song preferences and user history, and then generate songs that the user thinks that they'll like. And the harm here -- in that analogous situation, the harm would be if the music app was choosing songs that were so interesting and engaging to the listener, they just had to listen to the next song. It's exactly the same. You just substitute videos for songs.

THE COURT: Well, isn't that the addiction that the District speaks of? That it's not -- let me back up. As I understand the District's argument in Count I with the addictive design features is that these features are responsible for the harm, not the content that it creates or pushes or feeds or push -- or actually pushes --

MR. HACKER: Right.

THE COURT: -- through the -- through the push feature. And so it doesn't matter necessarily -- it doesn't matter at all what the content is. What's



happening is that -- and I think the District said that it's akin to a slot machine. Users are anticipating that next dopamine hit, and they know that they're going to have a curated stream that they can appreciate, that's a good stream of content. But that's what keeps them addicted. The slot machine of dopamine.

MR. HACKER: But the simplest way to explain why that actually proves our point is the way it's not a slot machine. A slot machine isn't giving you speech. This is giving you speech. The dopamine response -- they will tell you this, the dopamine response comes from videos, the video that's sort of extra exciting. That's what triggers the dopamine response. You don't get a dopamine response from the algorithm operating away from the video.

THE COURT: So TikTok's argument is that the videos themselves create the dopamine response, and not the way in which the videos are pushed, which is the design.

MR. HACKER: It's both, Your Honor. That's why it's so critical. That's why both Barnes factors two and three are satisfied. Right? It's publishing because the algorithm selects not, you know, cherries and lemons in a slot machine. What the algorithm is doing is selecting videos. That's the design elements. That's the publishing part of it. So where does the harm come from?

Barnes three, right, asks is the harm from content that's being viewed. And the answer is yes, it is here because unlike a slot machine, you're not getting fed, you know, a chance to win $1 million on the next hit.

What you're getting fed is a video that you find so engaging, you just, you know -- they would say you just can't put your phone down. You want to look at the next video and the next video. That's where the dopamine response -- alleged dopamine response comes from. That's where the harm is, is that you're finding the videos so engaging. That's why I read to you paragraph 67. That's literally what they say in unambiguous terms, is that the videos are so engaging. Just to repeat their point, they're designed to rank content based on how likely a user is to engage with it by collecting data on user behavior.

The recommendation curates a personalized video stream to keep scroller -- users scrolling endlessly. They're scrolling through videos, and that's the harm that's alleged is continually viewing speech, which is protected. The harm is from the speech. The harm is from the content, not the algorithm operating by itself. The algorithm only operates because it is feeding users speech that they want to see, that they prefer.

Now the second point, though, is the District



says, well, now you know, that's not quite right, even though they just said it. They just told us in paragraph 67, it's curated towards viewers preferences. Their second point is, well, it doesn't actually just choose engaging, appealing videos. It manipulates, is their phrase, users by sending videos that sometimes elicit the dopamine response. Right? Sometimes they don't. This is what the District says. And so you wait for the next one that is exciting. You get a boring one, and then you get a good one. Sometimes it's videos -- they even say -- that a user doesn't want to see. It sort of elicits an -- maybe an outrage response.

First of all, it's contradicted by what they just wrote to you in paragraph 67. But either way, Your Honor, accept for a moment, absolutely just take as true this argument -- and we resist all of the factual inferences, of course, but take it as true that the harm arises because some videos elicit a dopamine response. Some videos do not. Some videos are sort of bad videos that elicit maybe an outrage response.

What's the common thread in everything I just said? Everything the District just said? The response is from the videos. It's from the content. Again, it doesn't have to be puppies or porn. That's the phrase. I get that, but the point is, it's the videos are the

problem. The algorithm is picking videos that create a problem. The only answer at the end of this case, Your Honor, is going to be if they win this case, it's going to be because they persuade you or a jury that the algorithm is sending the wrong videos, too many of a particular type of video, in the wrong order, in the wrong manner. It's about the videos, and the algorithm needs to be changed, the District will tell you. The algorithm needs to be changed because it needs to be sending users different videos. That's why the harm cannot be disaggregated.

THE COURT: Is that your understanding of the District's argument, that the algorithm must be changed?

MR. HACKER: They say that I think on paragraph 69.

THE COURT: To send different videos?

MR. HACKER: Right. That's the problem is --

THE COURT: That maybe don't create this dopamine hit?

MR. HACKER: Right, or just the sort of endless scrolling, as they say. The engagement, whether it's -- I don't think they're saying that every video creates a dopamine release. Some of them they say do. And as I was just explaining, they say some of them don't. And they think that's a problem too, because you get the dopamine response from the first one and then maybe you don't get



it. And so you're waiting for it. So you scroll to the next one. You finally get the dopamine response. I think none of this is true, but even accepting that it is, every single time they tell you about the harm, what they're telling you is that the algorithm is sending the wrong types of videos because the videos are creating that dopamine response. The videos are not creating a dopamine response, and so enticing you to stay on. They need -- they want the algorithm to send different videos.

THE COURT: And so it's the videos, the content alone, irrespective of the timing and the spacing produced by the algorithm on the platform?

MR. HACKER: Not quite, Your Honor.

THE COURT: Okay.

MR. HACKER: Again, that's why I'm saying they work together, right? It's not -- I don't think they would say -- again, this is their allegation -- but they wouldn't say the videos, irrespective of the algorithm, are just sitting there creating a problem. They complain that the algorithm is sending those, you know, the wrong videos in the wrong time, in the wrong manner. Now, it's true that if somehow the videos were fed to you without an algorithm, they would have the same argument because ultimately, if you're seeing ten videos, the user is seeing ten videos and they create this problematic

escribers
www.escribers.net | 800-257-0885

response, it's the problematic response that they're allegedly concerned with. It wouldn't matter how they got there.

Now it's just a reality that the way this app works, like all -- like a music app works, is through an algorithm that says, what is this person likely to be engaged with? They tell us in paragraph 67 that it's, you know, identifying user preferences. And their argument, they say, well, it's not just user preferences. It's really ones that are engaging in different ways, elicit different kinds of responses. But every time they talk about a harm, Your Honor, every single time, it's because the videos are doing something that they don't like to the viewers.

You cannot escape the videos as the locus, the mechanism by which the algorithms are causing harm. And that's not true of the slot machine. It's just a different -- the slot machine is not delivering speech. The last point on this, on fairness is closely related, which is the argument, well, this is content blind. It's content neutral. You see that phrase in their briefs and their complaint and out there in the world, the algorithm is content blind. With respect to Your Honor, that's just a misunderstanding of the -- what that phrase, content blind, content neutral means.



Obviously, the algorithm is not blind to content. If Your Honor can see why it can't be, because it's selecting videos based on whether the algorithm predicts that the user will enjoy the video or will be -- or will react to the video, will be engaged in some way. So of course, the algorithm identifies videos based on content in the exact same way a music app identifies songs that the user is likely to enjoy.

THE COURT: But does the algorithm understand content?

MR. HACKER: It has to in the sense that if the viewer, again to simplify, likes puppy videos, the only way the algorithm is going to send that viewer a puppy video is to understand that it's looking for puppy videos. And so the algorithm is, you know, looking and it identifies, here's one with two puppies and one where the two puppies are, you know, pretending to fight with a cat. It has to know the content because it knows that the user really likes videos of two puppies fighting with cats. So of course it understands the content in that way. But what it is --

THE COURT: Is it understanding the content? Or is it predicting? Predicting videos that a user might enjoy or engage in?

MR. HACKER: It's definitely doing the latter.



It's predicting videos by understanding the content. It can only -- it has a user profile. Again, I'm oversimplifying -- a user profile of what things, what videos the user -- what speech the user enjoys experiencing, and then it goes out into the world of content on the platform. And of course, it has to understand the content in order to match the prediction. It's really a matching system, right?

So the prediction is this user -- I keep using the example of this user likes two puppies and a cat, right? That's one of the things this user likes. So it has to go find -- in order to meet that prediction and satisfy the user's preference, it has to go find and interpret all that content and find, well, this one has, you know, three dogs, not two puppies. And it's got four cats. I don't want that one, says the algorithm. I want this one. Aha, I found one that matches what I predict. Here's two puppies and a cat that match the user's preference.

Again, just like in music app. This user likes bluegrass and there's a million songs out there. There's hip hop, there's heavy metal, there's singer songwriter, right? There's folk music. I'm not going to -- I'm understanding the content of those songs because I know this user doesn't like them. I need to find the bluegrass

escribers
www.escribers.net | 800-257-0885

songs. So that algorithm goes and finds bluegrass songs and matches the prediction. So it predicts, based on what the user has done in the past in various inputs. But then it absolutely understands and interprets content in order to match the prediction. And then if on -- whether it's a music app or a video app, if it's predicting and matching too well, it's too engaging.

The videos are just -- as they say in paragraph 67, entice the user to endlessly scroll because by God, that next video, that next song is just what they want to see. Or it makes them so mad they want to turn to the next video. Whatever it is, it's all about the harms from the content. And just to be clear, what content blind and content neutral is -- because we don't want to make a mistake on this. Content blind, content neutral is a reference to content moderation. What the app, what the algorithm does not do is enforce rules, sort of categorical rules about content that's allowed or disallowed on the site.

So lots of sites have rules about you know, you can't have offensive content, you can't have obscene conduct -- content, that kind of thing. An algorithm is not the source for enforcing that. There's content moderation policies and practices that do that. The algorithm is blind to the content, neutral to the content.

escribers
www.escribers.net | 800-257-0885

It's not making judgments about whether the content is good or bad; it's just identifying content that will match the user's interest.

THE COURT: The algorithm is neutral to the content, but I thought I heard you argue that the algorithm understands the content, so.

MR. HACKER: What I mean by neutral -- yeah.

THE COURT: Go ahead.

MR. HACKER: What I mean by neutral is it doesn't make a judgment that it's good or bad content or that it satisfies, you know, a rule about it being obscene. The algorithm is just --

THE COURT: So how is this understanding then manifested?

MR. HACKER: In the way -- so leave aside the enforcement of rules, safety rules, whatever they may be. It's understanding the content in order to do, like, literally it's job. It's predicting the user. I keep saying this and I'm sorry, the two puppies and a cat. The user.

THE COURT: You didn't say that. The Court in Vermont.

MR. HACKER: Okay. Yeah.

THE COURT: Or D.C. said that.

MR. HACKER: All right. Fair enough. Fair

escribers
www.escribers.net | 800-257-0885

enough. It likes two puppies and a cat. So it has to interpret the content that's out there to match that preference. Right? That is unambiguously interpreting content. I don't think the District would even disagree with that. They just keep referring to the content neutrality because that's something the algorithm does not do is then say, well, you know what, this site has a rule that says we don't do animal videos. This site is a sports video site -- making this up. And so you know, animal videos are prohibited on this site. That's -- that would be -- sometimes it may be baked into the algorithm. I don't know, but like it's a separate inquiry where the algorithm isn't judging whether or not the content is valuable, socially valuable, whether it satisfies the platform rules. It's just identifying and matching user preferences with the content that's out there.

THE COURT: Okay.

MR. HACKER: So it's neutral. It's not judging the content. That's what it's meant to be content neutral. So for all these reasons, Your Honor, it's not an excuse or a justification for the District to focus on its challenge to the platform's own conduct. The conduct is publishing activity. It's choosing what videos to display and how to display them. That conduct, yes, it's TikTok platform's own conduct, but it's expressive and

it's protected by the First Amendment. And it's allegedly harmful precisely because they say it's selecting the wrong videos and displaying them in the wrong manner that causes harm.

Let me turn to Count II and Count III quickly. Let me just jump to Count III for a second because it fits more with the unfairness claim. Count III is the misrepresentation claims. The only point they made last -- at the last hearing is all we're saying, all we're challenging is TikTok's representations that the platform is safe, generally safe. There's these general claims about the platform being safe. And I think the Court asked a question along the lines of, well, if you just eliminate the statements that the platform is safe, then you're not editing any content itself.

And so if that were right, then there wouldn't be a 230 or a First Amendment problem. And I think the decision that we submitted over the weekend in *Grindr* explains why that's wrong. It's not just *Grindr*. There's a number of other decisions that make this point. But the problem is when you're challenging just a general claim that the platform is safe, what that requires the fact finder to do is second guess the activity itself and make -- the fact finder makes its own judgment about whether the platform is safe. So you can't extricate a

escribers
www.escribers.net | 800-257-0885

misrepresentation claim at that level of generality from the underlying attack on the conduct itself.

If they're saying the conduct itself -- the basic unfairness claim is the conduct itself is unsafe. And then all the misrepresentation claim does is layer onto that the claim that, well, you said it was safe, and we've just proved in Count I that it's not, they would say, so you've also misrepresented, but it's just the flip side of the same coin. That general statement is just another way of saying the platform either is or is not safe, and that's what's barred. So that's why what *Grindr* says and other cases like *YOLO* and *Wozniak* say, a misrepresentation claim at that high level of generality is barred by 230. And we would submit also --

THE COURT: But in *Grindr* were there allegations of affirmative statements that --

MR. HACKER: Yes.

THE COURT: -- making the misrepresentations misleading?

MR. HACKER: Yes.

THE COURT: Okay. And the -- and were there specific promises --

MR. HACKER: So that's the difference, right? That's the key point.

THE COURT: -- made?



MR. HACKER: Right? In *Grindr* there weren't specific promises about specific users and specific acts. And in the *YOLO* case, which I think was written by the same judge, Judge Okuda (phonetic). Okuda, excuse me, had said there's a difference in those scenarios. If you're just saying we're safe and the District says, or the Government says, no, you're not. Or a plaintiff says, no, you're not, that's just another way of saying, you know, the platform design elements are unlawful. And that's why that kind of claim is barred.

When you make a specific promise to a specific user, I'm going to remove this bad actor's profile, and then you do not do that, that specific promise is a misrepresentation that's enforceable. But that's not what we're talking about here. We're talking about general claims. This is what the District argued last week.

THE COURT: What were the informative statements in *Grindr*?

MR. HACKER: In *Grindr* it's very similar. It was that the platform is safe. You know, I don't have the verbatim words of it, but that's what the Court is describing is a generalized claim -- representation of what the platform safety standards are, which is what the District is challenging here, various statements about how the platform operates and various assertions that that

operation is safe for users. And they're basically saying, if you look back at Count I, we will prove that they're not safe, and therefore it's a misrepresentation. That's why Count I and Count III collapse. That's what *Grindr* is saying. It's different from a very specific representation about a specific user or specific practice.

THE COURT: Okay.

MR. HACKER: And then the last point I would just make is on Count II, the TikTok LIVE count, which the District said, I think correctly last week, it's somewhat different from the other claims and I think can be treated differently by the Court. The Court argument there is that TikTok LIVE is not a publication at all. Whereas with Count I and derivatively Count III, they all but concede that the design elements, the way the platform selects videos is a publishing act. Of course it is. With Count II, they say, well, let's not even -- we don't even get to the content issue because it's not publication at all.

They just say it's direct allegation. It's direct brokering of illegal transactions involving -- citing cases like that involved back office services. That's the *Salesforce* case. Or operate -- literally operate a casino online. That's *Roblox*. *Grindr*, again, explains why, in fact, it is publishing activity. Because

escribers
www.escribers.net | 800-257-0885

unlike when you've actually got a back office literally providing, you know, the accounting services, or a casino, in this situation, it's publishing because what you're doing is facilitating speech between users. The alleged harms all arise from the fact that users are communicating with each other, and that you're facilitating a way for a user to communicate with another one.

In *Grindr*, the plaintiff alleged that the platform was facilitating abusive relationships. I mean, the facts are terrible -- abusive relationships between adults and young users. The Court nevertheless held that what the platform was doing was facilitating communication. The harms arose from those communications, and so it is in fact publishing activity. And the harm is from the communications, which is protected by Section 230. And the same is true here. Facts are nothing like those facts, but the harms that are alleged arise entirely from protected speech that's facilitated by the -- excuse me, by the elements they are challenging in TikTok LIVE.

They complain that, well, you have to purchase coins in order to send gifts. But the gifts are protected speech. They're just like likes. They're just like a thumbs up emoji. In fact, they're more protected. They're more creative than that. The mere fact that you have to purchase them, purchase coins in order to send a

gift, doesn't change the fact that the purchase is facilitating speech. That's all that's being alleged. They complain that while there's the ephemeral LIVE because LIVE is ephemeral; it goes away. It's not there sort of forever.

That causes too much engagement because it causes FOMO. Remember we talked about FOMO. Fear of missing out. And so people want to jump on because they want to see the LIVE, so they don't miss out when their friends are talking about, did you see that amazing video? They don't want to miss out. But even articulating what the fear of missing out is tells you that we're talking about protected speech because it's fear of missing some great video. That's the whole problem here that they allege, is these videos are out there. They're not out there long enough. And so people want to --

THE COURT: I understand the argument to be that it's this combination of TikTok LIVE and with the monetary feature, the coin feature. That because TikTok allegedly knows that the combination facilitates illegal activity that TikTok is facilitating these transactions. And so it's more than just facilitating communication, but it's facilitating these illegal transactions online for which the CDA provides no protection for.

MR. HACKER: I understand that's their argument,



and I think *Grindr* explains -- and other cases, but *Grindr* is a good explanation for why that's not correct. Because it's the exact same facts in *Grindr* in that sense. That it was facilitating illegal transactions between young users and adults. And the Court said, when you actually look at the allegation, what the transactions are, are communications between users and adults. And the same thing is true here. What they describe as brokering illegal transactions is communications between users.

It's sending gifts to the viewers like content. They say the content is illegal and bad. I understand that. We don't agree, but accepting that it's true, it's still about the content. It's still about the ways in which viewers can express appreciation for the content, and the monetization piece of it only adds to the fact that in order to send that message of appreciation and actually modify -- the sender can actually modify the content. So it's like affirmatively creative. The sender has to purchase a coin, which you then use to purchase gifts.

But that's the only monetization piece of it is that you -- that the so-called monetization facilitates the speech. So you can't escape this. You can't disentangle the alleged harm, the alleged problem here from the fact that it's a decision about how to display

speech, what speech to display, all publishing decisions, all protected expressive activity.

THE COURT: Okay.

MR. HACKER: So I'll just finish with where I started the argument last week. The District's theory here is explicitly that to be lawful in this District and to be generally safe as TikTok represents, the TikTok platform has to select and display for viewers videos that are less likely to match their preferences or otherwise engage those viewers, and the platform must display the videos in a different manner, a manner more to the District's liking. The District doesn't deny that characterization of their claims, Your Honor. To its credit, the argument last week, and in their briefs and in their complaint, it leans in and says, TikTok, you're exactly right. Choices about which videos to display and how they are displayed are TikTok's own conduct. And because they are TikTok's own conduct, the District says it is free to regulate that conduct and decide for itself how videos should be displayed, how videos should be chosen.

But the District's focus on TikTok's own conduct misses the whole point, Your Honor, because that conduct represents expressive choices about what speech to display and how to display it. It's protected by Section 230;



it's protected by the First Amendment. I think the complaint should be dismissed.

THE COURT: What -- what -- what speech is TikTok intending to express?

MR. HACKER: So two points on that, Your Honor. The first is, as the Court said in *Moody*, the Supreme Court said in *Moody*, there is no requirement under the First Amendment that speech have an articulable message. We can't, in this country, have the Government demanding that artists and poets and newspaper opinion writers, or -- that's an easy one -- artists and poets and songwriters and music apps and video apps justify themselves by explaining what it is they really meant, what message they intended to send. That's just not how this nation has worked since its founding. But the other point is, there is an answer.

THE COURT: But I think *Moody* says that the speech doesn't have to be clear or cognizable, but it must be your own. So even if the Court accepts as true that it may not be neatly packaged or clear, I believe *Moody* says it must be your own. And so what is TikTok's speech? What is the speech?

MR. HACKER: Right. So the -- again, I don't think it's incumbent on us to identify an articulatable message, but the speech is --



THE COURT: No, I just said --

MR. HACKER: Okay.

THE COURT: -- that, it doesn't have to be clear or cognizable.

MR. HACKER: Yep.

THE COURT: That's what *Moody* says.

MR. HACKER: Right. The speech is, the decisions about what particular videos to include, what to exclude, and so that you have when you open up a TikTok, the app, you see a stream of videos. That stream, in the aggregate, reflects a set of choices for the viewers about what the platform thinks is likely to engage viewers. And that is an absolutely permissible and protected message by a publisher. A publisher can say, here's how I, as a publisher, want to express myself. It's to identify essays, stories, whatever it may be that I think my readers, my viewers, are likely to find engaging. That's my message.

In *MP*, the Fourth Circuit case, tells us exactly that. That's what newspapers have always done. Newspapers don't create the news. They're, you know, they're just sort of reporting the news. And when they report the news and identify which stories are going to go on the front page and which is going to go on the third page, and which is going to go on the arts section, a



newspaper is fundamentally deciding what they think readers are going to find engaging, right?

They're not writing the content -- and sometimes they are, but you can have a general interest publisher. You can have a magazine -- a magazine editor and publisher that publishes essays. That's not a specific, you know, essays about travel or sports or animals. It's just a general interest magazine, the message of which is, you, reader, are going to find this engaging. You will find it interesting.

THE COURT: Isn't it the algorithm that is determining which videos to include or not include?

MR. HACKER: That's correct.

THE COURT: Okay. Didn't *Moody* stop short of determining whether an algorithm based upon a user's preference warrants First Amendment protection?

MR. HACKER: Right. So -- so *Moody* stopped short of saying that --

THE COURT: Right.

MR. HACKER: -- because what it emphasized was that we're only dealing with what we discussed earlier, the content --

THE COURT: Correct.

MR. HACKER: -- moderation.

THE COURT: Correct.

MR. HACKER: But it didn't say algorithms are not protected, right? If you just -- if you look at that footnote, it's just saying --

THE COURT: But it did not say that algorithms based on a user's preference would be.

MR. HACKER: It didn't explicitly address that. But what it did say -- this is the critical point -- what it did say, in explaining why content moderation standards are -- are protected, the Court said, here's the rule of law that explains why content moderation standards are protected. It said, here's -- this is straight from *Moody*. Quote, deciding on the third --

THE COURT: What's your pin point?

MR. HACKER: I'm sorry. I don't have the pin point.

THE COURT: Okay. When you say, quote, I like to know --

MR. HACKER: No, you're right. I -- I can ask. We will absolutely provide it after. I promise.

THE COURT: I don't doubt the veracity of the quote.

MR. HACKER: Yeah, you're right.

THE COURT: Go ahead.

MR. HACKER: I should have the -- the pinpoint. But what it says, you'll find it; we can find it for you,

"Deciding on the third-party speech that will be included or excluded from a compilation, and then organizing and presenting the included items, is expressive activity of its own." So that's the rule of law that *Moody* doesn't adopt; it just reaffirms. That here's how the United States Supreme Court defines expressive publishing activity protected by the First Amendment.

The question is, if you are deciding on third-party speech that will be included or excluded from a compilation, and then organizing and presented the included items. That's the rule of law. And then *Moody*, it says -- and here, you know, here we have content moderation, and it fits that definition. So then the next -- although, it doesn't say we're not deciding the algorithm question, the next court that does decide the algorithm question, which was the *MP* court, the Facebook versus_Force_ -- or *Force v. Facebook* in the Second Circuit had already decided that. But other courts, it is then incumbent on them to take the rule of law prescribed for all of us by the Supreme Court and say, well, is this other activity the Court didn't reach -- is it deciding third-party speech that will be included or excluded from a compilation, and then organizing and presenting the included items. Is that what this conduct is?

And you -- just like any case with the rule of



law, you just apply it to new facts. These are those facts. The question here then is: Is the algorithm doing that?

THE COURT: But didn't *Moody* apply the rule of law to the set of facts before it?

MR. HACKER: It did to content moderation. The algorithm was not before the Court; this is my point. And so it just said in the footnote -- I think it was footnote 4 -- we're not reaching that question. It did not say in footnote 4, and Justice Barrett did not say in her concurrence, I have applied the rule to algorithms, and I now hereby declare that algorithms do not do this thing that we just described, right; it just didn't reach the question.

But when another court does reach the question, because the facts are presented, that Court -- and that's this Court in this case, and it was the Fourth Circuit in *MP*, has to decide whether this other set of facts, this other conduct is, to quote again, "deciding on the third-party speech that will be included or excluded, then organizing and presenting the included items". Is it that --

THE COURT: Based upon the platform's preference and not the user -- not that of the user, which is what we have here.



MR. HACKER: Well, to be clear, *Moody* doesn't have that qualification in that sentence when it's describing what is expressive activity. But one can add that qualification. And then you are presented with the question, if you're doing it based on what you predict the user preference to be, is that excluded, does that become non-expressive because your objective is to express yourself in a way that people will find engaging?

I don't think one will find a decision, certainly from the Supreme Court or from anywhere else, other than what Judge Kravitz said in *Meta*, which I just think is fundamentally wrong, that because you're -- to the extent your objective is to express your ways and self in ways the public will find appealing, that's not protected. You need to do something more than that.

THE COURT: Is everything -- and I'm simplifying this -- is everything, all content, with some caveats, included on the platform?

MR. HACKER: Well, there's that separate question about content moderation rules.

THE COURT: Right.

MR. HACKER: So there are certain things that you can't even upload or I don't know --

THE COURT: Right.

MR. HACKER: -- I don't know --



www.escribers.net | 800-257-0885

THE COURT: I know there's some caveats, but -- right.

MR. HACKER: So leaving aside the caveats, the answer is yes. There's a -- there's a universe of content that's created by TikTok users, right --

THE COURT: Okay.

MR. HACKER: -- by the creators. And that's all the things that are out there. And so if you are a -- a viewer, it's just -- it's very much like a -- the music app we were talking about. If you're a viewer or a listener, and you say, I want a video stream or I want a playlist, the app is going to survey effectively the whole universe of content available on the platform, based on various inputs about your preferences, and exclude all of the songs that it predicts you won't like, in this case all of the videos it predicts you won't like, and include only those few from the many, many millions of songs or videos that are out there, for you, the user, because it thinks this is the -- these are the videos, these are the songs that you will find engaging.

THE COURT: So the platform, with caveats of course, allows videos, content on the platform. It then curates this content and creates a load for that -- that's curated for a particular user. Is that how it works?

MR. HACKER: That's -- that's --



THE COURT: Okay.

MR. HACKER: -- very, very accurate. That's what they alleged in paragraph 67.

THE COURT: So is your understanding of TikTok's -- excuse me, of the District's argument, given what I've just said in a very simple way, that the District is challenging what TikTok decides to include or not include on the platform?

MR. HACKER: That is exactly what they're challenging.

THE COURT: That's --

MR. HACKER: I --

THE COURT: -- and -- and I just want to make sure I understand.

MR. HACKER: Yeah.

THE COURT: So your -- your understanding of the argument is that the District is trying to moderate the content by excluding or including certain videos?

MR. HACKER: The only caveat I would have is --

THE COURT: Sure.

MR. HACKER: -- moderate is kind of a term of art. Content moderation. That's what the issue was.

THE COURT: Yes. Content moderation.

MR. HACKER: Yeah.

THE COURT: That's right.

escribers
www.escribers.net | 800-257-0885

MR. HACKER: They're not trying to moderate it and say, you can't have this -- well, maybe they would, but you know, this category of obscene, you know, whatever it might be, conduct. What they're trying to do is change the way the algorithm works so that it doesn't send videos that are -- that keep users scrolling endlessly. This is what paragraph 67 says. That's just one example of their whole allegation, their set of allegations.

Here's what they say in paragraph 72. "TikTok knows that eliminating filter bubbles," remember, that's the trap issue they're talking about. I'll back it up. Paragraph 72 says, "One technique the recommendation engine uses to keep users on the app," that's their whole problem; they don't like us keeping users on the app, "to keep users on the app is by trapping them in filter bubbles or rabbit holes of similar content. These bubbles learn a user's video preferences," we've talked about that, "and then reinforce them by recommending even more and often increasingly extreme versions of those videos," that's what we said earlier, "stringing them together in an endless reel." This is the manner in which they're presented. They don't like that. They want us to display them differently.

"Stringing them together in endless reel, overloading the brain's reward system," this is the



dopamine point, "and making it difficult for users to disengage." Right there. Right there, they're telling you it's the videos that are creating that problem.

THE COURT: Where? Right where?

MR. HACKER: Right -- when they say, "Stringing them," that's the videos, "stringing the videos together in endless reel."

THE COURT: But this -- this -- this paragraph does not identify the type of videos --

MR. HACKER: Right.

THE COURT: -- or the particular kind of content. What I see here is the way in which the algorithm produces the videos, because it creates this dopamine --

MR. HACKER: Yes.

THE COURT: -- effect. And so I don't see in this paragraph what you see, but that's okay.

MR. HACKER: It's okay for us to still be, you know -- I -- I get that, and you are the judge. But -- but again, it's not -- I recognize that their challenge is not to specific videos. It's not that there's this one video is inappropriate, by and large. Their argument, though, is that the problem arises because the algorithm sends an endless stream of videos that -- that users supposedly cannot disengage from.



It's the videos. It's not a slot machine, which isn't speech; it's speech, protected-speech videos that create that so-called dopamine response. And let me just finish the last part of the paragraph, because there's some confidential content there. But then this is the key point to answer your question earlier.

The -- "TikTok knows", they allege, "that eliminating filter bubbles entirely would mean making changes to the core recommendation engine and thus, decreasing the time and attention users give to the platform, so it does not"; that's their allegation.

But that's what they want to happen. Their allegation is that TikTok has unlawfully failed to change its recommendation engine to send different videos that would be less engaging, that would not trigger that dopamine response. It doesn't matter that we're not talking about a specific video content. What does matter is that the algorithm is sending videos they don't want the algorithm to send, because the videos, they say, create this over engagement. And that's the problem as they allege it. But that problem creates an insuperable First Amendment and Section 230 barrier.

THE COURT: Okay.

MR. HACKER: Okay.

THE COURT: Thank you.



MR. HACKER: Thank you.

THE COURT: All right. I'd like to hear from the District as to --

MR. HACKER: Oh, Your Honor? I'm sorry; I'm so sorry.

THE COURT: Yes, sir?

MR. HACKER: I was handed a pin cite to the *Moody* --

THE COURT: Oh, great. What is that?

MR. HACKER: It is 603 U.S. 731 is the -- the pin cite.

THE COURT: Okay. Thank you.

How is the *Grindr* case different than the fact -- how is it distinguishable?

MR. ROCK: Happy to answer that, Your Honor. It's distinguishable both on the unfairness claim and the misrepresentation claim. So when it comes to the TikTok LIVE part, I think that the -- I think that TikTok is misrepresenting what was going on in *Grindr* or -- because there was no money transmission going on in *Grindr*. What the *Grindr* court said was, is that *Grindr* is providing neutral tools for communication, and that communication in and of itself is what is causing the harm here.

Whereas, the District -- yes, TikTok allows communication, but on top of that -- those neutral tools

escribers
www.escribers.net | 800-257-0885

for communication, TikTok is providing a money transmission system, and that is what is causing the harm. The District has alleged that on this communication platform, their -- TikTok is allowing children to come on there and be paid by adults through TikTok's money transmission system to perform sex acts.

That would not be happening without TikTok's money transmission system. That's the difference here. And in *Grindr*, there's no money being exchanged. There was nothing on top of this neutral tools for allowing parties to communicate, and that's the difference there as it relates to TikTok LIVE.

And I think that the *Utah* decision that we submitted that -- I think it just came out Thursday afternoon or Friday, so it's probably relatively fresh for all of us. I think that that court did a good job of getting into the facts of what is actually going on on TikTok LIVE and doing the appropriate analysis there under Section 230.

As far as the -- the failure to warn claim that *Grindr* addressed and TikTok's, you know, making that equivalent to the District's misrepresentation claims and deception claims, here what the difference is, is that the District is not saying that, one, TikTok is making general claims about safety. If the Court looks at the complaint

the District makes, alleges that TikTok has made some very specific allegations about the safety of its platform.

But the real key difference here is that the District has alleged that TikTok itself knows that those statements that are -- that it's making are false because of its own independent knowledge of the harms on the platform. And even in the *Grindr* case, the -- the Ninth Circuit noted that when a platform has independent knowledge of harms, that it could -- that would create a duty to warn in that case.

So even *Grindr* is saying that what the District's allegations are here, that TikTok says one thing while independently knowing another thing, those claims aren't barred by Section 230. It cites -- and for that proposition, it cites internet brands in a more recent case. So I think that both on the TikTok LIVE claim and the --

THE COURT: But there were affirmative statements in Grindr.

MR. ROCK: Absolutely.

THE COURT: Correct?

MR. ROCK: Absolutely. But what the --

THE COURT: More than just the generalized allegations with the District, as you said, and as I understand, the complaint the District is making, more



than general -- the District is alleging that TikTok has made more than general allegations or -- or statements.

MR. ROCK: Yes, Your Honor.

THE COURT: So there were affirmative statements made in the *Grindr* case that led to -- or that the omissions led to misrepresentations. Isn't that what's at issue here?

MR. ROCK: Well, Your Honor, the distinction is, which is the same distinction that Judge Kravitz and all these other courts have found, is that TikTok's own independent knowledge is what is creating the duty here, or what is the -- creating the duty to warn if it's an omission claim. So --

THE COURT: So the distinguishing factor here is that TikTok is aware that the statements are misleading?

MR. ROCK: Yes, Your Honor. And -- and *Grindr* specifically mentions, citing to internet brands, when the platform has independent knowledge of the harms and they do still have a duty to warn and that is not protected by Section 230. And that's what the District has alleged here.

THE COURT: Okay. I'd like to hear from you as to the counts under the MTA (phonetic) Counts IV and V.

MR. ROCK: I'm going to let my colleague handle that.



THE COURT: Oh, okay.

MR. VERMILLION: Good morning, Your Honor.

THE COURT: Good morning. And so the overarching argument is one of judicial economy and showing deference to DISB, which has the primary jurisdiction, according to counsel. So even if we put aside for a moment whether or not there is a formal administrative undertaking, whether there has been any further action since TikTok provided the documents, does it not make judicial -- is it not judicially economical to wait to see if, in fact, TikTok is required to have a license?

MR. VERMILLION: No, no, it's not Your Honor.

THE COURT: Okay. Why not?

MR. VERMILLION: So a couple of reasons for that. One, and let's start with correcting some mistakes that TikTok's counsel made when they were arguing just a moment ago. One is that pointed to a colloquy between Your Honor and I at the last hearing, and said that that was an indication that the District agreed with TikTok's position that it would be judicially economal -- economical, and that was at page 75.

And I was responding at that point to a question from Your Honor about whether or not whatever DISB might do, would it be necessarily binding on this Court. And I



said, no, it's going to depend on whether that's formal or informal or not. And if it's informal, it wouldn't have any more binding effect than the informal advice that was the subject of *Harmon II* (phonetic), which while it didn't concern the same company, did concern the same type of money transmission.

And there, the -- Judge Beryl Howell looked at what DISB had done and said, this is informal, it has no indicia that it was done in a thoughtful way, that all the facts were applied, and so I'm going to -- I'm going to examine this myself. And so the reason it's not judicially economical here is because there is no evidence from TikTok that there is any formal proceeding going on over there at DISB. And because of that, we have no idea what might come out the other side of that. And it may not be binding at all on Your Honor.

What we do have here, though -- and I want to talk about the *Savoy* case for a second. But what we do have here, though, is the Office of Attorney General, having conducted its own investigation, dragged information out of TikTok, and then the Office of Attorney General examined the law, which clearly says you can't engage in unlicensed money transmission in the District, and concluded that law was being violated and bringing its own enforcement action after its own investigation, which

took some time, and is here in front of Your Honor, pressing that claim.

And it's not a -- this is not a simple bookkeeping claim either when you tie the money transmission with the District's unfairness claim as to TikTok LIVE. This is an important case that's about whether or not TikTok is currently engaged in what could be illegal money transmission that is also facilitating the sexual exploitation of children.

And so it's not judicially economical because we don't know what DISB will do. We don't know when DISB will do it. And we don't know that whatever DISB will do, will it be the outcome of a formal administrative proceeding, such that it is -- is in any way useful to this Court.

The better course of action is to proceed on with this case now, including these claims. And part of that is because the discovery that would go to some of the other pieces of this case would also be relevant to the money transmission claims, even if those weren't in there. And so nothing is really saved by -- by stating that part of the case.

And then the final thing I want to talk about for a second is the *Savoy* case. Your Honor asked TikTok, is there anything in the text of the money transmission

escribers
www.escribers.net | 800-257-0885

statute that requires a stay. And the answer had to be no, there's not, because there isn't. Then, they pointed to the *Savoy* case. The *Savoy* case actually involved parallel administrative and Superior Court enforcement. That was a contract dispute between the District and a construction company.

The construction company -- the District was paying under the contract. The construction company first filed an appeal with the Contract Appeals Board. So there was first an administrative proceeding happening, and then the construction company filed a suit against the District in Superior Court. And the District asked several times for the Superior Court to stay that case while the administrative process played out in front of the Contract Appeals Board, and the Superior Court refused to do that. And the Court of Appeals on appeal said there was no error in that stay. The proceeding in front of the Superior Court could proceed right on.

And so you know, TikTok points to that case for some principle about a stay in judicial economy. But when you actually look at what happened in that case is the Superior Court declined to stay the contract action in front of it in Superior Court while the Contract Appeals Board process played out.

THE COURT: Okay. I don't have any further

questions for the District.

MR. VERMILLION: Great. Thank you, Your Honor.

THE COURT: Thank you.

MR. VERMILLION: And I would -- I would just note, too, as I see TikTok coming back up here. There has been a real imbalance in the time between the parties here. And so I would like -- if there's going to be more said, Your Honor, ask a question to TikTok --

THE COURT: I said I don't have any further questions. I didn't tell you that you couldn't make any further argument.

MR. VERMILLION: Yes. Thank you, Your Honor.

THE COURT: You're welcome.

UNIDENTIFIED SPEAKER: I would just -- as the moving party, just a very short rebuttal.

THE COURT: Okay.

MR. HACKER: Your Honor had a lot of questions. I'm very happy to answer them. But just on the -- the couple points of Grindr. They point out there was not a money transmission claim. I never said to the contrary. There -- there wasn't a money transmission there. I did point out that the fact that one has to pay for, you know, a coin in order to make the speech doesn't make it less speech, doesn't make it less publishing. It's just paying for the opportunity to communicate with the users is not a



material difference.

Again, they point out there's not a money transmission claim there. That's a different problem that's addressed by a different set of counts, Counts IV and V. It doesn't distinguish *Grindr* in the relevant sense.

And then finally, there's this question about whether the failure to warn claims and the representation that the platform is safe, there absolutely were representations like that in *Grindr*. When we say they're -- they're only challenging general allegations of safety, I'm not saying they don't identify specific statements in the complaint that say that the platform is safe. What I'm saying is they don't identify specific promises about specific things. That's what *Grindr* is distinguishing. Sure, there are various -- a few paragraphs that talk about statements in the community guidelines and some public statements about the safety of the platform. But again, they're -- those specific statements are general claims about the safety of the platform. And that's what *Grindr* says is impermissible and other cases.

It -- the District points out that *Grindr* refers to the independent knowledge of harm. I think that's an incredibly important point, because what *Grindr* is talking



about is when you have -- and that's exactly the point I was making earlier -- it's when you have a specific threat from a third-party that you know about, then you might have a duty to do something about the specific threat from third parties -- information about a conspiracy from third parties.

Here's how the court distinguishes internet brands, the very case that counsel cites. Rather, the plaintiff faulted the defendant for, quote, "failing to warn her about information it obtained from an outside source". That's -- the outside source is critical there. Here, the claim that it's safe by counsel's own representation is that TikTok, you know, knows the design elements are addictive, and yet, it says it's safe. That's just another way of saying -- of challenging whether or not the design elements cause that -- that addiction harm.

And then on the DISB point, just a couple of points there, Your Honor. Counsel seemed to be upset that I was quoting what he said in Transcript 70, page 75, but all I was pointing out is what he said, that the DISB answer depends on what he just said again. Whether it's formal or informal as to whether or not it will affect this Court's jurisdiction. Again, all I can say is we agree with that. I didn't mean to accuse them of just

flat agreeing with everything we had to say, but I am making the point that they agree that it really matters what DISB has to say. And of course it does.

And our submission is that we can and should await for DISB to do the job that DISB says it is doing. That doesn't mean we have to stay the case indefinitely and forever. Of course, the Court, the parties can reconvene at some point if and when we obtain more information about what the DISB -- what is happening in the DISB process.

Counsel says that this case is different because while the Attorney General examined the law, it's bringing its own enforcement action, and two arguments that we've had thus far in briefing in this case, the District has yet to identify where in Section 1021 it has the authority to do more than collect amounts owing. It just assumes this is like the three-tier enforcement scheme from other cases. And again, counsel has no answer to the point that the very other examples they cite explicitly confer broad enforcement authority on the Attorney General, and this statutory scheme just does not do that.

At a minimum, that confirms that the DISB jurisdiction, here it is, is primary. I think that's also the reason that it doesn't matter that in *Savoy* itself, there was a parallel proceeding going on. The principle

remains the same, which is just one of judicial modesty. It's just urging courts to stay their hand when another agency is doing the job a statute tells the agency to do.

There's no reason to jump ahead in this case and proceed unless and until we get an answer from DISB. Thank you.

THE COURT: Okay. Thank you. We'll just take a short recess. When I return, I will give my ruling on the record. Okay, thanks.

(Recess from 11:26 a.m. until 12:07 p.m.)

THE DEPUTY CLERK: Calling the matter of District of Columbia versus TikTok, Inc., 2024 CAB 6377.

All parties are present.

**FINDINGS OF THE COURT**

THE COURT: Okay. The Court has had an opportunity to consider the oral argument of counsel, as well as the briefing in this matter, and took an opportunity during the short recess to review some of the cases that relied upon at today's oral argument and the Court is ready to rule.

So of course, at the outset, the Court is guided by the 12(b)(6) standard. And dismissal under this standard is warranted where the complaint fails to allege the elements of a legally viable claim. And in deciding a Rule 12(b)(6) motion, the Court must accept all of the



allegations in the complaint as true here, must accept the allegations as alleged by the District in its complaint as true, and construe all inferences in favor of the District.

So to survive a motion to dismiss, a claim must have facial plausibility. That simply means factual content that allows the Court to draw inferences, or to draw the reasonable inference that the defendant, here TikTok, is liable for the alleged misconduct. And so guided by that broad framework, the first question the Court must consider is whether Section 230 of the Communications Decency Act, what we've been referring to as the CDA, bars Counts I through III of the complaint.

So the CDA, the Act, which was enacted in 1996, contains provisions that increases the penalties for conduct, for indecent conduct, harassing conduct, obscene conduct, and other wrongful uses of telecommunications by persons who knowingly or intentionally created said prohibited messages, or otherwise used communications in a harmful way. To harm others, in fact.

And the statute, which has been the subject of a lot of our conversations, includes an immunity clause and an immunity provision which is intended to exclude from liability, telecommunications and information service providers and system operators who are not themselves

knowing participants in the making of, or otherwise responsible for the content of the prohibited communications.

And the immunity provisions are codified in Section 230, what has been called or referred to as Section 230 immunity. In that section, in subsection (C)(1) says that, "No provider or user of an interactive computer service shall be treated" -- excuse me -- "as the publisher or speaker of any information provided by another information" contact -- or "content provider."

Further along in the statute in subsection (E)(3), the statute says that, "No cause of action may be brought and no liability may be imposed under any state or local law that is inconsistent with this section." And so when one combines these two provisions, they provide immunity for telecommunications and information service providers and systems operators that seek to treat them as publishers of information provided by other content providers.

It seems, at least from this record, that both parties agree that the decision in the *Barnes* case, *Barnes v. Yahoo*, which comes from our Ninth Circuit in 2009, sets forth the proper analytical framework for determining whether this Section 230 immunity applies at any given set of circumstances. And so *Barnes* creates a test, a three-

part test, holding that Section 230 immunizes from liability: one, a provider or user of an interactive computer service; two, whom a plaintiff seeks to treat under a state law -- state cause of action as a publisher or speaker; or three, of information provided by another information content provider.

Now, with respects to all count, there does not seem to be dispute in this record, that the first *Barnes* element is satisfied here, namely that TikTok is a provider of interactive computer services. As to the second opinion, there's been some discussion in the briefings by the parties and at oral argument related to Judge Kravitz's decision in *Meta*, the 2023 case. I think it's 2023 CAP 6550, I believe. And the Court agrees with Judge Kravitz on this issue, and that is that whether or not the defendant is attempting to -- or whether the plaintiff -- excuse me -- is attempting to treat TikTok as a publisher is really a close question and it need not be resolved now at the pleading stage, as the Court finds that the third prong of the test, namely whether the District is or has sought to treat TikTok as the publisher of third-party content is sufficiently established on the record.

And so looking at each of the counts, starting with Count I, of course we know Count I alleges these



www.escribers.net | 800-257-0885

addictive design features such as the recommendation engine, the infinite scroll, the push notifications, the filters, the coins. And which do not, according to the District, involve traditional publishing activity like reviewing, editing, and deciding whether to publish or withdraw from publication third-party content.

Their recommendation engine, which has been referred to the algorithm, the District alleges that the platform uses this algorithm to provide content recommended for each user. This algorithm then curates a personalized video stream and facilitates excessive platform use. This is going to take me quite a few minutes to get through this and so just be ready, okay?

It'll probably take me about three hours. I am joking. It won't take me that long. So the District is not seeking to ascribe liability on TikTok because of the content that is produced by the algorithm. This is the District's argument. The District is contending instead that TikTok is liable for this anticipation of dopamine.

These dopamine hits, again, akin to the slot machine that the Court mentioned during our earlier colloquy with TikTok's attorney. And that this anticipation of dopamine, which the algorithm is designed to provide as a reward, is the issue. And so the addiction is not to the content, but to this expectation

and anticipation which is specifically engineered by the algorithm as an ultimate goal of the engine.

And that's in paragraph 70 of the District's complaint. And the ultimate goal is, in disrupting what has been termed this habit loop, this cue routine and reward. And so that is the loop that causes disruption and harm. And so the engine, according to the District, is designed to give young users immediate gratification and boosts rewards, encouraging this excessive routine use of the app.

Next, there's the infinite scroll. And this is described as a function that allows new videos to automatically and constantly load each time a user watches a third-party generated video. That comes from paragraph 77 of the complaint. And this design element is -- it facilitates extended use by users of the platform and the same content, displayed another way, would not have this effect.

So the District is not seeking liability against TikTok and accepting the allegations as true, as the Court must at this juncture, for publishing third-party content. So what is the Court saying? It is not about the content; it's about the ease of the access to the content, which was -- undergirded the colloquy the Court had at the onset with TikTok's attorney.

The push notification. So here, the District challenges the use of these push notifications to alert new users, or to alert to new messages -- excuse me -- to provide updates and to suggest new videos, which according to the District, entices users to reopen the app. This is at paragraph 82.

Advertising the content on the app or trying to entice users, as the District alleges, to open this app back up. The Court finds, based upon the allegations, it's not third-party content. It is not about the content, but indeed, it's about TikTok's own actions here. Same is true for the filters. The District alleges that the filters and the effects, with which the platform users can edit their content, are unsafe for users because one can't -- a user can alter their appearance. That's in paragraph 86.

The decision to apply filters to users' content without consent, or even to supply them at all, is TikTok's decision. It's not a decision of the user. And so again, it's not about the content, it's about what TikTok affirmatively provides to users, and that it is done automatically.

TikTok LIVE. Well, according to the District, this feature permits users to use these virtual coins to purchase virtual gifts, which they can then use to express



appreciation to other users for their content. And these gifts allegedly function like social recognition of reward signal, similar to likes on other social media application. And so the District's claims, the Court finds, are not seeking liability for the content, which is on TikTok LIVE; but for TikTok's decision, its own decision, to combine this live feature with this digital coin to create monetary incentives in live streaming, which introduces a variable reward that the Court mentioned, which is effective in changing or driving predicted behavior or even changes in behavior. That's in paragraph 97.

And so Count I is not challenging TikTok's content moderation policies, which counsel argued today are achieved through the algorithm, but how TikTok promotes and displays the content that it has already approved for the app to keep children addicted. And so going back to this line, whether users are watching porn or puppies -- not this judge's words -- the claim is not that they are harmed by the time spent, not by what they are -- they are harmed by the time spent and not what they are seeing. That comes from the *D.C. v. Meta* case.

So as to Count II, the complaint states in paragraph 211, "That TikTok has had an understanding of the increased risk of fraud and other criminal activity,"

escribers
www.escribers.net | 800-257-0885

and that it created -- "and it was created by" adding -- "combining this live streaming feature with a virtual monetary system in TikTok LIVE."

Paragraph 212 discusses TikTok's failures to take measures to mitigate the risk of fraud, sexual exploitation, and financial harm that LIVE creates. It has maintained the design -- according to the District, it has maintained these design features that create these risks. And they have -- TikTok has failed to implement compliance programs common for the industry and required under federal law.

And so Count II seeks to hold TikTok liable for its own conduct, which has been characterized as the District as brokering this illegal -- or brokering unlawful transactions through its live streaming features. And so the District seeks liability, as the Court understands and accepts as true, for TikTok's decision, its own decision, to combine this live streaming function with the monetary function because TikTok knows that the combination facilitates unlawful or illegal activities.

And so the District is not suing TikTok for accountability for the fraud, sexual exploitation of minors which has been alleged by the District and alleged to be occurring online. But it's suing TikTok for facilitating these transactions, acting as the conduit, if

you will, by providing the platform which makes them possible.

Certainly, the CDA does not protect brokering illegal transactions online as alleged in the complaint. In fact, the courts have refused to extend the CDA immunity to online platforms that sound -- and this has been discussed; it was mentioned in the briefing. The particular cases, I believe it were -- it was virtual casino chips for legal gambling or these short-term rental transactions for unregistered properties in violation of ordinances.

And this comes from the *In re: Apple* case, the *In re: Facebook's* simulated casino style games case, and many cases cited by the parties in their briefings. And so the Court agrees with the plaintiff here, that Counts I and II do not arise from third-party content, and in fact, are rather content neutral.

As the addictive features, not the content that is being pushed, is responsible for the harms alleged, and the courts have held that where the claim does not depend on publishing or speaking, Section 23(C), which creates this immunity that TikTok seeks, becomes irrelevant and the Court agrees.

As to Count III, the concern, as I understand it, is related to allegations about statements made that



were explicitly or implicitly misleading about the safety of the platform. And so for example, in the complaint, paragraph 221, the District alleges that TikTok claims it is deeply committed to being a safe and positive experience for people under the age of 18 when, according to the District, and the Court accepts it as true, that District -- that TikTok knows it is profiting from the sexual exploitation of minors. The Court disagrees with TikTok that these statements are puffery. This was not the subject of our argument today. It was such a part, just a little, at the last motion hearing. But it was certainly briefed in the papers.

And so the Court disagrees with TikTok that these statements are puffery, are not actionable because their truth or falsity, as TikTok alleges, cannot be precisely determined. Count III seeks to hold TikTok liable for its own statements and not for anyone else's. And so that means, according to the District and the Court agrees, that TikTok could satisfy its duty under the CPPA by avoiding the misrepresentations or the misleading omissions without reviewing, editing, or withdrawing any third-party content on its application.

The Court took a look at the -- the *Demetri v. Yelp* case. It's a 2014 case. In there, a plaintiff alleged that Yelp, an online publisher of business



reviews, falsely advertised that reviews passed through a filter, ultimately providing consumers with the most trusted reviews.

The Court found that the CDA did not apply because the plaintiff target Yelp's own statements regarding the accuracy of its filter, not the third-party reviews themselves. That is what's happening here. And so the District is not seeking to hold TikTok accountable as a publisher of harmful conduct -- or content, excuse me. The District is seeking liability for the alleged affirmative statements and omissions, which tend to mislead users and their parents into thinking that the platform is safe for children, when TikTok knows that it in fact is not.

AS the plaintiff notes in the briefing, not argued orally, the protections of the CDA cannot become part of a per se test. That is, that where an entity publishes other people's views, they are automatically insulated from all suits. And where the claim does not depend on publishing or speaking, Section 2030(C) of the CDA is irrelevant. And therefore, the CDA does not provide immunity to TikTok in this matter, and dismissal is not warranted under this theory.

The second question then becomes whether or not Counts I through III should be dismissed on First



Amendment grounds. Now, of course the First Amendment protects a platform from when it compiles the third-party speech it wants in the way that it wants, and thus offering this expressive conduct or this expressive product, I think is what *Moody* says, which most reflects its own views and priorities. Of course, it's the *Moody v. Net Choice* case from 2024.

In a variety of context, the Supreme Court has afforded First Amendment protection to the editorial function itself. And TikTok listed a host of cases that stand for this proposition. The Court's decision -- the Court's decisions prohibiting the Government from requiring newspapers to afford a right to reply -- I think that's the *Miami Herald* case. There's other cases where entities were prevented from forcing a company to offer a forum for alternative viewpoints and a newsletter, or from compelling parade organizers to include a group that advocates a different message. I believe that comes from -- the latter comes from the *Hurley* case, and so that's clear in this record. It's certainly clear in this jurisdiction.

So looking at Count I, II, and III in particular, relying on *Moody* as done in the briefings and as done today, TikTok argues that the challenge design features each involved the platform's method of displaying

content. And these features are -- help TikTok exercise its traditional publishing and editing discretion to select and shape other parties' expression into its own curated speech products. Now, while *Moody v. Net Choice* -- while the Court agrees that it is in fact quite informative, it doesn't warrant dismissal here of Counts I, II, or III.

As the Court mentioned, during its colloquy with Counsel, *Moody* specifically considered state action which sought to regulate the content which online platforms removed or deprioritize. These regulations were squarely on the basis in *Moody* of the content published, and implicated the online platform's First Amendment rights because the platform has the right to select, based upon its own preferences, the content which it publishes.

And so what's important here is that in *Moody*, the Supreme Court stated, and without resorting to recollection, "We therefore do not deal here with the feeds whose algorithms respond solely to help users act online, giving them the content they appear to want without any regard to independent content standards." And that's at 2401; that's in note 5, I believe. And so the Court -- as the Court mentioned, during its colloquy, clearly stopped short of determining whether an algorithm based on the user's preferences warrants similar First

escribers

www.escribers.net | 800-257-0885

Amendment preferences. Now here, the District claims are content-neutral.

The recommendation engine -- while the Supreme Court has only found an algorithm to be -- and this is what we're talking about when we're speaking of the recommendation engine, the algorithm. So the Supreme Court has only found an algorithm to be worthy of First Amendment protection where it's creating some kind of a message on its operator's behalf.

And although TikTok's message, as counsel stated during argument, need not be clear or cognizable, even articulate, it must in fact be its own message. Here, it is that of the users, based upon the allegations in the complaint. In terms of infinite scroll, TikTok is not on this record at this juncture, expressing any message by allowing its users to continue to scroll from one video to the next without having to search or select a video.

The push notifications. Well, the District's allegations are not simply about the use of the notifications all together, as the Court understands them, but about the use of the notifications and the way that is going to be harmful to children, i.e. sending notifications during the school day, at all hours of the night, and inhibiting their sleep and focus in school.

Such allegations are not about the content of



the advertisement or even a type of advertisement being pushed by these notifications, but the manner in which these notifications or these advertisements are transmitted. And so TikTok on this record, at this juncture, simply cannot be said to be expressing a message by sending these notifications to children during these hours. And the fact that the app could transmit these same notifications at other hours is indicative of the fact that speech here is simply not at issue.

Filters. Well, TikTok, on this record at this juncture has not shown that it's expressing any message by providing filters for its users to use. The coins, well, as the Court understands it, based upon the District's pleading, it provides the opportunity for users to engage in financial transactions. This is not speech. Even if it were, the Court would apply the intermediate scrutiny standard. And of course, that standard must be applied when a statute implicates expression, but it's content neutral. And that comes from a whole host of Supreme Court cases. The *Turner Broad Systems* (phonetic) case, the *Creative LLC* case, *United States v. O'Brien, Runsfield v. Form*, et cetera.

And so here, the Court finds that the CPA is content-neutral. It's a content-neutral statute focused on the protection of consumers. Here, the focus is that

of children consumers. And the District's interests in prosecuting the claims, its claims is to protect these children, these users, from the significant harms of these addictive features, and the District's interests has nothing to do with the content based upon this record.

Count II. Well, although liking, briefly -- this wasn't argued but this was certainly discussed -- which could be likened to paying based upon approval or appreciation, has been understood to be an expressive activity. That comes from the *Bland* case, *Bland v. Roberts*. It was deep and expressive activity of the person liking the post, not the entity which provided the platform. It was the conduit on which the individual liked the post.

Count III. Contrary to TikTok's argument, the District, based upon the pleadings which the Court must accept as true, is not seeking an order requiring TikTok to regulate the content on its app in a manner more consistent with the stated policies. Any such allegations of the complaint are simply indicators of the fact that TikTok knew that the content at issue did not comport the policies it itself publicly expressed.

And so rather, as the Court understands it and as supported by the allegations of the complaint, the District contends that the public statements made in

omissions were meant to mislead users in violating -- in violation rather, of the CPPA.

Now, *Meta Platforms v. D.C.* and this was cited by the District. And this is 301, Atlantic 740. It's a 2023 case. This was cited by the District, I believe, in opposition regarding the compelled speech question. It's in the record in some place. But the District says that it's investigating only whether -- in that case, whether Meta's representations regarding efforts to prevent and remove vaccine information from the Facebook platform, violates the consumer protection statute, the CPPA. And there was no suggestion -- this is from the *Meta* case, that the District is investigating whether Meta's moderation policies or efforts to police them were unlawful or insufficient in themselves, except to the extent that they belie Meta's representations. The Court finds this to be persuasive and akin to and similar to the issues that the Court is faced with in this case.

Now, there was some mention about whether or not it is considered compelled speech to give warnings. This was briefed in the pleadings. While this case is different, from this Court's perspective, from the cases that TikTok cites, one of one of them is the *Olivia v. National Board* case, I believe, and that is because the District is not seeking warnings to prevent copycat

behaviors, not seeking tort liability for copycat behavior on a failure to warn theory, or even, as the Court understands the allegations, to hold TikTok accountable for the content which it publishes or pushes. But the District is alleging that the user, the parents are simply unaware of the potential risk of the platform and further misled by TikTok's assertions that everything on the platform is child safe.

In addition to these affirmative statements made by TikTok, according to the District, the admissions are misleading. These include failing to inform children and parents about the risk that children will encounter extensive harmful material on the app, the risk that children will encounter or be coerced into sexually exploitative activities on TikTok, the risk that children will be taken advantage of financially by live gifting, TikTok's use of coercive features and design tactics that limit user agency, particularly that of children. This is all found in paragraph 222 of the complaint.

So the affirmative statements make the omissions misleading here is what the District is alleging. The plaintiff, the District cites to *Earth Island*, among many other cases, to support this proposition, and that case says that the First Amendment does not prohibit the state from ensuring that the stream of commercial information

flow cleanly as well as freely. And the speech that *Earth Island* targets is Coca-Cola's commercial speech about its goods and services. It was alleged in that case that Coca-Cola cultivated a sustainability narrative in an effort to sell its particular products, and because *Earth Island* plausibly alleges that commercial speech would mislead reasonable consumers, the court found that Coca-Cola's First Amendment claim was a nonstarter.

The Court finds the same is true here. And contrary to the issue cited by TikTok on these issues, one of them was the Wisconsin case, the *Democratic Party of the United States v. Wisconsin*. It's a 1981 case. The District is not expressing approval or disapproval over a particular expression that it deems unwise or irrational, which is the subject of that *Wisconsin* case.

Additionally, TikTok cites to the *Thomas v. Review Board of Indiana*. This is in the Employment Service Division. I believe this was a 1981 case, as well, from our Supreme Court. And TikTok cites to this for the proposition that, like religious expression, expressive activity need not be acceptable, logical, consistent, or comprehensive to others in order to merit First Amendment protections. But this case dealt exclusively with religious expression, stating that the state cannot deny the free exercise of rights based on

escribers
www.escribers.net | 800-257-0885

which beliefs it deems sensible.

From the case law that TikTok cites, it is clear that a speaker need not have a clear message in order to warrant First Amendment protection, but that they must have a message based upon their own interest and their viewpoint nonetheless. The record does not demonstrate at this juncture that TikTok, in fact, has a viewpoint or a message here. Even in TikTok's example of a book publisher making decisions based upon readership, such function is still rooted, it's undergirded, supported by a decision to publish or not to publish, indicating some sort of opinion as to the relevance of the book in the current climate.

TikTok's features, specifically the algorithm, publishes everything and sorts it depending on the preference of the reader and creates this curated load or this package for the particular reader. Such actions do not express any kind of view of the content on behalf of TikTok.

Therefore, the Court finds that the First Amendment affords no protection from liability for TikTok at this stage.

So this brings us to the claims under the CPPA and whether or not the District has stated a claim under the CPPA. The CPPA establishes an enforceable right to



what has been deemed truthful information from merchants about consumer goods or services that would be purchased, leased, or received in the District. And this jurisdiction and many others have found or opined that the CPPA is to be construed liberally and applied liberally to promote its purpose. And so even despite the intended breadth of the end reach of the CPPA, it certainly is not limited. And by its own express terms, and as relevant here, the CPPA applies to trade practices only to the extent that they relate to the sale, the transfer, or the lease of consumer goods and services.

In the *DC v. Meta* case, the 2024 case, the Court found that users were exchange -- Judge Kravitz found that users were exchanging their time and their data for use of the platform, and that such exchange was a transfer under the CPPA. At this pleading stage, the Court agrees. Judge Kravitz, in his opinion, opined that the CPPA defined the -- well, it's not his opinion. He looked at the definition of the CPPA and pointed out that consumer is defined as a person who, other than for purposes of resale, does or would purchase, lease, or receive consumer goods or services, and that this inclusion of the term receive in addition to purchase, according to Judge Kravitz, and lease, and the definition of consumer, strongly suggests the intent of our legislator to cover

escribers
www.escribers.net | 800-257-0885

circumstances in which a person receives goods or services free of charge in return for something of value other than a direct monetary payment.

The Court agrees at this juncture, but finds that whether or not the app is indeed free has not been conclusively established, but it does not have to be at the pleading stage, as the Court must accept the allegations in the complaint as true.

Well, what about the unfair practices under the CPPA? The CPPA does not expressly require a showing of substantial injury and understanding or construing the term unfair or deceptive trade practice. And due consideration must be given to interpretations by our Federal Trade Commission and the federal courts of the term unfair act or deceptive practice in the FTC. And so the FTC, in turn, provides that it, the FTC, may not declare unlawful any act or practice on the grounds that such act or practice is unfair, unless the act or practice causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable, which is important here, by consumers themselves and not outweighed by countervailing benefits to consumers or competition.

The FTC has determined that ordinarily emotional impact and other more subjective types of harms as how it's been characterized would not make a practice unfair.

escribers
www.escribers.net | 800-257-0885

And that can be seen in the *FTC* case coming from our circuit in 1985. *Financial Services Association v. FTC*. Monetary harm, however, is not always a necessary component of substantial injury. The FTC determined in In re *International Harvester Company*, it's a 1984 case, that farm equipment caused substantial injury where the design -- in that case, a design flaw led to severe burns and resulting in mobility limitations. I believe there was lasting psychological harm and severe disfigurement.

Well, the FTC in that case held the health risk caused by the equipment, rather than any monetary injury, supported a finding of substantial injury, explaining that unwarranted health and safety risks may also support a finding of unfairness. In order for there to be an unfair practice, the case law is very clear that the practice must cause or is likely to cause injury, substantial injury to consumers, which is not reasonably avoidable and not outweighed by other benefits.

And so coming to the issue of free and informed choice, a topic that was discussed today during oral argument, as the Court mentioned, the Court is not entirely conclusive on whether or not the monetization of TikTok LIVE means that the app is not free. The complaint certainly alleges that TikTok is not free and thus involved consumer sales under the CPPA. And that's

escribers
www.escribers.net | 800-257-0885

because, according to the District, TikTok earns money. And I don't think this is disputed by TikTok, that it earns monetary commissions from in-app purchases and from the transmission of money between live users through their virtual coins and gifts.

The District alleges that young consumers did not have a free and informed choice to use TikTok, as they were misled into thinking that the platform was safe and that once users joined the app, TikTok's addictive features, which we've discussed at length, exploit their neurological vulnerabilities to keep them engaged, to keep them in this loop, and consumers cannot reasonably avoid these unfair practices, just as TikTok intended.

Also, the fact that these issues have been reported on other -- and have been reported on and that other social media sites which are similar allegedly have similar deficiencies is simply insufficient here to overcome the 12(b)(6) standard.

Well, what about the deceptive practices? As it relates to misrepresentations, again, under the CPPA, the District's complaint alleges that there are misrepresentations of provably false statements, like TikTok is safe from children. Well, this is a distinction here when discussing or considering puffery, which has been unfavored in this jurisdiction and others. While

some of TikTok's language, as TikTok argued in its briefing, could indicate an aspiration for safety, Plaintiff alleges that even this aspiration was false, because TikTok knew that these harmful effects were occurring and chose to do nothing at least sufficient. The Court finds this allegation sufficient to survive this 12(b)(6) motion.

And so there's other sufficient allegations here that create a plausible claim which must be present in the record. I'll name a few. So contrary to TikTok community guidelines, which claim that TikTok is deeply committed to being a safe and positive experience for minors, TikTok internally admitted that its features are causing severe psychological harm. This is in the complaint, paragraphs 88 and 116. This is, again, the District's allegation that contrary to TikTok's claims from its CEO, TikTok has clear community guidelines and that executives do not make any ad hoc decisions to deal with bad actors. TikTok acknowledged leaks in their moderation tools due to existing policy gaps and under-moderation, which exposes users' children to harm and discomfort. This is found in paragraphs 118 and 211. Or excuse me, 121 of the complaint.

Zero tolerance policy. There was discussion about that in the briefings. TikTok publicly promotes



www.escribers.net | 800-257-0885

that the company knows moderation quality is low across several, or excuse me, contrary to the zero tolerance policy TikTok publicly promotes. TikTok knows moderation quality is low across several policy categories, including sexual abuse, minors, sexual solicitation, so on and so forth. And this is found at the complaint, paragraphs 123 to 124, 129, and 136.

And so the Court finds that the claims at this juncture, and accepting all of the allegations in the complaint are true, do provide or do have facial plausibility such that 12(b)(6) shall not defeat the plaintiff's claims at this time.

Let me mention quickly the 9(b) standard. There was an argument that the 9(b) standard is applicable for frauds. And of course 9(b) anticipates a higher pleading standard. One has to plead with particularity when making allegations of fraud. The District, or excuse me, TikTok, contends that that standard is applicable here. Well, the Court agrees with Judge Kravitz in his opinion, looking at the *Frank Kinney v. District Hospital Partners* (phonetic) case. It's a binding Court of Appeals case from our jurisdiction, a 2020 case, that this case indicates that the CPPA was created to avoid these pleading requirements and traditional fraud causes of action to make it easier for litigants who believe they have been harmed by

escribers
www.escribers.net | 800-257-0885

particular practices to sue under the CPPA, including the intent to deceive, and that the Rule 9(b)'s purpose is to put the defendant on proper notice of the allegedly fraudulent statements.

Let me talk quickly about the *Grindr* case. We had some discussion about *Grindr*. The Court took another look at it during the short recess. TikTok, as I understand it, uses *Grindr* in relation to two main points. One is that the Court held that targeting speech between users on the app violates the immunity provision of the CDA, Section 230. And two, that statements must be targeted to specific issues of safety to shed CDA 230 liability on the misrepresentation theory.

Well, regarding the first issue, as the Court understands it, *Grindr* considered a more removed harmful activity, namely speech between users that could lead to illegal activity. In *Grindr* there was speech between users, which led, unfortunately, to a rape in the real world outside of the application. Here, in alleging a harm and illegal financial transactions themselves, such as paying for sexual acts of minors or in perpetuating a fraud, there is a clear difference. The Court agrees with the argument made by the District's attorney.

So while TikTok alleges that sending financial gifts is akin to likes, that may be the case if the

transactions themselves were not illegal as alleged by the District. Moreover, relating to the misrepresentation theory in *Grindr,* the affirmative statements focused on in *Grindr*, the Court asked counsel whether or not there were affirmative statements in *Grindr*. Counsel said, oh, yes, there are. Well, the affirmative statements in *Grindr* that were focused on was that the app was designed to create a safe and secure environment for its users. It's not a -- it's not a specific promise, as TikTok noted, but a description of its moderation policies.

Here, the statements alleged by the District are much more specific promises. The Court went over some of the statements enumerated by the District in its complaint earlier, but as it relates to why the Court believes the statements here are much more specific, the Court took a look at some of those statements.

So for example, the District argues that TikTok worked to address -- TikTok has stated that it worked to address issues with its recommendation engine, including filter bubbles, as early as 2020. TikTok's policies are strict and apply to everyone and everything. TikTok prohibits content about bullying, drugs, mature themes, disordered eating and weight loss, suicide and self-harm, and content that exploits children. TikTok identifies and proactively removes content that violates these policies.

These statements are much more specific than those that the Court contemplated in *Grindr*. And even a statement that TikTok LIVE or any part of TikTok is safe is more specific than the aspirational claim and *Grindr* describing, as the Court understands, what *Grindr* strives to do or what the policy is designed to do. The sorts of statements the District is considering are specific representations as to what TikTok is actually doing today.

And so based on the foregoing, the CPPA claims survive.

Now lastly, moving to Counts IV and V, which are the claims under the MTA, the Court agrees with the District that the MTA creates and what the District has described as an overlapping enforcement regimen whereby DISB may institute an administrative cease and desist proceeding pursuant to D.C. Code 26-1022(a), and that under the MTA, the civil enforcement provisions, the Office of the Attorney General has the power to bring proceedings to recover all amounts due to the District under the civil penalty provision.

Nothing in the statute, and counsel was candid when the Court inquired on this issue, nothing in the statute requires the civil enforcement to stay the proceeding, or requires this Court to stay the proceedings while DISB makes a determination.

escribers
www.escribers.net | 800-257-0885

And there was talk about the *Harmon* case and how perhaps this was a bit different. The Court disagrees. In *Harmon*, the USAO indicted a defendant under a section of the MTA. I think it was 26-102(c) of the MTA for engaging in unlicensed money transmission acts by trading virtual currency in the District, even though at the time of the indictment DISB had never determined that the defendant needed a license, and so the defendant and *Harmon* sought reconsideration based upon DISB's view of the MTA's application of the situation. But the Court concluded that the letter was only an informal opinion about the status of a single company and did not purport to express broader principles about the application of the MTA contained flawed and abbreviated research and reasoning, and at the end of the day, it refused to dismiss the indictment, relying upon its own construction of the MTA licensing requirements.

There is no dispute in this record that TikTok does not have a license under the MTA. This undergirds both counts. For this reason alone, the claims have facial plausibility here. Even so the defendants have not presided or have not presented, excuse me, viable arguments as to the merits, only that the Court should hold off until the administrative process concludes. But the Court is simply not convinced that it should,

escribers
www.escribers.net | 800-257-0885

especially considering that DISB's inquiry, at whatever stage it finds itself, does not preclude this Court's judicial review.

There was some conversation today by counsel for TikTok about primary jurisdiction, and the primary jurisdiction doctrine applies whenever enforcement of a claim requires the resolution of the issues under which, under a particular regulatory scheme, have been placed within the special competence of an administrative body. This comes from the *Lawlor* (phonetic) case and its progeny. And the doctrine is really grounded in the teaching that cases that raise an issue of fact, not within the conventional wisdom of the finder of fact or judges, should be left to the discretion of administrative agencies, and that the administrative agency should not be passed over, akin to the arguments made by counsel during oral argument.

Well, number one, the Court can make a determination as to whether or not the MTA has been violated. It's not without the conventional experience or wisdom of the Court, because either one has a license or they don't. And here, there is no license in the record, or there's no indication that TikTok has a license, and TikTok has not produced any evidence that DISB engaged in any formal administrative action against it that could

even ripen, rather, attach an informal inquiry from DISB.

The Court does acknowledge that the November 6th, 2024 letter does indicate that TikTok may be or that the Department has concerns related to TikTok engaging in certain money transaction activities and intends to conduct a comprehensive review of the various activities and asks for a meeting and additional documentation.

The record has not established that there has been any further movement, whether there has been an informal or even a formal undertaking beyond what we see here in this record.

And so given the record at this stage, there's simply no basis to stay consideration of these counts and certainly not to dismiss them, given the lack of argument as to the merits.

The Court will say that if DISB, in fact, undertakes an administrative proceeding, TikTok can raise this issue again. I'm going to deny the request. Of course, it's not without prejudice.

And so based upon the rulings of the Court, the Court finds that all claims have facial plausibility and TikTok's motion will be denied.

And so moving to the second motion, and that is the 1122 opposed motion for protective order, one of the reasons for the request was that TikTok did not want to be

escribers
www.escribers.net | 800-257-0885

belabored with responding to the District's discovery requests. I believe they were propounded on October the 8th. Has there been any exchange of discovery? Has TikTok responded to the discovery request?

MS. MARCHITELLO: Your Honor, we submitted a response in the date. Well, I'll get the date for you on that.

THE COURT: I'm sorry?

MS. MARCHITELLO: There was a response provided to those early requests.

THE COURT: Okay. So is that issue now moot?

MS. MARCHITELLO: I'm not sure, Your Honor. I know we have a case scheduling conference coming up. I think discovery may be at issue there. It sounds like my friend wants to speak on this.

MR. ROCK: Yeah. From the District's perspective, Your Honor, this is Mr. Rock. There were objections provided, but there have been no substantive responses to the District's initial discovery responses. Given the filing of the motion for a protective order, the District has not sought to move to compel response, so the Court could rule on this motion first before we would go down that route.

THE COURT: I didn't hear the last part of what you said.



MR. ROCK: Before the District would go down that route. But there is -- there has --

THE COURT: Sure.

MR. ROCK: -- not been substantive responses other than objections based on the filing of the motion for a protective order.

THE COURT: So do you, given the Court's ruling on the motion to dismiss and the fact that there has been a response to discovery, do you find this issue to be moot, or this motion to be moot? I know it's not yours.

MR. ROCK: Right. Well --

THE COURT: I'm just trying to figure out the state of affairs. And if the Court has to resolve any dispute, we have four other motions we need to get to. The last will be the protective order.

MR. ROCK: Correct. I think it would be entirely appropriate for the Court to deny this motion as moot, and then the parties can negotiate over an appropriate response date by TikTok, now that the Court has denied the motion to dismiss.

THE COURT: Okay. Counsel, anything to add?

UNIDENTIFIED SPEAKER: The only emendation I would add, we're talking about the protective order based on the DISB discovery, to be clear.

THE COURT: Well, yes.



UNIDENTIFIED SPEAKER: Right. Okay.

THE COURT: Well, there's -- right. That's part of it. Yes.

UNIDENTIFIED SPEAKER: Yes. So I mostly agree with counsel with the slight emendation that because that order, excuse me, that motion was, by and large, dependent on our argument that the Court should stay or dismiss the proceedings with respect to DISB.

THE COURT: Right.

UNIDENTIFIED SPEAKER: If the Court is not doing that, then some amount of the case presumably would proceed. I would just ask for indulgence, I guess, to look at now the specific requests, and the parties can discuss and see if there's a basis, a more narrow, specific basis with respect to specific requests about, for example, the status of the dispute proceedings, that kind of thing, that may be objectionable, sort of, on their own grounds based on the status of those proceedings, if that makes sense.

THE COURT: I think so.

UNIDENTIFIED SPEAKER: So rather than a broad --

THE COURT: I think so.

UNIDENTIFIED SPEAKER: -- protective order saying --

THE COURT: Yeah.

escribers
www.escribers.net | 800-257-0885

UNIDENTIFIED SPEAKER: -- don't proceed, if the Court wishes us to proceed, then there wouldn't be a basis for a broad protective order. But there may be, and I'm not saying there is, there may be grounds for more specific objections tied to what's going on at DISB.

THE COURT: Sure. Okay. Well, at this juncture, I am going to deny it as moot. We do have an upcoming ISC, and going to now go into the motion to seal the complaint. And I think that that might, I don't know, maybe it'll narrow the issues. I'm not quite certain. But here's what I'll do.

I just indicated that I will deny it as moot. Before we conclude today, I'll circle back to this, okay, to see where TikTok stands based upon the other rulings of the Court. I think it might make more sense to deny it as moot. There's been no motion to compel. There certainly seems to, from the District's perspective, seems to be outstanding discovery.

Let's circle back to that. Okay? I think that would be the most efficient thing to do.

Let's move to the motion to seal the complaint. And so the high level, as I understand the defendant seeks continued. Okay.

UNIDENTIFIED SPEAKER: No, it's -- my colleague, Ms. Hutton, will be addressing that.



THE COURT: Okay. All right. Continue redaction of information which is already redacted in the complaint but does not seek continued redaction of information that may have been unsealed in litigation, in this litigation or perhaps otherwise. Give me one moment to get my chart here.

And that the defendant and State AG signed a confidentiality agreement when the defendant produced a large volume of documents that were designated as confidential in response to the administrative investigatory subpoenas, and then the defendant outlines what that agreement is in their motion. So the Court has a solid understanding of what that is.

Relying upon the *Hubbard* factors, TikTok goes through why the particular areas of the complaint should be redacted. I won't go through all of the *Hubbard* factors. I will say that I understand that the District has indicated that it has a strong interest in maintaining the confidentiality, of course, of its sensitive information, financial data, any data that might cause them competitive harm, any data that their competitor would receive that they would not have to work for themselves. And so this includes nonpublic financial data and confidential analysis, disclosure of other type of information, usage of the platform, strategy information,

personal information. And I understand there's been some -- there's been some agreement as it relates to 60, paragraphs 60, 90, 134, 136, and 192.

Let me stop there. Has there been any further agreement with respect to any of the other allegations of the complaint before I go any further?

MS. MARCHITELLO: Your Honor, there has not been further agreements between the parties, but I do have four of the requests to withdraw since this --

THE COURT: Okay.

MS. MARCHITELLO: -- briefing because of rulings in other cases. And the District has been apprised of this.

THE COURT: Okay.

MS. MARCHITELLO: I can read those out now, or we can go through them.

THE COURT: Okay. What are they?

MS. MARCHITELLO: We are withdrawing the requests that relate to paragraph 75, 172, 175, 190 on the basis that information, we believe, is or will become public in other cases.

THE COURT: 75, 175. 190?

MS. MARCHITELLO: 172 and 175.

THE COURT: Oh, 172. Okay.

So 75, 172, 175, 190?

MS. MARCHITELLO: Those are withdrawn, Your Honor.

THE COURT: Okay. Let me just make a note of that. 72.

Okay. There was also one particular provision, or one particular allegation where there was agreement. I believe it was just to a percentage. But we'll get to that because I have questions for some of the redactions.

I understand the opposition high level to be that, other than personally identifiable information, of course, beyond what has already been agreed to, the information that TikTok seeks to seal is either in the public forum or would harm its reputation, for which there should be no redaction. And it causes no concrete harm to the competitive interests of TikTok and doesn't enable bad actors. That's the broad opposition here. And that TikTok has not met its burden of showing a need for secrecy that outweighs the overriding strong preference for access to public court records.

And so that being said, why don't we go straight to the questions the Court has. Okay. The first is to paragraph 10, and the argument is that the data includes sensitive information regarding its revenue. What is the specific competitive harm here, from paragraph 10?

MS. MARCHITELLO: Your Honor, I think, to set



the table a little bit here, as we've gone through some of these withdrawals, what we're looking at here is a motion relating to 19 of 244 paragraphs. And only 15 of those are contested. So there's been a real effort to be tailored here, which we understand to relate to some of the *Hubbard* factors.

THE COURT: Sure.

MS. MARCHITELLO: What is the public interest? How strong is the interest of the movement to maintain the confidentiality?

And so with that background, the information here relates to the monetary values. And I guess, to set the table on one more thing, Your Honor, we have wanted to proceed on this in public as much as possible, understanding that is the mandate of the courts. And to that end, I'm going to try to engage in this conversation without revealing the information that is under --

THE COURT: Sure.

MS. MARCHITELLO: -- the redaction. So that's my intent. And I believe the District will --

THE COURT: Okay.

MS. MARCHITELLO: -- follow that as well.

THE COURT: All right.

MS. MARCHITELLO: And so with that background, this is very specific financial information. And really,



the competitive harm is -- and more specific, I think, the more harmful -- how successful is a feature? How successful is the company? Where is the revenue coming from? Ultimately, in a competitive industry, revenue is the outcome. And so the more specific the information, and the fact that it relates to kind of the health and success, what comes out in revenue of specific pieces and portions of the company.

Again, I'm kind of speaking generally around --

THE COURT: Sure.

MS. MARCHITELLO: -- the redacted material --

THE COURT: Sure.

MS. MARCHITELLO: -- is the kind of information a competitor would want to know? And they are getting it here, if it is unredacted, for free? We've heard a lot about some cases, during the motion to dismiss hearing, regarding other online companies of various types. I think it's beyond sort of doubt that this is a competitive industry.

But I also -- I don't want the Court to take my word for it, because I went to law school and not to engineering school. And we do have a declaration I want to point to that substantiates some of the harm here. And that's a declaration by Noreen Yeh, that's an appendix to the motion.

So those are some of the bases that we would look to seal this type of information. And I know Your Honor has an appendix with arguments from the District and from TikTok. I will note that where the District has argued on this one that, okay, similar information is public elsewhere; first, it's important to know that that might not actually be a basis to unseal. The more of a company's inner workings that are revealed, it could make additional information all the more useful to a competitor, all the more harmful.

But beyond that, the information they point to here is extremely general. It's a revenue figure for a group of nations. I think it's a transcontinental grouping.

THE COURT: But it is some data.

MS. MARCHITELLO: Uh-hmm.

THE COURT: It is revenue data that was made public, correct?

MS. MARCHITELLO: Some is a --

THE COURT: That's what the District argues --

MS. MARCHITELLO: Right.

THE COURT: -- that some reports publicly provide data, revenue data, which is what we're dealing with here.

MS. MARCHITELLO: Absolutely. And the company



could decide that in a certain circumstance, such as in here -- it's a 2023 report regarding a really amalgamated piece of information for, again, multiple countries and continents -- that that could be not especially sensitive or required under those circumstances. And it doesn't speak to the confidentiality of different and more specific information in this complaint. They really are apples and oranges.

THE COURT: But how does knowledge of revenue allow -- how would it allow a competitor to gain market insight about strategy? Because it doesn't say here how TikTok netted the amount that we have here, what they did to do that. It doesn't reveal the mathematical equations that make up the algorithm. It just says how much money was netted.

MS. MARCHITELLO: So two responses to that -- or a two-part response, Your Honor. The first is, while we're going piece by piece -- and we're doing that because we've only sought to seal these --

THE COURT: Sure.

MS. MARCHITELLO: -- discrete portions --

THE COURT: Sure.

MS. MARCHITELLO: -- there is an awful lot that describes about what they think the business model is in this complaint, generally. So that's one way to look at



it.

Second, I think here, looking at the description of -- and it's unsealed, as to the in-app TikTok purchases -- that's, as I think we just heard during the motion to dismiss ruling, part of the business model here. How well have you done on that in a particular community, in a particular time frame?

A competitor is going to want to know, and they might, in fact, say, well, hey, this has been unsealed on D.C. Maybe I can get a piece of information from elsewhere. I'm going to say D.C. is a weak market for them. I'm going to come after that. I'm going to spend my advertising money there without having to have invested in any market research about where might be best for me to do that.

And that's the type of competitive intelligence that could come into play with this sort of information being put into the public sphere.

THE COURT: Okay. Let's move to number -- let me just keep a list of what -- okay. That's still at issue -- number 16, or paragraph 16, excuse me. Isn't this just, really, reputational harm?

MR. ROCK: 16, that's withdrawn. 16 --

THE COURT: 16 has been withdrawn?

MS. MARCHITELLO: Yes, Your Honor.



THE COURT: Okay, very good. Let me add that to the list.

All right. 28. Is that still at issue?

MS. MARCHITELLO: Yes, Your Honor.

THE COURT: All right. So here, I understand the argument that, if disclosed, competitors could use this information to gain insight into advertising strategy. How exactly? If you could articulate that without, of course, revealing --

MS. MARCHITELLO: Right.

THE COURT: -- the information that you're seeking to keep withdrawn -- or sealed, excuse me.

MS. MARCHITELLO: I think, Your Honor, this again goes to the idea of two things. One, opportunity cost for -- maybe that's not even the right word, but a competitor can understand what's happened here. What are they choosing to do? Where are they allocating their resources, and how am I going to use that to inform my business decisions in this competitive environment?

THE COURT: But how does that harm TikTok?

MS. MARCHITELLO: If a competitor knows that without expending any of their resources, they are operating net in a world where they can go and invest those resources they didn't spend and that market research, to go do some more advertising to a target



population, to develop a new feature, to pay the new engineers. They have --

THE COURT: So the competitor would be getting market research at no cost?

MS. MARCHITELLO: Right, that is the heart of it.

THE COURT: Okay. What about 30? Is 30 still at issue?

MS. MARCHITELLO: Yes, Your Honor.

THE COURT: All right. So how does the number of users create this competitive harm that TikTok speaks of?

MS. MARCHITELLO: Right. So Your Honor, this has both user kind of counts and some information about use. And it says "daily use" in the unsealed portion of the last sentence. So again -- and this actually is clear, that it's coming from internal documents -- this is the effort and work product that TikTok has spent its time and money to put together and finds valuable, and is looking into as a way to direct its own business. And making that available, again, to competitors for free is the heart of the harm.

And here, I will note that there are some more specific numbers here. It's got ages. It's got a daily figure. It has got a number of accounts that are



supposedly associated with users of a certain age frame. So again, this is much more specific data that would be more expensive and more consuming for a competitor and potentially, you know, more harmful because of its disclosure there.

And this is, as we've heard today, a use-based platform. The users who log onto the platform and enjoy and participate with its content are the heart of the business. And so this really is core information that is valuable and sensitive.

THE COURT: So I understand your argument to be that the information found in paragraph 30 represents the work product of TikTok. And it is valuable information, and it should not be made public for free.

MS. MARCHITELLO: That's right.

THE COURT: Okay. What if a competitor said, hey, TikTok, I'll pay you some money to have this data? Would it then be revealed? Would TikTok then reveal it?

MS. MARCHITELLO: I can't speak to that, Your Honor.

THE COURT: Okay.

MS. MARCHITELLO: That would be -- maybe it would depend on the money. And the fact that it would be worth something is just indicative of the fact that that is proprietary and valuable business information. I will

escribers
www.escribers.net | 800-257-0885

say --

THE COURT: But what makes it proprietary?

MS. MARCHITELLO: The internal nature and who developed it, who has it, who holds it close. We have the declaration, again, from the business, which probably gives the clearest direction, which I can't do, about how the business views this, which again, is relevant, as Your Honor knows, under the *Hubbard* factors. Is this information that is cast about publicly, or is this something that the public would not normally have access to?

THE COURT: Okay. 33. Still at issue?

MS. MARCHITELLO: Yes, Your Honor.

THE COURT: All right. The same is true. If you could articulate the strongest argument as to why a competitor would gain market insight from what's found in paragraph 33.

MS. MARCHITELLO: Sure. And this one, Your Honor's got a lot of description that's not sealed, so we can easily see kind of what they're talking about. So it's talking about a specific year, a single quarter of that year, and the revenue from a specific type of transaction, right? That's clear from the first part of it. So then it goes in to describe a certain dollar value from the District. So that's a very specific location.

And then it's giving a differential between years.

So a couple of things make this both like, in some ways, to what we've been talking about, and also uniquely sensitive and confidential for a couple of additional reasons related to what I just described, which is, you've got a delta here, right? It's describing one year's data and then another year's data; how does that information -- how does information about revenue, growth, usage, change for any product, not just an online entertainment platform, over time, in a specific market.

That's a chart that would be kind of heartland. You could see it on a PowerPoint. How did the business do in the past? How is it going to do in the future? What are the changes? And again, I don't have to take my word for it. We do have a declaration on that point.

And so that covers kind of, I think, most of the information that's covered here. It both should be viewed individually and also in the way that it describes changes over time, are additional kind of business description and information.

THE COURT: Okay. Paragraph 57. Again, if you could articulate how --

MS. MARCHITELLO: Right.

THE COURT: -- the harm would manifest here.

MS. MARCHITELLO: Your Honor, it is a similar



internal, confidential usage data, which we discussed in our briefs. And I know you're aware of some of those arguments. So I'll note that what this is providing is not just who and what type of user, but really, when they are using the app. And for a specific time frame, there's also a figure that goes really in detail.

And I think if you're looking at the appendix, Your Honor -- it's probably mighty small, but it's larger in the complaint. You have the unredacted version. It's just providing extremely detailed information about kind of who, what, when, where. And the sensitivity of that, as described in the declaration -- and is discussed with relating to the earlier paragraphs -- is, this is a usage-based app that we're talking about. Who's there when and how is what's happening.

And if a competitor is able to say, you know what? At 6:00 p.m. is really when they don't have -- nobody wants to use that. Maybe we have the same problem. Let's invest a different time slot, or let's promote -- let's find -- if they're really popular with this group, then maybe we can compete for that and get those. You know, they're structuring in a reactive way. That's kind of how competition and business works.

THE COURT: And the restructuring in an interactive way causes TikTok competitive harm because --



MS. MARCHITELLO: I'm sorry, Your Honor. Restructuring --

THE COURT: So I thought I heard you say that a competitor can take a look at the data and restructure --

MS. MARCHITELLO: Yeah, respond.

THE COURT: -- their own usage.

Pardon?

MS. MARCHITELLO: Respond, I guess, maybe, is what I meant.

THE COURT: Okay.

MS. MARCHITELLO: Respond and say, let's take that into account when we make our own plans.

THE COURT: And if they were to do that, to adjust what they do, when, where, and how, how does that harm TikTok?

MS. MARCHITELLO: I think in a competitive environment, there's an idea that there is kind of a limited amount of time. We've heard about people staring at a screen. If there's a different screen-based app, and they want some of that time, we've heard today about advertising being a revenue service. If advertisers are going elsewhere, that's going to be a harm to TikTok. It's being in that same space and having your competitor work with more information than you have.

THE COURT: I see, I see.



Okay. 75. That's no longer at issue, or is it? Yes, according to my notes --

MS. MARCHITELLO: Your Honor, that's withdrawn.

THE COURT: That's withdrawn? Okay.

MS. MARCHITELLO: Yeah.

THE COURT: All right. 88. Is that still at issue?

MS. MARCHITELLO: 88 is withdrawn, Your Honor.

THE COURT: Okay. 91 is withdrawn.

MS. MARCHITELLO: Oh, Your Honor, I don't think that's correct. I'm sorry.

THE COURT: 91 -- I'm sorry?

MS. MARCHITELLO: 91 is not withdrawn.

THE COURT: 91 isn't.

MS. MARCHITELLO: There is some agreement with the District as to portions of it. That might be --

THE COURT: But 88 has been withdrawn fully?

MS. MARCHITELLO: 88 is withdrawn.

THE COURT: Okay. So 91 is still at issue?

MS. MARCHITELLO: That's right.

THE COURT: Okay. And actually, that's what my little note says. Is this still at issue? So why don't you articulate to me what the current request is, in terms of redaction of 91?

MS. MARCHITELLO: Your Honor, the District



agrees to redact the title that is in the second redacted portion of this paragraph, out of consideration for that being a potentially identifiable individual and their safety and privacy. So we appreciate that agreement and advocate for that result as well.

As to the second portion, it's a excerpt from an internal strategy discussion that is really identifying on what's clearly, if you look at it, kind of a lengthy, sort of tire-kicking set of internal strategy concerns. The idea of -- and I'm just going to -- without waving anything, you know -- someone in the company explaining sort of a lengthy set of strategic considerations and concerns.

And putting that kind of internal tire-kicking and discussion of challenges out there, with the amount that's quoted, the nature of the content is, again -- it's not numerical. But that is giving a competitor insight into the challenges and the approach, according to the complaint, right?

We don't concede any of the characterizations of what's cited here. I do want to be clear about that.

THE COURT: Sure.

MS. MARCHITELLO: And say, well, maybe they think they're weak there. Maybe they think they're strong there. I'm going to take that into account when I go and



make my decisions. And maybe I can get them where they think they are here. And that's the kind of advantage it would provide.

I want to say one thing about -- in case it comes up. In the District's response to several of the paragraphs we've discussed today, they make the argument that certain information shouldn't be sealed here because it's become public through a complaint in Kentucky that was not properly filed redacted. And it got into the press, so it was not through advertence -- inadvertently. But you know, was supposed to be sealed and now, by that same court in Kentucky, has been sealed as to every redaction that TikTok requested.

And so where the District has proposed this Court should say something can't be sealed because of this lapse in Kentucky, we would advocate that doing so would actually be contravening what the Kentucky court itself has now said, which is that information should be sealed. And we don't think that's a good basis to unseal anything here. It would be essentially condoning and rewarding this problem that occurred.

THE COURT: As I understand the District's response to that, it is not that the leak should be condoned or rewarded. It is simply that the information was leaked and that it's already in the public forum. And

so why, then, should it be sealed in this forum, given that it already is in the public forum, notwithstanding the mechanism by which it found itself in the public forum?

MS. MARCHITELLO: Well, a couple of responses, Your Honor. The first is that I don't know if there is a notwithstanding there. I think it's very important that, where a court order has specifically said this should not have gotten out. I'm going to seal it now; that that is worthy of respect and of not compounding the inappropriate publicity that happened there.

Second, you know, one thing that they are citing a lot is some of the news reporting that has come out about that. And so yeah, there is a news reporting, maybe discussing some of these characterizations. And I really can't comment as to whether you could go out and grab the --

THE COURT: Sure.

MS. MARCHITELLO: -- improperly redacted complaint. But I think if there is going to be some argument that, hey, anything that's ever been public anywhere must no -- that there should be an exception for when it's in violation of a court order, which it now would be, to say it should be unsealed here.

THE COURT: Okay. Just a few more. I had



questions about 108. I'm just sort of cross-referencing. I see that it's still being at issue?

MS. MARCHITELLO: Yes.

THE COURT: Okay. So what exactly is TikTok -- so I understand -- this is what I mentioned at the onset -- that at least one of the responses included that TikTok is no longer seeking to redact the 20 percent --

MS. MARCHITELLO: That's right.

THE COURT: -- that's shown?

MS. MARCHITELLO: Yes.

THE COURT: I just want you to tell me exactly what other information is being sought to be -- is it everything else that's in the gray bubble, or the gray highlight?

MS. MARCHITELLO: So Your Honor, I think the only thing that should be gray at this point is in the last sentence, where it describes, the company estimates that by 2027, it could capture up to a number --

THE COURT: Uh-hmm.

MS. MARCHITELLO: -- a year from -- and that number is the information that's sought to be sealed.

THE COURT: Why?

MS. MARCHITELLO: Your Honor, not only is this kind of, again, a feature-specific, numerically specific business figure, it's also a future-looking one. So this

escribers
www.escribers.net | 800-257-0885

is not even saying, hey, in the past, this is how things work. This is how it's working now. A competitor can use that to inform itself and structure and avoid costs to get the same competitive intelligence we've been discussing.

But here, you can say, here's where we think they're going, and we're going to get ahead of them on that. And so for a future-looking statement, relating to a pretty specific feature of the app, of the platform, then the business sensitivity there is significant and should be protected.

THE COURT: But it's simply an estimate.

MS. MARCHITELLO: It's an estimate that they're taking and purporting to report, directly from the company, about where they think they're going. Business predictions and futures are, I think, kind of quintessential --

THE COURT: But how --

MS. MARCHITELLO: -- planning and future-looking information.

THE COURT: I'm sorry, Counsel.

MS. MARCHITELLO: I'm sorry.

THE COURT: I'm sorry. These questions come, it's like I have to get them out.

How would a competitor -- how would a competitor obtain an unfair advantage? They can look at this number



and say, I could only hope to reach that number, or you know, I liked -- or gauge where they themselves are.

MS. MARCHITELLO: Uh-hmm.

THE COURT: I just don't see what moves the competitive ball forward, except a company may size themselves up against TikTok.

MS. MARCHITELLO: And that sizing, I think, is important. Your Honor.

THE COURT: Why?

MS. MARCHITELLO: I think you've got it in part. They're going to say, hey, I think that's a big number. And look, they're going to be playing hard in that space. Maybe I have a better opportunity for my dollar and my investment over here. Or they're going to say, I think that's a wimpy number. They're clearly walking away. Guess what? Let's go into that space and grab the business that might be available to us, then.

THE COURT: So I think I understand clearly. So it's because it's tied to a particular feature --

MS. MARCHITELLO: Uh-hmm.

THE COURT: -- and that a competitor can --

MS. MARCHITELLO: Right.

THE COURT: -- look at the feature that's listed --

MS. MARCHITELLO: Right.



THE COURT: -- and say, well, this is where the money is. Let's focus --

MS. MARCHITELLO: Right.

THE COURT: -- our efforts --

MS. MARCHITELLO: Yeah.

THE COURT: -- on a similar feature?

MS. MARCHITELLO: That's right.

THE COURT: Okay. I know I'm simplifying it --

MS. MARCHITELLO: No, I think --

THE COURT: -- because I really want to understand.

MS. MARCHITELLO: -- you know, if a law firm said, I'm going to invest $0 in my litigation department in the future, I might not want to go work there, you know?

THE COURT: I see.

MS. MARCHITELLO: That's the kind of information we would --

THE COURT: I get it now.

MS. MARCHITELLO: -- want to --

THE COURT: Okay. All right --

MS. MARCHITELLO: -- know.

THE COURT: I understand.

123. Is that still at issue? This is actually a question for the plaintiff. Let me see. I believe the



rest are for the plaintiff. Let me take a look. Yes, so I only have one further question for TikTok.

Oh, so 128. Is 128 still in controversy?

MS. MARCHITELLO: Yes, Your Honor.

THE COURT: Okay. So I know that you already argued against why the Court should not place any significance, or particularly, no great significance, on the fact that information may already be in the public forum --

MS. MARCHITELLO: Uh-hmm.

THE COURT: -- given the mechanism by which it found itself in the forum. But when it relates to this issue found in 128, how, exactly, would a user be emboldened -- well, let me ask a different question.

Let's assume that the Court does not accept the argument that it should place no weight on the fact that this information is in the public forum, given this leak. So given that it's in the public forum, does the fact that it can embolden an actor material?

MS. MARCHITELLO: So Your Honor, one really important point I want to make: the District isn't arguing, and would not be accurate, if they said everything that we're seeking here became public briefly in that Kentucky --

THE COURT: No, I don't think that's what it



says here, not everything.

MS. MARCHITELLO: Okay. So for 128, I just want to make sure, we're not -- I don't think that this is a paragraph that would have been public through that. So I just wanted to make sure I was kind of seeing eye to eye on the request. But I do think, in terms of emboldening of that actor, absolutely, that should be taken into consideration.

There is a sense where some of this information -- and I think the District has conceded as much with regards to, like, names and titles -- maybe it's out there somewhere. But if you were putting it out there again, the name of the District, with its law enforcement officer saying, you have done bad -- and as we heard in today's argument, these are significant allegations that there is kind of independent harm to republishing that in this specific context, where there are clear implications.

It's coming direct from TikTok. They've had the opportunity to structure it in a certain way because, of course, it's their complaint. So whether there's a bitter piece of information, potentially findable somewhere, would not necessarily mean the way that they've put the information here that might be similar -- or if a concept -- because I think for 128, their argument is, oh, this general idea has been reported on. That is not the

same as having specific information become public in a complaint by the District.

THE COURT: Counsel, you just argued that there might be harm, individual harm, to republish. Harm to whom?

MS. MARCHITELLO: Your Honor, I'm just referring to the names and titles that the District has agreed should be redacted and --

THE COURT: So not harm to the users, but I --

MS. MARCHITELLO: Yeah, I'm wondering --

THE COURT: -- just want to make sure I understand.

MS. MARCHITELLO: -- if I'm understanding. I'm sorry if I'm not, I think --

THE COURT: Well, maybe I'm asking a confusing question.

MS. MARCHITELLO: For 128? Is that where --

THE COURT: Yeah. So I'm on 128.

MS. MARCHITELLO: Okay.

THE COURT: And --

MS. MARCHITELLO: All right.

THE COURT: -- one of the arguments is that, if disclosed, this could undermine the effectiveness of the systems and the processes, which would cause competitive harm to TikTok, in addition to potentially harming the

TikTok platform users. The latter is what I was getting to. When you just --

MS. MARCHITELLO: Okay.

THE COURT: -- argue harm to republish, I wondered who that harm would flow to: TikTok or its platform users or both? I'm just reading what TikTok wrote here. Or I know the District --

MS. MARCHITELLO: Yeah.

THE COURT: -- compiled this and that this is what the District believes to be TikTok's response to 128.

MS. MARCHITELLO: I guess I want to make sure I'm looking at the right thing. I think that it should not be -- the Districts -- Your Honor, should have an appendix that was filed by TikTok in a reply. So I don't want to say that they've necessarily compiled it. What I believe that appendix should have is their response --

THE COURT: Right.

MS. MARCHITELLO: -- and then our reply.

THE COURT: Yes.

MS. MARCHITELLO: Okay, great.

THE COURT: Yes, and this is -- and this is 128, unless it's been updated. I hope not because I spent a great deal of time --

MS. MARCHITELLO: Oh, Your Honor, if we've got 128 --

THE COURT: -- marking this one up.

MS. MARCHITELLO: -- I think our response would be that this is kind of internal, confidential strategy and safety and content moderation information. And the safety -- I think what Your Honor is looking at -- and the user protection analysis here, is really giving a kind of a pulling back the curtain on how might TikTok be looking at understanding when there could be a violation and how that would be handled, which, the more information about that that's public, the more workarounds are available to users or bad actors who might want to do that.

And that's a pretty limited number of the paragraphs here. I think 128, talking about these policies, and possibly more 148, is describing workarounds. So that's something that we don't think there's any public interest in publishing.

The District's opinion and allegations that some of this safety or workaround information is -- or some of the safety information or some of these features are not sufficient, is very plain from the information that's already unsealed. There is not any public interest in these kind of bits and pieces, whereas there is a risk of having too much out there and allowing kind of workarounds to the safety processes.

THE COURT: Okay. All right. Thank you,



Counsel. The rest are for TikTok [sic].

MS. MARCHITELLO: Thank you, Your Honor.

THE COURT: So let's start with 128. And so as I understand it, one of the reasons, or perhaps the biggest reason, that the District brought this case is to protect children who use the platform. And so accepting that proposition as true, why, then, would unsealing the information in 128 not embolden bad actors and further potentially harm children?

MR. ROCK: Actually, unsealing this information would protect children.

THE COURT: How?

MR. ROCK: It would inform parents about the issues that TikTok has with its own content moderation. If you look at the District's argument in this chart, as to 128, where it's talking about some of the public reporting out here -- just to place 128 in context, this is the part of the complaint that talks about TikTok making representations to the public about the steps it takes to police and make its platform safe.

And then, in 2022, you see there was public reporting on Forbes and in The Guardian that those content moderation efforts, which are supposed to make TikTok a safer place, in particular for kids, aren't actually applied with rigor when it comes to certain accounts that

TikTok makes more money off of because they're more popular.

And so that's the public reporting, there, from Forbes and The Guardian, that there's this workaround if you are particularly -- if you're a particularly popular account, TikTok has what Forbes reported was a preferential treatment of those accounts and an internal creator labeling system. And so what --

THE COURT: But Counsel, let me ask, if you are a user with more than the number listed here, followers, and you were a bad actor, one who is seeking to cause harm to the children who use TikTok, it seems to me that if you were savvy enough, or if this is just what you unfortunately wanted to do, you might target creators with the more than blank followers. Because you may think to yourself, well, TikTok's not going to find out about this because, you know, they're not going to pay that much attention to the discourse between me and this follower, given the amount of followers they have.

Or these policy shortcuts mentioned on page 47. Looking at those first two words after "shortcuts like", right? Those two words, there. You might say, well, you know what? I'm going to target these particular accounts because they will fall under the radar. And if it does come to the attention of TikTok, there'll be shortcuts,

such as what you see there. Doesn't that go against the protections that the District is seeking to provide for users?

MR. ROCK: Not in this instance, Your Honor, because the bad actors want to know that there's a preferential system out there, where TikTok relaxes its content moderation policies. They know that from the public reporting. And so what happens here, by adding this additional --

THE COURT: But they don't know the -- they don't know who to target. If they were a bad actor, the record hasn't established that there is a particular number of followers that one has that receives this preferential treatment. That is not in the public domain.

And so if you're a bad actor and you know this, you say, okay, I'm going to follow this person. They have X amount of followers. I'm going to -- I'm not going to be found out. I'll be under the radar. If they catch me, nothing will happen because there will be this policy shortcut.

MR. ROCK: One of the things that creates a disconnect here on that is, when you look at the date of these policies that are being quoted -- I'm trying to be sensitive to not --

THE COURT: I am too.



MR. ROCK: -- say what's in the current --

THE COURT: I am too, I am too.

MR. ROCK: If you look at the information that's being reported here, it's from 2020. These are old policies. These are old numbers. Hopefully, TikTok has adjusted and closed these loopholes here. They weren't closed -- they weren't closed in 2022, at the time you have the quotes from trust and safety policy leaders.

And so whether this is -- whether these are the loopholes there today, five years later, or not, is not being revealed. It may be different. But having this information out there -- that in 2022 there were these loopholes. People inside of TikTok were raising issues about them, and they are consistent with subsequent public reporting -- is an important thing for the public to know, in connection with reading the allegations here.

And I will say, Your Honor, that that highlights one of the issues with the Yeh affidavit. You know, it's TikTok's burden here, to come forward with specific information about why keeping this information from the public here actually will create substantial harm to them, or run the risk of these bad-actor defenses. And this is kind of an argument that flows over to a lot of these paragraphs.

And not to date myself, but I read the Yeh



affidavit, and I found myself thinking, where's the beef here? This is very cursory. There's not a lot of detail here. And you know, the Illinois State Court judge in Illinois -- the Illinois Attorney General's recent TikTok case that was filed there -- completely unsealed that complaint, and did so because looked at the affidavit and said, you know, there's really four and a half pages here, just like was filed in the District. This doesn't get into the specifics, like --

And when we get to the usage and financial data, again, there's not going to be this linkage inside the affidavit of anything, really, more than saying, on a substantive level, well, this stuff isn't public, and so it's competitively sensitive. But it's more than that to keep it from the public.

THE COURT: Well, and I understand the argument as it relates to the timing. This is data from 2024. And as you said, to the extent that these loopholes exist, that's not being brought into the public forum.

But I'm still quite stuck, quite frankly, on this issue and that the user, the children that the District is concerned with, or any user -- excuse me -- let's assume it's an adult user who's attempting to lure in children. They might create a platform and use the platform, even with the stale data, to produce content

that they know violates the terms of the platform, because they think no one's going to come after them. Is that not a conceivable risk --

MR. ROCK: It --

THE COURT: -- to unsealing this data?

MR. ROCK: And to be clear that, you know, the District takes very seriously this idea that this information would be used for bad actors. But it has to be balanced against, does the public need to know this information? Again, this level of detail is coming inside of the parts of the complaint where the District is alleging that TikTok is making these statements about it having effective safety measures, effective content moderation, that then are being undercut by the actual things that are happening inside of TikTok.

And so when you have public reporting that has gone ahead and put this out there, and you're marrying it up against specific facts that shows that public reporting is accurate, that is from 2022, the balance there strikes in favor of letting the public know that -- letting the parents who might let their kids on TikTok know that, that historically, there have been meaningful gaps and meaningful gaps, and whistle blowing going on inside the company about, look, what we actually do doesn't match what we're telling the public.



There has to be a balance between that, especially -- and I completely understand Your Honor's concern about, could this potentially be used by bad actors? But this is particularly dated information. We saw nothing in Yeh's affidavit that this is still the same case today.

THE COURT: Okay. All right. I just have a few more. And for 148, is 148 still at issue? Yes? 150? 148 and 150 are still at issue?

MR. ROCK: 148 is still at issue.

THE COURT: 150?

MR. ROCK: 150 is not.

THE COURT: Is not?

MS. MARCHITELLO: That's right, Your Honor.

THE COURT: Withdrawn? Okay.

Okay. So the same question, quickly.

MR. ROCK: Yes.

THE COURT: 148, why would this not -- the unsealing of this data -- embolden a bad actor and cause harm to the users that the District is seeking to protect?

MR. ROCK: Right. So this particular information goes to the effectiveness, or lack of effectiveness, as the District has alleged, of TikTok's age gating. And this is reporting something -- to the extent this is protecting an actor -- or to the extent

this information would be useful to an actor, it would be useful to the users that are described by a particular age group inside of the gray highlighted part, Your Honor.

And respectfully, those users will know this information. This is inside of a portion of the complaint where the District alleges that TikTok simply does not have effective age gating, that anyone can get around it --- because it's a neutral age gate -- by just reporting an age that is not consistent with their actual age.

And this shows that that is, in fact, the case and that TikTok knows it. And it's something that -- I wouldn't label -- I would not label the users of the age under the gray highlighting as bad actors. But they would know this just by going to the application and going to the age gate and putting in -- and realizing they can put in any age that they would like to.

THE COURT: Okay. 155. Is that still in dispute?

MR. ROCK: Yes, Your Honor.

THE COURT: Okay. Why doesn't the data in 155 give competitors a valuable insight into the platform's features, notwithstanding the fact that they might get it for free? But why wouldn't it, looking at what's in the gray area?



MR. ROCK:  The --

THE COURT:  I understand that TikTok has the burden.

MR. ROCK:  Right.

THE COURT:  But what is your strongest argument as to why the argument advanced is without merit as to this paragraph?

MR. ROCK:  It's simply confirming things that have been part of public reporting already.  There's a site to the NPR article there that goes into the ineffectiveness of these tab reportings -- these tab videos.  And then the data just shows how ineffective they are.

THE COURT:  But couldn't a competitor take a look at this and consider the data and create a platform that's consistent with -- or inconsistent, depending on the success, as indicated in the paragraph -- and that could potentially cause competitive harm?  It says how many users watch for some certain time, of these videos.  And a certain number of users watch only a certain amount of time.  Now, isn't that data that a competitor could use to compete, perhaps successfully, against TikTok, if they sort of follow what's here or make it better somehow?

MR. ROCK:  I don't think this, here -- I don't think this is helpful competitive information.  And you



have to go up to the allegations in paragraphs 153 and 154, which are kind of framing these allegations, where it's talking about what the tab feature is, which is take a break here. And so you have TikTok launching this feature in February of 2020, so some time ago. This is a feature that has been out there publicly for about five years now. And it, in paragraph 154, talks about this being a way to help users break the habit of being trapped inside of endless use.

Competitors have known this has been out there for some time. What 155 is doing is showing -- again, and this is part of the complaint about how the public statements about things TikTok is doing don't match what is going on internally -- all those statistics do is show the numerical ineffectiveness of that feature that's described in 154, which is no longer under seal.

THE COURT: Okay. All right. I have no further questions. Anything further?

MR. ROCK: Two quick points I want to make. I think that, as an overarching point, go to the paragraphs that you asked TikTok about. One is -- well, I've already mentioned the affidavit doesn't really get into detail. But a lot of those paragraphs on the revenue numbers and the user numbers that Your Honor was asking about are historical figures, and they come from prior years. And

so how that would be competitively sensitive information to be released, now, the Yeh affidavit doesn't explain that.

And then I will just note that for a number of these paragraphs, other courts besides Kentucky have unsealed the same information for those states, in particular for paragraphs 10, paragraphs 30, paragraph 33, paragraph 57, that you asked TikTok about --

THE COURT: You said 10, 30, 37 --

MR. ROCK: 10, 30, 33 --

THE COURT: 33.

MR. ROCK: -- and 57. A New Jersey court has recently unsealed information that is similar for New Jersey user numbers or New Jersey revenue numbers. And so you know, the Court there has unsealed that same type of information for New Jersey. And so the idea that the same type of information couldn't be unsealed for the District now, honestly, makes no sense.

And then my final point is, I would invite Your Honor to look back at page 9 of the District's opposition, where there is a cutout of information that TikTok posted on its website when it collected together revenue and usage data from various states, when it was trying to convince -- it was trying to lobby those states to take certain actions.

And there's a cutout there. They didn't do this for the District, but this is for a number of states and including -- there's a cutout one from the State of Florida, where the company willingly put out information about the number of users that it had in the state. And it did that because it wanted to convince, I assume, those state governments to take some sort of action.

And so the idea that state-specific user information is some super competitive information, that TikTok would then go release it on its own, as to other states, sort of undercuts why the District-specific user number needs to be sealed here. And again, I think it also just highlights the inadequacy of the Yeh affidavit not to explain that. Like, how is it that, for instance, the number of Florida users for TikTok can be super sensitive information, but the user numbers for the District isn't?

THE COURT: Okay.

MR. ROCK: Thank you, Your Honor.

THE COURT: I would like a response --

MS. MARCHITELLO: Thank you.

THE COURT: -- to that issue, particularly the New Jersey unsealing.

MS. MARCHITELLO: Thank you, Your Honor. In the filings for this motion -- and there have been several. I



know we've put a lot of paper up there -- Your Honor can find some information about decisions by a number of courts. And Counsel just referenced New Jersey and Illinois and did not reference some of the other rulings that are appended to some of the papers, including not only the Kentucky decision that we discussed earlier, but rulings in Massachusetts, in New York, one case in Utah, in Washington, and in fact -- there has not been an order yet, but eventually -- in New Jersey, courts that have in fact sustained all or portions of the information that TikTok sought to seal in a posture much like this.

So it is certainly not some kind of 1-0 ruling in favor of the plaintiff's position here. And I want to make sure that's clear, that a number of courts have looked at these issues and found that, in fact, there is significant competitive and other sensitivity. So one thing I can't do is go and say, here's all the information they sealed, Your Honor. Because by doing that, I would be revealing sealed information.

So where they are pointing to information that has been unsealed, I can't necessarily counter that directly because of the obvious unsealing that would involve. But I would point Your Honor to the decisions, which make clear that they are, in fact, sealing portions of the complaint. So that's to set the playing field kind

of more correctly on that point.

Second, on this information about whether there is usage information that has been used or is now public in other jurisdictions, it's really neither here nor there, as to the information in D.C. If it has been publicized over TikTok's objection, I don't think that has any bearing, then, on whether it has been put forth properly as competitively and business sensitive information here, under the District's standard. Which is, of course, the *Hubbard* factors that this Court has mentioned, and not, perhaps, the standard of a different jurisdiction.

And second, as to there being -- and the District pointed to a page in its complaint that involved display of some usage information. I think it's Georgia or Florida -- is also neither here nor there. To the extent that there might be a specific aggregated number, which is more high level than much of the data we've gone through today -- and so again, likely less immediately usable in a really specific way -- that's just showing this information is valuable. They're using it to get a result.

They are saying, if I'm going to put this out here publicly, you know, it's for a purpose. Your Honor said, could they sell it? Maybe. And that would just

show that it is, in fact, valuable. Where it is used and deployed and publicized to a particular competitive end, that just shows it is, in fact, competitively useful and sensitive information.

THE COURT: But value, in and of itself, even competitive harm, must be balanced against the other factors.

MS. MARCHITELLO: Right.

THE COURT: And so the inquiry doesn't begin and end --

MS. MARCHITELLO: Sure.

THE COURT: -- with either of those two factors. You would agree the Court has to engage in a balancing test.

MS. MARCHITELLO: That's right, Your Honor. And I think some of the other considerations for that balancing test are plainly in favor of what we're seeking here. For these little bits and pieces of information that we're talking about, the public interest is not significant. There is extensive documentation. In fact, during his argument just now, Counsel went through -- he said, well, you go back to the other paragraph. You can read all about it. That just tells you, the information that someone actually needs to understand what the District is doing here is all right there already.

escribers
www.escribers.net | 800-257-0885

And a lot of this, although there's been some back and forth about it, is not already public elsewhere. Any specific District data, of course, was never in a Kentucky complaint. A number of the paragraphs, the District properly doesn't say, hey, this got out for a little bit and now it's back in. This is new information that would be publicized for the first time if allowed out in this court.

And then the other *Hubbard* factors. The party has objected to the disclosure, of course. The strength of that objection we have established through the briefing, through the affidavit. And Counsel attacks it, but it's from the business. It goes paragraph by paragraph. To put something in the public domain that can be understood -- rather than seeking to file all of this so the public could never understand what the dispute was about -- is the effort of something that is done in that way, and not having to, like, hire an expert to put out a sealed analysis of the potential economic impact of each particular bit and piece.

And so the possibility of prejudice, I think, to those opposing disclosure, is a lot of what we've talked about today. I think we've gone through that. And then the purpose for what the documents were introduced. Again, everything the District wants to tell District

consumers, the parents we've heard about, the Court through its complaint -- it can be done by looking at the vast amount of information that is broadly available.

THE COURT: Okay. Thank you, Counsel. Before you resume your seat, I'd just like to go over to make sure my numbers are correct as to what is no longer in dispute. And let's go in ascending order. So the first, I believe, is 16, paragraph 16?

MS. MARCHITELLO: No longer in dispute.

THE COURT: No longer in dispute, yes.

MS. MARCHITELLO: That's right.

THE COURT: Okay. And then let's go from there. 16, someone can just count them or advise me of them.

MR. ROCK: So 16 is withdrawn. 17 is withdrawn.

MS. MARCHITELLO: Given, Your Honor, that there's only 19 with any, would it be easier to go through the ones where we're maintaining?

THE COURT: No.

MS. MARCHITELLO: Because our -- withdrawn as of --

THE COURT: The way my --

MS. MARCHITELLO: -- which date?

THE COURT: As of today.

MS. MARCHITELLO: Right.

THE COURT: As of today. What is currently

withdrawn as of today?  The way my notes are set up, this is the easiest for me.

MS. MARCHITELLO:  Sure.  Withdrawn since which date?  I just want to make sure --

THE COURT:  As of right now --

MS. MARCHITELLO:  Okay.

THE COURT:  -- what is no longer at issue?

MS. MARCHITELLO:  That was --

THE COURT:  So combining what was done previously with the more recent concessions --

MS. MARCHITELLO:  Sure.  So 16 --

THE COURT:  -- what are all of them?  Uh-hmm?

MS. MARCHITELLO:  -- 17, 44, 68 -- oh --

THE COURT:  What about 60?  I have 60.  Is that wrong?

MS. MARCHITELLO:  I'm sorry, Your Honor.  That's why I'm kind of trying to figure out where I'm starting from.

THE COURT:  Well, see?  That's the Court's problem.

MS. MARCHITELLO:  Yeah.

THE COURT:  I have data pulled from a few different places, and I appreciate the parties working together to withdraw.  I just need a solid list of, as of today, which of the paragraphs have been withdrawn,



notwithstanding when the parties came to the agreement?

Could you help --

MR. ROCK: Yes.

THE COURT: -- Mr. Rock?

MR. ROCK: Yeah. Your Honor, do you have the appendix --

THE COURT: I do.

MR. ROCK: -- to TikTok's reply?

THE COURT: I do.

MR. ROCK: It might be easiest if we just walk -- starting with paragraph 2 on it, we can just walk through that and tell you if it's still --

MS. MARCHITELLO: Yeah.

MR. ROCK: -- at issue or withdrawn, or if there's been agreement.

THE COURT: Unless you just have the numbers written out somewhere or they -- okay, fine. We can do this.

MS. MARCHITELLO: Yeah. I'm sorry, Your Honor.

THE COURT: Okay.

MS. MARCHITELLO: I think the issue is that we've done a couple rounds of withdrawals, and so we just want to make sure we're starting from the right place.

THE COURT: And my notes --

MS. MARCHITELLO: Okay.



THE COURT: -- reveal that.

MS. MARCHITELLO: Okay, great.

THE COURT: All right. So 2?

MS. MARCHITELLO: 2 is, it continues.

THE COURT: Okay. 7?

MS. MARCHITELLO: Maintaining 7 and 10.

THE COURT: 10, okay.

MS. MARCHITELLO: 28 --

MR. ROCK: So well --

THE COURT: Well, 16 --

MR. ROCK: 16's withdrawn.

THE COURT: -- is withdrawn.

MR. ROCK: Yeah.

MS. MARCHITELLO: Right, 16 is withdrawn. All right.

THE COURT: So I was told we were going to go in order. 17?

MR. ROCK: Withdrawn.

THE COURT: Okay. 28?

MS. MARCHITELLO: That is continued.

THE COURT: Okay. 30?

MS. MARCHITELLO: Not withdrawn.

THE COURT: All right. 33?

MS. MARCHITELLO: Not withdrawn.

THE COURT: 44?

escribers
www.escribers.net | 800-257-0885

MS. MARCHITELLO: Not withdrawn.

THE COURT: I have it as being withdrawn.

MR. ROCK: Yeah.

MS. MARCHITELLO: Well, it's in part, then. I think there is the -- in an attempt to narrow the issues, we agreed to withdraw the redactions to the first clause that read, "In 2020 [sic] strategy kickoff document for its business partner".

THE COURT: Okay.

MS. MARCHITELLO: And then the second highlighting is still subject to our motion.

THE COURT: Okay.

MR. ROCK: And --

THE COURT: So that's the end part.

MR. ROCK: Yeah, and then the very last -- the bottom seven lines has been withdrawn as well, I believe.

THE COURT: So 44, so that last line, okay.

MS. MARCHITELLO: No, the --

THE COURT: I'm hearing two different --

MS. MARCHITELLO: Yeah.

THE COURT: -- things.

MR. ROCK: Yeah.

MR. ROCK: Do you need a copy of the --

MS. MARCHITELLO: No, I have it. I'm just trying to make sure -- thank you. For 44, it was, I



think, not our intent to withdraw as to the last sentence. So I'm just confused about your statement. I think what we tried to convey was just withdrawing the first portion of that. So if that was not correctly conveyed, then I want to make sure.

THE COURT: So the sentence beginning, "In a 2023", then there's a word there --

MS. MARCHITELLO: Yeah, so I think I'm just going to read it out loud to make sure it's --

THE COURT: Okay.

MS. MARCHITELLO: -- fully withdrawn, because I'll be doing that by reading it.

THE COURT: Okay.

MS. MARCHITELLO: Where it says, "In 2023 strategy kickoff document for its business partner Abercrombie Kids", the motion is withdrawn as to that content.

THE COURT: Okay.

MS. MARCHITELLO: We are still making the motion as to the highlighted portion and the rest of it and that --

THE COURT: Understood.

MS. MARCHITELLO: Yes.

THE COURT: Okay. That's helpful.

55. I believe that was previously withdrawn?



MS. MARCHITELLO: Yes.

THE COURT: Okay. And 57?

MS. MARCHITELLO: We are still moving on 57, Your Honor.

THE COURT: 68?

MS. MARCHITELLO: Withdrawn.

THE COURT: 69?

MS. MARCHITELLO: Still moving on 69.

THE COURT: 75 was withdrawn.

MS. MARCHITELLO: Withdrawn.

THE COURT: Okay. 88 was withdrawn?

MS. MARCHITELLO: Yes.

THE COURT: Okay. 91 was withdrawn?

MS. MARCHITELLO: No, Your Honor.

THE COURT: No, okay.

MS. MARCHITELLO: And 91 is one where we have consent on the first portion, relating to an individual's job title.

THE COURT: So withdrawn in part?

MS. MARCHITELLO: No, Your Honor. I'm just --

THE COURT: No?

MS. MARCHITELLO: -- indicating that at least part of it is not contested.

THE COURT: Okay. Let's go to the -- let's look at the actual language. Which part, specifically, is no

escribers
www.escribers.net | 800-257-0885

longer contested?

MS. MARCHITELLO: Your Honor, I understand that the phrase following, in 2023, comma, TikTok's -- and then there's a description of an individual's position --

THE COURT: Uh-hmm?

MS. MARCHITELLO: -- that the District does not contest keeping that redacted.

THE COURT: I see. Okay. But TikTok is seeking redaction of the below portion, still, correct?

MS. MARCHITELLO: That's right.

THE COURT: Okay. All right. 97?

MS. MARCHITELLO: Withdrawn.

THE COURT: Okay. 108?

MS. MARCHITELLO: Not withdrawn.

THE COURT: 97 was withdrawn.

You said 97 was withdrawn, Counsel?

MS. MARCHITELLO: Yes.

THE COURT: Okay. All right. And 108, still at issue. 123?

MS. MARCHITELLO: Still at issue.

MS. MARCHITELLO: 124?

MS. MARCHITELLO: Withdrawn.

THE COURT: 128?

MS. MARCHITELLO: Still at issue.

THE COURT: 148?

escribers

www.escribers.net | 800-257-0885

MS. MARCHITELLO:  Still at issue.

THE COURT:  And previously, 134 and 136 --

MS. MARCHITELLO:  Withdrawn.

THE COURT:  -- were withdrawn, right?  Okay.

MS. MARCHITELLO:  Yes.

THE COURT:  And then 150 is withdrawn?

MS. MARCHITELLO:  Oh, Your Honor --

THE COURT:  Yes.

MS. MARCHITELLO:  -- actually, can I go back?
I'm informed by my colleague that 134 and 136 contain some
information that the District does not oppose redacting.
And those are going to be information about specific
individuals who are not parties to the case.

THE COURT:  134 and 136?  I don't have that in
the --

MS. MARCHITELLO:  Yeah, I --

THE COURT:  -- A-1 appendix.

MS. MARCHITELLO:  Well, I think that the effort
was to not put the non-contested redactions --

THE COURT:  Okay.

MS. MARCHITELLO:  -- in that.  So --

THE COURT:  All right.

MR. ROCK:  Yeah, that's correct.  So there are
two --

THE COURT:  All right.



MR. ROCK: -- there are two -- there's a name and titles in those that will remain redacted.

THE COURT: Okay. You all work that out. So 148. 150 redacted?

MR. ROCK: Withdrawn.

MS. MARCHITELLO: 150 is withdrawn.

THE COURT: Excuse me, I meant to say withdrawn. 155?

MS. MARCHITELLO: That is not withdrawn.

THE COURT: Okay. 159?

MS. MARCHITELLO: I think it's withdrawn. And I'm trying to save some time, Your Honor. I think everything, then, until 192 is withdrawn.

THE COURT: So 150, 172 --

MS. MARCHITELLO: 175, 190, 190 -- yeah. 172, 175, and 190 are withdrawn.

THE COURT: All right. What about 189?

MS. MARCHITELLO: Withdrawn.

THE COURT: Okay.

MS. MARCHITELLO: And the last one, Your Honor, on 192, that's one where the District, again, agreed, relating to a individual's information.

THE COURT: Okay. All right. Thank you.

MS. MARCHITELLO: Thank you for your patience with that, Your Honor.



THE COURT: That's okay. All right. I am ready to rule --

I didn't give you a lunch break. I'm so sorry. I've just been rolling through. Do you need a break now? Do you need a break now?

THE DEPUTY CLERK: (Inaudible response.)

THE COURT: Hmm?

THE DEPUTY CLERK: (Inaudible response.)

THE COURT: Okay. You can take a restroom break now.

THE DEPUTY CLERK: Okay.

THE COURT: All right, all right.

Got to give Madam Clerk a quick convenience break. Perhaps you all need that as well. I can sit here for hours, and so I'm so sorry. I didn't realize I didn't even break for lunch. So why don't we stand in recess?

How long do you need, Madam Clerk?

THE DEPUTY CLERK: Your Honor --

THE COURT: Ten minutes?

THE DEPUTY CLERK: Yes, that's fine.

THE COURT: Okay. All right. We'll stand in recess.

(Recess from 2:11 p.m. until 2:26 p.m.)

THE DEPUTY CLERK: Recalling the matter of the District of Columbia versus TikTok Inc., 2024 CAB 6377.

escribers
www.escribers.net | 800-257-0885

All parties are present.

THE COURT: Okay. The Court is ready to rule. The parties reached concession and/or agreement on the following -- I'm just going to repeat the list that I have here. If it's incorrect, someone call it out in real time. And the Court is referring to the appendix, the A-1 appendix, provided by the District. So the following are no longer contested: that's 16, 17, 44 in part, 55, 60, 75, 88, 91, 97, 124, 148, 150, 159, 172, 175, 189, and 190. 192 is not on the appendix, but I understand there was some consideration given to that previously. Did I get those numbers right?

MS. MARCHITELLO: Your Honor, I think those include some withdrawn requests; is that correct?

MS. MARCHITELLO: Yes, yes.

MS. MARCHITELLO: In terms of the requests where there is agreement with the District as to the sealing, the numbers that I have -- I don't know if they're meant to be included therein.

THE COURT: Well, whether or not they've been withdrawn or there's agreement --

MS. MARCHITELLO: Okay.

THE COURT: -- there's nothing for the Court to decide.

MS. MARCHITELLO: Okay, and --



THE COURT:  Let's put it in that bucket.  Those are all the numbers that I have, looking at appendix A-1, notwithstanding 192.

MS. MARCHITELLO:  Thank you.

THE COURT:  Is that right?  Did I get the numbers right?

MS. MARCHITELLO:  I think --

MR. ROCK:  That lines up with my notes, Your Honor.

MS. MARCHITELLO:  Yes, Your Honor.

### FINDINGS OF THE COURT

THE COURT:  Okay.  All right.  Okie doke.  So TikTok filed the motion asking for redaction of certain paragraphs in the complaint.  And there are limited exceptions to what this jurisdiction and others have indicated this time-honored right to access to records, or this common-law right of access, is what the courts have said.

And this right of access includes protecting businesses from disclosing information that might harm their competitive standing, if disclosed.  And the interest in preventing such harms may justify keeping under seal certain portions of documents, where there would be an unwarranted invasion of privacy or an invasion of business confidentiality.



And so our Court of Appeals adopted the *Hubbard* factors, which the parties went through at great detail. And the Court must consider these factors when determining whether or not to seal. The first is the need to public access to the documents. There's certainly a presumption in favor of public access to judicial records. Well, the presumption, I would say, is stronger, the Court has said, when the documents are specifically referred to in a trial judge's public decision, I think is what the *Adilahi* (phonetic) cases states. And even though the court did not rely upon an exhibit, there is still this interest in transparency.

That's the first element. The second is the extent to which the public had access to the documents prior to the sealing. The third is the fact that a party has objected to disclosure. The fourth is the strength of the property and privacy interests involved. And there was discussion provided, or authority provided, by the District, relating to, when a party asserts a privacy right over commercial information, it must set out the very specific facts that demonstrate disclosure would result in substantial harm. And so the District was correct that the burden lies to my left.

So using that as a framework -- well, let me say this before I get into the actual provisions. There was



argument about the relevancy of other states having released certain information. I believe this was an argument made by the District and relates to New Jersey and that jurisdiction. There was similar information unsealed in that litigation.

The Court doesn't find that to be entirely relevant, because it's such a fact-specific inquiry that each court must undertake. And the courts, as this Court, the New Jersey court, the other jurisdictions, are weighing different factors, are weighing different considerations and slightly different factual issues to balance, based upon the exact nature of the claims. And so the Court mentioned at the onset, which are no longer at issue, whether there was concession, withdrawal, it doesn't matter. They're not at issue. And so the ones that remain are as follows:

Paragraph number 2 is still at issue. The Court is going to decline the request or deny the request of the of the defendant to seal paragraph number 2. There's not enough -- the Court doesn't find, in balancing the factors, that there's enough to cause a competitive advantage, even if the information is nonpublic, and even if a competitor might receive this information from the disclosure information that they ordinarily may have to seek to pay for, essentially.



www.escribers.net | 800-257-0885

Number 7, the Court is going to deny the request to keep 7 sealed. It's not public. The Court acknowledges that this information is nonpublic, but again, it's not specific enough. The Court hasn't found that TikTok has met its burden to show competitive advantage. I mean, it defines Gen Z as anyone 12 to 27. And so the data on this demographic, in this Court's mind, is not specific enough to cause any harm.

And the fact that children watch TikTok -- children ages, I believe it's 13 to 17, between a certain number of hours, is important to understanding the addictive harm alleged in the complaint. Of course, the Court must balance those facts that the public might have an interest in. And so 7 will remain unsealed.

Wait, I'm sorry. Give me one moment. Yes, 2 will be unsealed. 7 will be unsealed. And so the Court's denying the request as to those two.

As to paragraph 10, the Court is also going to unseal paragraph 10. The counsel for TikTok asked the Court to review the affidavit. The Court did review the affidavit. The Court didn't particularly find it to be helpful to overcome the burden that TikTok has in proving or demonstrating that there is competitive harm that outweighs any public interest here. And there had not been any identifiable, specific harm. And the Court

escribers
www.escribers.net | 800-257-0885

disagrees with plaintiff's [sic] argument. The Court finds that you can't contextualize in terms of the overall profits and provide strategy. And so the Court's going to unseal 10.

28. The Court will also deny the request to keep sealed, and will unseal, number 28. This reveals an advertising budget across all 50 states. The Court finds that's not enough to overcome the burden of showing competitive harm without further information. And certainly when weighing the competitive harm with the other factors, particularly the presumption of unsealing, the Court finds that TikTok hasn't met its burden.

As to Number 30, the Court is going to seal paragraph 30 in complaint -- one moment. Well, excuse me, the Court is going to seal paragraph 30 in part. And so paragraph 30 has a number of users and also the percent that they use the daily app. Now, this is a bit different than in 7. The age statistics are smaller, and the Court finds that allowing the number to be unsealed, that first number found in paragraph 30, would create competitive harm. And it doesn't really add to the interest of the public. It doesn't really facilitate the public understanding the harms as alleged by the District. But it shows that a high percentage of the app every day goes to the allegations of its addictive nature. And so the

escribers
www.escribers.net | 800-257-0885

Court will seal the number of users.  Let me make sure that I have this right.

MR. ROCK:  Your Honor?

THE COURT:  Yes.

MR. ROCK:  There are four numbers sealed in 30.

THE COURT:  Right.  That's why I'm pausing --

MR. ROCK:  And --

THE COURT:  -- to make sure my notes are accurate.

MR. ROCK:  Yeah, and three of those were unsealed either in paragraphs 2 or 7.

THE COURT:  Okay.  Identify the ones that were unsealed.

MR. ROCK:  So the --

THE COURT:  Because I think that's what --

MR. ROCK:  So --

THE COURT:  -- I have pause here.

MR. ROCK:  Yeah, the number of TikTok accounts associated with District users --

THE COURT:  Uh-hmm.

MR. ROCK:  -- between the age of 13 and 17 was unsealed in 2.

THE COURT:  Right, right.

MR. ROCK:  And then the two percentages at the end were unsealed in 10.  So the only --

MR. VERMILLION: 7.

MR. ROCK: 7. I'm sorry, 7.

THE COURT: 7, okay. And the 75 -- or --

MR. ROCK: That was unsealed in 7. The two percentages were both unsealed in 7.

THE COURT: So the two percentages were unsealed. Let me make sure, here, that I have this right. Okay. That's not -- yes. Bear with me here. 7. That's right, that's right.

Did you want to speak?

MS. MARCHITELLO: Your Honor, I agree with the figures that are on there.

THE COURT: Yeah.

MS. MARCHITELLO: I think, obviously, we maintain our motion as to these --

THE COURT: Sure.

MS. MARCHITELLO: -- and think that the aggregate is kind of the problem in some of these. But we understand Your Honor's rulings in both.

THE COURT: Okay. Well, thank you for bearing with me. Given the more recent concessions, I needed to clarify my notes. The Court agrees, the figures have been unsealed in the Court's determination, as relates to 2 and 7. And so 30 -- so 2 will be unsealed.

MS. MARCHITELLO: Your Honor?



THE COURT: Yes.

MS. MARCHITELLO: Excuse me. I think that the second redacted number in 30 --

THE COURT: Yes.

MS. MARCHITELLO: -- is not part of 2 or 7. And so I just want to make sure we're on the same page.

THE COURT: Yes.

MR. ROCK: That's correct.

THE COURT: That's correct, that's correct. I don't have that as being unsealed previously. Nonetheless, the Court doesn't find that the burden has been established to seal that number.

Okay. So moving to 33. Let me just double check here. One moment. Okay. The Court just wanted to check to make sure that the Court's ruling is consistent so far. So 33, the Court finds that the defendant has not sufficiently alleged the competitive harm. Counsel argued that 33 provides revenue from a certain type of transaction and revenue growth and usage change. However, the Court doesn't find that to be a sufficient argument that would weigh against sealing 33, in this case. And 33 will be unsealed.

44. There was an agreement to unseal, in part, the allegations in paragraph 44. And the first -- beginning with the sentence, "In a 2023". So the



information that follows the request has been withdrawn, and what remains is the last two sentences in this case. The Court is going to allow that last part to remain sealed. And this is in paragraph 44. So the sealing begins with, "After not only", and then what follows, the "but that", is not sealed.

The Court understands why the District -- or why there was withdrawal of that first part, because there is a partnership with Abercrombie, and I think that's known. But this is an internal strategy document that I do think could cause competitive harm to TikTok, even weighing against the public's need to know information, particularly that glean or that help individuals to understand the allegations of the complaint.

57. Counsel argued that 57 provides internal, confidential usage. It's not just who, but it's the who, what, where, and why, and that a competitor could obviously obtain this information and use it to restructure its interactive content. The Court isn't persuaded that New Jersey allowed for the unsealing of this information. The Court finds that this paragraph should remain sealed in this case. The Court finds that TikTok has met its burden in proving that competitive harm could flow from the release of this information. So 57 will remain sealed.

68. The Court is going to -- 68 was withdrawn?

MS. MARCHITELLO: Yes.

THE COURT: Okay. All right. I was going to seal it, but okay. All right. Let's just make a note of that.

69. Okay. 69 the Court is going to allow to remain sealed. The Court finds this to be, quite frankly, an exact equation used by the algorithm. And it's not generalized information about TikTok's recommendation algorithm, contrary to the arguments made by the District

91 -- one moment. Counsel for TikTok argued that 91 provides internal strategy concerns. I think the argument was tire kicking. I'm not quite certain if that is what I -- that's what I wrote down. I don't know if that's what you intended to say. But the Court finds -- well, first of all, in terms of 91, the first part of 91 is no longer in dispute. And so that's the title that's found in the first paragraph. But what remains, the Court finds that it could cause competitive harm and that it is internal strategy here, and that this does not -- the need for the public to know and to understand the allegations is not outweighed from the potential harm that can flow to TikTok if this information should be unsealed. And so the Court will seal the remaining portion of 91.

108. Counsel for TikTok argued that 108



provides this specific and future statement, and that one could take a look at 108 and sort of size up TikTok and perhaps take action to do what it's done or to do it even better. Well, the Court does not find that there's been an articulation of the harm that would overcome the burden, particularly given that some of -- I mean, there is an indication and other paragraphs in which the Court -- or there's data, rather, in other paragraphs that the Court has determined will not be sealed. And so the Court finds that the public interest certainly outweighs any competitive harm, which the Court doesn't find to be established.

123. So 123 deals with how well, sort of, TikTok implements its terms of use and whether statements were, in fact, misrepresentations. And there's no competitive -- the Court finds there's no competitive business harms. And knowing how accurate TikTok is at moderating its content will, at least in the Court mind, not help wrongdoers to violate the terms. If anything, this is reputational harm for which the Court has indicated should not be a basis for redaction of public information.

128. Counsel are -- and so 128 [sic] will be unsealed.

MS. MARCHITELLO: Excuse me --



THE COURT: Yes.

MS. MARCHITELLO: -- Your Honor. I think you had just spoken as to 123.

THE COURT: 123, 123. My apologies. I'm moving to 128.

So 128, Counsel argued that there is individual harm to publish. And so the Court asked Counsel, exactly who would be harmed here? Would it be TikTok itself? Would it be the users of TikTok? Would others be emboldened? And the Court finds that this information -- well, first of all, this information is public, except for some numbers indicating the quantity insignificant to the overall allegation.

The Court agrees with TikTok that the very fact that information is public does not weigh in favor of disclosure. But the Court finds that 128 really lends itself to reputational harm, or that it, you know -- that it demonstrates, or provides information, rather, that could lead to reputational harm. Because what it really is conveying is that there is a lack of enforcement by TikTok, and the public certainly has an interest in knowing what is actually happening. And if there is some more leniency, then the public has a right to know that information.

The Court did ask the District about whether or



not having this information would embolden bad actors. And the District argued that this information, number one, it's old information. It's stale -- that's the Court words, not the Districts, but it's from 2020 -- and that whether or not there are any loopholes, whether or not those exist today is not being revealed. But the public, particularly parents, have an interest in knowing that these gaps or these loopholes exist. The Court was convinced by that argument against redaction. And so 128 would be unsealed.

148. So 148 relates to the percentage of users who are dishonest about their age -- one moment. But the Court notes that 150, which has been withdrawn, provides a great deal of information about this sort of back door or age reporting. And so it's hard for the Court to reconcile sealing 148, quite frankly, when 150, that request has been withdrawn. Nonetheless, even absent this recent withdrawal, the Court finds that 148 should be unsealed. It simply states that a certain percentage of users lie about their age to gain access, while 150 gives even more detail as to how that's done.

MS. MARCHITELLO: Your Honor?

THE COURT: Yes.

MS. MARCHITELLO: Understanding your ruling, I do want to just make the point that 150, since we didn't



discuss this during argument --

THE COURT: Sure.

MS. MARCHITELLO: -- is about a slightly different allegation of entering an account through a different app -- and I think this is unsealed now -- you know, Facebook or Google. I think that's a little bit different than going directly and creating an account and going through the age gate at that point. So my client --

THE COURT: But it deals with age gating. It does.

MS. MARCHITELLO: Age gating through third-party versus through the app. And so I think my client would want me to make sure we were straight about that.

THE COURT: Okay.

MS. MARCHITELLO: Thank you.

THE COURT: Understood. Thank you for correcting your record. And so 148 will be unsealed.

155. The District argued that 155 really just shows the ineffectiveness of the features here, or the features that are listed, and bolsters the District's allegations -- or excuse me, that's a different paragraph. 155 talks about the features of this tab, the tab videos, and that it just shows the ineffectiveness of the features. The Court finds that TikTok did not adequately explain the competitive harm from information, indicating

that these videos simply don't work, and how long people stay on the app after having watched the tab videos. There's nothing about development here, just that it doesn't work and that TikTok isn't doing anything about it, at least as alleged by the District. And so the Court finds that TikTok hasn't met its burden as to 155.

As to 189 -- hang on one moment. Counsel, are you rising to discuss 189?

MS. MARCHITELLO: Your Honor, I believe it's withdrawn.

THE COURT: I'm sorry?

MS. MARCHITELLO: Your Honor, I believe it's withdrawn.

THE COURT: Oh, okay. That's right. Okay.

THE COURT: All right. And 190 is withdrawn, so I think that's it. Let me just reconcile. Okay. 192. Right, that's sealed.

Okay. And so I believe that I've captured all of those that have not been resolved. Again, like the parties, my notes indicate, in various different places, where there was concession, withdrawal, or otherwise. Has the Court missed anything that remain at issue? I need the parties' help on this. It's been like a moving target.

MR. ROCK: I don't have anything else, Your

Honor --

THE COURT: Okay.

MR. ROCK: -- from the District.

MS. MARCHITELLO: Your Honor, just clarifying that where parties are in agreement, Your Honor will grant the motion as to that --

THE COURT: Yes.

MS. MARCHITELLO: -- agreed portion? Thank you.

THE COURT: Yes, that's right. That's right.

Okay. And so where does that leave us? That leaves us -- and what would be helpful is if TikTok could provide a proposed order to make sure the Court gets it right, quite frankly, okay?

MS. MARCHITELLO: We'll do that, Your Honor --

THE COURT: All right.

MS. MARCHITELLO: -- and we'll share with the District before submitting it so that they're in agreement we've got it correct.

THE COURT: Okay, fantastic.

All right. And so that brings us to TikTok's opposed motion to seal confidential portions of the motion to dismiss, the motion to stay, and the opposed motion for protective order that was filed on November 22nd. I'm not going to recite what the arguments are. I'll ask TikTok, where do things stand, at least in your mind, at this

juncture, given the rulings thus far?

MR. HACKER: Right. And I think we can expedite this because we see no need to proceed with the motion to seal the motion to dismiss briefing, which was all focused on --

THE COURT: Right.

MR. HACKER: -- just the issues that have been publicly discussed --

THE COURT: Right.

MR. HACKER: -- in the argument. I have two motions related -- I'm not sure there's -- but the motion to seal, the motion to dismiss, and the motion to seal the briefing, I think, we're not proceeding with. I'm not sure if those are separate motions, but --

THE COURT: So the motion at hand is to seal confidential portions of the motion to dismiss, or the alternative opposed motion to stay, and opposed motion for protective order. I'd like to deal with them in order --

MR. HACKER: Yeah, I understand.

THE COURT: -- so the record's clear. So from this motion, what, if anything, remains at issue? I understand the motion to dismiss, that's a moot issue, but what about the other two?

MR. HACKER: So nothing, I think, remains at issue on this motion.



THE COURT: Okay. All right.

MR. HACKER: We do not need to proceed. It can be dismissed as moot or --

THE COURT: Okay.

MR. HACKER: -- we withdraw it.

THE COURT: All right. The Court will deny as moot.

MR. HACKER: Or deny as moot.

THE COURT: All right. So that brings us to the fifth. And you tell me where you believe, Counsel, things stand. Let me just find it.

MR. HACKER: I just want to be sure I have the exact motion in hand when you say that's --

THE COURT: So it's the plaintiff's --

MR. HACKER: Okay.

THE COURT: -- opposed motion for entry of protective order that was filed on the 17th of December.

MR. ROCK: Yes, Your Honor. Jimmy Rock, on behalf of the District. The District's opposed motion for entry of protective order is still a live issue. There are five areas of disagreement that remain between the District and TikTok on entry of a protective order to govern discovery here. And those are the same five issues that were set out in the District's reply brief. They are whether the protective order would include a law

enforcement sharing provision that would allow other law enforcers; the District to share information with other law enforcers for law enforcement purposes, if those law enforcers agree to be bound by the terms of the protective order. Then there are three issues that deal with highly confidential information and how it could be used. The three disputes there are whether the definition of highly confidential information should be limited --

THE COURT: Mr. Rock, I beg your pardon.

There was one other motion, Counsel.

If you could have a seat for one moment.

MR. ROCK: Oh, sure.

THE COURT: I want to make sure we're doing this in order.

You had mentioned, Counsel, that you wanted to make sure that you responded, and you wanted to know exactly what motions were at issue. I forgot to mention the January 9th motion, filed by TikTok, for leave to file, under seal, confidential portions of its reply brief in support of its motion to dismiss or the alternative. What is your stance on that?

MR. HACKER: So that can be treated the same as --

THE COURT: Okay.

MR. HACKER: -- the motion to seal the motion to



dismiss briefing.

THE COURT: All right, very good. So here is our last and final motion. I'm sorry, Mr. Rock. All right.

MR. ROCK: No worries, Your Honor. Thank you.

So yes, the motion for protective order is still -- there's still the dispute. Three disputes that are there. One is the inclusion of a law enforcement sharing provision, which is common in protective orders, where OAG is bringing an affirmative case in the Superior Court. The second are three disputes that are tied together, and they go to whether the definition of highly confidential information should include only information that is extremely sensitive.

And from the District's position, it should be so limited. Because this is not a case where you have two companies who are competitors. You have a government enforcer as the plaintiff and a company as the defendant. So having an extremely broad definition of highly confidential information makes no sense.

And then there are two underlying disputes to that, which is what, then, can be done with information that is labeled highly confidential by TikTok. And TikTok has requested that there be inclusion of a term that would limit the District from sharing highly confidential

information from TikTok with experts, without the District disclosing those experts earlier in the discovery process than normally they would be disclosed.

And then second is whether information marked highly confidential could be shared with deponents, and under what terms. The District's position is highly confidential information should be shared with any fact deponent if there is a good reason to do it. TikTok's position is that you should only share their highly confidential information with fact witnesses who you know authored that information. The District, for reasons in its brief, believe that is overly limiting.

And then the final dispute is whether information that's in the public domain would continue to be subject to the protective order if it was -- if it's in the public domain and was not improperly put into the public domain by the District. So if there's information out there that TikTok believes should be protected by the order, but the public now knows about it through some other party than the District putting it out there, then it would not be subject to a protective order.

And just to frame this issue, I will say the Office of Attorney General has spent a lot of time in recent years litigating the scope of protective orders in the Superior Court, in part, to avoid having to go back

and start anew every time and have another dispute with every defendant that ends up being the subject of an enforcement case.

The law enforcement sharing provision, which is, you know, the first dispute among the parties, has been litigated extensively in the Superior Court by the Office of Attorney General. In cases like this, it is routinely adopted. And as the District put into its reply brief, Superior Court judge after Superior Court judge have recognized the public benefit and the public interest in allowing law enforcement sharing, by the Office of Attorney General, when it's involved in an affirmative enforcement case like this.

And so we cite cases involving complex consumer claims like this one. We cite cases, you know, as recently as December 2023, where Judge Carl Ross, in entering exactly the same law enforcement sharing provision that the Attorney General asked for here, in another enforcement case, recognized -- this is *District of Columbia versus Shipt, Inc.*, 2022 Ca. 4909b. You know, Judge Ross said this Court recognizes the important public interest in allowing law enforcement agencies to share information for legitimate purposes, and precluding the Attorney General from doing so in this case would not be consistent with this policy.

escribers
www.escribers.net | 800-257-0885

THE COURT: But isn't one of the contentions of TikTok that the law enforcement agencies are not identified?

MR. ROCK: That true, but they -- in order to receive the information, that agency has to agree to treat it subject to this Court's order. Or if they have a parallel case, they can have that information subject to a protective order in another case there. But that is right. And there might be legitimate reasons why a law enforcement agency would not want TikTok to know that it was looking at them for a particular issue. But it's still -- the OAG can only share it, under the terms of the order, if there's a legitimate law enforcement purpose, and the law enforcement agency agrees that in receiving that information, they will treat it subject to this Court's order.

So one, the sharing will likely be very limited in context, because it has to be for legitimate law enforcement purposes. And then if the information is shared, it's going to be subject to the same protections that we already have in this case.

THE COURT: Counsel, I've read the the motion, the opposition, the reply. I've taken a look at the District's most recent proposed protective order, and it seems as if the parties have been working together to

narrow the issues. I understand what remains. But I wonder if, given the Court's rulings, if the parties should try to work on this further, to come to an agreement. Or do you believe that that would not be efficient? Perhaps there's an impasse. It just seems to me that the parties should have a conversation and work this out.

MR. ROCK: So the parties did have a conversation --

THE COURT: Another conversation.

MR. ROCK: My sense is that the law enforcement sharing provision is -- I'll let TikTok speak for itself. But my sense is that is a nonstarter for them, and that it would be most efficient for the Court to rule on that.

THE COURT: Okay.

MR. ROCK: And part of that is informed by the experience of the Office of Attorney General in having to litigate over this so many times. This is just something that the defendants have a difficult time accepting. And that's why it has been litigated, I think for the law enforcement sharing provision, probably an impasse, and it's more efficient for the Court to rule on it.

I'm not sure whether -- and it might be better question for TikTok -- whether there's flexibility on their part, on not using a definition of highly



confidential that's borrowed from cases that are really more -- that are really between two competitors, as opposed to a government enforcer on one side and a company that's the target of enforcement action on the other.

THE COURT: Okay. Let me hear from TikTok to see if this can be narrowed, or if you think another conversation might be helpful. Because usually the parties can reach some agreement on the protective order.

MS. MARCHITELLO: Your Honor, we will undertake, in good faith, any conversation that you want us to have. I do want to just respond for a little context, since Opposing Counsel has offered some. First, we do think there are some significant differences on the five provisions that Opposing Counsel discussed.

And I think a baseline issue -- as much as the District is saying that it shouldn't have to ever relitigate this, it uses this all the time -- we've heard a lot today about Judge Kravitz. And in the Meta case that we discussed in the motion to dismiss briefing, there was a very similar process to what we're doing here. And they were able to secure, in some cases with the District's agreement, a more protective protective order than the District is offering here.

So I think any negotiation which is going to concern, in a large part, TikTok's confidential



information, should be a little bit more than what we've been able to get so far. So if there is some -- I would be willing to talk with my team about more heading where Judge Kravitz lay. We also have an MDL court overseeing similar issues that has a protective order. We think that offers some good guidance. They've resisted some of that. So it is a little bit difficult, but perhaps we can get a bit closer with further discussion.

THE COURT: What about with respect to --

And Counsel, you can have a seat. I'm going to be here a minute with Counsel.

What about the law enforcement sharing provision?

MS. MARCHITELLO: Your Honor, I think the issue, in part is what Mr. Rock described. Maybe they don't want us to know. In that case, if something is given out and it's confidential information, maybe they sign the protective order. I'm sure they would try to follow it. We would never know. There would be no ability to enforce it. It essentially is a, information walks out the door. We would not know about it. We'd have no ability to effectuate the protective order.

That's a really big risk, especially when we don't really know how they are defining law enforcement agencies. And in the protective order for the Meta action

with Judge Kravitz, there was a more defined universe -- I think it was specifically federal law enforcement agencies and -- I'm sorry, I should have it right here -- but you know, at least naming who you think counts. Oh, yeah. State attorneys general and United States federal government enforcement agencies.

Now, I'm not sure I have the authority to agree to that right now, but that sure is more limited and tells us who might have this information than what we're able to get here, which is sort of an unwillingness to identify which are these law enforcement agencies in the first instance. And we think at least that much is reasonable in this context.

THE COURT: Okay. Here's what I'd like to do. I'd like the parties to have another conversation, okay? About the protective order to see if the parties can reach a consensus.

When are they back before me?

THE DEPUTY CLERK: Friday --

THE COURT: Is there an ISC -- I think this Friday.

MR. HACKER: It's Friday.

THE COURT: Okay. Does that give the parties enough time? And then you can report back to me where you are? Today's Monday.



MR. ROCK: Yes, we can revisit this motion at the initial status conference.

THE COURT: Okay. Well, Fridays are quite busy. And as you can see, I take all the time that I need. So we'll see where we are. We'll see where we are. I have some thoughts, but I think the parties should just have another conversation. So it would be helpful if the parties can submit a precipe to the Court on Thursday, advising the Court of whether or not there is a consensus as to the categories or what remains at issue.

And that way the Court can rule as to that issue. I think that's the best -- I think that's the best path forward, okay? So that's Thursday, you know, by noon, okay? That will give me some time.

So we were going to -- so that takes care of everything, except I promised I'd circle back to the fourth.

MR. ROCK: Can I ask one quick question --

THE COURT: Yes.

MR. ROCK: -- on the ISC, Your Honor?

THE COURT: Yes.

MR. ROCK: Which is, it's currently set as a remote status conference.

THE COURT: Yes.

MR. ROCK: Do you hold those remotely or --

escribers
www.escribers.net | 800-257-0885

THE COURT: Yes.

MR. ROCK: Okay, great.

THE COURT: Yes, yep, those will be remote. And I don't know what my day looks like on Friday, but if there is any issue left for the Court, then I will endeavor to resolve it. There's not much for me to do here. I've already considered the issue, so I will endeavor to resolve it, on the record, on Friday.

I indicated that I would circle back to, I believe it was the fourth -- was it the fourth motion? Okay. And Counsel indicated that you would give it more thought. And tell me where you believe your client stands as it relates to the motion. Let me just find it here. Was it 4? I don't know if it was 4.

MR. HACKER: I have it listed as 2, but --

THE COURT: Yeah, I do too, I think. Give me one moment. I do think it's 2.

All right, Counsel, let me hear from you.

MR. HACKER: So I think we are now where we were earlier, which is we understand and accept treating the denial of the motion as moot because it's effectively -- the substance of the relief sought is effectively resolved by the Court's ruling of, you know, denying the motion to dismiss or stay in the alternative, recognizing that that's without prejudice to renewing it at an appropriate



time, if and when Visby (phonetic), you know, takes whatever action is going to take.

And so --

THE COURT: Right.

MR. HACKER: -- that seems like the right disposition. Then what would proceed is sort of discovery in the normal course, with, at that point, we can resolve -- I think it would be appropriate to resolve any narrow, specific objections, you know, to particular requests, some of which -- I'm not prejudicing this at all -- but which might be based on, you know, the need for more information from Visby, that kind of thing. But that would just be resolved through the usual discovery back and forth --

THE COURT: Okay.

MR. HACKER: -- and if necessary, motions to compel, that kind of thing.

THE COURT: I see. Okay. And so your thought hasn't changed, essentially. And so the motion will be denied as moot. Of course, that is without prejudice.

All right. If I could have the proposed order by -- well, it's 3:10 -- by close of business tomorrow, okay, that will be helpful. Then I'll look out for the precipe. Please send a courtesy copy to chambers so that I can know that it's there, and I can be prepared on

Friday. I think that's about all we can do today.

Anything for the District?

MR. ROCK: No. Thank you, Your Honor.

THE COURT: All right. Anything for TikTok?

MR. HACKER: No, Your Honor. Thank you.

THE COURT: All right. Thank you. I think I've worn you all out. I'm so sorry. All right.

THE DEPUTY CLERK: Court is adjourned for the day.

(Thereupon, the proceedings were concluded.)

* * * * *



CERTIFICATE OF TRANSCRIBER

I, DeAnne Ridge, transcriber, do hereby certify that I have transcribed the proceedings had and the testimony adduced in the case of DISTRICT OF COLUMBIA v. TIKTOK, INC., Docket Number: 2024 CAB 006377, in said Court, on the 24th day of February, 2025.

I further certify that the foregoing 184 pages constitute the official transcript of said proceedings as transcribed from audio recording to the best of my ability.

In witness whereof, I have hereto subscribed my name, this 26th day of February, 2025.

_____

TRANSCRIBER



# EXHIBIT M

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS,

        Plaintiff,

   v.

TIKTOK INC., TIKTOK U.S. DATA
SECURITY INC., TIKTOK LLC, TIKTOK PTE.
LTD., TIKTOK LTD., BYTEDANCE INC., and
BYTEDANCE LTD.,

        Defendants.

Case No. 2024CH09302

Judge Michael T. Mullen

## MEMORANDUM OPINION AND ORDER

This is an action brought by the Illinois Attorney General under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, ("ICFA") (Count 1) and the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, ("UDTPA") (Count 2) against the owners and operators of the popular social media application TikTok. More specifically, this action is brought against defendants TikTok Inc., TikTok U.S. Data Security Inc., TikTok LLC, TikTok Pte. Ltd., TikTok Ltd., ByteDance Inc., and ByteDance Ltd. (the "Defendants"). This matter comes before the Court on the Defendants' combined section 2-619.1 motion to dismiss (the "Motion") the Complaint filed by Plaintiff the People of the State of Illinois (the "State"). The Court has reviewed the briefs and supplemental authorities submitted by the parties and heard the parties' oral arguments. For the reasons discussed below, the Defendants' motion is denied.

## I. Background

In 2017, ByteDance released TikTok as a video-hosting application. Complaint ("Compl.") ¶ 51. Today, TikTok is among the most widely used social media applications in the world. *See id.* ¶¶ 64-66. The "TikTok Platform" is an online entertainment platform that allows users to create,

share, and comment on videos. *Id.* ¶¶ 50-54. The central feature of TikTok is its "For You" feed. *Id.* ¶ 96. Each individual user has a different "For You" feed that serves the user with an endless stream of videos provided by TikTok's "Recommendation System." *Id.* The Recommendation System is comprised of a complex set of algorithms that work together to predict how to maximize user engagement. *Id.* ¶ 100. The Recommendation System's predictions are based on behavioral patterns and data trends gleaned from users' interactions with the videos. *Id.* ¶¶ 104-05. The Recommendation System does not detect a video's content or identify why a user might decide to watch (or skip) a video. *Id.* ¶¶ 98-99. Therefore, the Recommendation System does not, because it cannot, determine what users subjectively want to see. *Id.* ¶ 96. As the Recommendation System does not know or understand the contents of the videos it serves, the State's allegations describe this system as "content-agnostic." *Id.* ¶ 101.

The State alleges that TikTok is designed to create compulsive and excessive use by young users, *i.e.*, children (individuals under the age of 13) and teenagers (individuals aged 13 to 17). *Id.* ¶¶ 1-3. The State further alleges that the Defendants have *targeted* children and teenagers with coercive-by-design features to keep young users on the TikTok Platform as long as possible in order to sell advertisements and catalog their data. *Id.* ¶¶ 1, 3, 67-79, 82, 122, 144, 154. The State alleges that the Defendants are aware that the TikTok Platform is particularly compelling but harmful to young users as it is designed to override their autonomy and increase time spent on the TikTok Platform. *See id.* ¶¶ 1, 80-95. The State additionally alleges that TikTok Platform features also drive compulsive and excessive use by young users, which the Defendants know is detrimental to young users' mental health. *Id.* ¶¶ 5, 118-56, 195, 199, 208, 213-14, 361. These features include filters that interact with videos, push notifications, and the "For You" feed's endless stream of

2

videos. *Id.* The State alleges that the Defendants' development and deployment of these technologies amount to unfair business practices under the ICFA. *Id.* ¶ 362.

The State further alleges that the Defendants have misled the public about its Platform. The State alleges that the Defendants have made false statements about TikTok's features, as well as the company's overall goals as to how the TikTok Platform is used. *Id.* ¶¶ 230-358. TikTok's officials – including their CEO – allegedly made deceptive public statements in Congressional testimony, as well as at TED Talks (filmed at TED conferences and released online), in full-page newspaper advertisements, and in official statements on their company website. *Id.* The State alleges that these false and misleading statements violate both the ICFA and the UDTPA, 815 ILCS 510/2, which is incorporated into the ICFA. *Id.* ¶¶ 361, 369; 815 ILCS 505/2.

More specifically, the State alleges that the TikTok platform is "unfair" because certain features cause user-generated content on the TikTok Platform to become "addict[ive]," leading younger users to engage with excessive content. Compl. ¶¶ 362-65. The State alleges a number of features are unfair:

- **Recommendation system.** The State challenges the TikTok Platform's use of algorithms to review and select videos for each user, presenting each with a personalized stream of videos. *Id.* ¶¶ 96-117;

- **Effects.** The State challenges "[e]ffects" that allow user-creators to edit how their videos appear. *Id.* ¶¶ 119-20;

- **Autoplay and "infinite scroll."** The State challenges the use of features that allegedly "automatically begin[] to play" videos in a user's feed when the user opens the application, *id.* ¶¶ 121-23, and that "load and serve new videos for the user to view as the user scrolls through their feed," *id.* ¶¶ 124-27;

3

- **TikTok Stories and LIVE.** The State challenges TikTok Stories, which allows users to post videos that remain visible on the TikTok Platform for 24 hours. *id.* ¶¶ 127-28, and TikTok LIVE, a feature that allows users to livestream videos, *id.* ¶¶ 127-31;

- **Push notifications.** The State challenges "push notifications," which "alert a user" to activity within the TikTok Platform. *Id.* ¶¶ 132-44; and

- **Likes, comments, and other interactions.** The State challenges features that allow users to interact with each other, by "lik[ing]" or commenting on videos. *Id.* ¶¶ 145-56.

The State further alleges that the Defendants have inadequately and inaccurately described the alleged risks and harms of using the TikTok Platform. *Id.* ¶¶ 361, 369. The State's deception claims allege misrepresentations concerning the following topics:

- **Safety of TikTok Platform design features.** The State alleges that the Defendants misrepresented and concealed that TikTok Platform features promote "compulsive, prolonged, and unhealthy use by young users." *Id.* ¶¶ 157-227, 361(A)-(C), (F), 362(A), 369(A)-(B), (D)-(E);

- **Efficacy of TikTok Platform "safety tools."** The State alleges that the Defendants misrepresented the efficacy of various TikTok Platform safety "features" and "processes for protecting young users." *Id.* ¶¶ 228-356, 361(D), (G), 369(C), (F). Specifically, the State challenges representations about the efficacy of TikTok Platform "screentime management tools," *id.* ¶¶ 231-65, and content management features, *id.* ¶¶ 266-88, and the Defendants' alleged inconsistent application and enforcement of TikTok Platform content-moderation policies, such as its "Community Guidelines," *id.* ¶¶ 289-356; and

- **TikTok Platform's safety priorities.** The State alleges that the Defendants misrepresented that it "prioritized young users' health and safety." *Id.* ¶¶ 357-58, 361(E).

4

In response to the State's Complaint, the Defendants moved to dismiss the State's Complaint in a combined motion pursuant to Code of Civil Procedure section 2-619.1, 735 ILCS 5/2-619.1, raising arguments under 735 ILCS 5/2-619 ("Section 2-619") and 735 ILCS 5/2-615 ("Section 2-615").[1] In essence, the Defendants argue that dismissal is warranted under Section 2-619, as the State's claims are precluded by both Section 230 of the Communications Decency Act, 47 U.S.C. § 230, and the First Amendment to the United States Constitution, U.S. Const. amend. I. The Defendants further argue that dismissal is required under Section 2-615 as the State has failed to plead properly the required elements of an ICFA claim. The motion has been fully briefed. Following the close of briefing, the Court allowed both parties to cite to supplemental authorities and then heard oral arguments from the parties' very able counsel.

## II. Analysis

### A. Standard of Review

The Defendants' motion has been brought pursuant to Section 2-619.1 of the Code of Civil Procedure, which permits Section 2-615 and Section 2-619 motions to be brought in a single motion. *See* 735 ILCS 5/2-619.1 (2024). Although the Section 2-615 and 2-619 motions may be combined, they may not be commingled. A motion to dismiss filed under Section 2-615 of the Code challenges the legal sufficiency of the complaint based upon defects apparent on its face. 735 ILCS 5/2-615 (2024); *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 47. The critical inquiry is whether the allegations in the complaint are sufficient to state a cause of action for which relief may be granted. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). In making this determination, all well-pled facts in the complaint and all reasonable inferences that may be drawn from those facts,

---

[1] Although the Defendants do not specifically identify under which subpart of Section 2-619 this motion has been brought, the Court assumes that the Defendants' motion is brought under Section 2-619(a)(9), which provides that an asserted claim is barred by "other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9).

5

are taken as true and are to be construed in a light most favorable to the plaintiff. *Khan*, 2012 IL 112219, ¶ 47; *Young v. Bryco Arms*, 213 Ill. 2d 433, 441 (2004). A 2-615 motion does not admit conclusions of law or conclusory factual allegations unsupported by specific facts alleged in the complaint. *Zander v. Carlson*, 2020 IL 125691, ¶ 25. A cause of action should not be dismissed unless it is clearly apparent that no set of facts can be proved that would entitle a plaintiff to recover. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). However, a court may not rely on extrinsic material when ruling on a Section 2-615 motion. *Bryson v. News Am. Publ'ns. Inc.*, 174 Ill. 2d 77, 91 (1996).

In contrast, a motion to dismiss under Section 2-619 admits the legal sufficiency of all well-pled facts but allows for the dismissal of claims barred by affirmative matter that defeats those claims or avoid their legal effect. *Janda v. U.S. Cellular Corp.*, 2011 IL App (1st) 103552, ¶ 83 (citing *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006)). "Affirmative matter" encompasses any defense other than a denial of the essential allegations of the plaintiff's claim. *Khan*, 2012 IL 112219, ¶ 18. For this reason, a Section 2-619 motion admits as true all well-pled facts and all reasonable inferences drawn from those facts. *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 488 (2008). Additionally, a cause of action should not be dismissed under Section 2-619 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 277-78 (2003).

### B. The Defendants' 2-615 Motion

The Consumer Fraud Act is a regulatory and remedial statute designed to protect consumers against unfair and deceptive business practices. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416-17 (2002). "It is to be liberally construed to effectuate its purpose." *Id.* at 417. Section 7 of the ICFA authorizes the Attorney General to sue any person utilizing methods. acts. or

6

practices declared to be unlawful under it and to seek a multitude of remedies including injunctive relief, restitution, and civil penalties. 815 ILCS 505/7. To state a claim under the ICFA, "the Attorney General need allege only that: (1) a defendant is engaged in a trade or commerce; and (2) the defendant is engaged in unfair deceptive acts or practices in the conduct of that trade or commerce." *People ex rel. Hartigan v. All Am. Aluminum & Constr. Co.*, 171 Ill. App. 3d 27, 34 (1st Dist. 1988). The State, through the Attorney General, has sufficiently pled that the Defendants have engaged in both deceptive and unfair conduct.

### i. The Complaint sufficiently pleads deceptive acts.

#### A. The Consumer Fraud Act.

The State has sufficiently alleged that the Defendants violated the ICFA through deceptive statements regarding TikTok Platform features and the company's intent to keep users on the TikTok Platform for as long as possible. *See* Compl. ¶¶ 157-358. To state a claim for deceptive conduct under the ICFA, the State must allege that: (1) the Defendants committed a deceptive act or practice; (2) the Defendants intended for consumers to rely on that deceptive act or practice; and (3) the deception occurred in the course of trade or commerce. *People ex rel. Madigan v. United Constr. of Am.*, 2012 IL App (1st) 120308, ¶ 16.

The Defendants maintain that the State has failed to plead the first element, *i.e.*, that the Defendants committed a deceptive act or practice. An act or practice is deceptive under the Consumer Fraud Act if it has the tendency or capacity to deceive. *Harwood v. Piser Mem'l Chapels*, 102 Ill. App. 3d 514, 518 (1st Dist. 1981). In its Complaint, the State has identified numerous statements made by the Defendants' representatives that, if proven, would meet this standard. These allegations include:

7

- A full-page advertisement in the *Washington Examiner*, along with similar advertisements in newspapers like the *Washington Post*, stating that "Teen accounts automatically have a daily screen time limit of 60 minutes," though, the State alleges, this "limit" is easily circumvented by entering a passcode and, thus, is not really a limit at all. It is reasonable to infer that the purpose of this advertisement was to convince parents that their teens would be unable to spend more than one hour per day on TikTok, inducing them to allow their teens to use it. The words "automatically" and "limit" have well-understood, concrete meanings, and the phrase "[o]nly on TikTok" represents that this is a feature differentiating TikTok from other social media applications that have no purported limits. When paired with the State's allegations that this "limit" could be easily disabled for the remainder of any given day, the Complaint sufficiently alleges that this advertisement was deceptive. Compl. ¶¶ 241-44, 256-63.

- Congressional testimony by Michael Beckerman, TikTok's Vice President and Head of Public Policy, and statements by Shou Chew, TikTok's CEO, at a TED Talk touting "Take a Break" videos and "Family Pairing," which were purportedly created to be time-management tools. The State alleges, however, that TikTok acknowledged that these referenced tools are merely "useful talking points" and are "not altogether effective" at actually managing compulsive use or time spent on the TikTok Platform. *Id.* ¶¶ 162-67, 259-64.

- Congressional testimony by CEO Chew describing TikTok's approach to its product as a "safety-by-design mentality, even if those features limit [TikTok's] monetization opportunities," while the State alleges TikTok's internal records established that its business model was actually designed to optimize time spent on the TikTok Platform.

8

Indeed, the company's internal metrics for success regarding several "safety features" measured drops in time minors spent on the TikTok Platform and sought to *minimize* any drop in time spent by minors to no more than 5%. *Id.* ¶¶ 249-55.

- Official media statements representing that TikTok had not found any evidence of a dangerous "Blackout Challenge" on the application, although, the State alleges that months before these statements were made, TikTok's internal records described the "Blackout Challenge" as a "high risk trend." *Id.* ¶¶ 296-304.

Taking these well-pled allegations as being true, as is required when determining whether to grant or deny a 2-615 motion, the State has clearly set forth explicit statements regarding TikTok Platform's design and safety features that extend well beyond "mere puffery." These statements are not "subjective characterizations" as the Defendants argue when quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 173-74 (2005). "Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud." *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 73 (2007).

In the State's Complaint, it is clearly and factually alleged that the statements:

i.      were public representations about specific features of the TikTok Platform;

ii.     described how the company designed its product and intended consumers to engage and react to its product; and

iii.    demonstrated whether the company was aware of dangerous content on the TikTok Platform.

The Complaint alleges that each of these statements were false and contradicted by TikTok's own documents. At this stage of the proceedings, it is reasonable to infer that the Defendants intended for consumers to rely on identified statements considering their public nature

9

and that some were contained within paid advertisements that clearly emphasized the alleged safety of the TikTok Platform. Further, the State's Complaint alleges that during testimony at a Congressional hearing (which had been convened to determine TikTok Platform safety) CEO Chew emphasized that TikTok's cited features ensured the safe and appropriate use of its product. A reasonable inference is that CEO Chew's testimony demonstrates both the importance of this information and that the Defendants intended for consumers to rely on the accuracy and truthfulness of the information conveyed.

Although the Defendants argue that the State is attempting to have this Court find that an otherwise lawful good or service itself constitutes an unfair act or practice, the well-pled allegations support the State's identified cause of action and is not novel as the Defendants argue. The State's Complaint sufficiently alleges claims for deceptive conduct in violation of the Consumer Fraud Act.

## B. The Uniform Deceptive Trade Practices Act.

In its Complaint, the State alleges that the Defendants violated Sections 2(a)(5), (7), and (12) of the UDTPA. Section 2(a)(5) makes it unlawful to represent that a good or service has characteristics, uses, or qualities that the good does not have. 815 ILCS 510/2(a)(5). The State alleges that TikTok represented that the TikTok Platform had certain features designed to limit the time young users spend on it when these features are actually ineffective. For example, the State alleges in its Complaint that Beckerman testified before Congress that TikTok has "a responsibility, along with parents, to make sure that [TikTok is] being used in a responsible way" and that Chew stated at a TED talk that the Defendants' "goal is not to optimize and maximize time spent." Compl. ¶¶ 159-60. The State alleges that these cited statements misrepresented the nature of the TikTok Platform, as the Defendants designed it to do just the opposite – "target users' time and attention"

10

and "exploit psychological vulnerabilities to keep young users compulsively using the TikTok Platform." *Id.* ¶ 161.

Section 2(a)(7) makes it unlawful to represent that goods or services are of a particular standard or quality when they are really of another. 815 ILCS 510/2(a)(7). Chew's cited testimony before Congress that TikTok "launch(ed)...products with a safety-by-design mentality, even if those features limit our monetization opportunities," is contradicted by TikTok's cited internal metrics for success that reasonably establish that the opposite is true. Compl. ¶¶ 249-55. For example, the State alleges that TikTok's guidelines are to stay within "guardrails" for new safety features to only allow a maximum of a 5 % drop in stay time for young users. *Id.* ¶¶ 252-53.

Section 2(a)(12) makes it unlawful to engage in conduct that creates a likelihood of confusion or misunderstanding. 815 ILCS 510/2(a)(12). The State's Complaint contains allegations as to how the Defendants have misled consumers regarding the 60-minute "limit" for teen accounts that are easily circumvented and which, in fact, do not create any real limit at all. The State's Complaint sufficiently alleges claims for conduct in violation of the UDTPA, which is a violation of Section 2 of the ICFA.

### ii.   The Complaint sufficiently pleads unfair business practices.

Illinois courts consider three factors to determine if conduct constitutes an unfair business practice in violation of the ICFA. "These factors are: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Robinson*, 201 Ill. 2d at 417-18 (citing *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)) (the "*Sperry* factors"). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the

11

degree it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 418 (quoting *Cheshire Mortgage Serv's, Inc. v. Montes,* 612 A.2d 1130, 1143 (Conn. 1992)).

The State identifies several technologies developed and deployed by the Defendants to teens that it claims constitute unfair business practices. These technologies, all of which were pushed to and used by teens, include: (1) an algorithm that recommends an endless stream of new and diversified videos on users' "For You" feeds meant to create a "slot machine" type of effect of producing dopamine reactions in young users' brains; (2) "effects" that are overlayed on top of videos to alter users' appearances; (3) autoplay of videos; (4) live and ephemeral videos; (5) push notifications; and (6) interactive features such as "likes" and comments. Compl. ¶¶ 96-156. The State claims that these features drive young users to compulsive and excessive use of the TikTok Platform and that TikTok is aware that they are detrimental to teens' mental health. *Id.*

Construing the Complaint in the light most favorable to the State, the Court finds that these allegations satisfy all three *Sperry* factors at least to some extent. *First,* a practice satisfies the "immoral, unethical, oppressive, or unscrupulous" *Sperry* factor if it is so oppressive that it leaves consumers with little alternative but to submit to it. *Robinson,* 201 Ill. 2d at 418. The State argues that this *Sperry* factor is satisfied through its allegations that the TikTok Platform is designed to keep young users on it by taking advantage of their dopamine reward systems and creating social consequences for those who do not use the TikTok Platform excessively. Compl. ¶¶ 80-156. While the Defendants argue that consumers always have a choice as to whether to use a service that is on the market, it is reasonable to infer, given the facts as alleged in the Complaint, that this choice is illusory for teens because of social pressure and the immaturity of their developing brains. The State alleges that the Defendants specifically target children, who have unique psychological vulnerabilities, with algorithmic models and features meant to keep them on the TikTok Platform

12

as long as possible. *Id.* ¶¶ 3. 67–156. Further, the State alleges that studies have shown that 63 % of Americans aged 13-17 reported using TikTok, with most teens reporting using it daily. *Id.* ¶¶ 66, 210.

The cases cited by the Defendants to rebut this factor, *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731 (N.D. Ill . 2016), and *Ristic v. Machine Zone, Inc.*, No. 15 CV 8996, 2016 U.S. Dist. LEXIS 127056 (N.D. Ill. Sept. 19, 2016). are distinguishable. Both cases dealt with the general addiction of adults. not claims based on the deliberate targeting of minors' brain chemistry and their uniquely sensitive "fear of missing out" of what their peers are doing. Indeed. the one court to apply Illinois law to a claim similar to this one found both *Phillips* and *Ristic* inapplicable. *See California v. Meta Platforms, Inc. (In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.)* (the "*Social Media MDL*"). 753 F. Supp. 3d 849, 895-97 (N.D. Cal. Oct. 15, 2024).

*Second*, a practice may satisfy the "substantial injury" *Sperry* factor by doing a small harm to a large number of people or raising a significant risk of concrete harm. *Id.* at 895-96. The State satisfies this criterion through numerous allegations showing that the Defendants have knowledge that the coercive nature of the TikTok Platform is harmful to young users but refuse to change the TikTok Platform to prevent such harm. Compl. at ¶¶ 169–229. The Defendants again argue that *Phillips* and *Ristic* show that this criterion is not satisfied because the courts in those cases found that the adult plaintiffs could have reasonably avoided the costs of buying more virtual coins from those gambling sites. Def. Motion at 15; *Phillips*, 173 F. Supp. 3d at 743; *Ristic*, 2016 U.S. Dist. LEXIS 127056 at *12. But the State's Complaint alleges that the Defendants target the psychological vulnerabilities of young users by designing the TikTok Platform's features to override their ability to engage with it in a non-compulsive manner. Compl. at ¶¶ 134, 138, 161.

13

223(d), 362(C), 363. The State also alleges that significant percentages of users are on TikTok "several times a day" or "almost constantly." *See id.* ¶¶ 66, 210. Consequently, the known harms of the TikTok Platform cannot reasonably be avoided by young users, at least based on the well-pled facts contained in the Complaint. Unsurprisingly, similar arguments that TikTok has made in other jurisdictions have been rejected. *See, e.g., Social Media MDL*, 753 F. Supp. 3d at 898-99; *Commonwealth v. Meta Platforms, Inc.*, No. 23-2397-BLS1, 2024 Mass. Super. LEXIS 161 (Sup. Ct. Mass. Oct. 17, 2024); *Dist. of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-6650, 2024 D.C. Super. LEXIS 27 at *50–51 (Sup. Ct. D.C. Sept. 9, 2024).

*Finally*, to satisfy the "public policy" *Sperry* factor, a practice needs to at least fall within the penumbra of a common-law or statutory concept of unfairness. *See Doctors Direct Ins., Inc. v. Bochenek*, 2015 IL App (1st) 142919, ¶ 34. The State argues that creating an application meant to addict minors falls within the penumbra of various Illinois laws to shield minors from products and services that tend to be used addictively, such as drugs, alcohol, and gambling: 1) the Juvenile Court Act of 1987, art. IV, 705 ILCS 405/4-1; 2) the Juvenile Drug Court Treatment Act, 705 ILCS 410; and 3) the Illinois Gambling Act, 230 ILCS 10, *et seq.* The Court agrees that the State's claim falls within this penumbra sufficiently to satisfy the public policy *Sperry* factor.

The well-pled allegations contained within the State's complaint satisfy each *Sperry* factor. Therefore, the Complaint states a sufficient claim for unfair conduct in violation of the ICFA. The motion to dismiss pursuant to Section 2-615 must be denied.

### C. The Defendants' 2-619 Motion

The Defendants' threshold argument contained in its 2-619 motion, is that even if the State's allegations set forth viable claims under ICFA or UDTPA, those claims are barred by Section 230 of the Communications Decency Act and the First Amendment. The Defendants

14

recognize that the State has made allegations relative to TikTok Platform's "own conduct," but argue that the cited conduct is actually conduct that constitutes the acts of deciding which third-party videos to display to each user and how to display them. The Defendants maintain that as such, the acts are expressive publishing activity protected by both Section 230 and the First Amendment.

### i.    *Section 230 of the Communications Decency Act does not bar the State's claims.*

Section 230 generally protects online platforms from being held liable as the "publisher or speaker" of third-party content. 47 U.S.C. § 230(c)(1). Section 230 makes clear that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider[,]" and it preempts any state law inconsistent with that provision. 47 U.S.C. §§ 230(c), (e)(3). These provisions immunize online platforms from both suit and liability for any alleged harms arising out of "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009); *Winter v. Facebook, Inc.*, 2021 U.S. Dist. LEXIS 224836, at *8 (E.D. Mo. Nov. 22, 2021) (collecting cases).

Section 230's protections are broad and extend to "causes of action of all kinds[,]" *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267 (D.C. Cir. 2019), ranging from claims arising from a provider's "exercise of its editorial and self-regulatory functions," *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997), to claims arising from providing users with "a forum with[in] which to communicate" and "failure to delete content," *Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019). To avoid chilling the expressive activity that online platforms facilitate, courts "agree" that "close cases . . . must be resolved in favor of" protecting online platforms. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,

15

521 F.3d 1157, 1174 (9th Cir. 2008) (en banc). As the Defendants correctly argue, courts should apply Section 230 at the pleading stage, as the statute protects online platforms "from ultimate liability," and also "from having to fight costly and protracted legal battles." *Id.* at 1175; *see, e.g., Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738 (9th Cir. 2024).

Section 230 was passed in the wake of a New York Court's decision in *Stratton Oakmont v. Prodigy Servs. Co.*, No. 31063/94, 1995 N.Y. Misc. LEXIS 229 (Nassau Cnty. Sup. Ct. May 24, 1995), which held that an internet forum website was liable for defamation by a third-party user as the website moderated out some, but not all, potentially defamatory statements of that user. *Zeran*, 129 F. 3d at 331. "The amendment was intended to overrule *Stratton* and provide immunity for 'interactive computer service[s]' that make 'good faith' efforts to block and screen offensive content." *FTC v. LeadClick Media, LLC*, 838 F. 3d 158, 173 (2d Cir. 2016).

While Section 230 has been broadly applied across various causes of action sounding in state tort law, its text and subsequent application clearly show that it is meant to immunize liability based on the substance of third-party content. It is not a "get-out-of-jail-free card" for websites that permit user-submitted content. *Doe v. Internet Brands, Inc.*, 824 F. 3d 846, 853 (9th Cir. 2016). Nor was it "meant to create a lawless no-man's-land on the Internet." *Roommates.com, LLC*, 521 F. 3d at 1164.

Within the not so distant past, many state courts have been presented with motions similar to the Defendants' present motion that seeks the involuntary dismissal of the State's Complaint based on Section 230 immunity. In several cases in which State Attorneys General have brought claims under the relevant state consumer fraud acts against TikTok and Meta, courts have declined to dismiss the Complaints based on arguments that Section 230 provided those entities with immunity. *See, e.g., State of Vermont v. Meta Platforms, Inc.*, No. 23-CV-4453, 2024 Vt. Super.

16

LEXIS 146 at *15–16 (Vt. Super. Ct. July 28, 2024); *Iowa v. TikTok Inc.*, No. EQCE089810, at 20–21 (Iowa Dist. Ct. Aug. 26, 2024); *Dist. of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-6650, 2024 D.C. Super. LEXIS 27 (Sup. Ct. D.C. Sept. 9, 2024); *Nevada v. TikTok Inc.*, No. A-24-886127-B, at 99 (Nev. Dist. Ct. Sept. 24, 2024); *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 230907634, at 13 (Utah Dist. Ct. Nov. 12, 2024); *Commonwealth*, 2024 Mass. Super. LEXIS 161; *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 240904292 at 9-10 (Utah Dist. Ct. Feb. 20, 2025); *Dist. of Columbia v. TikTok, Inc.*, No. 2024-CAB-006377 (Super. Ct. D.C. Feb. 24, 2025); *State of Washington v. TikTok, Inc., et al*, No. 24-2-23100-5 SEA (Super. Ct. Wash. Mar. 28, 2025); *South Carolina v. TikTok, Inc.*, No. 2024-CP-40-06018 (Ct. of Com. Pleas S.C. May 6, 2025).[2]

The Defendants maintain that each court has made the same fundamental mistake. According to the Defendants, each court interpreted the underlying claims as attacks on the Defendants' own conduct. The Defendants assert that the focus should be on the substance of the third-party videos on the Defendants' platform.

The parties agree that the Ninth Circuit's three-prong test in *Barnes v. Yahoo!, Inc.* provides the proper framework to analyze a Section 230 defense. Under this test, Section 230 applies if: (1) the defendant is a provider or user of an interactive computer service; (2) whom a plaintiff seeks to treat as a publisher or speaker under a state law cause of action; and (3) of information provided by another information content provider. *Barnes*, 570 F. 3d at 1100-01. There is no dispute that the Defendants are providers of an interactive computer service; therefore, the first prong of the identified test is satisfied.

"The second and third prongs of *Barnes* require [courts] to consider each cause of action alleged 'to determine whether a plaintiff's "*theory of liability* would treat a defendant as a

[2] The Court fully recognizes that, although each cited decision was well reasoned, none of the cited decisions are binding on this Court.

17

publisher or speaker of third-party content.'"'" *Doe v. Grindr, Inc.*, 128 F.4th 1148, 1151 (9th Cir. 2025) (quoting *Calise v. Meta Platforms, Inc.*, 103 F. 4th 732, 740 (9th Cir. 2024)) (quoting *Barnes*, 570 F. 3d at 1101)) (emphasis in original). The Defendants argue that their actual conduct was a decision they made to determine what third-party content should be published to each user. Therefore, the Defendants maintain that any claims raised by the State (in this or any other cited case) is necessarily based on the substance of the third-party content.

The scope of Section 230 is broad, barring any "lawsuit[] seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions." *Zeran*, 129 F.3d at 330. These "protected" functions encompass any "activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Roommates.com, LLC*, 521 F.3d at 1170-71. The functions include "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content," *Barnes*, 570 F.3d at 1102, as well as "editorial decisions and functions ancillary to the decision to make content available." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 827 (N.D. Cal. 2023) ("In re Soc. Media I").

The "ordinary meaning" of "publisher" includes an online platform's use of "tools such as algorithms that are designed to match [third-party] information with a consumer's interests." *Force*, 934 F.3d at 66. The reason for this broad definition is that a key function of an online platform is to decide what content to select, how to organize it, and how to present it to users. Decisions that are "part and parcel of [a website's] overall design and operation"—and that "reflect choices about what content can appear on the website and in what form"—"fall within the purview of traditional publisher functions." *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (citation omitted).

18

In each decision the Defendants have cited to support dismissal based on Section 230, the plaintiff's theory of liability was based on the substance of third-party user content and the allegations that the defendant was liable because of that content. *See, e.g., Nasca v. ByteDance Ltd.,* Index No. 607250/2023, slip op. (N.Y. Sup. Ct. Apr. 15, 2025) (the claim was based on plaintiff's son committing suicide after viewing user-submitted content promoting suicide and self-harm); *Grindr, Inc.,* 128 F. 4th at 1152 (the claim was based on direct messages on a dating application that led to adults having inappropriate encounters with the minor plaintiff); *M.P. v. Meta Platforms, Inc.,* 127 F. 4th 516, 521 (4th Cir. 2025) (the claim was based on Dylan Roof being radicalized by white supremacist propaganda he viewed on Facebook); *Force,* 934 F. 3d at 65 (the claim was based on Facebook "giving Hamas a forum with which to communicate and for actively bringing Hamas' message to interested parties").

The State's theory of liability as set forth in its Complaint does not treat the Defendants as the publisher or speaker of third-party content. The State alleges that it is *not* seeking to hold the Defendants liable for content created by "another information content provider," but instead for the Defendants' own alleged unfair and deceptive statements and acts. This is true both regarding the alleged addictive-by-design features of the TikTok Platform, as well as the alleged misleading or deceptive claims made by TikTok regarding the safety of the TikTok Platform for children and teenagers.

The alleged unfair conduct consists of technologies developed and deployed by the Defendants. These technologies are analogous to the defendant-developed speed filter at issue in *Lemmon v. Snap,* 995 F. 3d 1085, 1094 (9th Cir. 2021), and the defendant-developed questionnaire at issue in *Roommates.com, LLC,* 521 F. 3d at 1164, neither of which were protected by Section 230. For example, the State alleges that the Recommendation System is designed to create a "slot

19

machine" type effect in users' brains such that the arrival of a new video creates a dopamine reaction, leading to compulsive use in anticipation of more dopamine. Compl. ¶¶ 138-39. "And so the addiction is not to the content, but to this expectation and anticipation which is specifically engineered by the algorithm as an ultimate goal of the engine." *See Tr. of Mar. 28. 2025 Ruling. Wash. v. TikTok, Inc.*, No. 24-2-23100-5 SEA at 57. The State's theory of liability is therefore based on the Defendants' own conduct, not the substance of any third-party user content.

The Defendants maintain that the State's claim *is* in fact based on third-party user content, at least regarding the Recommendation System. According to the Defendants. when the Recommendation System serves a video in a user's "For You" feed, it is "publishing" that video to that user based on the substance of the video and the users' preferences. The Defendants argue that the Complaint explicitly alleges this. At oral argument, Defense counsel pointed to Paragraphs 112 and 113 of the State's Complaint as examples of allegations that are based on the Recommendation System being aware of the substance of the content of the video. These paragraphs allege that the system creates a unique score for each video that creates a weighed prediction as to whether a user will engage with the video. Compl. ¶¶ 112-13. Defense counsel argued that this could not be done without understanding the content of the videos.

The Defendants appear to be seeking an inference that these paragraphs allege that the Recommendation System is aware of the substance of videos. The Complaint's allegations make no such assertion. and such an inference would also contradict prior Complaint allegations. In fact. the Complaint *does* allege that scoring is done without understanding the content of the videos. Neither paragraphs 112 nor 113 allege that the system is aware of the substance of a given video. To determine the nature of the State's cause of action, the Court must consider the whole of the Complaint and not focus on isolated paragraphs. *See Borcia v. Hatyina*, 2015 IL App (2d) 140559,

20

¶ 37. The State's allegations about the Recommendation System describe it as "content-agnostic" – that it does not know to concentrate on content based on a shared substantive trait between videos. Compl. ¶¶ 101-03. Instead, the Complaint alleges that the Recommendation System relies on patterns of user engagement as opposed to the substance of the videos. *Id.* ¶¶ 104-16.

The second prong of the *Barnes* test is also unmet as the State's theory of liability does not treat the Defendants as a "publisher or speaker," but as a product maker. "Although the statute does not define 'publisher,'" courts have interpreted the term to refer to an individual or entity who "*mak[es] the decision* whether to print or retract a given piece of content," as this decision-making function represents "the very essence of publishing." *Klayman v. Zuckerberg*, 753 F. 3d 1354, 1359 (D.C. Cir. 2014) (emphasis added). It protects decisions about "whether to exclude material that third parties seek to post online." *Roommates.com, LLC*, 521 F.3d at 1170-71. These authorities demonstrate that there must be a nexus between a defendant's decision to publish or remove content and the specific substance of that content for Section 230 to apply. Based upon the well-pled allegations, no such nexus exists.

None of the Complaint's allegations pertain to any aspect of the TikTok Platform that could reasonably be related to any decision making as to content exclusion. Therefore, the Defendants cannot be considered a "publisher" under Section 230 because the State's unfairness claim concerns the TikTok Platform's content-agnostic technology that does not involve any decision-making regarding the substance of videos. Section 230 does not bar the State's unfairness claim.

Section 230 also does not immunize the Defendants' alleged deceptive statements. The State's deception claim does not concern the Defendants' role as a publisher of third-party content. Put another way, the State's allegations are based on the Defendants' *own* deceptive statements, not those of a third party. In contrast, the Defendants argue that the State's deception claim is based

21

on the Defendants' failure to remove harmful third-party content. A fair reading of the Complaint makes clear that the deception claim does not seek to hold the Defendants liable for failing to remove third-party content as aggressively as their own policies would require. Rather, the Defendants' failure to remove third-party content is only relevant to the extent that the Defendants have issued statements potentially misleading the public into concluding that the Defendants remove certain types of content despite their failure to do so. Compl. ¶¶ 289–305. A similar argument was rejected in *Demetriades v. Yelp, Inc.*, in which a plaintiff alleged that the Yelp website falsely advertised that its user-submitted reviews passed through a filter to provide consumers with the most trusted reviews. *Demetriades*, 228 Cal. App. 4th 294, 300–01 (2014). The court found that Section 230 did not apply as the plaintiff's claim targeted Yelp's "own statements regarding…its filter," not the third-party reviews themselves. *Id.* at 313. Likewise, the deception claim here targets the Defendants' own statements, not any third-party statements.

The Court has reviewed the well written and reasoned decisions cited by the Defendants in *M.P. v. Meta Platforms Inc.*, 127 F.4th at 524-27, *Grindr, Inc.*, 128 F.4th at 1152-55, and *Angelilli v. Activision Blizzard, Inc.*, 2025 U.S. Dist. LEXIS 7724 (N.D. Ill. Apr. 23, 2025). In this case, the State focuses on the Defendants' statements. Again, it is the Defendants' own statements that are being used to support the deception claim relative to specific features and/or company goals. The Defendants' cited statements are allegedly false and are contradicted by TikTok's internal records. Based upon a thorough review of the State's Complaint and viewing the State's Complaint in the light most favorable to the Plaintiff, it is reasonable to conclude based on specific factual allegations that the State does not seek to treat the Defendants as publishers of third-party content. Rather, the State seeks to hold the Defendants responsible for their own design features that determine what videos to display, how to display them and how users can interact with the videos.

22

The Court has concluded that as both the State's unfairness and deception claims do not seek to treat the Defendants as a publisher of the third-party content published on the TikTok platform, the protections afforded by Section 230 do not apply.

### ii. The First Amendment does not bar the State's claims.

The Defendants further argue that the First Amendment bars the State's claims. More specifically, the Defendants argue that the First Amendment prohibits the State's challenge to the manner in which the TikTok Platform selects and organizes third-party content. In support of their position, the Defendants cite the recent decision in *Moody v. NetChoice, LLC,* 603 U.S. 707 (2024), in which the Court struck down a challenge seeking to impose liability for protective expressive activity. The Defendants also argue that the State's deception claims would compel the Defendants to warn about potential harms from viewing third-party content on the TikTok Platform in violation of the First Amendment.

The First Amendment protects a platform's "exercise of editorial control and judgment" in selecting content for publication and the speech on the platform itself. *Miami Herald Publ'g Co. v. Tornillo,* 418 U.S. 241, 258 (1974). *Moody* stemmed from a facial challenge to Florida and Texas statutes that regulated content moderation. The Supreme Court confirmed that expressive editorial judgments made by traditional publishing entities apply equally to online platforms, like the TikTok Platform, and are protected by the First Amendment. As the Court observed, a platform's choices about "which third-party content" an online platform's viewer feed "will display"—"or how the display will be ordered and organized"—are what "give the feed a particular expressive quality." *Moody,* 603 U.S. at 738-40. The *Moody* Court made very clear that the First Amendment prohibits a state's attempt to regulate or "alter[]" how an online platform chooses "the views [it] will, and will not, convey." *Id.* at 737. The Court, however, specifically excluded "feeds

23

whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." *Id.* at 736, n.5. *Moody's* holding explicitly excluded the type of claim that is framed within the State's Complaint. *See Vermont v. Meta*, 2024 Vt. Super. LEXIS 146 at *18 (distinguishing *Moody*).

As to the unfairness claim, the Defendants assert that the State is challenging the Defendants' editorial control and judgment over what content to show to users. Generally, a state actor's interference with a newspaper's editorial control and judgment, *i.e.*, the choice of material that appears in a newspaper or the treatment of public issues and public officials, violates the First Amendment's guarantees to a free press. *Tornillo*, 418 U.S. at 258. The State's claims, however, are not based on the substance of any content appearing on the TikTok Platform.

The State specifically alleges that the Defendants' content-agnostic technology does not know or engage with the substance of the content it serves. Compl. ¶¶ 101-03. Rather, the claim is based on TikTok's alleged role in manipulating young users' brain chemistry to induce compulsive and excessive use of the TikTok Platform. *See Vermont*, 2024 Vt. Super. LEXIS 146 at *17 (noting that Meta's First Amendment argument "fails to distinguish between Meta's role as an editor of content and its alleged role as a manipulator of Young Users' ability to stop using the product."). The State's deception claims are based on the Defendants' own alleged false and misleading commercial speech, not how the Defendants moderate content. "[T]he Supreme Court has repeatedly emphasized that the first amendment is not a bar to State regulation prohibiting false, misleading or deceptive commercial speech." *Scott v. Assoc. for Childbirth at Home, Inter.*, 88 Ill. 2d 279, 287 (1981) (citing *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 774 (1976)). A fair reading of the allegations contained within the State's

24

Complaint and viewing the well-pled allegations in the light most favorable to the State, the State is challenging non-expressive conduct, not a manifestation of the Defendants' expression.

The Defendants further argue that the First Amendment bars the deception claim as the ultimate injunctive relief would necessarily be compelled speech. Yet, the State has not presently requested this Court for the extraordinary remedy of injunctive relief. Consequently, this argument is clearly premature. As importantly, the State's Complaint does not request the relief as characterized by Defendant. The specific injunctive relief requested in the State's Complaint is an injunction "to prevent future violations of the Consumer Fraud Act." Compl. at 81, ¶ B. The Court will not order any injunctive relief unless the State properly establishes the need for such a remedy.

The Court concludes that the State does not seek to impose liability impermissibly for protective expressive activity. The Court further concludes that the State's unfairness and deception claims do not violate the Defendants' First Amendment protections as they do not seek to "regulate" or "alter[]" "editorial choices" that the TikTok Platform makes in providing a third-party content viewing experience. The Defendants' Section 2-619 motion is therefore denied.

### III. Conclusion

The State has sufficiently alleged claims for both deceptive and unfair conduct under the ICFA and deceptive conduct under the UDTPA. These claims are not barred either by Section 230 of the Communications Decency Act or the First Amendment. The Defendants' Section 2-619.1 motion to dismiss is therefore denied.

WHEREFORE, it is hereby ordered that:

1.      The Defendants' Combined Motion to Dismiss the State's Complaint pursuant to 735 ILCS 5/2-619.1 is denied in its entirety.

25

2. The Defendants shall file their Answer to the Complaint within 21 days of the date of this order and no later than July 3, 2025.

3. The previously set status date of July 8, 2025 at 1:30 p.m. stands, and the parties may appear via Zoom pursuant to the below instructions:

ZOOM INSTRUCTIONS
Zoom Meeting ID:      966 9558 1801
Zoom Meeting Password:      160424
Zoom Call-in Number:      312-626-6799

DATE:                                                    SO ORDERED:

6-12-2025

Judge Michael T. Mullen

Judge Michael T. Mullen

JUN 12 2025

Circuit Court-2084

26

# EXHIBIT N

IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT
OF HINDS COUNTY, MISSISSIPPI

**FILED**

AUG 27 2025

EDDIE JEAN CARR, CHANCERY CLERK

BY _____ D.C

**ORIGINAL**

LYNN FITCH, ATTORNEY GENERAL
OF THE STATE OF MISSISSIPPI, *ex rel.*,
STATE OF MISSISSIPPI                                                        **PLAINTIFF**

V.                                          CIVIL ACTION NO. G2024-1235
2025-M-1111-SCT

TIKTOK, INC., BYTEDANCE INC.,
BYTEDANCE LTD.,TIKTOK LTD.
TIKTOK LLC                                                                  **DEFENDANTS**

---

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS [MEC #28]

---

THIS CAUSE is before the court on *Defendants' Motion to Dismiss* [MEC #28] the

*Complaint* [MEC #2] of Plaintiff Lynn Fitch, Attorney General of the State of Mississippi *ex*

*rel.* State of Mississippi ("the State").  This court has held full hearing on the matter and

received all relevant argument in support and opposition thereto.   After careful

consideration, this court finds that the motion is not well taken and should be denied.

The current action was filed by the Attorney General of the State of Mississippi against

Defendants TikTok, Inc., TikTok Ltd., TikTok LLC, ByteDance Inc., and ByteDance Ltd.

(collectively "TikTok") for alleged violations of the Mississippi Consumer Protection Act,

Miss. Code Ann. §75-24-1, et seq. ('MCPA").  In its *Complaint* [MEC #2], Plaintiff alleges

that Defendants' deceptive trade practices, unfair acts and practices, negligence, and

1


MOTION# 2025-30556

**FILED**

SEP 17 2025

OFFICE OF THE CLERK
SUPREME COURT
COURT OF APPEALS

App. 659

failure to warn has significantly impacted the State of Mississippi and its citizens, particularly "Young Users"; the State seeks an award of damages, disgorgement and civil penalties pursuant to statutory law, as well as injunctive relief. Defendants maintain that the State's *Complaint* [MEC #2] must be dismissed for lack of personal jurisdiction under Rule 12(b)(2). Defendants further allege that the State's *Complaint* fails to state a claim upon which relief may be granted under Rule 12(b)(6); Defendants maintain that the action is barred by Communication Decency Act, Section 230, the First Amendment and Mississippi's Free Speech Clause.

## FACTUAL BACKGROUND

Defendants operate as one of the world's largest social media platforms, allowing people to create, share and exchange content (such as the posting of texts, photos, videos, etc.) with other users of the platform. The State maintains that Defendants' platform design features violate the MCPA because they allegedly "encourage Young Users' compulsive and unhealthy use of and addiction" to the platform. Plaintiff further asserts that Defendants "deceived consumers, parents, and guardians by failing to disclose that TikTok is, on balance, harmful to consumers . . . by concealing information about some of their most popular platform features, by promoting misleading metrics about platform safety, and by touting inaccurate and ineffective 'well-being' initiatives" among others. Accordingly, the State alleges that "the unfair addictive design elements of the TikTok platform cause substantial injury to Mississippi consumers, particularly to Young Users in the state, which cannot be reasonably avoided by Mississippi consumers due to the addictive quality of the

2

design elements and TikTok's misrepresentations regarding the safety and nature of the platform."

## ANALYSIS

### Personal Jurisdiction

"When a nonresident defendant moves to dismiss for lack of personal jurisdiction, plaintiffs need not make a full showing on the merits that jurisdiction is proper but must make a *prima facie* showing of the facts upon which *in personam* jurisdiction is predicated to avoid dismissal for lack of jurisdiction. In this regard, 'the allegations of the complaint, except as controverted by the defendants' affidavits, must be taken as true.'" *Hogrobrooks v. Progressive Direct*, 858 So. 2d 913, 919–20 (Miss. Ct. App. 2003)(quoting *Strong v. RG Indus., Inc.*, 691 F.Supp. 1017, 1018 (S.D.Miss.1988).

Personal jurisdiction over a nonresident defendant is determined under a two-part inquiry. *Joshua Props., LLC v. D1 Sports Holdings, LLC*, 130 So. 3d 1089, 1092 (Miss. 2014)(citing *Estate of Jones v. Phillips ex rel. Phillips*, 992 So. 2d 1131, 1137 (Miss. 2008)). The first inquiry is whether Mississippi's long-arm statute, Miss. Code Ann. § 13-3-57, confers personal jurisdiction over the nonresident defendant. If so, the second inquiry is whether personal jurisdiction comports with constitutional due process. *Fitch v. Wine Express Inc.*, 297 So. 3d 224, 228 (Miss. 2020). Mississippi's long-arm statute provides, in pertinent part:

3

> Any nonresident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

Miss. Code Ann. § 13-3-57 (Rev. 2019). Defendants herein did not contest the applicability of the pertinent statute. Even absent this tacit acknowledgement, this court specifically finds that Defendants have engaged in "doing business" within the state as set forth in § 13-3-57.

Finding that Defendants are subject to the long-arm statute, this court must determine whether adjudicating the claims in Mississippi comports with constitutional due process. When the plaintiff alleges specific jurisdiction, as the State does here, a three-prong test must be satisfied to meet due process requirements:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Nordness v. Faucheux*, 170 So. 3d 454, 464 (Miss. 2015) (quoting *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009). Courts have applied differing tests for evaluating when online activity constitutes minimum contacts with a forum state: (i) the sliding-scale test as enunciated in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124

4

(W.D. Pa. 1997) or (ii) the totality-of-the-circumstances approach set forth in *Illinois v. Hemi Group LLC*, 622 F.3d 754 (7th Cir. 2010). This court finds that Defendants have minimum contacts with Mississippi under either test.

In *Zippo*, the court opined:

> the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper.

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). The State's *Complaint* demonstrates that "[t]o fully access TikTok, consumers must create an account. As part of the account-creation process, consumers enter into a contract with Defendants. By entering into these contracts, users agree to be bound by. . . TikTok's Terms of Service and its Privacy Policy." Taking the same as true, this court finds that Defendants enter into contracts with residents of the State of Mississippi that "involve the knowing and repeated transmission of computer files over the Internet" and therefore personal jurisdiction is proper under the *Zippo* test.

In a similar consideration of minimum contacts involving online activity, the *Hemi* court found sufficient minimum contacts for personal jurisdiction when defendant "stood ready and willing to do business with Illinois residents. And [defendant], in fact, knowingly did do business with Illinois residents." *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 758 (7th Cir.

5

App. 663

2010). The State's *Complaint* details Defendants' directed advertising in Mississippi, including certain Mississippi-specific accounts and advertising agencies in the state specifically devoted to TikTok marketing. The State asserts that "TikTok specifically tracks the average revenue per user it generates through ads targeted to Mississippi, which is well over $100 per year per Mississippi user, including from those under the age of 18".

In addition, the State gives specific examples of actual contact and donations given by Defendants to organizations in Mississippi. The *Complaint* details donations to the Parent Teacher Associations ("PTA"s) specifically earmarked for Mississippi, including thousands of dollars to McWillie Elementary PTA and Barack H. Obama Magnet Elementary School. The *Complaint* maintains that internal documents note close tracking of donations to the PTA, contacts and communications with PTA members, and scheduling of private meetings with state PTA organizations; such tracking specifically includes donations, contacts and communications with Mississippi PTAs. The State also notes that Defendants have donated grants to the James Bear Foundation with an emphasis on Mississippi businesses in an effort to promote TikTok to Mississippi consumers and a $1 million donation to Tougaloo College in Jackson in order to further its misrepresentations regarding TikTok's commitment to public health in the Mississippi.

Finally, the State's *Complaint* details affirmative lobbying efforts by Defendants within the state. It referenced a July 30, 2024, media-only event in Jackson where members of TikTok's safety enforcement team spoke on "TikTok Sparks Community". It also noted a May 8, 2020 appearance on a "Mississippi radio segment".

6

Based on the foregoing, this court finds that the Defendants "'stood ready and willing to do business' with Mississippi residents, and 'knowingly did do business' with Mississippi residents. And they did so frequently." *Fitch v. Wine Express Inc.*, 297 So. 3d 224, 233 (Miss. 2020) (citation omitted). Accordingly, Defendants clearly had minimum contacts with the state. The entirety of the State's cause of action arises out of or relates to the Defendants' forum-related activities; the same is uncontested. To determine whether jurisdiction comports with fair play and substantial justice:

> A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.

*Asahi Metal Indust. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 113, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987) (quoting *World-Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. 580); *Phillips*, 992 So. 2d at 1141-42. Defendants herein did not assert any particular burden on defending a lawsuit in Mississippi. However, the State has a particularly weighty interest in obtaining relief for its citizens, injunctive and otherwise, within Mississippi. "Mississippi courts have a strong interest in providing a forum to resolve disputes involving the state itself." *Fitch v. Wine Express Inc.*, 297 So. 3d 224, 233 (Miss. 2020). Therefore, the court finds that jurisdiction within the state comports with fair play and substantial justice. Accordingly, the court finds that personal jurisdiction over Defendants is proper and the request for dismissal for lack of same is hereby denied.

7

## Rule 12(b)(6)

Mississippi law is clear that courts should favor disposition on the merits of the claim and that any motion otherwise should be granted cautiously. *See Franklin County Cooperative v. MFC Services (A.A.L.)*, 441 So. 2d 1376 (Miss. 1983); *Brown v. Credit Center, Inc.*, 444 So. 2d 358 (Miss. 1983). A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint. *Lagniappe Logistics, Inc. v. Buras*, 199 So.3d 675, 677 (Miss. 2016). The court limits its review to the face of the complaint, accepting all allegations therein as true. *City of Meridian v. $104,960.00 U.S. Currency*, 231 So.3d 972, 974 (Miss. 2017). Rule 12(b)(6) motions "are decided on the face of the pleadings alone." *Hartford Cas. Ins., Co. v. Halliburton Co.*, 826 So.2d 1206, 1211 (Miss.2001); *State v. Bayer Corp.*, 32 So. 3d 496, 502 (Miss. 2010). Such a motion should not be granted unless "it appears beyond a reasonable doubt that the plaintiff will be unable to prove any set of facts in support of the claim." Id. (*citing Rose v. Tullos*, 994 So.2d 734, 737 (Miss. 2008)). *See also Pryer v. Gardner*, 247 So. 3d 1245, 1250 (Miss. 2018), reh'g denied (Aug. 2, 2018), cert. denied, 139 S. Ct. 949, 203 L. Ed. 2d 137 (2019). Judicial practice favors disposition on the merits, and a motion to dismiss under Rule 12(b)(6) "contemplates a high degree of speculation by the reviewing court." *Children's Medical Group, P.A. v. Phillips*, 940 So.2d 931, 934 (Miss. 2006). Where any doubt exists as to the appropriateness of summarily dismissing a matter, the court should err on the side of a disposition on the merits.

Defendants assert that the State's claims fail under Rule 12(b)(6) based on three (3) primary arguments: (1) Section 230 of the CDA; (2) the First Amendment; and (3)

8

Mississippi's Free Speech Clause. Defendants further assert a general "failure to state a claim upon which relief may be granted."

The federal Communications Decency Act ("CDA") states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C.A. § 230 (c)(1) (West). Federal courts have interpreted this provision, as follows:

> it appears that subsection (c)(1) only protects from liability
> (1) a provider or user of an interactive computer service
> (2) whom a plaintiff seeks to treat, under a state law cause
> of action, as a publisher or speaker (3) of information
> provided by another information content provider.

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009), *as amended* (Sept. 28, 2009). Federal courts have been somewhat divided in applying subsection (c)(1) with regard to claims stemming from web-based service providers' publication of information created by third parties. *See e.g., Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008); *Anderson v. TikTok, Inc.*, 116 F.4th 180, 184 (3d Cir. 2024). This court finds guidance in a recent discussion of the issue by the Ninth Circuit:

> It is imperative to consider that "neither [subsection 230(c)]
> nor any other declares a general immunity from liability
> deriving from third-party content." *Id.* at 1100. Indeed, that
> could not be true; for most applications of § 230 in our
> internet age involve social media companies, which nearly all
> provide some form of platform for users to communicate with
> each other. In cases such as these, "[p]ublishing activity is a
> but-for cause of just about everything [defendants are] involved
> in. [They are] internet publishing business[es]." *Internet Brands*,
> 824 F.3d at 853; *see also Calise v. Meta Platforms, Inc.*,
> 103 F.4th 732, 742 (9th Cir. 2024) ("Putting these cases
> together, it is not enough that a claim, including its underlying
> facts, stems from third-party content for § 230 immunity to
> apply."). The proper analysis requires a close examination

9

of the duty underlying each cause of action to decide if it "derives from the defendant's status or conduct as a publisher or speaker." *Barnes*, 570 F.3d at 1107.

*Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1176 (9th Cir. 2024), *cert. denied sub nom. Est. of Bride v. Yolo Techs., Inc.*, 145 S. Ct. 1435, 221 L. Ed. 2d 558 (2025). Under a Rule 12(b)(6) analysis, this court need only consider whether the State's *Complaint* is based upon Defendant's status or conduct as a publisher or speaker. The plain language of the *Complaint* belies the same. The State expressly disavows any such basis for the claims asserted in this action, stating:

> The State does not challenge or seek to curtail the publishing of any specific type of thirdparty content. Notably, these design elements . . . are not tethered to any specific thirdparty content. Indeed, the substance of any content incorporated into or used by the Design Elements is immaterial. Instead, the Design Elements themselves create the risk and harm of addiction.

The crux of the State's case is that Defendants "'encourage Young Users' compulsive and unhealthy use of and addiction" to the platform through dangerous design elements and that Defendants "deceived consumers, parents, and guardians by failing to disclose that TikTok is, on balance, harmful to consumers . . . by concealing information about some of their most popular platform features, by promoting misleading metrics about platform safety, and by touting inaccurate and ineffective 'well-being' initiatives" among others. This court finds that such allegations are not based upon the status or conduct of Defendants as publisher or speaker. Accordingly, this court declines to find that Defendants are entitled to immunity under Section 230.

10

Similarly, this court finds that the State does not seek to interfere with Defendants' editorial discretion regarding the user-generated content it displays on its platform. Therefore, Defendants' rights under the First Amendment and Mississippi's Free Speech Clause are not infringed by this action. The State seeks to hold Defendants liable for "its deceptive business practices in, among other things, designing its platform to be inescapably addictive, and for misrepresenting that addictiveness to the people of Mississippi." The United States Supreme Court has observed that commercial misrepresentations are not protected under the First Amendment.

> Untruthful speech, commercial or otherwise, has never been protected for its own sake. Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805-806 (1974); Konigsberg v. State Bar, 366 U.S. 36, 49, and n. 10, 81 S.Ct. 997, 1005-1006, 6 L.Ed.2d 105, 116 (1961). Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely.

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771–72, 96 S. Ct. 1817, 1830–31, 48 L. Ed. 2d 346 (1976). In a case involving claims against a social media platform under a consumer protection statute similar in kind to the MCPA, the D.C. Court of Appeals held "[i]n other words, even if content moderation is itself protected speech, fraudulent misrepresentations regarding a company's moderation practices is not." *Meta Platforms, Inc. v. D.C.*, 301 A.3d 740, 758 (D.C. 2023). This court has considered the cases cited by Defendants which extend the First Amendment to

11

editorial discretion in compiling third party content. However, this Court finds *Moody v. NetChoice, LLC*, 603 U.S. 707, 144 S. Ct. 2383, 219 L. Ed. 2d 1075 (2024) and its progeny to be distinguishable from the facts herein based on the allegations of deception and misrepresentation. Assuming all facts contained in the *Complaint* as true, this court cannot find that Defendants' rights under the First Amendment or Mississippi Free Speech Clause are infringed by the State's pursuit of its claims under the MCPA. Therefore, this court denies the motion seeking to dismiss based on the same.

Finally, Defendants assert that the State has failed to state a claim under the MCPA upon which relief may be granted. The purpose of the MCPA is "to protect the citizens of Mississippi from deceptive and unfair trade practices." In re *Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So.3d 829, 841 (Miss. 2015). The MCPA prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." Miss. Code Ann. § 75-24-5(1). "Mississippi does not require a finding of fraud for an act to be deemed unfair or deceptive." *In re Miss. Medicaid Pharma. Avg. Wholesale Price Litig.*, 190 So. 3d 829, 841 (Miss. 2015). Rather, Mississippi courts are "guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act." *Id.* (citing Miss. Code Ann. § 75-24-3). A trade practice is unfair if three factors are met: (1) it causes or is likely to cause a substantial injury; (2) the injury is not "outweighed by any countervailing benefits to consumers or competition that the practice produces"; and (3) the injury could not have been reasonably avoided. *Id.* (citing 15 U.S.C. § 45(n)). In order to survive a Rule 12(b)(6) motion, the State need only plausibly allege an "unfair" or "deceptive" practice under the

12

MCPA. In its *Complaint*, the State maintains that Defendants engaged in actions which, taking all facts as true, would constitute unfair and deceptive trade practices under the MCPA, Miss. Code Ann. §75-24-1, *et seq.* and Section 5(a)(1) of the Federal Trade Commission Act. The *Complaint* specifically sets out allegations of Defendants' "unfair and deceptive conduct, which violated Mississippi law." These allegations include intentionally incorporating design elements to make its platform unfairly addictive to Mississippi consumers, especially to Young Users of the platform, and misrepresenting those addictive qualities thereby constituting unfair and deceptive practices in violation of the MCPA. Such misrepresentation and concealment are actions prohibited under Miss. Code Ann. §75-24-5(2)(g) and Miss. Code Ann. §75-24-5(2)(e). Furthermore, "[p]roviding false information is deceptive and violates the [Mississippi Consumer Protection] Act." *In re Mississippi Medicaid Pharmaceutical Average Wholesale Price Litig.*, 190 So.3d 829, 842 (Miss. 2015), *reh'g denied* (May 26, 2016).

The *Complaint* further alleges that Defendants herein have used and continue to use methods, acts, and practices which are prohibited by Section 75-24-5. The State alleges that Defendants have engaged in a pattern of deceptive conduct, currently engage in a pattern of deceptive conduct, and will likely continue such conduct in the absence of injunctive relief. When considering the sufficiency of the allegations to bring an action under 75-24-9 of the MCPA, "the controlling issue is whether the State has alleged facts that support a reasonable inference of present or future illegal conduct that needs to be enjoined." *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1186 (Miss. 2020). *See also Navient Corp. v. State ex rel. Fitch*, 313 So. 3d 1034, 1041 (Miss. 2021). The

13

State has adequately alleged continuing misconduct sought to be enjoined that is asserted as likely to be repeated in the future. Accordingly, the State has established a viable claim for injunctive relief under the relevant statutory scheme. Based upon the foregoing, this Court cannot find beyond a reasonable doubt that the Plaintiff can prove no set of facts in support of its claims.

The State has sufficiently pled its claims under MCPA, addressing all essential elements necessary to survive a motion seeking dismissal at this juncture.

## CONCLUSION

A motion to dismiss "tests the legal sufficiency of the complaint[.]" *City of Meridian v. $104,960.00 U.S. Currency*, 231 So. 3d 972, 974 (Miss. 2017) (citing *Jourdan River Estates, LLC v. Favre*, 212 So. 3d 800, 802 (Miss. 2015)). "The motion should not be granted unless it appears beyond a reasonable doubt that the plaintiff will be unable to prove any set of facts in support of the claim." *Id.* (citing *Rose v. Tullos*, 994 So. 2d 734 (Miss. 2008)). Lastly, "[t]here must be no set of facts that would allow the plaintiff to prevail." *Id.* (internal quotation marks omitted) (quoting *J.B. Hunt Transp., Inc. v. Forrest Gen. Hosp.*, 34 So. 3d 1171, 1173 (Miss. 2010)).When considering a Rule 12(b)(6) motion to dismiss, the Court must accept the allegations in the complaint as true ."However, the decision to grant or deny a motion to dismiss is in the discretion of the trial court and will not be reversed on appeal unless that discretion is abused." *Taylor v. S. Farm Bureau Cas. Co.*, 954 So. 2d 1045, 1047 (Miss. Ct. App. 2007)(citing *State Indus., Inc. v. Hodges*, 919 So.2d 943, 945(¶ 2) (Miss.2006)). Based upon the foregoing analysis, this Court cannot

14

find beyond a reasonable doubt that the State will be unable to prove any set of facts in support of its claims. Therefore, *Defendants' Motion to Dismiss* [MEC #28] is denied.

SO ORDERED, ADJUDGED, AND DECREED THIS the 27th day of August, 2025.

_Tiffany Grove_

CHANCELLOR TIFFANY GROVE

15

App. 673

# Exhibit K to Petition
# - Order Denying Defendants' Motion to Dismiss

# EXHIBIT O

IN THE SUPREME COURT OF THE STATE OF NEVADA

TIKTOK, INC.; BYTEDANCE INC.;
BYTEDANCE LTD.; TIKTOK, LTD.;
AND TIKTOK LLC,
Petitioners,
vs.
THE EIGHTH JUDICIAL DISTRICT
COURT OF THE STATE OF NEVADA,
IN AND FOR THE COUNTY OF
CLARK; AND THE HONORABLE
JOANNA KISHNER, DISTRICT
JUDGE,
Respondents,
  and
THE STATE OF NEVADA,
Real Party in Interest.

No. 89709

FILED

NOV 06 2025

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
DEPUTY CLERK

Original petition for a writ of prohibition or, alternatively, mandamus challenging a district court order denying a motion to dismiss for lack of personal jurisdiction and for failure to state a claim in a consumer protection action.

*Petition denied.*

O'Melveny & Myers LLP and Jonathan D. Hacker, Stephen D. Brody, and Martha F. Hutton, Washington, D.C., and Daniel M. Petrocelli and Lauren F. Kaplan, Los Angeles, California; Campbell & Williams and J. Colby Wiliams and Philip R. Erwin, Las Vegas,
for Petitioners.

Aaron D. Ford, Attorney General, Ernest Figueroa, Consumer Advocate, and Mark J. Krueger, Chief Deputy Attorney General, Carson City; Claggett & Sykes Law Firm and Michael J. Gayan, Sean K. Claggett, William T. Sykes, Richard K. Hy, Brittnie T. Watkins, Micah S. Echols, Charles Finlayson, and David P. Snyder, Las Vegas; Kemp Jones, LLP, and

 

J. Randall Jones and Don Springmeyer, Las Vegas; Morris, Sullivan, Lemkul, and Turtzo, LLP, and Will Lemkul, Christopher Turtzo, and Christian Barton, Las Vegas; Nachawati Law Group and Philip D. Carlson and Brian E. McMath, Dallas, Texas; WH Law and David F. Slade, North Little Rock, Arkansas,
for Real Party in Interest.

BEFORE THE SUPREME COURT, EN BANC.

*OPINION*

By the Court, CADISH, J.:

Real party in interest State of Nevada filed a complaint against petitioners TikTok, Inc., and its related entities asserting, as is relevant here, violations of the Nevada Deceptive Trade Practices Act (NDTPA). The State alleged that TikTok knowingly designed its social media and short-form online video platform to addict young users, thus inflicting various harms on young users in Nevada, and knowingly made misrepresentations and material omissions about the platform's safety. TikTok moved to dismiss, arguing lack of personal jurisdiction and immunity from liability. The district court denied the motion, determining that it could properly exercise specific personal jurisdiction over TikTok based on conduct purposefully directed at Nevada and that neither the Communications Decency Act (CDA), codified as 47 U.S.C. § 230, nor the First Amendment immunized TikTok from the State's NDTPA claims. TikTok now petitions for writ relief, challenging both rulings.

We agree with the district court as to both issues. First, the State showed that TikTok had the necessary litigation-related contacts to support specific jurisdiction via (1) TikTok's collection of young Nevada users' personal data and its sale of that data to third-party advertisers that target those users and (2) the design of its platform to maximize data collection and ad sales. Second, the CDA § 230 and the First Amendment do not bar the State's NDTPA claims as pleaded. One claim targets TikTok's own alleged misrepresentations and misleading omissions and therefore does not run afoul of the First Amendment or invoke TikTok's traditional editorial functions immunized under the CDA § 230. The other claim that TikTok uses harmful design features does not on its face target any expressive activity or third-party content; nor would TikTok need to alter or remove any third-party content to comply with the alleged duty to design a reasonably safe social media platform for young users. Accordingly, we deny TikTok's petition.

## RELEVANT FACTS

Because this case is before us on a denied motion to dismiss, for purposes of our analysis, we view the following factual allegations from the State's complaint as true and draw all inferences in its favor. *Buzz Stew, LLC v. City of North Las Vegas*, 124 Nev. 224, 228, 181 P.3d 670, 672 (2008). TikTok is a free social media platform that allows users to create, upload, and share their own short videos and watch, "like," share, and comment on other users' videos, known as TikToks. The TikTok platform is accessible online through an app on electronic devices, including cell phones. From users' online activity, TikTok collects personal data, including information about messages users send or receive, the content users provide, the way they interact with ads, the time they spend interacting with different

content, the hardware and software they use, and their locations. Although the app is free, TikTok generates revenue from the targeted, data-informed advertising opportunities that it sells to various companies. TikTok is popular with users aged 17 and under, with roughly 19 million U.S.-based young users on the platform as of 2022. TikTok generated roughly $9.4 billion in revenue in 2022, $2 billion of which resulted from ad revenue linked to young users in the U.S. TikTok has community guidelines that prohibit users from posting certain types of content, including sensitive and unlawful content. Those guidelines state that TikTok is "deeply committed to ensuring . . . a safe and positive experience for people under the age of 18."

The principal interface of the app is the "For You" feed, which presents an endless scroll of videos that TikTok recommends to users based on their activity on the app and TikTok's algorithm. A new video automatically appears and begins playing when the user finishes watching a TikTok (autoplay). TikTok's algorithm uses signals from the user's interactions with various content and ads to personalize the scroll. To access the app, users must create an account and agree to TikTok's terms of service and privacy policy. TikTok's user interface also displays (either publicly or privately) a user's number of "friends" as well as the number of interactions, views, likes, dislikes, reactions, and comments on user-provided content (quantified popularity). Hashtag challenges are a popular trend on TikTok, wherein users take some action, record it, and post with a particular hashtag—e.g., the complaint refers to the "Blackout Challenge," where a user asphyxiates themself on camera, and the "Nutmeg Challenge," where the user attempts to ingest a large amount of nutmeg on camera, inducing hallucinations and other side effects.

TikTok sells digital coins to users that the users can send to their favorite TikTok content creators as gifts. TikTok also allows users to post live content that is only available in that moment (livestreaming). To drive engagement, TikTok uses "push notifications" to alert users to new content that might interest the user or otherwise entice them back to the app with messages, buzzes, lights, or sounds. These notifications may arrive at any hour, day or night. TikTok also makes available augmented-reality or aural filters that users can apply to their own videos and photos, including cosmetic filters that alter a user's appearance to make them more attractive—e.g., the "Bold Glamour" filter, which changes facial features and simulates makeup.

TikTok recently added features that could be considered well-being initiatives. For example, the app prompts users who spend more than 100 minutes on the app to consider taking a break. TikTok users under the age of 15 on average spend roughly 105 minutes a day on TikTok, with 10 percent of those users spending more than 4 hours a day on the app.

TikTok issued a publicly available statement on "Youth Safety and Well-Being," stating:

> Youth safety is our priority. We do not allow content that may put young people at risk of exploitation, or psychological, physical, or developmental harm. This includes child sexual abuse material (CSAM), youth abuse, bullying, dangerous activities and challenges, exposure to overtly mature themes, and consumption of alcohol, tobacco, drugs, or regulated substances. If we become aware of youth exploitation on our platform, we will ban the account, as well as any other accounts belonging to the person.

(O) 1947A

TikTok, Ltd.'s CEO stated in testimony to Congress that "[TikTok] will keep safety—particularly for teenagers—a top priority[.]" TikTok has made similar comments at national and state PTA meetings. TikTok's Community Guidelines also state that TikTok "do[es] not allow showing or promoting disordered eating or any dangerous weight loss behaviors" or "sexual activity or services" and does not allow the promotion of dangerous or criminal activities that may harm people, animals, or property. TikTok has also acknowledged problematic "filter bubbles," where a "user encounters only information and opinions that conform to and reinforce their own beliefs, caused by algorithms that personalize an individual's online experience." These filter bubbles result in content with drugs, alcohol, sex, and violence being placed in young users' For You feed because "the app doesn't differentiate between videos it serves adults and minors."

As of mid-2022, roughly 49 percent of all Nevadans were active TikTok users. Using users' personal data and location, TikTok allows advertisers inside and outside of Nevada to target Nevadans who are on the TikTok app. TikTok also engages in outdoor advertising, including billboards in Las Vegas and Reno. TikTok gave a grant to an elementary school PTA in Las Vegas and attended virtual PTA events, including an event that Nevada's PTA president attended. News stories have been published about kids in Nevada using TikTok in both productive and harmful ways. Lucy Diavolo, *After Her Viral Tik Tok Calling for a Student Strike, Nevada Teen Gillian Sullivan Says Her Classmates Are Still Ready to Mobilize*, Teen Vogue (Aug. 29, 2019), https://www.teenvogue.com/story/viral-tik-tok-student-strike-nevada-teen-gillian-sullivan; Jarah Wright, *'Man up, plead out': Family of Andreas Probst calls on teens to plead guilty,*

KTNV (Oct. 18, 2023), https://www.ktnv.com/news/man-up-plead-out-family-of-andreas-probst-calls-on-teens-to-plead-guilty.

*PROCEDURAL HISTORY*

The State filed a complaint against TikTok, asserting claims for deceptive and unconscionable acts or practices in violation of the NDTPA and other torts. The State alleged that TikTok's platform uses harmful design features intended to keep young users on the app for as long as possible in order to maximize advertising revenue, including (1) low-friction variable rewards (endless scroll and auto-play), (2) social manipulation tools (quantified popularity and coins), (3) ephemeral content, (4) push notifications, (5) visual filters, and (6) ineffective and misleading parental controls and well-being initiatives. The State also alleged that, driven by commercial gain, TikTok publicly and knowingly made several misrepresentations and omissions to deceive consumers about young users' safety on the platform. To support this allegation, the State cited internal TikTok documents acknowledging that young users use the platform compulsively and access harmful content in their For You feed due to filter bubbles. The State further alleged that because of young users' unhealthy engagement with the TikTok app, they suffer mental, physical, and privacy harms.

TikTok moved to dismiss, arguing that (1) the district court lacks personal jurisdiction over it because the State's claims are not based on conduct that TikTok purposefully directed at Nevada, (2) the CDA § 230 immunizes TikTok from liability for third-party content published on the TikTok platform, and (3) the First Amendment to the U.S. Constitution and

the analogous provision of the Nevada Constitution[1] protect TikTok's decisions about how to select, organize, and present third-party user-generated content. The district court denied TikTok's motion in part, concluding that it had specific personal jurisdiction over TikTok and that the State's NDTPA claims were not barred by the CDA § 230 or the First Amendment. The court dismissed the other claims without prejudice. TikTok now petitions for extraordinary writ relief, challenging the district court's personal jurisdiction, CDA § 230, and First Amendment rulings.

## DISCUSSION

Writ relief is an extraordinary remedy, and whether to entertain a writ petition on its merits lies solely within our discretion. *Smith v. Eighth Jud. Dist. Ct.*, 107 Nev. 674, 677, 679, 818 P.2d 849, 851, 853 (1991). A writ of prohibition may issue to restrain district courts or other tribunals from exceeding the limits of their jurisdiction, while a writ of mandamus may issue "to compel an act that the law requires." *Archon Corp. v. Eighth Jud. Dist. Ct.*, 133 Nev. 816, 819, 407 P.3d 702, 706 (2017). This court typically declines considering petitions that challenge orders denying motions to dismiss, *Buckwalter v. Eighth Jud. Dist. Ct.*, 126 Nev. 200, 201, 234 P.3d 920, 921 (2010) (noting that "[n]ormally this court will not entertain a writ petition challenging the denial of a motion to dismiss"); however, the rule is not absolute, *see Int'l Game Tech., Inc. v. Second Jud. Dist. Ct.*, 122 Nev. 132, 142-43, 127 P.3d 1088, 1096 (2006). Such petitions

---

[1]Because Article 1, Section 9 of the Nevada Constitution "affords no greater protection to speech activity than does the First Amendment to the United States Constitution," *Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712, 722, 100 P.3d 179, 187 (2004), our resolution of the First Amendment issue in this case also resolves TikTok's argument under the Nevada Constitution.

may be appropriate for review where the district court lacked jurisdiction to decide a matter, *Viega GmbH v. Eighth Jud. Dist. Ct.*, 130 Nev. 368, 374, 328 P.3d 1152, 1156 (2014) (observing that prohibition is available to correct an invalid exercise of personal jurisdiction), or where an important legal issue needs clarification and judicial economy and public policy considerations "weigh in favor of considering the petition," *Lorton v. Jones*, 130 Nev. 51, 54, 322 P.3d 1051, 1053 (2012).

TikTok's petition meets the criteria for writ review, raising important issues of law that require our clarification—chiefly, whether a social media platform is subject to personal jurisdiction in Nevada and whether the CDA § 230 and the First Amendment protect such a platform from the State's NDTPA claims, such that the district court was required to dismiss the State's complaint. Therefore, we exercise our discretion to consider the petition.

*The district court properly exercised personal jurisdiction over TikTok*

We review de novo a district court's determination regarding personal jurisdiction. *Tricarichi v. Coöperatieve Rabobank, U.A.*, 135 Nev. 87, 91, 440 P.3d 645, 650 (2019). "A court of this state may exercise jurisdiction over a party to a civil action on any basis not inconsistent with the Constitution of this state or the Constitution of the United States." NRS 14.065(1). At the motion to dismiss stage, the State, as the plaintiff, bears the burden of making a prima facie showing that personal jurisdiction is proper by "produc[ing] some evidence in support of all facts necessary for a finding of personal jurisdiction." *Trump v. Eighth Jud. Dist. Ct.*, 109 Nev. 687, 692, 857 P.2d 740, 744 (1993). The district court must accept properly supported proffers of evidence as true and resolve factual disputes in favor of the plaintiff. *Id.* at 693, 857 P.2d at 744.

To establish a prima facie case for specific personal jurisdiction over TikTok, the State was required to demonstrate that TikTok's claim-related conduct created sufficient minimum contacts with the state to make the exercise of jurisdiction fair and reasonable. *In re Paul D. Burgauer Revocable Living Tr.*, 138 Nev. 801, 806, 521 P.3d 1160, 1165 (2022). In determining whether the State met that initial burden, we apply a three-part test. *Id.* First, TikTok must have purposefully availed itself of the privilege of acting in the state or purposefully directed its conduct to the state. *Id.* Second, the claims must arise from or relate to that purposeful contact. *Id.* Third, the exercise of jurisdiction must be reasonable so that it does not offend traditional notions of "fair play and substantial justice." *Id.* (internal quotation marks omitted).

*The State satisfied the first prong of specific jurisdiction, purposeful direction, under the* Calder *effects test*

When the claims sound in intentional tort, as they do here, we use the *Calder* effects test to analyze the purposeful direction prong.[2] *Id.* at 806, 521 P.3d at 1166 (referring to *Calder v. Jones*, 465 U.S. 783 (1984)). Under this test, "purposeful direction is satisfied when the defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* at 808-09, 521 P.3d at 1167 (internal quotation marks omitted). We look to the defendant's contacts with the forum state itself and not "random, fortuitous, or attenuated" contacts with persons who

---

[2]We decline to address the State's suggestion—raised for the first time at oral argument—that the *Calder* effects test may not apply to the NDTPA claims.

reside there. *Id.* at 809, 521 P.3d at 1167 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

TikTok challenges the district court's conclusion as to the second prong of the *Calder* test, i.e., that TikTok purposefully directed its conduct at Nevada by maintaining a continuous and systematic presence in the state via its online platform, which "is downloaded to phones and/or other devices" in Nevada "hundreds of thousands of times." TikTok argues that purposeful direction was not shown through this conduct because operating an interactive website accessible to users worldwide does not constitute an intentional act targeted at Nevada.

While we disagree with the district court's determination that Nevada residents' downloading of the app to their phones constitutes a "physical presence" in the state for purposes of establishing express aiming under the effects test, we conclude that the express-aiming prong is satisfied by TikTok's targeted marketing and data-collection activities. This conclusion aligns with the Ninth Circuit's reasoning in *Briskin v. Shopify*, which clarified, in the context of web-based companies, that the express-aiming prong may be met through contacts involving data collection and marketing directed at forum residents, whether or not the targeting is differential or tailored to the forum. 135 F.4th 739, 757-58 (9th Cir. 2025). In *Briskin*, the plaintiff asserted unfair and deceptive business practices under California law arising out of Shopify's collection of user data for sale to third-party merchants. *Id.* at 748-49. Overruling prior precedent, the en banc court determined that Shopify, an online point-of-sale platform with entities incorporated in Canada and Delaware but doing business in all 50 states, was subject to personal jurisdiction in California because "[a]s a part of its regular course of business, Shopify is alleged to target California

consumers to extract, collect, maintain, distribute, and exploit for its own profit . . . personal identifying information that it extracts from the software it permanently installs on [California consumers'] devices." *Id.* at 755-56. The court noted that Shopify allegedly knew the location of consumers after its tracking software was installed onto their devices. *Id.* at 756. The court rejected Shopify's argument that because it operates nationwide, Shopify did not expressly aim its conduct at California, which accounted for only 8% of its worldwide merchants. *Id.* at 757. The court reasoned that "requiring differential targeting would have the perverse effect of allowing a corporation to direct its activities toward all 50 states yet to escape specific personal jurisdiction in each of those states for claims arising from or relating to their relevant contacts in the forum state that injure that state's residents." *Id.* at 758.

We agree with the analysis in *Briskin*, which supports that the State made a prima facie showing that TikTok expressly aimed its conduct at Nevada based on the facts shown. While operating a website accessible in many states in and of itself does not constitute express aiming, *see Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011) (explaining that operating "a passive website alone cannot satisfy the express aiming prong"), TikTok's interactive social media business model depends on capturing users' attention in order to collect demographic and behavioral data that it then sells to third-party advertisers. The State alleged and supported with evidence that TikTok knew of and pursued its market success in Nevada and that young users have struggled with limiting their TikTok use due to the at-issue design features. That TikTok engaged in marketing in Reno and Las Vegas and in outreach to an elementary school PTA in Nevada further supports the district court's

SUPREME COURT
OF
NEVADA

(O) 1947A

12

conclusion that TikTok expressly aimed its conduct at Nevada. We therefore reject TikTok's argument that a more forum-specific focus was required simply because its app is accessible globally and Nevada accounts for only a small percentage of TikTok's overall customer base. As *Briskin* recognized, differential targeting is not required so long as TikTok made the requisite purposeful contact and availed itself of the Nevada market. The State made a prima facie showing of such contact under the *Calder* effects test.[3]

*The State satisfied the second and third prongs of the specific jurisdiction test, relationship and reasonableness*

TikTok challenges the district court's determination on the second prong of specific personal jurisdiction analysis, namely, that the TikTok app's presence on young users' devices in Nevada gives rise or relates to the State's claims and resultant alleged harms. TikTok contends that such conduct fails under the "arise out of or relate to" prong because the State did not allege that TikTok made any statements or omissions or developed any design elements in Nevada.

TikTok's arguments are like those rejected by the U.S. Supreme Court in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021). In that case, Ford was sued for products liability in Montana and Minnesota after its cars were involved in accidents in those states. *Id.* The Court held that the "[or] relate to" component of the second prong "contemplates that some relationships will support jurisdiction without a causal showing." *Id.* at 362. The Court observed that Ford

---

[3]TikTok does not meaningfully challenge the district court's conclusion as to the first and third prongs of the *Calder* effects test as it relates to purposeful direction.

"systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege[d] malfunctioned and injured them," through Ford's advertising, sales, and maintenance and repair services offered in those states. *Id.* at 365. From this conduct, the Court held there was a "strong relationship among the defendant, the forum, and the litigation—the essential foundation of specific jurisdiction." *Id.* (internal quotation marks omitted).

The same holds true here. Although TikTok did not design its platform or make the alleged misrepresentations and omissions in the forum, TikTok's pervasive digital presence in Nevada—through the one million-plus Nevada users from whom TikTok collects personal data to sell targeted advertising—parallels Ford's extensive physical presence in Montana and Minnesota that satisfied the second prong in *Ford Motor Co.* The State alleged that the design features and TikTok's misrepresentations and omissions about the platform's safety were intended to keep young users in Nevada addicted to the TikTok platform and spending as much time as possible viewing TikToks, so that it could profit from the data collection and revenue from advertising aimed at Nevada. Those allegations, along with evidence the State submitted, support that TikTok "systematically serves" and profits from these young users, *id.*, making Nevada the "most natural" forum for the State to sue TikTok for the alleged harm to its young residents, as the alleged harmful actions by TikTok relate to the purposefully directed marketing, data collection, and advertising, *see id.* at 370. Therefore, the State's claims sufficiently relate to TikTok's purposefully directed contacts under the second prong of the specific jurisdiction test. The third prong of the specific jurisdiction test is not at issue here, as TikTok does not meaningfully argue that the exercise of

personal jurisdiction would be unreasonable. Accordingly, the district court correctly concluded that the State made a prima facie showing of personal jurisdiction. *See Milender v. Marcum*, 110 Nev. 972, 977, 879 P.2d 748, 751 (1994) ("[I]t is well established that this court may affirm rulings of the district court on grounds different from those relied upon by the district court.").

*The CDA § 230 and the First Amendment do not immunize TikTok from the State's NDTPA claims at the pleading stage*

Whether the CDA § 230 provides immunity is an issue of law that we review de novo, even in the context of a writ petition challenging a denial of a motion to dismiss. *Heights of Summerlin, LLC v. Eighth Jud. Dist. Ct.*, 140 Nev., Adv. Op. 65, 556 P.3d 959, 964 (2024) (observing, in the context of considering whether a federal act immunized a defendant from liability, that Nevada appellate courts review legal questions raised in writ petitions de novo). We similarly review de novo a district court's decision on a motion to dismiss under NRCP 12(b)(5). *Nelson v. Burr*, 138 Nev. 847, 850, 521 P.3d 1207, 1210 (2024). "Nevada is a notice-pleading state; thus, our courts liberally construe pleadings to place into issue matters which are fairly noticed to the adverse party." *W. States Constr., Inc. v. Michoff*, 108 Nev. 931, 936, 840 P.3d 1220, 1223 (1992). The State's NDTPA claims must be dismissed for failure to state a claim "only if it appears beyond a doubt that [the State] could prove no set of facts, which, if true, would entitle it to relief." *Buzz Stew, LLC*, 124 Nev. at 228, 181 P.3d at 672.

The CDA § 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Congress passed the CDA "to promote the continued

development of the Internet and other interactive computer services." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019) (quoting 47 U.S.C. § 230(b)(1)). The statute effectively immunizes website operators from liability for third-party content, material, or speech that is posted on the operator's website. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162-63 (9th Cir. 2008) (en banc). That immunity extends to claims that seek to hold an internet service provider liable based on its exercise of "traditional editorial functions." *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003) (internal quotation marks omitted). A defendant is thus immune from state law liability under the CDA § 230 if it is "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009).

Pointing to *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021), the district court concluded that § 230 of the CDA did not immunize TikTok because the State's complaint did not seek to place TikTok in the shoes of third-party content creators, but

> rather, the Complaint places [TikTok] in [its] own shoes for designing [its] platform in a way that [it] know[s] to be harmful to children and teens, and for making [its] own misrepresentations and material omissions about the safety of [its] platform. [TikTok's] liability in this case does not depend on any of the third-party content posted or distributed by [its] platform, but rather the harmful design features of the platform itself. To comply with the duties alleged in the Complaint, [TikTok] would not need to alter any third-party content or otherwise engage in publication activities. Instead, [it] would

SUPREME COURT
OF
NEVADA

(O) 1947A

16

> need to change only its own misstatements, omissions, marketing, platform development, and design decisions.

TikTok claims that designing algorithms and making decisions about the structure and operation of a social media platform inherently entail choices about what content can appear, and those types of choices fall within the purview of traditional publisher functions. TikTok frames the State's allegations about the TikTok platform's design as an argument that sustained viewing of third-party content leads to unhealthy addiction. It contends that the State's misrepresentation claim depends on allegations that TikTok did not do enough to block and remove content, which are core publishing functions.

Those arguments implicate the second and third components of the *Barnes* test, namely, whether the State's NDTPA claims seek to treat TikTok as a publisher of information provided by third-party users such that the CDA § 230 immunity applies. *Barnes*, 570 F.3d at 1100-01. Determining whether the *Barnes* test is met here requires "engag[ing] in a careful inquiry into the fundamental duty invoked by the [State] and determining if it derives from [TikTok's] status or conduct as a publisher or speaker." *Est. of Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1178 (9th Cir. 2024), *cert. denied sub nom. Est. of Carson Bride v. Yolo Techs., Inc.*, ___ U.S. ___, 145 S. Ct. 1435 (Mar. 24, 2025) (internal quotation marks omitted).

In *Lemmon*, the case on which the district court relied, the parents of two boys who died in a high-speed car accident sued the maker of Snapchat (Snap), alleging that through Snap's negligent design of the app, it encouraged their sons to drive at dangerous speeds, causing their deaths. 995 F.3d at 1087. The parents alleged that Snap knew or should have known that its "Speed Filter" and reward system design features

SUPREME COURT
OF
NEVADA

(O) 1947A

worked in tandem to incentivize young drivers to drive at dangerous speeds, citing news reports and other accidents linked to the Speed Filter. *Id.* at 1089-90. On Snap's motion, the trial court dismissed the complaint, finding that the CDA § 230 immunized Snap from liability. *Id.* at 1090.

The Ninth Circuit reversed the trial court's decision, concluding that the parents' claim did not seek to treat Snap as a publisher or speaker of third-party content because it turned on Snap's design of Snapchat. *Id.* at 1094. The court reasoned that "[t]he duty underlying such a claim differs markedly from the duties of publishers as defined in the CDA" because "[m]anufacturers have a specific duty to refrain from designing a product that poses an unreasonable risk of injury or harm to consumers." *Id.* at 1092. On the other hand, "entities acting solely as publishers—i.e. those that review material submitted for publication, perhaps edit it for style or technical fluency, and then decide whether to publish it—generally have no similar duty." *Id.* (internal citations and quotation marks omitted). The court held that Snap could have satisfied its duty by taking "reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate." *Id.* The court also determined that the parents' negligent-design claim did not rely on "information provided by another information content provider," *id.* at 1094, that "internet companies remain on the hook when they create or develop their own internet content," *id.* at 1087, and that the boys' interactions with the reward system and Speed Filter induced the dangerous speeding—not the act of publishing the boys' Snaps, *id.* at 1093.

We are persuaded by the reasoning in *Lemmon* and conclude that the district court properly applied that decision in rejecting TikTok's CDA § 230 immunity argument. On its face, the State's complaint does not

SUPREME COURT
OF
NEVADA

(O) 1947A

seek to hold TikTok liable for any third-party content that it publishes. The State's first NDTPA claim under NRS 598.091 targets TikTok's alleged own knowingly false statements and omissions to regulators and the public about young users' safety on the platform. Though the State references problematic third-party content in its complaint—such as TikTok "challenge" trends and videos depicting drugs, sex, and suicide—it does so to support its claims that (1) TikTok made misrepresentations about its enforcement of the platform's community guidelines and the safety measures that TikTok implements and (2) TikTok knows that young users experience mental, physical, and privacy harms due to their compulsive TikTok use. Therefore, consistent with the *Barnes* analysis, this claim does not trigger CDA § 230 immunity because the State seeks to hold TikTok liable for its own statements and omissions and resulting duties to users with only a tangential relationship to third-party content. *See Bride*, 112 F.4th at 1179 (reversing a district court decision dismissing a misrepresentation claim based on CDA § 230 immunity because the tech company's own statements to users about unmasking and removing abusive users constituted an "outwardly manifested intention" that created an expectation of safety among users and guardians of young users, thus "generat[ing] a legal duty distinct from the conduct at hand" (internal quotation marks omitted)).

As to the State's second NDTPA claim under NRS 598.0923, it explicitly targets the design of TikTok's platform rather than the content of posted videos, alleging that TikTok "willfully committed unconscionable trade practices in designing and deploying" features intended to exploit young users' lack of knowledge or capacity to appreciate the risks inherent in the platform's design. That the complaint's allegations specifically target

SUPREME COURT
OF
NEVADA

the platform's content-neutral design features distinguishes this case from *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), a case that TikTok argues supports immunity. In *Moody*, the Court considered whether state laws restricting social media platforms' control over the ideological mix of third-party speech displayed in user feeds offended the First Amendment. 603 U.S. at 717. The Court explained that "select[ing] and shap[ing] other parties' expression into their own curated speech products" is a traditional publishing activity subject to protection. *Id.* at 716-17; *see also Barnes*, 570 F.3d at 1102 (explaining that "reviewing, editing, and deciding whether to publish or to withdraw from publication" are traditional publisher functions under the CDA § 230). But unlike *Moody*, this case does not concern restrictive state laws and the State, as the plaintiff, explicitly *does not* seek to curtail or alter the mix of third-party content that TikTok publishes—it only purports to challenge the design features that TikTok implements to keep users on the platform as long as possible, no matter the type of third-party content that may appear in a user's feed.

That some of these features interact with third-party content does not alter that the State seeks to hold TikTok liable for "violating its *distinct duty to design a reasonably safe product*," rather than for publishing user content. *Lemmon*, 995 F.3d at 1092 (emphasis added). Thus, the State's claims arise from TikTok's alleged duty to provide a reasonably safe social media app rather than any failure to edit or remove third-party content. *See Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 645 (9th Cir. 2025) (holding that the CDA § 230 did not immunize Twitter from liability for a design defect based on the platform's lack of a reporting infrastructure for child exploitation material because "Twitter could fulfill its purported duty to cure reporting infrastructure deficiencies without monitoring, removing,

Supreme Court
OF
Nevada

(O) 1947A

or in any way engaging with third-party content"). Therefore, at the motion to dismiss stage, we cannot say that there is no set of facts that, if true, would entitle the State to relief on its NDTPA claims and not be subject to immunity based on the CDA § 230.

For similar reasons, the First Amendment does not bar the State's NDTPA design-based claims as pleaded. We recognize that curating third-party content and moderating that content can amount to protected expressive activity under the First Amendment, per *Moody*. 603 U.S. at 718. However, *Moody* expressly declined to consider how the First Amendment would apply to algorithms and other design features that employ user-interaction data to shape an addictive user experience. *Id.* at 736 n.5 ("We therefore do not deal here with feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards."); *see also NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1021 (9th Cir. 2025) (recognizing "that some personalized recommendation algorithms may be expressive, while others are not, and that inquiry is fact intensive"). Moreover, the State explicitly disclaims any intent to impose liability based on any content or its curation and thus alleges a claim that does not target expressive First Amendment activity.

We also agree with the district court that the First Amendment does not bar the State's misrepresentation and omission claims, as the First Amendment does not protect inherently misleading commercial speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). The misleading aspect is key to the State's claim that TikTok misrepresented or omitted information on its website, in its community guidelines, and in presentations to PTAs and the U.S. Congress. Though

SUPREME COURT
OF
NEVADA

(O) 1947A

TikTok argues that its representations regarding the safety of young users on the platform are protected under the First Amendment as subjective statements of opinion or aspiration, the State points to several affirmative statements that go beyond mere aspiration or opinion, such as statements in the community standards that "[TikTok] do[es] not allow content that may put young people at risk of exploitation, or psychological, physical or developmental harm," including "child sexual abuse material (CSAM), youth abuse, bullying, dangerous activities and challenges, exposure to overtly mature themes, and consumption of alcohol, tobacco, drugs, or regulated substances." Thus, the State has asserted claims that are not subject to dismissal based on the First Amendment. Accordingly, the district court correctly denied the motion to dismiss because there are facts that could be shown to entitle the State to relief on its NDTPA claims without invoking the protections of the CDA § 230 and the First Amendment.

## CONCLUSION

The district court properly exercised specific personal jurisdiction over TikTok because the State's NDTPA claims target TikTok's alleged misrepresentations and unconscionable design elements that addict Nevada's young users to the TikTok platform. Those claims sufficiently relate to TikTok's purposeful Nevada contacts in collecting young users' personal data and selling it to advertisers targeting those Nevada users, thus satisfying due process requirements. The district court also properly denied the motion to dismiss these claims because the CDA § 230 and First Amendment do not protect TikTok from liability for its own allegedly misleading statements and omissions about safety risks to young users or for allegedly harmful design features that are not based on third-party

SUPREME COURT
OF
NEVADA

(0) 1947A

content or its own expressive activity. Accordingly, we deny TikTok's petition.

_____, J.
Cadish

We concur:

_____, C.J.
Herndon

_____, J.
Parraguirre

_____, J.
Bell

_____, J.
Stiglich

_____, J.
Lee

PICKERING, J., concurring:

I join the opinion in full. I write separately only to note that, in a proper case, this court should evaluate the anomalous burden imposed by the standard for evaluating personal jurisdiction challenges that this court announced in *Trump v. Eighth Judicial District Court*, 109 Nev. 687, 857 P.2d 740 (1993). In my view, and consistent with other jurisdictions, a plaintiff opposing a motion to dismiss for lack of personal jurisdiction can rest on the well-pleaded allegations of the complaint and need only provide additional evidence to support jurisdiction where those pleadings are controverted by the defendant. *See* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1351 (4th ed. 2025) (explaining that when reviewing a motion to dismiss for lack of personal jurisdiction, federal courts "take as true the allegations of the nonmoving party with regard to the jurisdictional issues and resolve all factual disputes in his or her favor"); *see also Del Valle v. Trivago GmbH*, 56 F.4th 1265, 1271-72 (11th Cir. 2022) (accepting "the factual allegations in the complaint as true to the extent they are uncontroverted" when reviewing a district court's dismissal for lack of personal jurisdiction). I hesitate to invoke *Trump* in a way that reaffirms a heavier burden than that.

_____Pickering_____, J.
Pickering

# EXHIBIT P

State of N.C. v. TikTok Inc., 2025 NCBC 47.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| WAKE COUNTY | 24CV032063-910 |

STATE OF NORTH CAROLINA, ex rel. JEFFREY N. JACKSON, ATTORNEY GENERAL,

Plaintiff,

v.

TIKTOK INC.; TIKTOK U.S. DATA SECURITY INC.; TIKTOK LLC; TIKTOK PTE. LTD.; TIKTOK, LTD.; BYTEDANCE INC.; and BYTEDANCE LTD.,

Defendants.

**ORDER AND OPINION ON DEFENDANTS' MOTIONS TO DISMISS**

1. Nationwide, social-media companies are defending lawsuits claiming that their apps are addictive and harmful to minors. In this case, the State of North Carolina has sued the owners and operators of TikTok, a popular app for sharing and viewing user-created videos. According to the State, the makers of TikTok designed the app to be highly addictive to minors and then undertook a deceptive publicity campaign to convince parents and children that the app is safe. On that basis, the State asserts a claim for unfair or deceptive trade practices under N.C.G.S. § 75-1.1.

2. Pending are the defendants' motions to dismiss on several jurisdictional and merits-related grounds. For the following reasons, the Court **DENIES** the motions.

*North Carolina Department of Justice, by Joshua D. Abram, Charles G. White, Kunal Choksi, and Brian D. Rabinovitz, for Plaintiff State of North Carolina, ex rel. Jeffrey N. Jackson, Attorney General.*

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Eric M. David, Gabrielle Motsinger, Jennifer K. Van Zant, and William Gregory Gaught, and O'Melveny & Myers, LLP, by Daniel M. Petrocelli, Lauren F. Kaplan, Jonathan Hacker, Martha F. Hutton, and Stephen D. Brody,*

*for Defendants TikTok Inc., TikTok U.S. Data Security Inc., TikTok LLC, TikTok Pte. Ltd., TikTok Ltd., ByteDance Inc., and ByteDance Ltd.*

Conrad, Judge.

I.
BACKGROUND

3. The following background assumes that the allegations in the complaint are true.

4. TikTok is a software application that allows users to view, post, and interact with short-form videos. The defendants are ByteDance Ltd. and six subsidiaries bearing some variant of the name ByteDance or TikTok. Together, they own, design, market, and operate the app. For simplicity, the Court will refer to the app as TikTok and the defendant companies, collectively, as ByteDance. (*See* Compl. ¶¶ 12–18, 22, 25, 26, 33, ECF No. 3.)

5. It would be hard to overstate TikTok's popularity, especially with minors. The app first launched in the United States in 2018. Just two short years later, nearly every American teen with a smartphone was using the app at least monthly. In North Carolina alone, almost a million teens aged thirteen to seventeen and hundreds of thousands of younger children used the app as of 2023. (*See* Compl. ¶¶ 32, 38, 41.)

6. According to the State, ByteDance targeted teens and children to fuel its growth. The main way that ByteDance makes money is through advertising, which means that revenue goes up when users spend more time on TikTok. Early on, ByteDance identified teens as a "key user segment[] to grow" because they were more engaged and likely to continue to use the app into adulthood. Indeed, minors were

viewed as a dependable audience because they, unlike adults, "do not have executive function to control their screen time." (Compl. ¶¶ 34, 49, 50, 118, 119.)

7.    TikTok features an array of elements allegedly designed to exploit minors' developmental immaturity and induce compulsive use. TikTok's home page (coined the "For You Page") feeds each end user videos that are algorithmically selected to maximize engagement. The algorithm, or recommendation system, performs this task by recording the user's interactions with the app (such as sharing or skipping a video), identifying behavioral patterns, comparing the user's behavior with others', and ranking videos as more or less likely to be engaging based on that comparison. This individualized feed is, in the words of ByteDance employees, "addictive." (Compl. ¶¶ 49, 57–59, 118, 119.)

8.    Other design elements enhance TikTok's addictive quality. When a user opens TikTok, a video plays automatically. The user can then cycle through videos endlessly just by swiping a finger. These features—"autoplay" and "infinite scroll"—generate an immersive, seamless experience without the occasional pause that the user might regard as a natural stopping point. Of course, scrolling isn't all that the app has to offer. Filters allow users to touch up photos and videos in myriad ways; one filter called "Beauty Mode" makes facial features and hairstyles look more attractive. Various buttons and widgets also allow users to like and share videos, post comments, and follow specific content creators. The desire to amass likes and similar social rewards begets more frequent and protracted app usage. (*See* Compl. ¶¶ 70–72, 86, 87, 93, 96.)

9.     In addition, the app sends push notifications to coax users to return to the app when they are away.  Notifications arrive on a schedule most likely to get users' attention, such as late in the evening.  They may highlight algorithmically selected videos and sometimes promote content that is available to view only for a short period or at a specific time, playing on users' fear of missing out to create a sense of urgency.  There are also badges, which appear as a number above the app's icon and tempt the user to return by quantifying, perhaps falsely, all that they've missed while not using the app.  (*See* Compl. ¶¶ 73, 77–82.)

10.     These design choices allegedly make TikTok addictive to minors in much the same way that, say, roulette is addictive to gamblers.  One reason that roulette is so alluring is that it offers unpredictable, variable rewards.  As the wheel spins, gamblers "anticipate[] a reward that they know could come but is tantalisingly just out of reach," and they "experience a dopamine rush" in the process.  TikTok has similar traits.  Each new video in the feed is a surprise; users can scroll as long as they wish, endlessly anticipating but never knowing what they will see next.  By the same token, social rewards are variable; users do not know when they will get the next notification that a viewer followed their account or liked one of their videos.  For minors, this is irresistible.  As one expert put it, minors "struggle 'to ignore the prospect of a dopamine reward, even when this conflicts with other essential daily activities, such as sleeping or eating.' "  Tracking statistics bear this out: the average teen user opens TikTok sixteen times per day, and many teens spend more than four

hours on the app daily and often wallow in lengthy, late-night binges. (Compl. ¶¶ 52, 54, 55, 62, 87, 104, 105, 113.)

11. TikTok addiction is bad for minors' mental health, the State alleges. ByteDance's own employees have sounded the alarm to company leaders, worrying that compulsive use of the app disturbs sleep patterns, interferes with "work/school responsibilities," "leads to deficient self-regulation," causes or compounds "anxiety," and impairs "analytical and problem-solving skill[s], memory formation, contextual thinking, conversational depth and empathy." Beyond that, employees have expressed concerns about negative effects on teens' self-image and susceptibility to eating disorders, particularly in connection with appearance-altering filters. But not everyone at ByteDance shares these concerns. One dissenter brushed them aside, asking "isn't addiction in this sense considered a very positive metric in our field?" And ByteDance's leadership has allegedly rejected these and other internal calls to make the app less addictive. (Compl. ¶¶ 98, 101, 108, 109, 114–17, 123–128.)

12. To the outside world, though, ByteDance touts its safety efforts. In advertisements and public statements, ByteDance maintains that minor accounts carry an automatic screen-time limit of sixty minutes, built-in nudges to remind minors to take breaks, and customizable tools that parents can use to control what their kids see and do. Plus, ByteDance tells users that they can escape so-called "rabbit holes" of entrancing, personalized content by refreshing their feed as if they had just opened a new account. In the same vein, ByteDance publicizes Community Guidelines that draw the lines between permissible and impermissible content. The

Guidelines forbid and promise the removal of, among other things, "sexually suggestive" content created by minors and images of "gory, graphic human injuries." (Compl. ¶¶ 136–38, 147, 150, 161, 175, 179, 187, 189, 195.)

13. But these are smokescreens, according to the State. In every case, the purported safety features either do not function as advertised (refreshing the feed lasts just a few videos before heading back down the "rabbit hole") or are so easy to disable as to be useless (teens get a passcode that they can use to override the supposed limit on screen time). Indeed, ByteDance allegedly designed these features to be ineffective while giving the illusion of mitigating compulsive use. And ByteDance disregards its own Community Guidelines. Its skeletal content-moderation staff cannot review more than a small fraction of posted content for compliance, so that scads of videos and user comments that are "egregious," "dangerous," and "graphic" by ByteDance's self-imposed standards never get flagged. Even when aware of prohibited content, ByteDance chooses to make that content harder to find but not to remove it as promised. (*See, e.g.*, Compl. ¶¶ 139, 140, 156, 166, 168, 178, 182, 188, 205, 206, 211–14.)

14. The State asserts a single claim, based on TikTok's design and marketing, for unfair or deceptive trade practices under N.C.G.S. § 75-1.1. It claims that ByteDance unfairly designed TikTok to be addictive to minors despite knowledge that compulsive use harms them. It also claims that ByteDance deceived the public by misrepresenting TikTok's safety features and Community Guidelines while falsely assuring that the app is safe for young users. (*See, e.g.*, Compl. ¶ 219.)

15. ByteDance has moved to dismiss the complaint, both for lack of personal jurisdiction and for failure to state a claim for relief. (*See* ECF Nos. 7, 35.) The motions are fully briefed, and the Court held a hearing on 24 April 2025. The motions are ripe for decision.

## II.
## PERSONAL JURISDICTION

16. North Carolina is not home to any defendant. One is based and incorporated in Singapore, two are based in China and incorporated in the Cayman Islands, and four are based in California and incorporated in either California or Delaware. (*See* Compl. ¶¶ 12–18.) Together, they contend that the Court lacks personal jurisdiction over them. Because both sides have offered affidavits and exhibits, the Court "must determine the weight and sufficiency of the evidence before it" in assessing whether jurisdiction exists. *Toshiba Glob. Com. Sols., Inc. v. Smart & Final Stores LLC*, 381 N.C. 692, 694 (2022).

17. "Personal jurisdiction refers to the Court's ability to assert judicial power over the parties and bind them by its adjudication." *In re A.B.D.*, 173 N.C. App. 77, 83 (2005) (citation and quotation marks omitted). Jurisdiction must be authorized by the State's long-arm statute, N.C.G.S. § 1-75.4, and consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Beem USA LLLP v. Grax Consulting, LLC*, 373 N.C. 297, 302 (2020). In practice, this "two-step analysis" usually collapses into one because our Supreme Court has broadly construed the long-arm statute "to make available to the North Carolina courts the

full jurisdictional powers permissible under federal due process." *Id.* (citation and quotation marks omitted).

18. Due process requires that a defendant "have certain minimum contacts" with this State "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Although courts "have differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction," only the latter is at issue here. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Specific jurisdiction depends on the "relationship among the defendant, the forum, and the litigation." *Daimler AG v. Bauman*, 571 U.S. 117, 133 (2014) (citation and quotation marks omitted). There must be "an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (cleaned up). Put more succinctly, the plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (cleaned up).

19. In addition, the "defendant's contacts with the forum state must be such that [it] should reasonably anticipate being haled into court there." *Beem USA*, 373 N.C. at 303 (cleaned up). The defendant "must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." *Ford*, 592 U.S. at 359 (cleaned up). "Random, fortuitous, or attenuated contacts" won't do.

*Walden v. Fiore*, 571 U.S. 277, 286 (2014) (cleaned up). Rather, the material contacts "must show that the defendant deliberately reached out beyond its home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Ford*, 592 U.S. at 359 (cleaned up).

20. Here, ByteDance has extensive, purposeful contacts with North Carolina. It markets the TikTok app throughout the State while cultivating ongoing relationships with a vast body of in-state users. Millions of North Carolinians, including hundreds of thousands of teens and children, have downloaded and used TikTok. In doing so, they have accepted the app's privacy policies and terms of use, which broadly allow ByteDance to collect their data. And the reason that ByteDance collects data from North Carolina users is so that it can identify their preferences and sell advertising tailored to them. (*See* Am. White Decl. ¶¶ 4, 5, 22, 24, 30, ECF No. 53; Compl. ¶¶ 40–44, 118, 119.)

21. ByteDance downplays these contacts.[1] In its words, "merely providing a generally available online platform that is accessible to a state's residents does not subject a defendant to personal jurisdiction in that state." (Br. Supp. 6, ECF No. 36.)

---

[1] In its reply brief, ByteDance—for the first time—accuses the State of improper group pleading. This argument comes too late. The complaint expressly alleges that "[a]ll Defendants operate together as a common enterprise" and that "agency and/or alter-ego relationships have formed." (Compl. ¶ 19; *see also* Compl. ¶¶ 20–25 (alleging "interchangeable" operations and "blurred" company boundaries).) It also alleges that "each Defendant has actively formulated, participated in, approved, directed, or otherwise controlled the acts or practices referenced throughout this complaint and has jointly advertised, marketed, developed, and distributed the TikTok social media application and platform to consumers in North Carolina." (Compl. ¶ 26.) If ByteDance wished to rebut these allegations or argue that they are deficient, it should have done so in its opening brief. Because it did not, the argument is waived, and the allegations are deemed uncontested. *See* BCR 7.7 ("[T]he Court may decline to consider issues or arguments raised by the moving party for the first time in a reply brief.").

In addition, it denies "that any marketing in North Carolina was specifically targeted toward North Carolina." (Br. Supp. 6.)

22. To be sure, courts have long held "that a defendant's maintenance of a passive website does not support the exercise of personal jurisdiction over that defendant in a particular forum just because the website can be accessed there." *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 550 (7th Cir. 2004). But TikTok isn't a passive website. It is an interactive software application—a product that most users download on their smartphones and carry with them in their pockets and purses. Unlike a general web search, TikTok use is neither a one-and-done transaction nor a one-sided inquiry from a user. ByteDance regularly sends communications into North Carolina (through push notifications to users' phones, for example) and retrieves data from in-state users (including personal data that ByteDance monetizes via targeted third-party advertisements). What results is a two-way exchange of information across state borders on a massive scale.

23. Moreover, to say that ByteDance merely makes TikTok generally available across the country would be wrong. Ample evidence shows that ByteDance actively markets the app in this State through both national and local channels. In addition to advertising online and on local television, ByteDance promotes the app to local businesses for use in their own marketing. Plus, it sponsors grants awarded to local schools by the National Congress of Parents and Teachers. Although ByteDance denies having ultimate control over the grant program, it communicated its preferred recipients and named North Carolina as a "key priority." (Am. White Decl. ¶¶ 6–15,

22, 24, 29–31; *see also* Exs. C–M, R, S, X–Z to Am. White Decl., ECF Nos. 57, 51.4–.14, .19, .20, .26, .27; Kersul Decl. ¶¶ 4, 8, ECF No. 36.2.)

24. In short, ByteDance advertises widely in North Carolina, makes TikTok available here, and fosters ongoing relationships with its app's users. All this adds up to the active, purposeful exploitation of a market in North Carolina. *See Ford*, 592 U.S. at 365 (observing that purposeful availment was met when Ford Motor Company had advertised "[b]y every means imaginable" in the forum, made cars "available for sale" there, and "foster[ed] ongoing connections to its cars' owners"); *Ind. v. TikTok Inc.*, 245 N.E.3d 681, 690 (Ind. Ct. App. 2024) (concluding with "little trouble" that Indiana's courts could exercise jurisdiction based on similar facts, including that TikTok "knowingly and repeatedly transmit[s] data to and from each of those millions of Indiana end-users each and every hour of each and every day").

25. Without question, ByteDance's North Carolina-based conduct relates to the State's claim that TikTok is addictive and harmful to minors and that ByteDance has misrepresented its efforts to make the app safe for their consumption. Indeed, ByteDance has "systematically served a market in" North Carolina "for the very" product that allegedly addicts and harms the State's minor population. *Ford*, 592 U.S. at 365. "[W]hen a corporation has continuously and deliberately exploited a State's market, it must reasonably anticipate being haled into that State's courts to defend actions based on products causing injury there." *Id.* at 364 (cleaned up).

26. That holds true even though TikTok has a national audience and even though ByteDance has exploited markets in many other States in a similar fashion.

The fact that ByteDance has extensive contacts elsewhere does not diminish the extent or quality of its contacts with North Carolina. And the fact that its business is everywhere does not mean that it can be sued nowhere other than its home forum. *See id.* at 355 (noting that Ford's "business is everywhere"). A contrary decision "would have the perverse effect of allowing a corporation to direct its activities toward all 50 states yet to escape specific personal jurisdiction in each of those states for claims arising from or relating to their relevant contacts in the forum state that injure that state's residents." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 758 (9th Cir. 2025) (en banc).

27. Accordingly, the Court denies the motion to dismiss for lack of personal jurisdiction.

III.
RULE 12(b)(6)

28. Satisfied that jurisdiction exists, the Court turns to ByteDance's three remaining grounds for dismissal. First, ByteDance contends that federal law immunizes it from liability. Second, it contends that the First Amendment bars the State's claim. Third, it contends that the State's allegations, even if true, do not state a viable claim for relief. For these disputes, the Court must treat all well-pleaded allegations as true and view the facts and permissible inferences in the light most favorable to the State as the nonmoving party. *See, e.g., Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019).

29. **Immunity.** Under federal law, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information

provided by another information content provider." 47 U.S.C. § 230(c)(1). In so many words, this language immunizes a provider of an internet platform from liability for any legal claim that treats it as a publisher or speaker of third-party content. *See, e.g., A.B. v. Salesforce, Inc.*, 123 F.4th 788, 792–93 (5th Cir. 2024).

30. There's no dispute that ByteDance provides an interactive computer service. ByteDance maintains that it is immune because the State's theories of liability treat it as a publisher of third-party content, just as section 230 forbids. The unfairness theory, it contends, targets the way that TikTok selects, organizes, and presents content to users, and the deception theory faults it for doing too little to catch and delete harmful content. These are all core publishing functions protected by section 230, according to ByteDance.

31. The State frames things differently. It contends that the unfairness theory concerns product design, not publishing, because it is rooted in allegations that ByteDance devised technological features to make TikTok addictive to minors. And the deception theory, it contends, concerns ByteDance's own speech, not others', including false statements about TikTok's safety features and Community Guidelines. In the State's view, section 230 does not shield ByteDance from liability for its unfair design choices or its deceptive statements.

32. In recent years, federal courts have solidified section 230's outer boundaries, stressing that it "provides internet platforms with limited legal protections." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 119 (4th Cir. 2022). The statute "bar[s] certain claims, in specific circumstances, against particular types of

parties" but does not go so far as to "insulate a company from liability for all conduct that happens to be transmitted through the internet." *Id.* at 129. Put bluntly, "this immunity is not limitless," *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 739 (9th Cir. 2024), and "was not meant to create a lawless no-man's-land on the Internet," *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc).

33. Section 230 uses the word "publisher" in its common-law sense. "At common law, a publisher was someone who intentionally or negligently disseminated information to third parties." *Henderson*, 53 F.4th at 121. "Traditional publisher liability held that if a publisher took upon itself the task of moderating or editing the content that appeared within its pages, it became responsible for anything tortious written there." *Est. of Bride v. YOLO Techs., Inc.*, 112 F.4th 1168, 1175 (9th Cir. 2024). In that sense, publishers were "treated differently" than mere "distributors, such as bookstores." *Calise*, 103 F.4th at 739 (cleaned up).

34. Thus, when section 230 says not to treat an internet platform "as the publisher or speaker of" others' content, it means not to burden the platform with traditional publisher liability. The statute's reach ends there. It does not relieve internet publishers "from all potential liability" or provide "an all purpose get-out-of-jail-free card for businesses that publish user content on the internet." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016). And no court has indulged the "notion that a claim holds a defendant liable as a publisher anytime there is a 'but-for' causal relationship between the act of publication and liability." *Henderson*, 53 F.4th at 122. Rather, viewed against the backdrop of the common law, "a claim

only treats the defendant 'as the publisher or speaker of any information' under § 230(c)(1) if it (1) bases the defendant's liability on the disseminating of information to third parties and (2) imposes liability based on the information's improper content." *Id.* at 123; *see also Hill v. StubHub, Inc.*, 219 N.C. App. 227, 236 (2012) ("The liability must be based on the defendant having acted as a publisher or speaker." (cleaned up)).

35. As in most areas of the law, substance matters more than form. A plaintiff may not dodge the statute through artful pleading any more than a defendant may parlay its publishing activity into blanket immunity. The inquiry is "whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker." *Calise*, 103 F.4th at 740 (cleaned up). So, for example, section 230 applies when "the duty would necessarily require an internet company to monitor, alter, or remove third-party content"—the meat and potatoes of traditional publisher liability. *Salesforce*, 123 F.4th at 795 (cleaned up). But it does not apply when "the duty springs from another source—for example, a contract," *Calise*, 103 F.4th at 740, or "a promise or representation" made to a user, *Bride*, 112 F.4th at 1178.

36. Neither of the State's theories seeks to hold ByteDance liable for monitoring, altering, or removing user content, or for failing to do those things. The thrust of the unfairness theory is that ByteDance purposely designed TikTok to be addictive to minors. If what the complaint says is true, TikTok is packed with features—autoplay, endless scrolling, social rewards, and more—that exploit minors' developmental

immaturity and neurological susceptibility to intermittent, variable rewards. And TikTok addiction allegedly disrupts healthy sleep habits and social interactions, causing insidious psychological harms to teens and children. This theory has more in common with products liability than publisher liability, resting as it does on an alleged duty not to design and offer a product that endangers a vulnerable population. *See Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021) ("The duty underlying such a [products-liability] claim differs markedly from the duties of publishers.").

37. It is no answer to say, as ByteDance does, that addicted minors spend their time on TikTok viewing third-party content. ByteDance's business is, after all, to host and display user videos. Nearly everything it does is connected in some way to its users' content. But it and other social-media platforms "continue to face the prospect of liability, even for their 'neutral tools,' so long as plaintiffs' claims do not blame them for the content that third parties generate with those tools." *Id.* at 1094. The State's unfairness theory neither blames ByteDance for its users' content nor aims to hold it accountable in its capacity as a publisher of that content. The theory instead seeks to hold ByteDance liable "for its own injurious conduct" in "creating and employing tools to addict young users." *Commonwealth v. Meta Platforms, Inc.*, 2024 Mass. Super. LEXIS 161, at *16 (Mass. Super. Ct. Oct. 17, 2024) (denying immunity for similar anti-addiction claim against social-media company).

38. A case comparison may help. In *Lemmon*, grieving parents blamed the maker of Snapchat for the deaths of their sons in a high-speed vehicle crash. The boys died while using Snapchat's "Speed Filter" to record and superimpose their

driving speed onto a photo or video. *Lemmon*, 995 F.3d at 1088. They and many other users apparently believed that Snapchat would reward them with a digital achievement for taking a snap while driving over 100 miles per hour. *See id.* at 1089. The Ninth Circuit held that section 230 did not bar the parents' negligent-design claim, reasoning that liability did "not rest on third-party content." *Id.* at 1093. Rather, the claim treated the defendant "as a products manufacturer" and faulted it "solely for Snapchat's architecture, contending that the app's Speed Filter and reward system worked together to encourage users to drive at dangerous speeds." *Id.* at 1092–93. Section 230 offered no immunity against "being sued for the predictable consequences of designing Snapchat in such a way that it allegedly encourages dangerous behavior." *Id.* at 1094 (cleaned up).

39. By contrast, *Bride* applied section 230 to bar a product-liability claim against the maker of an anonymous messaging app. The plaintiffs had allegedly faced severe bullying and harassment by anonymous users. *See Bride*, 112 F.4th at 1173. They brought two sets of claims: one set based on the app maker's false promise that it would "unmask and ban abusive users"; and a second set for product liability on the theory that the app was "inherently dangerous because of its anonymous nature." *Id.* at 1178, 1180. The Ninth Circuit allowed the misrepresentation claims to proceed. *Id.* at 1179. But it viewed the product-liability claims as an attempt to hold the app maker "responsible for users' speech"—that is, "faulting [the defendant] for not moderating content in some way, whether through deletion, change, or

suppression" of bullying and harassing messages. *Id.* at 1180. Section 230 therefore immunized the defendant against the purported product-liability claims.

40. As in *Lemmon*, the State's unfairness theory treats ByteDance as a product designer, not a publisher, and faults it for offering a combination of features and social rewards that foster compulsive use by minors. Unlike *Bride*, ByteDance's liability does not turn on user content or its failure to remove or suppress that content. This sort of anti-addiction claim therefore does not implicate section 230, as many state courts have held. *See, e.g.*, *Dist. of Columbia v. Meta Platforms, Inc.*, 2024 D.C. Super. LEXIS 27, at *32 (D.C. Super. Ct. Sept. 9, 2024) (holding that section 230 does not bar claim based on "addictive design features employed by Meta—and not any particular third-party content"); *State v. Meta Platforms, Inc.*, 2024 Vt. Super. LEXIS 146, at *15–16 (Vt. Super. Ct. July 28, 2024) ("Whether they are watching porn or puppies, the claim is that [young users] are harmed by the time spent, not by what they are seeing. The State's claims do not turn on content, and thus are not barred by Section 230."); *In re Soc. Media Cases*, 2023 Cal. Super. LEXIS 76992, at *94 (Cal. Super. Ct. Oct. 13, 2023) ("Section 230 does not bar a claim based on features of a social media site that have an adverse effect on users apart from the content of material published on the site.").[2]

---

[2] Not all courts agree. *See State ex rel. Rosenblum v. TikTok Inc.*, 2025 Ore. Cir. LEXIS 5135, at *36–37 (Ore. Cir. Ct. June 13, 2025) (dismissing claim under section 230 and characterizing TikTok's tools as "content amplification features meant to publish content in a manner that increases user engagement"); *In re Soc. Media Adolescent/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 881 (N.D. Cal. 2024) (concluding that claims based on app features stem from third-party content and are therefore barred under section 230). Some of these decisions have been criticized for employing a form of but-for reasoning. *See Meta Platforms*, 2024 D.C. Super. LEXIS 27, at *30.

41. The deception theory is, if anything, more straightforward. As alleged, ByteDance portrayed screen-time limits, parental tools, and other features as serious curbs on compulsive use, knowing all the while that the features did not work as advertised. At the same time, ByteDance reneged on promises made in its Community Guidelines to police user videos and comments and to remove explicit content. The legal duty at issue arises from ByteDance's own promises and representations, not from its "failure to take certain moderation actions." *Bride*, 112 F.4th at 1178.

42. ByteDance insists that this is an attempt to hold it liable for failing to identify and remove violent, sexual, and racist content. It is not. "While yes, online content is involved in these facts, and content moderation is one possible solution for [ByteDance] to fulfill its promise, the underlying duty being invoked . . . is the promise itself." *Id.* at 1179 (allowing misrepresentation claims to proceed). Section 230 gives internet platforms wide latitude to moderate content. But it does not shield them from liability for breaching their promises or misrepresenting their content-moderation activities. *See Meta Platforms*, 2024 Mass. Super. LEXIS 161, at *11–12 ("[C]laims based on a publisher's representations about its publishing content are not immunized under Section 230.").

43. Accordingly, the Court denies the motion to dismiss on section 230 grounds.

44. **Free Speech**. The First Amendment to the federal Constitution guarantees the freedom of speech. One protected "aspect of speech" is "the editorial function"— that is, "exercising editorial discretion in the selection and presentation of content,"

including third-party content. *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) (cleaned up). Still, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (contrasting "restrictions on protected expression" with "restrictions on economic activity or, more generally, on nonexpressive conduct").

45. ByteDance contends that the State's claim violates this constitutional guarantee by aiming to muzzle its editorial discretion, on the one hand, and compel speech, on the other. The unfairness theory, it says, attacks constitutionally protected editorial features that select, organize, and display videos, while the deception theory is a disguised attempt to regulate the adoption and enforcement of content-moderation standards. Going further, ByteDance worries that a judgment against it would include injunctive relief compelling it to warn consumers of TikTok's risks to minors.

46. The State maintains that its unfairness theory concerns conduct, not speech, and that TikTok's addictive features are not expressive. Although it acknowledges that its deception theory does concern speech, the State contends that the false and misleading commercial speech at issue is not protected by the First Amendment. The State also offers assurances that, if successful, it will seek only to enjoin ByteDance from making false statements without compelling any speech.

47. Few areas of the law are more cutting-edge than this one. It was just last year in *Moody* that the United States Supreme Court confirmed that "some

[social-media] platforms, in at least some functions, are indeed engaged in expression" protected by the First Amendment. 603 U.S. at 716. Specifically, a platform's content-moderation policy reflects its editorial judgments "about whether—and, if so, how—to convey posts having a certain content or viewpoint." *Id.* at 738; *see also id.* at 717 (questioning state laws that "limit[ed] the platforms' capacity to engage in content moderation—to filter, prioritize, and label the varied messages, videos, and other content their users wish to post"). These "editorial judgments influencing the content" of social-media feeds are "protected expressive activity." *Id.* at 744.

48. "But what if," as Justice Barrett asked in her concurrence, "a platform's algorithm just presents automatically to each user whatever the algorithm thinks the user will like—*e.g.*, content similar to posts with which the user previously engaged?" *Id.* at 746 (Barrett, J., concurring). Is that protected expressive activity as well? The *Moody* majority left that question unanswered: "We therefore do not deal here with feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." *Id.* at 736 n.5.

49. This case invites Justice Barrett's question once again. The State bases its unfairness theory on features that induce compulsive use, including TikTok's algorithm. As alleged, the algorithm does not "understand" or "care about" content, nor does it "promote or suppress particular political agendas, views, or content." (Compl. ¶ 60 & Fig. 2.) Rather, the algorithm presents videos based solely on an

analysis of "the user's pattern of engagement." (Compl. ¶ 59.) Put another way, "[t]he recommendation engine is content-neutral, meaning that it recommends content based on behavioral and certain device signals, not on the semantic nature of the content itself." (Compl. ¶ 60 & Fig. 2.)

50. Taking these allegations as true, it's hard to discern any expressive activity. The algorithm does not convey a message by its programmer; it simply bows to user preferences and propensities. At a minimum, the complaint supports an inference that a reasonable person would understand TikTok's video feed to reflect a given user's content choices as opposed to ByteDance's own creative expression or editorial judgment. *See, e.g., U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 743 (D.C. Cir. 2016) ("As a result, when a subscriber uses her broadband service to access internet content of her own choosing, she does not understand the accessed content to reflect her broadband provider's editorial judgment or viewpoint."); *see also NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1222 (N.D. Cal. 2024) ("[I]t would be hard to say that the algorithm reflects any message from its creator because it would recommend and amplify both favored and disfavored messages alike so long as doing so prompts users to spend longer on social media.").

51. So too for the other disputed design features, such as autoplay, infinite scrolling, and social rewards. ByteDance says little about them, offering no basis to conclude that they deserve First Amendment protection independent of the underlying algorithm. And on the face of the complaint, none of the features has an obviously expressive quality. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d

1252, 1270 (11th Cir. 2004) ("Thus, in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message." (emphasis omitted)).

52. Of course, the complaint gives only a glimpse—and likely a contested glimpse at that—into the inner workings of TikTok's algorithm and ancillary features. A more developed record might reveal an expressive message that changes the calculus. But for now, the Court concludes that the First Amendment does not mandate dismissal of the State's unfairness theory. *See Meta Platforms*, 2024 Mass. Super. LEXIS 161, at *22–23 (deeming claims about features that "allegedly induce addiction in young users . . . to be principally based on conduct and product design, not expressive content"); *see also Meta Platforms*, 2024 D.C. Super. LEXIS 27, at *43 (same); *Meta Platforms*, 2024 Vt. Super. LEXIS 146, at *17–18 (same); *Utah Div. of Consumer Prot. v. TikTok Inc.*, No. 230907634, at 14 (Utah Dist. Ct. Nov. 12, 2024) (same).

53. Likewise, the Court concludes that the First Amendment does not bar the State's deception theory. ByteDance misconstrues the theory as an attempt to regulate its content-moderation practices to suppress overly engaging content. That is not what is alleged. Rather, the State alleges that ByteDance deceived the public by making false and misleading statements about the functionality of its safety features and its adherence to its Community Guidelines. "Untruthful speech, commercial or otherwise, has never been protected for its own sake." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 771 (1976); *see also Hest*

*Techs., Inc. v. State ex rel. Perdue*, 366 N.C. 289, 297 (2012) (observing that fraudulent speech "receive[s] no First Amendment protection").

54. To round things out, ByteDance need not fear the prospect of compelled speech. There is, as yet, no judgment against it. If the State prevails and seeks an injunction compelling ByteDance to speak, only then will the issue become ripe.

55. Accordingly, the Court denies the motion to dismiss on First Amendment grounds.

56. **Failure to State a Claim.** The General Assembly has "declared unlawful" all "unfair or deceptive acts or practices in or affecting commerce," N.C.G.S. § 75-1.1, and empowered the State's attorney general to prosecute violators "whenever in his opinion the interests of the public require it," *id.* § 75-15. Modeled after section 5 of the Federal Trade Commission Act, section 75-1.1 regards a practice as "unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 302 N.C. 539, 548 (1981). "A practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required." *Winston Realty Co. v. G.H.G., Inc.*, 314 N.C. 90, 98 (1985) (cleaned up).

57. ByteDance argues that its alleged actions, even if true, are neither unfair nor deceptive. It is not unfair, ByteDance contends, to offer an otherwise lawful product[3] that is extraordinarily engaging, especially when consumers remain free to

---

[3] The United States Supreme Court dealt with a challenge to legislation affecting TikTok's legality earlier this year. *See TikTok Inc. v. Garland*, 145 S. Ct. 57, 62 (2025) (per curiam) ("As of January 19, the Protecting Americans from Foreign Adversary Controlled Applications Act will make it unlawful for companies in the United States to provide services

choose other forms of entertainment. As for deception, ByteDance argues that the State has not alleged supporting facts with particularity and that any supposed misrepresentations weren't false or were mere puffery or statements of opinion.

58. The State accuses ByteDance of ignoring allegations that it designed TikTok to exploit the neurological vulnerabilities of minors, fully aware of the harms caused by compulsive use. This exploitation of minors, the State contends, is unfair and offensive to public policy. In addition, the State continues, ByteDance engaged in a public campaign to placate concerned parents with deceptive statements about its content-moderation activities and the app's safety features, thus doubly violating section 75-1.1.

59. This case is by no means the first attempt to hold a social-media company accountable for unfair practices under consumer-protection laws. Many States have pursued similar claims against social-media titans (including ByteDance) under their own consumer-protection statutes, also modeled after the FTC Act with slight variations. In those cases, one court after another has concluded that designing an app to induce addictive, compulsive use by minors comfortably qualifies as an unfair practice. The federal court overseeing multidistrict litigation against Meta (the company behind Facebook) held that exploiting minors' developmental susceptibility to addictive features met every state-specific standard of unfairness as well as the "purportedly stricter" federal standard. *In re Soc. Media Adolescent Addiction/Pers.*

---

to distribute, maintain, or update the social media platform TikTok, unless U.S. operation of the platform is severed from Chinese control.").

*Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d at 899.[4] These decisions involving analogous laws and comparable allegations are highly persuasive. *See Marshall*, 302 N.C. at 542 (noting that "decisions interpreting the FTC Act may be used as guidance in determining the scope and meaning of" section 75-1.1).

60.    ByteDance's chief argument—that consumers can make a free and informed decision to use or not use TikTok—does not reckon with the complaint's allegations. The consumers in this scenario are minors, not mature adults. As alleged, ByteDance designed TikTok to exploit the unique vulnerabilities that accompany youthful immaturity, inducing addictive, compulsive use and depriving minors of a free choice. Worse yet, ByteDance did so allegedly knowing that addiction causes social and psychological harms to minors. Taken as true, these allegations outline practices that are "immoral, unethical, oppressive, unscrupulous, or substantially injurious" under section 75-1.1. *Marshall*, 302 N.C. at 548; *see also, e.g.*, *In re Soc. Media Adolescent Addiction/Personal Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d at 897 (questioning whether "a minor still retains that 'free and informed choice' " when "the minor has developed—by the platform's own design—a compulsive habit to click through and continue use").

61.    Turning to deception, ByteDance's particularity argument is unpersuasive. "The degree of particularity required . . . varies from case to case." *Haigh v. Superior*

---

[4] The federal court rejected challenges to claims brought under at least six state consumer-protection statutes. *See id.* at 902 (upholding claims by California, Colorado, Indiana, Kansas, New Jersey, and Oregon). Individual actions in state courts have followed suit. *See, e.g.*, *Meta Platforms*, 2024 Mass. Super. LEXIS 161, at *25–26 (finding allegations that social-media company designed an app to have "features that it knows encourage addictive use by teenagers" unfair under consumer-protection statute).

*Ins. Mgmt. Grp.*, 2017 NCBC LEXIS 100, at *27 (N.C. Super. Ct. Oct. 24, 2017) (citation and quotation marks omitted). Here, the State alleges that ByteDance conducted a yearslong campaign on several fronts to convince the public that TikTok is safe for minors. The complaint identifies many false and misleading statements in press releases, advertisements, congressional testimony, and TikTok's Community Guidelines over that period—statements that ByteDance conspicuously skips over in its briefing. (*See, e.g.*, Compl. ¶¶ 138, 153, 187, 203.) These allegations are sufficiently particular.

62. Moreover, the allegedly deceptive statements are not vague, indefinite, or puffery. Three examples will suffice. First, ByteDance advertises that TikTok automatically limits teens' screen time when, in fact, the app has no daily limit. (*See* Compl. ¶¶ 137, 139.) Second, ByteDance tells users that they may refresh their feed to get a "fresh start on TikTok," but this feature worked only temporarily for most users and not at all for others. (Compl. ¶¶ 152, 156, 158.) Third, ByteDance represents that it removes content that violates its Community Guidelines but in practice chooses not to enforce the guidelines at all or to make illicit content harder to find without removing it. (*See, e.g.*, Compl. ¶¶ 187, 188, 197.) In each case, the alleged statement is a definite representation about how features work or how ByteDance moderates content. *See, e.g., In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d at 891 (denying motion to dismiss deception claim based on "yearslong course of conduct replete with numerous public statements regarding user safety").

63.     Elsewhere, the complaint details ByteDance's statements that it "prioritizes the safety" of minors and offers "practical tools" to manage their screen time. (Compl. ¶¶ 163, 164.) ByteDance urges that these and similar statements are too subjective to support a deception claim. But the complaint goes on to allege that ByteDance didn't mean what it said. While touting TikTok's safety tools in public, ByteDance was allegedly telling its employees in private to design those features so that they would be hard to find, hard to use, and broadly ineffective. (*See, e.g.*, Compl. ¶¶ 144, 156, 158, 159, 183.) Product designers understood that "[o]ur goal is not to reduce the time spent" by minors on the app. (Compl. ¶ 168.) Even a statement of opinion may support a deception claim when the speaker "holds an opinion contrary to the opinion" being expressed. *Leftwich v. Gaines*, 134 N.C. App. 502, 509 (1999); *see also, e.g.*, *Meta Platforms*, 2024 Vt. Super. LEXIS 146, at \*21 (holding that representation that "Instagram is safe" was actionable when taken with specific allegations that Meta designed Instagram to induce compulsive use and denied research showing its addictiveness).

64.     Finally, bound as it is to stay within the four corners of the complaint, ByteDance has not shown as a matter of law that the disputed statements were true. ByteDance argues, among other things, that it paired its promise to remove content violating the Community Guidelines with a caution that it "cannot guarantee that all content shared on TikTok complies." (Br. Supp. 32–33.) That is hardly a silver bullet. The State's theory is not that ByteDance muffed an impossible task (to catch and remove *all* offensive conduct). It is that ByteDance promised to remove illicit content

and made no good-faith attempt to follow through. Whether ByteDance's myriad statements were true or false is a matter for discovery.

65. Accordingly, taking the allegations as true and resolving all inferences in favor of the State, the complaint adequately states a claim under section 75-1.1. The Court therefore denies the motion to dismiss for failure to state a claim.

IV.
CONCLUSION

66. If the State's allegations are true, ByteDance has intentionally addicted millions of children to a product that is known to disrupt cognitive development, to cause anxiety, depression, and sleep deprivation, and (in the worst cases) to exacerbate the risk of self-harm. Federal law does not immunize this conduct, the First Amendment does not bless it, and North Carolina's laws and courts are not powerless to address it.

67. For all these reasons, the Court **DENIES** ByteDance's motions to dismiss.


**SO ORDERED**, this the 19th day of August, 2025.


/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases

# EXHIBIT Q

**Virginia:**

### In the Circuit Court of the City of Richmond, John Marshall Courts Building

**COMMONWEALTH OF VIRGINIA,**
*EX REL.* **JASON MIYARES**
**ATTORNEY GENERAL,**
    *Plaintiff,*
    v.

**TIKTIK INC.; TIKTOK LLC;**
**TIKTOK PTE. LTD; TIKTOK, LTD;**
**BYTEDANCE INC.; BYTEDANCE LTD,,**
    *Defendants.*

Case No. CL25-294

### ORDER

On September 5, 2025, came the parties, on Defendants' Demurrer and Motion to Dismiss Count IV. Having reviewed the pleadings and heard the arguments of counsel, the Court took the matter under advisement for written ruling. For the reasons articulated in the Opinion Letter dated October 24, 2025, the Court now **RULES** as follows.

The Court **OVERRULES** Defendants' Demurrer regarding the sufficiency of the Commonwealth's VCPA claims, and the assertions that the claims are not cognizable at law because of Section 230 of the Communications Decency Act and the protections of the First Amendment. The Court **DENIES** the Defendants' Motion to Dismiss Count IV, brought on the grounds of preemption, and further **DENIES** the Defendants' request to stay the above-styled matter pursuant to the doctrine of primary jurisdiction.

The Clerk is directed to forward a certified copy of this Order to the parties.

IT IS SO **ORDERED.**

ENTER: October 24, 2025

Richard B. Campbell, Judge

# Circuit Court

OF THE

# City of Richmond

RICHARD BARTON CAMPBELL
JUDGE
13TH JUDICIAL CIRCUIT

October 24, 2025

JOHN MARSHALL COURTS BUILDING
400 NORTH 9TH STREET, SUITE 303
RICHMOND, VIRGINIA 23219
(804) 646-0550

Jason S. Miyares, Attorney General
Steven G. Popps, Chief Deputy Attorney General
Thomas J. Sanford, Deputy Attorney General
Civil Litigation Division
Richard S. Schweiker, Jr., Chief and Senior
Assistant Attorney General
Joelle E. Gotwals, Senior Assistant Attorney General
Chandler P. Crenshaw, Assistant Attorney General
Office of the Attorney General
202 North 9th Street
Richmond, VA 23219

David H. Thompson, Esq.
Brian W. Barnes, Esq.
Athanasia O. Livas
Delisa L. Ragsdale
John Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036

Robert A. Angle, Esq.
Stephen Piepgrass, Esq.
Troutman Pepper Locke LLP
1001 Haxall Point, 15th Floor
Richmond, VA 23219

Benjamin C. Block, Esq.
Covington & Burling LLP
850 Tenth Street NW
Washington, DC 20001

RE:    *Commonwealth of Virginia v. TikTok Inc., et. al. - CL25-0294*

## Letter Opinion

Dear Counsel:

On September 5, 2025, the parties appeared, by counsel, on TikTok Defendants' ("Defendants") Demurrer and Motion to Dismiss. At the conclusion of the hearing, the Court took the matter under advisement. Having considered the parties' oral and written arguments, and for the reasons outlined below, the Court overrules the Demurrer and denies the Motion to Dismiss.

## I. Demurrer

Demurrers test the legal sufficiency of the pleadings. *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 24 (1993). The issue on demurrer is whether the Complaint sets forth sufficient facts, not merely conclusions of law, to constitute a foundation in law for the judgment sought. *See Moore v. Jefferson Hospital, Inc.*, 208 Va. 438, 440 (1967). To survive a challenge by demurrer, "a pleading must be made with sufficient definiteness to enable the court to find the existence of a legal basis for its judgment." *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 558 (2011). "The function of a demurrer is to test whether a bill of complaint states a cause of action upon which relief can be granted, and a demurrer admits as true all allegations of material facts which are well pleaded." *Penick v. Dekker*, 228 Va. 161, 166 (1984) (citing *Bellamy v. Gates and Gill*, 214 Va. 314, 315-16 (1973). "[T]he sole question ... is whether the facts pleaded, implied, and fairly and justly inferred are legally sufficient to state a cause of action against a defendant." *Pendleton v. Newsome*, 290 Va. 162, 171 (2015).

### A. Sufficiency of the Complaint

The Complaint alleges the Defendants violated the Virginia Consumer Protection Act (VCPA), §§ 59.1-196 through 59.1-207 of the Code of Virginia. "The VCPA was enacted with 'the intent of the General Assembly that [it] shall be applied as remedial legislation to promote fair and ethical standards of dealings between suppliers and the consuming public.'" *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 361 (2010) (alteration in original) (quoting Code § 59.1-197). Remedial legislation is construed liberally in favor of the plaintiff. *E.I. du Pont de Nemours & Co. v. Eggleston*, 264 Va. 13, 17 (2002).

The VCPA, in relevant part, prohibits specified fraudulent acts or practices by suppliers in connection with "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of

goods or services to be used primarily for personal, family or household purposes." Va. Code § 59.1-200(A) (prohibiting specified acts), § 59.1-198 (defining "consumer transaction"). Though the prohibitions address fraudulent actions, "the VCPA creates a new, statutory cause of action distinct from and in addition to common law fraud." *Ballagh v. Fauber Enters., Inc.*, 290 Va. 120, 124 (2015). Defendants repeatedly argue that the Commonwealth is required to allege fraudulent acts or practices committed by TikTok under the common law pleading standard. The VCPA does not require a showing of common law fraud. "The misrepresentations providing the basis of a VCPA claim need not be pleaded with the same kind of particularity as common law fraud claims." *Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F. Supp. 2d 535, 553-54 (E.D. Va. 2001), *aff'd*, 319 F. 3d 119 (4th Cir. 2003). Requiring consumers to satisfy the heightened pleading requirement for common law fraud would frustrate the statutory purpose of the VCPA. *See Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014) ("the legislative purpose underlying the VCPA was, in large part, to expand the remedies afforded to consumers and to relax the restrictions imposed upon them by the common law").

The instant action is brought on behalf of the Commonwealth pursuant to § 59.1-203 of the Code of Virginia. "[T]he Attorney General ... may cause an action to be brought in the appropriate circuit court in the name of the Commonwealth ... to enjoin any violation of § 59.1-200." Va. Code § 59.1-203(A). Violations may be enjoined "notwithstanding the existence of an adequate remedy at law." Va. Code § 59.1-203(A). In such actions for injunctive relief, "it shall not be necessary that damages be proved." Va. Code § 59.1-203(A). The Complaint asserts claims related to violations of five of the fraudulent acts or practices prohibited under the VCPA, specifically alleging that:

(1) The Defendants violated § 59.1-200(A)(3) by "[m]isrepresenting the affiliation, connection, or association of the supplier, or of the goods or services;"

(2) The Defendants violated § 59.1-200(A)(4) by "[m]isrepresenting geographic origin in connection with goods or services;"

(3) The Defendants violated § 59.1-200(A)(5) by "[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;"

(4) The Defendants violated § 59.1-200(A)(6) by "[m]isrepresenting that goods or services are of a particular standard, quality, grade, style, or model;" and

(5) The Defendants violated § 59.1-200(A)(14) by "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

For a complaint brought pursuant to § 59.1-203(A), it must state facts sufficient to support the elements of the statutory violations alleged. *Commonwealth v. Teva Pharms. USA, Inc.*, 107 Va. Cir. 44, 52-53 (Richmond Nov. 13, 2020). "Misrepresenting" is an element of the statutory violations claimed, however provisions of the VCPA do not define misrepresenting. "When the legislature leaves a term undefined, courts must give [it] its ordinary meaning, taking into account the context in which it is used." *American Tradition Inst. V. Rector & Visitors of the Univ. of Va.*, 287 Va. 330, 341 (2014) (citation and internal quotation marks omitted). The ordinary meaning of "misrepresent" is "to give a false or misleading representation of usually with an intent to deceive or be unfair."[1]

The Defendants have cited law in support of a definition of misrepresentation that would exclude statements of opinion: "[I]t is well settled that a misrepresentation, the falsity of which will afford ground for an <u>action for damages</u>, must be of existing fact, and not the mere expression of an opinion." *Lambert v. Downtown Garage*, 262 Va. 707, 712 (2001) (quoting *Yuzefovsky v. St. John's Wood Apartments*, 261 Va. 97, 110-11 (2001)) (emphasis added). The misrepresentations at issue, however, are not alleged in "an action for damages." *Id.* Because the decision in *Lambert*

---

[1] MISREPRESENT, *Merriam-Webster Dictionary*, https:www.merriam-webster.com/dictionary/misrepresent (last visited Oct. 23, 2025).

explicitly includes language limiting the rule to an action for damages, the rule is not controlling in an action for injunctive relief. Regardless, the Court does not find that the misrepresentations pleaded in the Complaint are mere opinions.

1. Count I—Alleging Violations of § 59.1-200(A)(5), (6), & (14)

The Commonwealth claims two categories of misrepresentations in Count I. It is alleged that Defendants misrepresent the addictiveness of the TikTok platform.[2] *See* Compl. ¶ 796. Additionally, that Defendants misrepresented the effectiveness and harmfulness of features found on the platform. *Id.* The facts pleaded in paragraphs 91-629 and 789-800 sufficiently support (i) misrepresentations of the characteristics, uses, or benefits of TikTok related to safety, addictiveness and features; (ii) misrepresentations that the services provided by TikTok were of a "particular standard, quality, grade" related to safety, addictiveness and features; and (iii) "[use of] any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction" by the Defendants related to safety, addictiveness and features of TikTok. *See* Va. Code §§ 59.1-200(A)(5)-(6), (14).

2. Count II—Alleging Violations of § 59.1-200(A)(5), (6), & (14)

In Count II, the Complaint alleges misrepresentations regarding the frequency of mature content and the appropriate "age rating" for the TikTok platform. *See* Compl. at ¶ 840. The facts pleaded in paragraphs 361-629 and 805-843 sufficiently support (i) misrepresentations of the characteristics, uses, or benefits of TikTok related to the frequency of mature content and age rating

---

[2] TikTok is a social media platform that allows users to create and share videos with other users of the platform. There are more than 1 billion TikTok users globally, with children using the platform at extremely high rates. *TikTok Global Users Statistics 2025 | TikTok Demographics*, The Global Statistics, October 10, 2025 (11:01 AM), https://www.theglobalstatistics.com/tiktok-global-users-statistics/. The Commonwealth claims that TikTok's internal data estimated in 2020 that "95% of Americans between the ages of 13 and 17 who used a smartphone were on the app monthly." Compl. ¶ 19. The platform's ubiquity cannot be understated.

of the platform; (ii) misrepresentations that the services provided by TikTok were of a "particular standard, quality, grade" related to the frequency of mature content and age rating of the platform; and (iii) "[use of] any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction" by the Defendants related to the frequency of mature content and age rating of the platform. *See* Va. Code §§ 59.1-200(A)(5)-(6), (14).

### 3. Count III—Alleging Violations of § 59.1-200(A)(5), (6), & (14)

The Commonwealth alleges the Defendants misrepresented that the TikTok platform's community guidelines prohibit certain content, that the community guidelines are rigorously enforced, and that the community guidelines apply equally to all users. *See* Compl. at ¶ 848(a)-(c). The facts pleaded in paragraphs 361-420 and 848-850 adequately support (i) misrepresentations of the characteristics, uses, or benefits of TikTok related to the enforcement and implementation of the platform's community guidelines; (ii) misrepresentations that the services provided by TikTok were of a "particular standard, quality, grade" related to the enforcement and implementation of the platform's community guidelines; and (iii) "[use of] any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction" by the Defendants related to the enforcement and implementation of the platform's community guidelines. *See* Va. Code §§ 59.1-200(A)(5)-(6), (14).

### 4. Count IV—Alleging Violations of § 59.1-200(A)(3)-(6), & (14)

Count IV claims two categories of misrepresentation. First, the Commonwealth alleges that Defendants misrepresented the Chinese Government's ability to access Virginia consumer data. Compl. ¶ 869(a). Second, the Commonwealth contends that Defendants misrepresented the control and influence that both Defendant ByteDance and the Chinese Government exercise over the

TikTok platform and its user data. *Id.* at ¶ 869(b)-(c). The facts pleaded in paragraphs 630-784 and 855-870 adequately support (i) misrepresentations of the affiliation of the supplier, or of the TikTok platform, with another; (ii) misrepresentations of the geographic origin of the TikTok platform; (iii) misrepresentations of the characteristics, uses, or benefits of TikTok related to the enforcement and implementation of the platform's community guidelines; (iv) misrepresentations that the services provided by TikTok were of a "particular standard, quality, grade" related to the enforcement and implementation of the platform's community guidelines; and (v) "[use of] any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction" by the Defendants related to the enforcement and implementation of the platform's community guidelines. *See* Va. Code §§ 59.1-200(A)(3)-(6), (14).

### B. *Whether the Claims Alleged in the Complaint are Cognizable at Law*

Defendants make two arguments supporting their assertions that the claims alleged in the Complaint are not cognizable at law. First, Defendants argue that Section 230 of the Communications Decency Act ("CDA") provides them immunity from the Commonwealth's claims. Second, Defendants contend that the First Amendment bars the Commonwealth's claims.

#### 1. Section 230

Section 230 of the CDA provides, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Courts applying the statute have traditionally "broken [it] down into three component parts." *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016). A defendant's conduct is shielded if "[(1) the defendant] is a provider or user of an interactive computer service, (2) the claim is based on information provided by another information content provider, and (3) the claim would treat [the defendant] as the publisher or

speaker of that information." *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2nd Cir. 2016).

The Commonwealth seeks to hold the Defendants liable for their own alleged misrepresentations regarding their platform TikTok. Section 230 of the CDA does not shield a defendant interactive computer service provider (ICSP) from claims based on information provided by defendant ICSP. It rather shields the defendant ICSP from being held liable for information provided by another ICSP. Because none of the instant claims relate to information provided by another ICSP, the second and third elements necessary for a claim of immunity under Section 230 cannot be met.

2. First Amendment

The Defendants assert the misrepresentations alleged in the Complaint are constitutionally protected speech. Misleading commercial speech is not protected by the First Amendment. *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Prof'l Eng'rs & Surveyors*, 916 F.3d 483, 487 (5th Cir. 2019). *See also Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563 (1980) (commercial speech that is "more likely to deceive the public than to inform it" may be banned). Because the alleged speech is commercial, the asserted misrepresentations are not constitutionally protected.[3]

---

[3] The misrepresentations relate to consumer transactions as defined by the VCPA. Commercial speech is speech "related to commercial transactions." *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F. 4th 238, 248 (4th Cir. 2024). Many of the allegations also satisfy the alternative definition of commercial speech: "speech connected with the sale of a good or a service—promoting the product of service, explaining it, or giving warnings about it—is commercial; it serves either the interests of the seller or assists consumers and furthers the societal interest." *Id.* (citation and internal quotation marks omitted).

## II. Motion to Dismiss Count IV (misrepresentations regarding data security risks and ties to China)

The arguments in support of the Motion to Dismiss Count IV have a common theme, the interplay of the respective powers of the United States and the Commonwealth, and of the judiciary and administrative agencies. The Defendants assert enforcement of the VCPA violations alleged in Count IV would (i) impermissibly intrude on foreign policy and (ii) constitute state action in conflict with the Protecting Americans from Foreign Adversary Controlled Applications Act (PAFACA) and the Executive Order "Saving TikTok While Protecting National Security" ("Executive Order"). In the alternative, the Defendants urge that the doctrine of primary jurisdiction requires Count IV be adjudicated by an administrative agency, not the Court.

### A. Foreign Policy

"No State can rewrite our foreign policy to conform to its own domestic policies. Power over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233 (1942). "[S]tate laws that intrude on this exclusively federal power are [constitutionally] preempted." *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F. 4th 178, 213 (4th Cir. 2022) (second alteration in original) (citation and internal quotation marks omitted). Preemption "applies … when a state law or policy disturbs foreign relations or if a State attempts to establish its own foreign policy," but "there must be a sufficiently clear conflict between the state law and an express foreign policy." *Mayor*, 31 F. 4th at 213 (citation and internal quotation marks omitted). State law may be preempted if it has "more than 'some incidental or indirect effect on foreign countries[]'…." *Id.*, citing *Zschernig v. Miller*, 389 U.S. 429, 434 (1968).

To determine whether a state action impermissibly intrudes upon foreign policy, the Ninth Circuit looks first at whether the real purpose of the state policy concerns an area of traditional state responsibility. *Gingery v. City of Glendale*, 831 F.3d 1222, 1229 (9th Cir. 2016). "In areas of

traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intent clear and manifest." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (citation and internal quotation marks omitted). See also *American Ins. Assn. v. Garamendi*, 539 U.S. 396, 420 (2003) (consider "the strength of the state interest, judged by standards of traditional practice").

The Commonwealth's pursuit of the VCPA violations alleged in Count IV does not impermissibly intrude on foreign affairs. The purpose of the VCPA is "to promote fair and ethical standards of dealings between suppliers and the consuming public." Va. Code § 59.1-197. The protection of the consuming public is a traditional state interest. *See Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 445 (1963) (noting "legislation … concerned with the health and safety of consumers, or with their protection against fraud and deception, embodies a traditional state interest").

### B. Conflict with Federal Law

The three different types of preemption – conflict, express, and field – "all work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018) (citation omitted). State law is preempted if it "impose[s] a duty that [is] inconsistent – *i.e.*, in conflict – with federal law." *Murphy*, 584 U.S. at 478, citing *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 493 (2013). "Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 584 U.S. at 479, quoting *R. J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130,

140 (1986). "[L]ike all other forms of preemption, it concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law." *Id.* (citation omitted).

Claims that the Defendants made misrepresentations regarding data security and foreign ties are not inconsistent with the PAFACA and Executive Order, nor do the claims intrude on the foreign policy of the United States as expressed therein. Both the PAFACA and the Executive Order acknowledge data security concerns and foreign ties at issue in Count IV.[4] Moreover, neither PAFACA nor the Executive Order operate to govern misrepresentations. The PAFACA prohibits foreign adversary-controlled applications in the absence of qualified divestiture, while the Executive Order finds that the required qualified divestiture has occurred. *See* PAFACA, § 2 (a)(1), (g)(6); EXECUTIVE ORDER, Sept. 25, 2025, *Saving TikTok*, § 2.

### C. Doctrine of Primary Jurisdiction

The doctrine of primary jurisdiction does not apply to Claim IV. Jurisdiction to adjudicate VCPA claims does not overlap with an administrative agency. *See* Va. Code § 19.2-203(A), (C) (vesting circuit courts with jurisdiction to adjudicate actions for injunctive relief pursuant to the VCPA). The doctrine of primary jurisdiction is "used by courts to allocate the decision-making responsibility between courts and agencies when jurisdiction may overlap and a potential for conflicts or inconsistent decisions exists." *The Country Vintner, Inc. v. Louis Latour, Inc.*, 272 Va. 402, 410 (2006).[5]

---

[4] *See* PAFACA (enacted "to protect the national security of the United States from the threat posed by foreign adversary controlled applications, such as TikTok…"); EXECUTIVE ORDER, Sept. 25, 2025, *Saving TikTok*, § (2)(b)(ii) ('[t]he divestiture proposed in the Framework Agreement resolves" the national security concerns in the PAFACA by "remov[ing] the TikTok application … from the 'control' of a foreign adversary and precluding any 'operational relationship' between a formerly affiliated entity controlled by a foreign adversary and the new joint venture").

[5] The Defendants urge that the issues raised by Claim IV are within an area of special competence of the Executive Branch of the United States Government. *Citing Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (the doctrine of primary jurisdiction is "specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency"). The Executive Branch is not a "functionary concerned with administrative

## III.    Conclusion

The Court, for the foregoing reasons, entered the accompanying Order overruling the Demurer and denying the Motion to Dismiss.

Very truly yours,

Richard B. Campbell,
Judge

---

law" or "single officer, board, commission, office, or department exercising administrative authority." Ballentine's Law Dictionary, 3rd ed., "administrative agency."

# EXHIBIT R

# SUPREME COURT OF ARKANSAS

**No.** CV-24-522

| | |
|---|---|
| TIKTOK INC., TIKTOK PTE LTD., BYTEDANCE INC., AND BYTEDANCE LTD. <br><br> PETITIONERS <br><br><br> V. <br><br><br> STATE OF ARKANSAS <br><br> RESPONDENT | **Opinion Delivered:** May 29, 2025 <br><br><br> PETITION FOR WRIT OF CERTIORARI OR, IN THE ALTERNATIVE, A WRIT OF PROHIBITION, WRIT OF MANDAMUS, OR OTHER SUPERVISORY WRIT <br><br><br> PETITION FOR EXTRAORDINARY RELIEF DENIED. |

**BARBARA W. WEBB, Justice**

Petitioners TikTok Inc., TikTok Pte. Ltd., ByteDance Inc., and ByteDance Ltd (collectively, "Petitioners") seek a writ of certiorari or other extraordinary writ following the Cleburne County Circuit Court's order denying Petitioners' motion to dismiss the State of Arkansas's amended complaint for lack of personal jurisdiction. We deny the petition.

The State filed an amended complaint against Petitioners on October 4, 2023. The complaint consisted of twelve counts, including eleven alleged violations of the Arkansas Deceptive Trade Practices Act, codified at Ark. Code Ann. §§ 4-88-101 through -1403 (Repl. 2023), and one claim of unjust enrichment. In response, Petitioners filed a motion to dismiss the complaint arguing, in pertinent part, that the circuit court lacked specific jurisdiction because the State did not adequately allege that Petitioners purposefully availed themselves of Arkansas, and the State's causes of action do not arise from Petitioners' contacts with Arkansas.

On May 15, 2024, the circuit court entered an order denying Petitioners' motion to dismiss. It found that Petitioners had availed themselves of doing business in Arkansas by entering into hundreds of thousands of service contracts with Arkansas residents who have downloaded the TikTok application. This allowed Petitioners to serve content and collect data from Arkansas users for the ultimate purpose of generating revenue through geographically targeted advertisements. The circuit court further found that the display of Petitioners' allegedly false age-rating representations on the application stores where Arkansans download TikTok constituted the necessary contacts from which the State's claims relate. Accordingly, the circuit court concluded that the State had pleaded sufficient facts to establish specific personal jurisdiction over Petitioners.

On August 12, 2024, Petitioners filed a petition for writ of certiorari or, in the alternative, a writ of prohibition, writ of mandamus, or other supervisory writ, and a motion to stay proceedings in the circuit court. They argued that no other adequate remedy was available to prevent the circuit court from improperly exercising jurisdiction. We subsequently took the petition as a case and granted the motion to stay proceedings.

A writ of certiorari is extraordinary relief. *McCain Mall Co. Ltd. P'ship v. Pulaski Cnty. Circuit Court*, 2016 Ark. 279, 495 S.W.3d 625. For this court to grant a petition for writ of certiorari, there can be no other adequate remedy but for the writ. *S. Farm Bureau Cas. Ins. Co. v. Parsons*, 2013 Ark. 322, 429 S.W.3d 215. The writ will not lie when there is an adequate remedy available—for example, an appeal. *Grinder v. Campbell*, 2023 Ark. 57, 661 S.W.3d 675.

Petitioners assert that an extraordinary writ is the only avenue to challenge the circuit court's erroneous jurisdictional finding before they are forced to expend substantial resources defending claims in an improper forum. This assertion does not give rise to the issuance of a writ. Matters of personal jurisdiction are not proper subjects for an extraordinary writ. *See Finney v. Cook*, 351 Ark. 367, 372, 94 S.W.3d 333, 337 (2002). This is so because personal jurisdiction generally turns on a fact-intensive question such as whether the defendant has sufficient contacts with the forum state or whether the defendant purposely availed himself of the protections of the forum state. *Id.* Such is the case here, as Petitioners contest whether the State's cause of action relates to Petitioners' contacts with Arkansas. And, as discussed above, the circuit court made factual findings regarding this question in its order.

Moreover, Petitioners may raise issues of jurisdiction in an appeal. *See S. Farm Bureau Cas. Ins. Co. v. Parsons*, 2013 Ark. 322, at 5, 429 S.W.3d 215, 219 (denying a writ of certiorari because jurisdiction can be addressed in an appeal). This court has been steadfast in holding that certiorari may not be used as a substitute for an appeal. *Conner v. Simes*, 355 Ark. 422, 139 S.W.3d 476 (2003). Based on the foregoing, we hold that Petitioners have another adequate remedy. We therefore deny Petitioners' petition for writ of certiorari or other extraordinary writ.

Petition for extraordinary relief denied.

Special Justice BARBARA HALSEY joins.

BRONNI, J., not participating.

*Wright, Lindsey & Jennings LLP*, by: *Scott A. Irby*, *Michael A. Thompson*, and *Jessica Pruitt Koehler*, for petitioners.

*Tim Griffin*, Att'y Gen., by: *Matthew M. Ford*, Sr. Ass't Att'y Gen., for respondent.

*Friday, Eldredge & Clark, LLP*, by: *Martin A. Kasten*, *Marshall S. Ney*, and *Katherine C. Campbell*, brief of amicus curiae NetChoice.

*Pillsbury Winthrop Shaw Pittman LLP*, by: *Anne M. Voigts*; *Conner & Winters, LLP*, by: *Kerri E. Kobbeman*, brief of Derek Bambauer and Alan Trammell as amicus curiae in support of petitioners.



# EXHIBIT S

# In the
# Indiana Supreme Court

State Of Indiana,
    Appellant(s),

    v.

TikTok, Inc., ByteDance, Ltd., ByteDance,
Inc., and TikTok Pte., Ltd.,
    Appellee(s).

Court of Appeals Case No.
23A-PL-03110

Trial Court Case No.
02D02-2212-PL-400

## Order

    This matter has come before the Indiana Supreme Court on a petition to transfer jurisdiction, filed pursuant to Indiana Appellate Rules 56(B) and 57, following the issuance of a decision by the Court of Appeals. The Court has reviewed the decision of the Court of Appeals, and the submitted record on appeal, all briefs filed in the Court of Appeals, and all materials filed in connection with the request to transfer jurisdiction have been made available to the Court for review. Each participating member has had the opportunity to voice that Justice's views on the case in conference with the other Justices, and each participating member of the Court has voted on the petition.

    Being duly advised, the Court DENIES the petition to transfer.

    Done at Indianapolis, Indiana, on  6/24/2025  .

Loretta H. Rush
Chief Justice of Indiana

All Justices concur, except Slaughter, J., and Goff, J., who vote to grant the petition to transfer.



EXHIBIT T

# The Supreme Court of the State of Louisiana

**STATE OF LOUISIANA**

No. 2025-CC-01179

**VS.**

**TIKTOK, INC., AND TIKTOK, LTD., TIKTOK PTE., BYTEDANCE, LTD., AND BYTEDANCE, INC.**

‒ ‒ ‒ ‒ ‒ ‒

IN RE: TikTok, Inc., et al. - Applicant Defendant; Applying For Supervisory Writ, Parish of Livingston, 21st Judicial District Court Number(s) 184754, Court of Appeal, First Circuit, Number(s) 2025 CW 0446;

‒ ‒ ‒ ‒ ‒ ‒

**November 25, 2025**

Writ application denied.

JDH

JLW

WJC

PDG

JMG

CRC

McCallum, J., would grant in part for the reasons assigned by Judge Stromberg.

Supreme Court of Louisiana
November 25, 2025

_Katie Marjanovic_
Chief Deputy Clerk of Court
For the Court

# EXHIBIT U

# THE STATE OF NEW HAMPSHIRE

## SUPREME COURT


RECEIVED SEP 2 3 2025 By___

**In Case No. 2025-0445, <u>State of New Hampshire v. TikTok, Inc.</u>, the court on September 15, 2025, issued the following order:**

Notice of appeal is declined.  <u>See</u> Rule 7(1)(B).

Under Supreme Court Rule 7(1)(B), the supreme court may decline to accept a notice of discretionary appeal from the superior or circuit court.  No appeal, however, is declined except by unanimous vote of the court with at least three justices participating.

This matter was considered by each justice whose name appears below.  If any justice who considered this matter believed the appeal should have been accepted, this case would have been accepted and scheduled for briefing.

In light of the foregoing, the various applications and motions to appear <u>pro hac vice</u> are moot.

<u>Declined</u>.

MacDonald, C.J., and Donovan and Countway, JJ., concurred.

**Timothy A. Gudas,
Clerk**

Distribution:
Merrimack County Superior Court,
    217-2024-CV-00399
Honorable John C. Kissinger, Jr.
Brian M. Quirk, Esquire
Olivia F. Bensinger, Esquire
Stephen D. Brody, Esquire
Winston Y. Chan, Esquire
Blaine H. Evanson, Esquire
Jonathan D. Hacker, Esquire
Sean Y. Howell, Esquire
Martha F. Hutton, Esquire
Lauren F. Kaplan, Esquire
Alyssa B. Kuhn, Esquire
Anne T. Marchitello, Esquire

Daniel M. Petrocelli, Esquire
Theo Benjamin, Esquire
John Feeney-Coyle, Esquire
Brandon H. Garod, Esquire
Demi Moore, Esquire
Emily Penkowski Perez, Esquire
Roger Perlstadt, Esquire
Jimmy R. Rock, Esquire
Kevin P. Scura, Esquire
Mary Frances Stewart, Esquire
Attorney General
Jesse J. O'Neill, Esquire
Jennifer L. Parent, Esquire
File

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gessica Taddei on behalf of Richard McCutcheon
Bar No. 24139547
gtaddei@cooperkirk.com
Envelope ID: 109388238
Filing Code Description: Response
Filing Description: REAL PARTY IN INTEREST STATE OF TEXAS???S RESPONSE TO RELATORS??? PETITION FOR WRIT OF MANDAMUS
Status as of 12/23/2025 7:17 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brandon Duke | | bduke@omm.com | 12/22/2025 5:16:47 PM | SENT |
| Trial Court | | 250.submission@traviscountytx.gov | 12/22/2025 5:16:47 PM | SENT |
| Adam Holtz | | adam.holtz@oag.texas.gov | 12/22/2025 5:16:47 PM | SENT |
| Brian Barnes | | bbarnes@cooperkirk.com | 12/22/2025 5:16:47 PM | SENT |
| David Thompson | | dthompson@cooperkirk.com | 12/22/2025 5:16:47 PM | SENT |
| Adam Laxalt | | alaxalt@cooperkirk.com | 12/22/2025 5:16:47 PM | SENT |
| Madeline Fogel | | madeline.fogel@oag.texas.gov | 12/22/2025 5:16:47 PM | SENT |
| Hannah Campus | | hannah.campus@oag.texas.gov | 12/22/2025 5:16:47 PM | SENT |
| Melinda Pate | | melinda.pate@oag.texas.gov | 12/22/2025 5:16:47 PM | SENT |
| Jerry Bergman | | jerry.bergman@oag.texas.gov | 12/22/2025 5:16:47 PM | SENT |
| Calendar Litigation | | litigationcalendar@omm.com | 12/22/2025 5:16:47 PM | SENT |
| Megan Crowley | | mcrowley@cov.com | 12/22/2025 5:16:47 PM | SENT |
| Richard Mccutcheon | | richard.mccutcheon@oag.texas.gov | 12/22/2025 5:16:47 PM | SENT |
| Zoann Willis | | zoann.willis@oag.texas.gov | 12/22/2025 5:16:47 PM | SENT |
| Rebecca Hermann | | rebecca.herrmann@oag.texas.gov | 12/22/2025 5:16:47 PM | SENT |
| Neema T. Sahni | | nsahni@cov.com | 12/22/2025 5:16:47 PM | SENT |
| Mary Clarkson | | Mary.Clarkson@oag.texas.gov | 12/22/2025 5:16:47 PM | SENT |
| JC Hernandez | | JC.Hernandez@oag.texas.gov | 12/22/2025 5:16:47 PM | SENT |